

PLAINTIFF'S
EXHIBIT

**STATE OF TEXAS**

**COUNTY OF DALLAS**

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") made as of the 31st day of August, 2002, by and between each of the shareholders of any class of the capital stock of ASR Acquisition, Inc., a Delaware corporation (the "Company" or "ASR"), and the persons and entities whose names appear on Exhibit B annexed hereto (collectively referred to as "Shareholders" or "Sellers"), each individual is a citizen and resident of the United States and each legal entity is duly formed under the laws of a State of the United States, and BACE International Corporation, a North Carolina corporation with its principal place of business in Charlotte, North Carolina (hereinafter referred to as "BACE" or "Buyer"). This Agreement contemplates a transaction in which the Buyer agrees to purchase and each Seller agrees to sell all of their equity interest, represented by their capital stock ownership the Company, in return for the consideration set forth herein. In consideration of the mutual promises, agreements and covenants set forth in this Agreement, Buyer and each Seller hereby agree as follows:

## W I T N E S S E T H:

WHEREAS, Sellers collectively own all of the shares of the issued and outstanding Common Stock (the "Shares") of the Company, and;

WHEREAS, the Company owns all of shares of the issued and outstanding common stock of subsidiaries listed on the Disclosure Schedule, Section 4.1, authorized and licensed to do business in the states set forth on the Disclosure Schedule, Section 4.1 as a Professional Employer Organization ("PEO") whereby the Company is engaged primarily in the business of employee leasing and providing contract human resource administrative services and the marketing of those services as well as various ancillary insurance benefits, products and coverages related thereto and maintains its principal place of business for such purposes in Dallas, Texas;

WHEREAS, Buyer is interested in purchasing all of the issued and outstanding Shares of the Company owned by Shareholders;

WHEREAS, representatives for the parties hereto have reached an understanding and executed on the 11th of July, 2002, a Letter of Intent (attached hereto as Exhibit C) pursuant to which Shareholders, subject to their unanimous ratification and execution of this Stock Purchase Agreement, will sell and Buyer will purchase all of the Shares of the Company owned by Sellers constituting all of the issued and outstanding equity shares of the Company including all equity and/or



EXHIBIT
E

BACE 00922

1

beneficial interest in the Subsidiaries, all on the terms and conditions more fully set forth herein;

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants herein contained, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

A.      **Defined Terms.**  Unless otherwise stated, the terms used in this Agreement have the usual and customary meanings associated with their use, and shall be interpreted in the context of this Agreement.  Certain capitalized terms that are used in this Agreement shall have the meanings given in Exhibit C.

1.      **Purchase and Sale of Stock.**  Subject to the terms and conditions contained herein, the Buyer agrees to purchase from the Shareholders and Shareholders agree to sell, assign and transfer to the Buyer on the Closing provided for in paragraph 2 hereof, all eight hundred forty-eight and 5/10 ( 848.5 ) shares of the Common Stock, representing all of the issued and outstanding common capital stock of the Company.

2.      **Transfer of Shares and Purchase Price.**  In consideration for all of the Company Capital Stock, BACE agrees to pay an amount equal to the following (the "Purchase Price"):

(i)      One Million Dollars at Closing.

(ii)     $500,000 payable ninety (90) days after Closing

(iii)    Six Million Dollars paid to Prairie Capital Mezzanine Fund, L.P., a Delaware limited Partnership ("Prairie"), Remount Capital, LLC, a Wyoming limited liability company, Harrison I. Steans, George P. Bauer, Thomas B. Hunter, III, The Estate of Richard D. Michaels, Adeline S. Morrison, and Jennifer W. Steans in the form of promissory notes, secured with a collateral assignment, a copy of which is attached as Exhibit D, payable on February 1, 2003.  The promissory notes will bear simple interest at the rate of 6.5% per annum paid at maturity of the notes.

(iv)     Two Million Dollars payable in the form of promissory notes, also secured with the collateral assignment, a copy of which is attached as Exhibit D, payable on February 1, 2003 at the rate of 6.5% simple interest per annum paid at maturity of the notes.



2          **BACE 00923**

3.    __Closing__.

The transactions contemplated under this Agreement shall close on or before September 18, 2002 to be effective as of August 31, 2002 at a closing (the "Closing") which shall occur at the place BACE and the Sellers mutually determine.

4.    __Representations and Warranties of Sellers__.  In order to induce BACE to enter into this Agreement and the transactions contemplated hereby, recognizing that Buyer is materially relying on each of the following representations, warranties and covenants, which shall survive for 48 months beyond Closing, Sellers hereby represent and warrant to Buyer that except as set forth in the corresponding sections or subsections of the Disclosure Schedule delivered to BACE by the Company concurrently with entering into this Agreement (the "Disclosure Schedule"):

Section 4.1. *Corporate Existence and Power.*  Section 4.1 of the Disclosure Schedule lists each Subsidiary of the Company and the number of shares and percentage of such Subsidiary's outstanding equity interest owned by the Company. Section 4.1 of the Disclosure Schedule also lists, for each of the Company and its Subsidiaries, its jurisdiction of incorporation and the states in which it is qualified to do business. Each of the Company and its Subsidiaries is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation, and has all corporate powers required to carry on its business as now conducted. Each of the Company and its Subsidiaries is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where the character of the property owned or leased by it or the nature of its activities makes such qualification necessary, except for those jurisdictions where the failure to be so qualified could not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect on the Company. The Company has heretofore delivered to BACE true and complete copies of the currently effective articles of incorporation and bylaws or similar organizational documents of the Company and each of its Subsidiaries (as the same may be amended and restated as of the date hereof).

Section 4.2. *Corporate Authorization.*  The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby (i) are within the Company's corporate powers and (ii) except for the adoption of this Agreement by the unanimous affirmative vote of the voting interests of the Shares, have been duly authorized by all necessary corporate and shareholder action. This Agreement has been duly executed and delivered by the Company and constitutes a valid, legal and binding agreement of the Company enforceable against the Company and the Shareholders in accordance with its terms, except (i) as rights to indemnity hereunder may be limited by federal or state securities Laws or the public policies embodied therein, (ii) as such enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the enforcement of creditors' rights generally, and (iii) as the remedy of specific performance and other forms of

3        **BACE 00924**



injunctive relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefore may be brought.

Section 4.3. *Governmental Authorization.* The execution, delivery and performance by the Company of this Agreement and the consummation of this transaction by the Company require no action by or in respect of, or filing with, any Governmental Authority (i) compliance with any applicable requirements of the HSR Act; (ii) compliance with any applicable foreign or state securities or Blue Sky Laws; (iii) the filing of appropriate documents with the relevant authorities of the jurisdictions in which the Company is qualified to do business; and (iv) such other items (A) required solely by reason of the participation of any party to the transaction or (B) that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect on the Company.

Section 4.4. *Non-Contravention.* Other than as set forth in Section 4.4 of the Disclosure Schedule, the execution, delivery and performance by the Company or the Shareholders of this Agreement and the consummation by the Company of the transactions contemplated hereby, do not and will not (i) contravene or conflict with the articles of incorporation, bylaws, Code of Regulations or similar organizational documents of the Company or any of its Subsidiaries, (ii) contravene or conflict with or constitute a violation of any provision of any Law, regulation, judgment, writ, injunction, order or decree of any court or Governmental Authority binding upon or applicable to the Company or any of its Subsidiaries or any of their respective properties or assets, (iii) constitute a default under or give rise to a right of termination, cancellation or acceleration of any right or obligation of the Company or any of its Subsidiaries or to a loss of any benefit to which the Company or any of its Subsidiaries is entitled under any provision of any agreement, contract or other instrument binding upon the Company or any of its Subsidiaries, or (iv) result in the creation or imposition of any Lien on any asset of the Company or any of its Subsidiaries, except, in the case of clauses (ii), (iii) and (iv), for any such violation, failure to obtain any such consent or other action, default, right, loss or Lien that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Company.

Section 4.5. *Capitalization*

(a) The authorized capital stock of the Company consists of one thousand one hundred eleven (1,111) shares of Common Stock of which as of December 31, 2001, there were eight hundred forty-eight and 5/10 ( 848.5 ) shares issued and outstanding . As of December 31, 2001, there were no shares of any other class of stock authorized, issued or outstanding. All outstanding shares of capital stock of the Company have been duly authorized and validly issued and are fully paid and non-assessable.

(b) Except as set forth in this Section 4.5 with respect to the Company and as set forth in Section 4.1 of the Disclosure Schedule for each of the Subsidiaries, there are no outstanding (i) shares of capital stock or other voting securities of the Company or

BACE 00925

any of its Subsidiaries, (ii) securities of the Company or its Subsidiaries convertible into or exchangeable for shares of capital stock or voting securities of the Company or its Subsidiaries, (iii) options, warrants, preemptive rights, rights of first refusal or other rights to acquire from the Company or its Subsidiaries, or obligations of the Company or its Subsidiaries to issue, any shares of capital stock, voting securities or securities convertible into or exchangeable for shares of capital stock or voting securities of the Company, and (iv) no equity equivalent interests in the ownership or earnings of the Company or its Subsidiaries or other similar rights (the items in clauses (c)(i), (ii), (iii) and (iv) being referred to collectively as the "Company and Subsidiary Securities"). Except as set forth on Section 4.5 of the Disclosure Schedule, there are no outstanding obligations of the Company or any Subsidiary to repurchase, redeem or otherwise acquire any Company and Subsidiary Securities. Except as set forth on Section 4.5 of the Disclosure Schedule, there are no shareholder agreements, voting trusts or other agreements or understandings to which the Company or any of its Subsidiaries is a party or by which it is bound relating to the voting or registration of any shares of capital stock of the Company or any of its Subsidiaries or any preemptive rights with respect thereto.

Section 4.6. *Reports and Financial Statements*

(a) The Company has timely filed all forms, reports, schedules, statements and other documents required to be filed by it under the employee leasing laws of Texas (such documents, as supplemented or amended since the time of filing). As of their respective dates, the reports, including without limitation, any financial statements or schedules included or incorporated by reference therein and any statements, certifications, attestations or warranties as to workers' compensation insurance coverage, employee benefit or welfare arrangements, plans or programs or any other insurance coverages or employee benefits, at the time filed (i) complied in all material respects with the applicable requirements and (ii) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The audited consolidated financial statements and unaudited, reviewed or compiled consolidated interim financial statements or other attestations included or incorporated by reference in the reports (including any related notes and schedules) fairly present, in all material respects, the financial position of the Company and its consolidated Subsidiaries as of the dates thereof and the results of their operations and their cash flows for the periods set forth therein, in each case in accordance with past practice and GAAP consistently applied during the periods involved (except as otherwise disclosed in the notes thereto and subject, where appropriate, to normal year-end adjustments that would not be material in amount or effect).

(b) The Company has heretofore made available or promptly will make available to BACE a complete and correct copy of any amendments or modifications to any reports filed prior to the date hereof, which are required to be filed but have not yet been filed.

Section 4.7. *Limited Recourse* Notwithstanding anything to the contrary in this Agreement, the aggregate amount payable to BACE with respect to a breach by Sellers under this Agreement shall be limited to payments due under the Notes payable to Sellers under Section 2 (iv), except in the case of fraud, in which case BACE shall be entitled to indemnification up to the Purchase Price.

Section 4.8. *Absence of Certain Changes or Events*

(a)  Since the Balance Sheet Date, and except as discussed in the Company Reports, the business of the Company and its Subsidiaries has been conducted in all material respects in the ordinary course consistent with past practice, neither the Company nor any of its Subsidiaries has engaged in any transaction or series of related transactions material to the Company and its Subsidiaries taken as a whole other than in the ordinary course consistent with past practice, and there has not been any event, occurrence or development, alone or taken together with all other existing facts, that, individually or in the aggregate, has had, or could reasonably be expected to have a Material Adverse Effect on the Company;

(b)  Without limiting the generality of the foregoing Section 4.8(a), since the Balance Sheet Date and except as disclosed in the Company Reports or Section 4.8 of the Disclosure Schedule, there has not been:

(i)  any damage, destruction or loss to any of the assets or properties of the Company or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect on the Company;

(ii)  any declaration, setting aside or payment of any dividend or distribution or capital return in respect of any shares of the Company's capital stock or any redemption, purchase or other acquisition by the Company or any of its Subsidiaries of any shares of the Company's capital stock or any repurchase, redemption or other purchase by the Company or any of its Subsidiaries of any outstanding shares of capital stock or other securities of, or other ownership interests in, the Company or any of its Subsidiaries, or any amendment of any material term of any outstanding security of the Company or any of its Subsidiaries;

(iii)  any sale, assignment, transfer, lease or other disposition or agreement to sell, assign, transfer, lease or otherwise dispose of any of the assets of the Company or any of its Subsidiaries for consideration in the aggregate in excess of $25,000 or other than in the ordinary course of business consistent with past practices;

(iv)  any acquisition (by merger, consolidation, or acquisition of stock or assets) by the Company or any of its Subsidiaries of any corporation, partnership or other business organization or division thereof or any equity interest therein;

**BACE 00927**



(v) any loans or advances to any Person in excess of $25,000 in the aggregate;

(vi) any incurrence of or guarantee with respect to any indebtedness for borrowed money by the Company or any of its Subsidiaries or others on their behalf other than pursuant to the Company's existing credit facilities in the ordinary course of business or any creation or assumption by the Company or any of its Subsidiaries of any material Lien on any material asset;

(vii) any material change in any method of accounting or accounting practice or Tax or Tax practice used by the Company or any of its Subsidiaries, other than such changes required by a change in Law or GAAP;

(viii) (A) any employment, deferred compensation, severance or similar agreement entered into or amended by the Company or any of its Subsidiaries and any employee, in each case other than sales commission agreements and product promotional agreements entered into in the ordinary course of business consistent with past practice, (B) any increase in the compensation payable or to become payable by the Company or any of its Subsidiaries to any of their respective directors or officers or generally applicable to all or any category of the Company's or its Subsidiaries' "internal employees" (as distinguished from "worksite employees"), (C) any increase in the coverage or benefits available under any vacation pay, company awards, salary continuation or disability, sick leave, deferred compensation, bonus or other incentive compensation, insurance, pension or other employee benefit plan, payment or arrangement made to, for or with any of the directors or officers of the Company and its Subsidiaries or generally applicable to all or any category of the Company's or its Subsidiaries' employees or (D) severance pay arrangements made to, for or with such directors, officers or employees other than, in the case of (B) and (C) above, increases in the ordinary course of business consistent with past practice and that in the aggregate have not resulted in a material increase in the benefits or compensation expense of the Company or any of its Subsidiaries;

(ix) any revaluing in any material respect of any of the assets of the Company or any of its Subsidiaries, including without limitation writing down the value of inventory or writing off notes or accounts receivable other than in the ordinary course of business;

(x) any loan, advance or capital contribution made by the Company or any of its Subsidiaries to, or investment in, any Person other than loans, advances or capital contributions, or investments of the Company made in the ordinary course of business consistent with past practices;

BACE 00928



(xi) any change, amendment or formal notice to the Company with respect to any insurance policy or program of the Company or any new insurance policy;

(xii) to Company or any of the Company's Subsidiaries' knowledge, any adverse change in the Company's or any of the Subsidiaries' prior or current worker's compensation coverage(s) including but not limited to actual coverage existence, experience ratings, claims liability exposure on a fully-developed basis (including fully-developed claims exposure under a large deductible plan, assessable mutual plan or similar arrangement), premium payment arrangements, "retro program" premium or liability exposure or collateral security arrangements, including collateral trust issues and requirements; or,

(xiii) any agreement to take any actions specified in this Section 4.8(b), except for this Agreement.

Section 4.9. *No Undisclosed Material Liabilities.* There are no liabilities of the Company or any of its Subsidiaries of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, which would be required by GAAP to be reflected on a consolidated balance sheet of the Company (including the notes thereto), other than liabilities and obligations which, individual or in the aggregate, could not reasonably be expected to have a Material Adverse Effect on the Company, and other than:

(i) liabilities disclosed in reports filed prior to the date hereof;

(ii) actual trade payables incurred in the ordinary course of business consistent with past practices;

(iii) liabilities incurred to perform this Agreement; and,

(iv) those set forth in Section 4.9 of the Disclosure Schedule.

Section 4.10. *Litigation.* Except as set forth in the reports filed prior to the date hereof and Section 4.10 to the Disclosure Schedule, (a) there is no action, suit, investigation or proceeding pending against, or, to the knowledge of the Company, threatened against or affecting, the Company or any of its Subsidiaries or their respective properties before any court or arbitrator or any Governmental Authority (a "Proceeding") and (b) to the knowledge of the Company, there is no basis for any such Proceeding.

Section 4.11. *Taxes*

(a) Except as set forth on Section 4.11 to the Disclosure Schedule, the Company and each of its Subsidiaries:

8

BACE 00929



(i) has timely filed all material Tax Returns that it was required to file and has paid or caused to be paid all Taxes required to be paid by it (including, but not limited to, any such Taxes shown due on any Tax Return). The accrual for current Taxes payable in the latest financial statements included or incorporated by reference is substantially adequate to cover all Taxes attributable to periods or portions thereof ending on the date of such financial statements, and no Taxes attributable to periods following the date of such financial statements have been incurred other than in the ordinary course of business;

(ii) has filed or caused to be filed in a timely and proper manner (within any applicable extension periods) all Tax Returns required to be filed by it with the appropriate taxing authority in all jurisdictions in which such Tax Returns are required to be filed, and all Tax Returns filed by the Company and each of its Subsidiaries are true and correct in all material respects; and,

(iii) has not requested or caused to be requested any extension of time within which to file any material Tax Return, which Tax Return has not since been filed.

(b) The Company has delivered to BACE true, correct and complete copies (including any amendments or supplemental filings) of all federal Tax Returns filed by or on behalf of the Company or any of its Subsidiaries for the periods ending on or after January 1, 2000.

(c) Except as set forth in Section 4.11 to the Disclosure Schedule:

(i) the Company has not been notified by the Internal Revenue Service, the Social Security Administration or any other taxing authority that any material dispute or claims have been raised by the Internal Revenue Service, the Social Security Administration or any other taxing authority in connection with any Taxes or any Tax Return filed by or on behalf of the Company;

(ii) there are no pending Tax audits and no waivers of statutes of limitations have been given or requested;

(iii) no Tax Liens, attachments or security interests on any of the Assets have been filed against the Company or any of the Subsidiaries, except for Tax Liens for current Taxes not yet due and payable for which adequate reserves have been provided for in the latest balance sheet of the Company;

(iv) no material unresolved deficiencies or additions to Taxes have been proposed, asserted, or assessed against the Company or any of the Subsidiaries;

(v) none of the Company or any Subsidiary has received notice within the last three years from any taxing authority in a jurisdiction in which the Company



9            **BACE 00930**

does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction;

(vi) the Company and each Subsidiary has withheld and paid all Taxes, including applicable employer tax matching, required to be withheld and paid in connection with amounts paid or owing to or on behalf of any employee;

(vii) none of the Company or any of the Subsidiaries is a party to a Tax sharing, Tax allocation or similar agreement and is not bound by any closing agreement, offer in compromise or other agreement with any Tax authority;

(viii) except in accordance with past practice, none of the Company or any Subsidiary has taken any action that would have the effect of deferring any taxable income of the Company or any Subsidiary from any taxable period or portion thereof ending before Closing to any period following Closing. None of the Company or any Subsidiary is required to include in its income any adjustment pursuant to Section 481 of the Code following Closing; and,

(ix) there is no contract, agreement, plan or arrangement covering any employee or former employee of the Company or any of its affiliates that, individually or collectively, could give rise to the payment of any amount that would not be deductible pursuant to the terms of Section 280G of the Code or that could obligate the Company to make any payments that will not be fully deductible by virtue of Section 162(m) of the Code.

(x) No shareholder, officer or director (or any employee responsible for Tax matters) of the Company has any Basis to expect that any authority will assess any additional Taxes for any period for which Tax Returns have been filed.

Section 4.12. *ERISA*

(a) The Company has delivered to BACE a copy of each "Employee Benefit Plan" (as defined in Section 3(3) of ERISA), material benefit arrangement plan, or policy, including without limitation, (i) each deferred compensation plan, (ii) each equity compensation plan, (iii) each plan or arrangement providing severance benefits ("Benefit Arrangements") which (x) is subject to any provision of ERISA or (y) is maintained, administered or contributed to by the Company or any affiliate (as defined below) within the last ten years, under which the Company or any Subsidiary has any liability. The most recent copies of such plans (and, if applicable, related trust agreements) and all amendments thereto have been delivered to BACE together with (A) the most recent annual reports (Form 5500 including applicable schedules and financial reports) or ERISA alternative compliance statements prepared in connection with any such plan and (B) the most recent actuarial valuation report prepared in connection with any such plan. (Such plans are referred to collectively herein as the "Employee Plans.") For purposes of this Section 4.12, "affiliate" of any

**BACE 00931**

Person means any other Person that, together with such Person, would be treated as a single employer under Section 414 of the Code. Employee Plans that individually or collectively would constitute an "employee pension benefit plan" as defined in Section 3(2) of ERISA (the "Pension Plans") are identified as such in the list referred to above.

(b)  Neither the Company nor any of its affiliates maintains or contributes to or has maintained or contributed to within the last five years a Pension Plan subject to Title IV of ERISA or Section 412 of the Code. Nothing done or omitted to be done and no transaction or holding of any asset under or in connection with any Employee Plan has or will make the Company or any Subsidiary, any officer or director of the Company or any Subsidiary subject to any liability under Title I of ERISA or liable for any Tax pursuant to Section 4975 of the Code that could reasonably be expected to have a Material Adverse Effect on the Company.

(c)  Each Employee Plan that is intended to be qualified under Section 401(a) of the Code has received a determination letter from the Internal Revenue Service to the effect that such Employee Plan is so qualified and no amendments have been adopted since the receipt of such determination letter that would result in the revocation of such letter. The Company has delivered to BACE copies of each plan documents and most recent Internal Revenue Service determination letters with respect to each such Employee Plan. Nothing has occurred since the date of the most recent Internal Revenue Service determination letters that would adversely affect the Tax-qualified status of any Employee Plan. Each Employee Plan has been maintained in compliance with its terms and with the requirements prescribed by any and all statutes, orders, rules and regulations, including but not limited to ERISA and the Code, which are applicable to such Employee Plan other than any non-compliance which could not reasonably be expected to have a Material Adverse Effect on the Company.

(d)  Except as set forth on Section 4.12(d) of the Disclosure Schedule, there has been no amendment to, written interpretation or announcement (whether or not written) by the Company or any of its affiliates relating to, or change in employee participation or coverage under, any Employee Plan or Benefit Arrangement which would increase materially the expense of maintaining such Employee Plan or Benefit Arrangement above the level of the expense incurred in respect thereof for the fiscal year ended on the Balance Sheet Date.

(e)  Except as disclosed on Section 4.12(e) of the Disclosure Schedule, none of the Company or any Subsidiary is a party to or subject to (i) any employment contract or arrangement providing for annual future compensation of $80,000 or more with any officer, consultant, director or employee, or that have a remaining term in excess of one year or are not cancelable (without material penalty, cost or other liability) within one year; (ii) any severance agreements, programs and policies with or relating to its employees except programs and policies required to be maintained by Law; or (iii) any plans, programs, agreements and other arrangements with or relating to its

11

**BACE 00932**




employees which contain change in control provisions. The Company will deliver to BACE copies (or descriptions in detail reasonably satisfactory to BACE) of all such agreements, plans, programs and other arrangements.

(f) Except as disclosed in Section 4.12(f) of the Disclosure Schedule, there will be no payment, accrual of additional benefits, acceleration of payments or vesting in any benefit under any Employee Plan or similar agreement or arrangement disclosed in this Agreement solely by reason of the Company's entering into this Agreement or in connection with the transactions contemplated by this Agreement.

Section 4.13. *Labor Matters.*

(a) There are no strikes, slowdowns, work stoppages, lockouts, union organizational campaigns or other protected concerted activity under the National Labor Relations Act or, to the knowledge of the Company, threats thereof, by or with respect to any employees of the Company or any of its Subsidiaries which could reasonably be expected to have a Material Adverse Effect on the Company. There are no controversies pending or, to the knowledge of the Company, threatened between the Company or any of its Subsidiaries and any of their respective employees, customers or clients, which controversies have or could reasonably be expected to have a Material Adverse Effect on the Company. Neither the Company nor any of its Subsidiaries is a party to any collective bargaining agreement or other labor union contract applicable to Persons employed by the Company or its Subsidiaries except as disclosed on Section 4.13(a) of the Disclosure Schedule. There are no pending or, to the knowledge of the Company, threatened charges or complaints against the Company or its Subsidiaries by the National Labor Relations Board or any comparable state agency.

(b) There are no pending Equal Employment Opportunity Commission ("EEOC") cases, charges, claims, allegations or issues concerning actions covered by Title VII for sexual harassment or discrimination of any type, disability claims covered by the Americans with Disabilities Act or any other similar issues covered by Title VII or other federal or state workplace laws, regulations, statutes, etc. or, to the knowledge of the Company, threats thereof, by or with respect to any employees of the Company or any of its Subsidiaries which could reasonably be expected to have a Material Adverse Effect on the Company except as disclosed on Section 4.13(b) of the Disclosure Schedule.

Section 4.14. *Compliance with Laws and Court Orders.* Neither the Company nor its Subsidiaries is in violation of, nor has it since January 1, 1995 violated, and to the knowledge of the Company, nothing is under investigation with respect to or has been threatened to be charged with or given notice of any violation of, any applicable Law, including but not limited to PEO Laws, except for possible violations that have not had and could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Company. This

12          **BACE 00933**



Section does not relate to matters with respect to Taxes or Environmental Laws, which are exclusively the subject of Sections 4.11 and 4.16, respectively.

Section 4.15. *Finders' Fees.* There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Company or any of its Subsidiaries which might be entitled to any fee or commission from the Company or any of its affiliates upon consummation of the transactions contemplated by this Agreement.

Section 4.16. *Environmental Matters*

(a) Except as set forth on Section 4.16 of the Disclosure Schedule:

(i) the Company and each Subsidiary is and has at all times been in compliance in all material respects with all Environmental Laws;

(ii) except in accordance with Permits, there has been no Release of Hazardous Substances at any real property that is or was owned or operated by the Company during the period of such ownership or operation except for Releases which could not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect on the Company;

(iii) no notice, demand, request for information, citation, summons, complaint or order has been received by, or, to the knowledge of the Company, is pending or threatened by any Person against, the Company or any Subsidiary nor has any penalty been assessed against the Company or any Subsidiary with respect to any alleged violation of any Environmental Law;

(iv) none of the Company or any Subsidiary has disposed or arranged for the disposal of Hazardous Substances on any third party property that has resulted in or may reasonably be expected to result in the Company or any Subsidiary's exposure to material liability under any Environmental Law; and,

(v) no underground tanks, asbestos-containing material or polychlorinated biphenyls are or have been located on real property that is owned or operated by the Company or any Subsidiary nor were any underground tanks, asbestos-containing material or polychlorinated biphenyls located on real property formerly owned or operated by the Company or any Subsidiary during the period of the Company's or such Subsidiary's ownership or operations of such real property, or to the knowledge of the Company, prior to the period of the Company's or such Subsidiary's ownership or operations of such real property.

(b) There are no material Permits issued pursuant to or required under any Environmental Law that require the consent, notification, approval or other action of any Person to remain in full force and effect following consummation of the transactions contemplated hereby. A true and complete list of all material Permits

**BACE 00934**



issued pursuant to or required under Environmental Laws is set forth in Section 4.16 of the Disclosure Schedule attached hereto.

(c) There has been no written report of any environmental investigation, study, audit, test, review or other analysis conducted of which the Company has knowledge and has in its possession or control relating to the business of the Company or any real property that is owned or operated by the Company or any Subsidiary which has not been delivered to BACE.

(d) None of the Company or any Subsidiary has agreed to assume, undertake or provide indemnification for any liability of any other Person under any Environmental Law, including any obligation for corrective or remedial action.

Section 4.17. *Trademarks, Servicemarks, Patents and Copyrights.* To the best of the Company's knowledge, the Company and each of its Subsidiaries own or possess adequate licenses or other legal rights to use all patents, patent rights, trademarks, trademark rights, trade names, trade dress, trade name rights, copyrights, service marks, trade secrets, software, mailing lists, mask works, know-how and other proprietary rights and information, including all applications with respect thereto (collectively, "Proprietary Rights") used or held for use in connection with the business of the Company and its Subsidiaries as currently conducted or as contemplated to be conducted, and the Company is unaware of any assertion or claim challenging the validity of any of the foregoing. The conduct of the business of the Company and its Subsidiaries as currently conducted and as contemplated to be conducted did not, does not and will not infringe in any way any Proprietary Rights of any third party that, individually or in the aggregate, could have a Material Adverse Effect on the Company. To the Company's knowledge, there are no infringements of any Proprietary Rights owned by or licensed by or to the Company or any of its Subsidiaries that, individually or in the aggregate, could have a Material Adverse Effect on the Company.

Section 4.18. *Subsidiaries.* Except as set forth in Section 4.18 of the Disclosure Schedule, all of the outstanding Shares of capital stock of each Subsidiary have been validly issued, are fully paid and non-assessable and are owned by the Company, by another Subsidiary or by the Company and another such Subsidiary, free and clear of all Liens or any other limitation or restriction. Except for the capital stock of the Subsidiaries, the Company does not own directly or indirectly, any capital stock or other ownership interest in any other Person. The outstanding capitalization of each Subsidiary is set forth on Section 4.1 of the Disclosure Schedule.

Section 4.19. *Insurance.* Each of the Company and its Subsidiaries maintains insurance policies (the "Insurance Policies") against all risks of a character and in such amounts as are usually insured against by similarly situated companies in the same or similar businesses. The Company has delivered to BACE the type, deductible, coverage limits and term for each of the Insurance Policies, and all of the

14          **BACE 00935**




information with respect to each Insurance Policy is complete and accurate in all material respects. Each Insurance Policy is in full force and effect and is valid, outstanding and enforceable, and all premiums due thereon have been paid in full. None of the Insurance Policies will terminate or lapse (or be affected in any other materially adverse manner) by reason of the transactions contemplated by this Agreement. Each of the Company and its Subsidiaries has complied in all material respects with the provisions of each Insurance Policy under which it is the insured party. No insurer under any Insurance Policy has canceled or generally disclaimed liability under any such policy or, to the Company's knowledge, indicated any intent to do so or not to renew any such policy. All material claims under the Insurance Policies have been filed in a timely fashion. The Company has delivered to BACE all health insurance and worker's compensation policies, and self-insurance funds or similar arrangements with which the Company or any of its Subsidiaries has been associated within the last five years.

Section 4.20. *Certain Business Practices.* None of the Company, any of its Subsidiaries or any directors, officers, agents or employees of the Company or any of its Subsidiaries has (i) used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to political activity, (ii) made any unlawful payment for foreign or domestic government officials or employees or to foreign or domestic political parties or campaigns or violated any provision of the Foreign Corrupt Practices Act of 1977, as amended, or (iii) made any other unlawful payment. Neither the Company nor any of its Subsidiaries has participated in any boycotts.

Section 4.21. *Customers.* The documents and information supplied by the Company to BACE or any of its representatives in connection with this Agreement with respect to relationships and volumes of business done with its significant customers are complete and accurate in all material respects. Except as set forth on Section 4.21 of the Disclosure Schedule, during the last 12 months, none of the Company or any Subsidiary has received any notices of termination or material alteration of a contract or business relationship, or written threats of any such action from any of the ten largest customers of the Company and its Subsidiaries. The Company has delivered to BACE a list of the ten largest customers of the Company and its Subsidiaries.

Section 4.22. *Contracts*

(a) The Company has delivered to BACE a complete and accurate list of all contracts (written or oral), undertakings, commitments or agreements (other than contracts, undertakings, commitments or agreements for employee benefit matters set forth in Section 4.12) of the following categories to which the Company or any of its Subsidiaries is a party or by which any of them is bound (collectively, and together with the contracts, undertakings, commitments or agreements for employee benefit matters set forth in Section 4.12 (the "Contracts"):

(i) Contracts requiring annual expenditures by or liabilities of the Company or its Subsidiaries in excess of $50,000 which have a remaining term in excess of 90 days or are not cancelable (without material penalty, cost or other liability) within 90 days;

(ii) promissory notes, loans, agreements, indentures, evidences of indebtedness or other instruments relating to the lending of money, whether as borrower, lender or guarantor, in excess of $50,000;

(iii) Contracts containing covenants limiting the freedom of the Company or any of its Subsidiaries to engage in any line of business or compete with any Person, in any product line or line of business, or operate at any location;

(iv) joint venture or partnership agreements or joint development or similar agreements pursuant to which any third party has been entitled or is reasonably expected to be entitled to share in profits or losses of the Company or its Subsidiaries;

(v) Contracts with any Governmental Authority which have a remaining term in excess of one year or are not cancelable (without material penalty, cost or other liability) within one year;

(vi) other Contracts or commitments in which the Company or any of its Subsidiaries has granted exclusive marketing rights relating to any product or service, any group of products or services or any territory;

(vii) to the knowledge of the Company, as of the date hereof, any other Contract the performance of which could be reasonably expected to require expenditures by the Company or any of its Subsidiaries in excess of $25,000;

(viii) Contracts that are otherwise material to the Company and its Subsidiaries.

(b) Except as set forth in Section 4.22 of the Disclosure Schedule, true and complete copies of the written Contracts and descriptions of verbal Contracts, if any, have been delivered to BACE. Each of the Contracts is a valid and binding obligation of the Company and, to the Company's knowledge without any investigation, the other parties thereto, enforceable against the Company in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium, reorganization, arrangement or similar Laws affecting creditors' rights generally and by general principles of equity. To the knowledge of the Company, except for the execution of this Agreement and the consummation of the transactions contemplated hereby and thereby, no event has occurred which would, on notice or lapse of time or both, entitle the holder of any indebtedness issued pursuant to a Contract set forth in Section 4.22 of the Disclosure Schedule in response to Section 4.22(a)(ii) to accelerate, or which does accelerate, the maturity of any such indebtedness.

16        BACE 00937




(c) Exhibit E is the Company's and its Subsidiaries standard form Contractual Service Agreement (the "PEO Form Contract") used by the Company and its Subsidiaries for each of its PEO customers. The PEO Form Contract is periodically changed and may vary from state to state. The Company has delivered to BACE a copy of each PEO Contract executed by the Company or any Subsidiary.

(d) Neither the Company nor any of its Subsidiaries is in breach, default or violation (and no event has occurred through the Company's action or inaction or, to the knowledge of the Company, through the action or inaction of any third parties, which with notice or the lapse of time or both would constitute a breach, default or violation) of any term, condition or provision of any Contract to which the Company or any of its Subsidiaries is now a party or by which any of them or any of their respective properties or assets may be bound, except for violations, breaches or defaults that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect on the Company.

Section 4.23. *Disclosure.* None of the representations or warranties made by the Company herein or in any schedule hereto, including the Disclosure Schedule, or in any certificate furnished by the Company pursuant to this Agreement, or in any Company reports, when all such documents are read together in their entirety, contains or will contain at Closing any untrue statement of a material fact, or omits or will omit at Closing to state any material fact necessary in order to make the statements contained herein or therein, in light of the circumstances under which made, not misleading.

Section 4.24. *Intellectual Property.*

(a) Each of the Company and its Subsidiaries owns or possesses adequate licenses or other valid rights to use all of the Company's existing United States and foreign patents, trademarks, trade names, service marks, copyrights, trade secrets and applications therefore (the "Company Intellectual Property Rights") except where the failure to own or possess valid rights to use such Company Intellectual Property Rights could not reasonably be expected to have a Material Adverse Effect on the Company.

(b) The validity of the Company Intellectual Property Rights and the title thereto of the Company or any Subsidiary, as the case may be, is not being questioned in any pending litigation proceeding to which the Company or any Subsidiary is a party nor, to the knowledge of the Company, is any such litigation proceeding threatened. Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Company and except as set forth in Section 4.24 of the Disclosure Schedule, the conduct of the business of the Company and its Subsidiaries as now conducted does not, to the knowledge of the Company, infringe any valid patents, trademarks, trade names, service marks or copyrights of others, and

BACE 00938

the consummation of the transactions completed by this Agreement will not result in the loss or impairment of any Company Intellectual Property Rights.

Section 4.25. *Related Party Transactions.* Except as set forth in the Company Reports or Section 4.25 of the Disclosure Schedule, (a) no beneficial owner of 5% or more of the Company's outstanding capital stock, or (b) officer or director of the Company (or any immediate family member of such officer or director) or (c) any Person (other than the Company) in which any such beneficial owner, officer or director owns any beneficial interest (other than a publicly held corporation whose stock is traded on a national securities exchange or in the over-the-counter market and less than 1% of the stock of which is beneficially owned by all such Persons) (collectively, "Related Parties") has any interest in: (i) any contract, arrangement or understanding with, or relating to, the business or operations of the Company or any of its Subsidiaries; (ii) any loan, arrangement, understanding, agreement or contract for or relating to indebtedness of the Company or any of its Subsidiaries, or (iii) any property (real, personal or mixed), tangible or intangible, used in the business or operations of the Company or any of its Subsidiaries. Following Closing, except for obligations set forth in this Agreement, neither the Company nor any of its Subsidiaries will have any obligations to any Related Party except for (x) accrued salary for such Related Party for the pay period commencing immediately prior to Closing and (y) the obligations set forth in the Company Reports and Section 4.25 of the Disclosure Schedule.

Section 4.26. *Assets.*

(a) The assets and properties of the Company and its Subsidiaries, considered as a whole, constitute all of the material assets and properties that are reasonably required for the business and operations of the Company and its Subsidiaries as presently conducted. The Company and its Subsidiaries have good marketable title to or a valid leasehold estate in all material personal properties and assets reflected on the Company's Balance Sheet at the Balance Sheet Date (except for properties or assets subsequently sold in the ordinary course of business consistent with past practice).

(b) The Company has delivered to BACE (i) a complete and accurate list of each improved and unimproved real property (each, a "Property") owned or leased by the Company or any of its Subsidiaries, and the current use of such Property and indicating whether the Property is owned or leased, (ii) a complete and accurate list of all leases pursuant to which the Company or any of its Subsidiaries lease personal property and (iii) with respect to each lease for Property, the term (including renewal options) and current fixed rent.

(c) Except as set forth in Section 4.26 of the Disclosure Schedule, there are no pending or, to the knowledge of the Company, threatened condemnation or similar proceedings relating to any of the Properties of the Company and its Subsidiaries, except for such proceedings which could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Company.

18        BACE 00939



**5.    Representations and Warranties of the Buyer.** In order to induce Sellers to enter into this Agreement and the transactions contemplated hereof, BACE hereby represents and warrants to Sellers that:

Section 5.1. *Corporate Existence.* The Buyer is duly organized, validly existing and in good standing under the laws of the State of North Carolina, it has full power to own all of its assets and to carry on its business as presently conducted, and is qualified to do business in each jurisdiction in which the ownership of its property or the conduct of its business requires it to be so qualified.

Section 5.2. *No Violation of Law, Etc.* The execution and delivery of this Agreement does not and the consummation of the transactions contemplated hereby will not (i) violate any provision of the Articles of Incorporation or bylaws of the Buyer, (ii) violate any provision of, or result in the termination or acceleration of any obligation under any mortgage, lien, lease, agreement, instrument, order, arbitration, award, judgment, decree, or franchise to which the Buyer is a party or by which the Buyer is bound, or (iii) violate or conflict with any other restriction of any kind or character to which the Buyer is subject.

Section 5.3. *Valid and Binding Obligation.* The execution and delivery of this Agreement has been duly authorized by all requisite corporate action and this Agreement is a valid and binding agreement of the Buyer, enforceable in accordance with its terms.

Section 5.4. *Investment Representation.* The Buyer is acquiring the Shares for investment and not with a view to or for resale in connection with distribution thereof. Buyer is aware that the Shares are not registered under the Securities Act of 1933, as amended, or under any state securities laws, and Buyer will not further transfer the Shares without compliance with all applicable securities laws. Buyer is not an underwriter, as that term is defined under the Securities Act of 1933, as amended, and is purchasing the Shares solely for investment, with no present intention to resell.

Section 5.5. *Income Tax Returns.* The Buyer shall be responsible for filing, and will file, all federal and state income tax returns of the Company for all periods due after the Closing, including any short year returns that may be required due to an election by the Buyer under Section 338 of the Internal Revenue Code of 1986, as amended.

Section 5.6. *Financial and Management Review.* Buyer states and represents that it has had full access and ability to review all financial information, including financial statements and federal income tax returns, provided by the Company. Buyer is fully familiar with the PEO industry, including the management of and property related to the PEO industry.




19       **BACE 00940**

Section 5.7. *Finders' Fees.* Buyer states and represents that there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Buyer which might be entitled to any fee or commission from the Buyer or the Company or any of its affiliates upon consummation of the transactions contemplated by this Agreement.

### 6.   **Mutual Covenants.**

The parties hereto agree that:

Section 6.1. *Reasonable Best Efforts.* Subject to the terms and conditions of this Agreement, each party will use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws and regulations to consummate the transactions contemplated by this Agreement. Each party shall also refrain from taking, directly or indirectly, any action that would impair such party's ability to consummate the sale and purchase of the Shares and the other transactions contemplated hereby.

Section 6.2. *Certain Filings*

(a) The Company and BACE shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (ii) in seeking any such actions, consent approvals or waivers or making any such filings, furnishing information required in connection therewith and seeking to obtain any such actions, consents, approvals, or waivers, provided, however, that the Company shall not be required to make any monetary expenditure or grant any material accommodation (financial or otherwise) in connection with any of the foregoing.

(b) The Company agrees to provide and will cause its Subsidiaries and its and their respective officers, employees and advisors to provide, (i) all documents that BACE may reasonably request relating to the existence of the Company and the authority of the Company for this Agreement, all in form and substance reasonably satisfactory to BACE and (ii) all necessary cooperation in connection with the arrangement of any financing to be consummated in respect of the transactions contemplated by this Agreement, including participation in meetings and due diligence sessions

Section 6.3. *Public Announcements.* BACE and the Company will consult with each other before issuing any press release or making any public statement with respect to this Agreement and the transactions contemplated hereby and each agree not to issue any such press release or make any such public statement prior to such consultation.



BACE 00941

Section 6.4. *Further Assurances.* At and after the Closing, the officers and directors of the Company will be authorized to execute and deliver, in the name of the Company, any deeds, bills of sale, assignments or assurances and to take and do, in the name and on behalf of the Company, any other actions and things to vest, perfect or confirm of record or otherwise in the Company any and all right, title and interest in, to and under any of the rights, properties or assets of the Company acquired or to be acquired as a result of, or in connection with, this Agreement.

Section 6.5. *Notices of Certain Events.* Each of the parties hereto shall promptly notify the other party of:

(i) the receipt by such party of any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(ii) the receipt by such party of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement, and;

(iii) any actions, suits, claims, investigations, or proceedings commenced or, to the best of such party's knowledge threatened against, or affecting such party which, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to this Agreement or which relate to the consummation of the transactions contemplated by this Agreement.

Section 6.6. *Taxes.* Buyer shall prepare or cause to be prepared and file or cause to be filed, at Buyer's cost, all Tax Returns for the Company for all periods ending on or prior to the Closing, which are due and payable after the Closing and the Company shall pay all Taxes indicated on such Tax Returns or determined thereafter to be due and payable.

**7.    Conditions to the Obligations of BACE.** The obligation of BACE to consummate the transactions provided for herein on the Closing is subject to the fulfillment of the following conditions:

Section 7.1. *Surviving Representations.* The Company shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to Closing, the representations and warranties of the Company contained in this Agreement shall be complete and accurate in all material respects at Closing (provided that representations made as of a specific date shall be required to be true as of such date only) as if made at and as of such time and BACE shall have received a certificate signed by the Chief Executive Officer and the Chief Financial Officer of the Company to their knowledge to the foregoing effect.

Section 7.2. *Transfer of Shares.* BACE or its designated agent shall have received original certificates representing the Shares duly endorsed in blank or

21                **BACE 00942**

accompanied by stock powers duly endorsed in blank, or in the event any such
certificates have been lost, destroyed, or misplaced, appropriate indemnification
agreements in which the Shareholder agrees to indemnify BACE from any claims
against it based on the lost, destroyed or misplaced certificates.

Section 7.3. *Access to Information; Right of Inspection.* From the date hereof
until closing, the Company will give BACE, their counsel, financial advisors, auditors
and other authorized representatives full access to the offices, properties, books and
records of the Company (so long as such access does not unreasonably interfere with
the operations of the Company), will furnish to BACE, their counsel, financial
advisors, auditors and other authorized representatives such financial and operating
data and other information as such Persons may reasonably request and will instruct
the Company's officers, counsel and financial advisors to cooperate with BACE in its
investigation of the business of the Company; provided that any information provided
to BACE pursuant to this Section 6.3 shall be subject to the Confidentiality
Agreement.

Section 7.4.  *Other Potential Acquirors.*

(a) Neither the Company nor any of its officers, directors, employees,
representatives, agents or affiliates shall, nor shall the Company authorize or permit
any of its or their respective officers, directors, employees, representatives, agents or
affiliates to, directly or indirectly, encourage, solicit or engage in discussions or
negotiations with or provide any non-public information to any Person or group
(other than BACE or its affiliates or any designees of BACE or their affiliates)
concerning any Third Party Acquisition. The Company shall immediately notify
BACE in the event it receives any proposal or inquiry concerning a third party
acquisition, including the terms and conditions thereof and the identity of the party
submitting such proposal, and shall promptly update BACE of the status and any
material developments concerning the same, including furnishing copies of any such
written inquiries.

(b) The Board of Directors of the Company shall not withdraw its
recommendation of the transactions contemplated hereby or approve or recommend,
or cause the Company to enter into any agreement with respect to, any Third Party
Acquisition.

Section 7.5. *Resignation of Directors.* The Company shall deliver to BACE
evidence satisfactory to BACE of the resignation of all directors of the Company.

Section 7.6. *Pending Action(s).* There shall not be pending (i) any action or
proceeding by any action or proceeding by any Governmental Authority or (ii) any
action or proceeding by any other Person, in any case referred to in clauses (i) and
(ii), before any court or Governmental Authority that has reasonable likelihood of
success seeking to (w) make illegal, to delay materially or otherwise directly or
indirectly to restrain or prohibit the consummation of the transfer of the Shares, the

22



transactions, contemplated hereby or seeking to obtain material damages, (x) restrain or prohibit BACE's (including it's affiliates) ownership or operation of all or any material portion of the business or assets of the Company, or to compel BACE or any of their affiliates to dispose of or hold separate all or any material portion of the business or assets of the Company, (y) impose or confirm material limitations on the ability of BACE or any of their affiliates to effectively control the business or operations of the Company or effectively to exercise full rights of ownership of the Shares, including, without limitation, the right to vote any Shares acquired or owned by BACE or any of their affiliates on all matters properly presented to the Company's shareholder's, or (z) require divestiture by BACE or any of their affiliates of any material amount of Shares, and no court, arbitrator or Governmental Authority shall have issued any judgment, order, decree, or injunction, and there shall not be any statute, rule or regulation, that, in the sole judgment of BACE is likely, directly or indirectly, to result in any of the consequences referred to in the preceding clauses (w) through (z); provided, however, that BACE shall use it's reasonable best efforts to have any such judgment, order, decree, or injunction vacated.

**8.    Conditions to the Obligations of the Sellers.** The obligations of the Sellers to consummate the transaction provided for herein on the Closing are subject to the fulfillment of the following conditions on the Closing:

Section 8.1. *Surviving Representations.* BACE shall have performed in all material respects all of their obligations hereunder required to be performed by it at or prior to Closing, the representations and warranties of BACE contained in this Agreement and in any certificate or other writing delivered by it pursuant hereto shall be true in all material respects at Closing (provided that representations made as of a specific date shall be required to be true as of such date only) as if made at and as of such time and the Company shall have received a certificate signed by the President or any Vice President of BACE to the foregoing effect.

Section 8.2. *Purchase Price.* Sellers shall have received the Purchase Price referred to in Section 2 hereof.

Section 8.3. *Director and Officer Liability.* BACE shall honor all of the Company's obligations to indemnify and hold harmless (including any obligations to advance funds for expenses) the present and former officers and directors of the Company in respect of acts or omissions occurring prior to Closing to the extent provided under the Company's articles of incorporation, bylaws and Code of Regulations in effect on the date hereof, until the expiration of the applicable statute of limitations with respect to any claims against such directors or officers arising out of such acts or omissions; provided that such indemnification shall be subject to any limitation imposed from time to time under applicable Law.

Section 8.4. *Pending Action(s).* There shall not be pending (i) any action or proceeding by any Governmental Authority or (ii) any claim, investigation, action, litigation or proceeding by any other Person, in any case referred to in clauses (i) and

(ii), before any court or Governmental Authority that has reasonable likelihood of success seeking to make illegal, to delay materially or otherwise directly or indirectly to restrain or prohibit the consummation of the transfer of the Shares or seeking to obtain material damages, and no court, arbitrator or Governmental Authority shall have issued any judgment, order, decree or injunction, and there shall not be any statute, rule or regulation, that, in the sole judgment of the Company is likely, directly or indirectly, to result in any of the consequences referred to above; provided, however, that the Company shall use their reasonable best efforts to have any such judgment, order, decree, or injunction vacated.

Section 8.5. *Workers' Compensation.* BACE shall be willing and shall be capable to furnish workers' compensation insurance coverage to the Company and/or to its Subsidiaries for the period commencing with the execution of the Letter of Intent and continuing until such time that the contemplated sale is completed or is irrevocably terminated. The related cost of such insurance coverage, if necessary to be provided, shall be solely the obligation of the Company and shall be paid or deposited into a separate bank account weekly as prescribed by BACE. During the period of coverage provided by BACE, the Company and/or its Subsidiaries agree to conform to all workers' compensation underwriting guidelines provided to any of them by BACE.

If the contemplated sale is irrevocably terminated, then the workers' compensation insurance coverage being provided by BACE and all liabilities related thereto shall cease one hundred eighty (180) days following the Closing unless it is mutually agreed by all parties, including the insurance carrier, to continue the coverage for some reasonable transition period beyond that time.

Section 8.6. *Noncompetition and Nonsolicitation.* Seller covenants and agrees that, except as otherwise permitted by the terms of this Agreement and for forty-eight months after Closing, each of the key shareholders and/or each senior member of the management of the Company and/or its Subsidiaries shall be precluded from engaging, directly or indirectly, into competition with BACE and/or any of its affiliated companies in any Professional Employer Organization or similar enterprise, shall have neither direct or indirect contact with the customers of the Company and/or its Subsidiaries for solicitation purposes or otherwise and BACE shall further require devotion of his (hers/their) exclusive efforts and energies in the PEO or similar field to the continued successful operation of the Company and/or its Subsidiaries (or their successor if merged with BACE's other PEO entities or interests) and to no other PEO or similar interest or enterprise. For purposes of this section, to "engage" shall include activities as an individual or as a stockholder, partner, director, officer, principal, agent, employee, trustee, creditor, financier or representative of any person, firm, corporation or association so engaged or have any interest, direct or indirect, in any employee leasing business or payroll services business.

24          **BACE 00945**

9.     **Notices.** All notices, requests and other communications to any party hereunder shall be in writing (including telecopy or similar writing) and shall be given:

(a) if to BACE, to

> BACE International Corporation
> 6000 Fairview Road, Suite 1500
> Charlotte, North Carolina 28210
> Telephone: (704) 365-0610
> Facsimile: (704) 366-1022
> Attention: William L. Baumgardner, Jr.
>
> *With a copy to:*
> Tharrington, Smith, LLP
> 209 Fayetteville Street Mall
> Post Office Box 1151
> Raleigh, North Carolina 27602-1151
> Telephone: (919) 821-4711
> Facsimile: (919) 829-1583
> Attention: Douglas E. Kingsbery, Esquire

(b) if to Sellers and/or the Company, to

> ASR Acquisition, Inc.
> 2100 McKinney Avenue, Suite 1700
> Dallas, Texas 75201
> Attention: R. J. Phillips, Jr.
> Telephone: (214) 981-8600
> Facsimile: (214) 981-8687
>
> With a copy to:
>
> Jenkens & Gilchrist,
> a Professional Corporation
> 1445 Ross Avenue, Suite 3200
> Dallas, Texas 75202
> Attention: L. Steven Leshin, Esq.

(c) If to the Sellers Agents:

> Prairie Capital Mezzanine Fund, L.P.
> 300 South Wacker Drive, Suite 2400
> Chicago, Illinois 60606
> Attention: Stephen V. King

25          BACE 00946



Ancor Holdings, L.P.
1600 Chase Texas Tower
201 Main Street
Fort Worth, Texas 76102
Attention: J. Randall Keene

R. J. Phillips, Jr.
P.O. Box 470099
Fort Worth, Texas 76147

or such other address or telecopy number as such party may hereafter specify for the purpose by notice to the other parties hereto. Each such notice, request or other communication shall be in writing and shall be deemed to have been duly given (i) on the date of service if served personally on the party to whom notice is to be given, (ii) on the next business day following delivery to a nationally-recognized overnight courier service for next-day delivery to the party to whom notice is given and properly addressed, and (iii) if given by facsimile, when such facsimile is transmitted to the facsimile number specified in this Section and the appropriate facsimile confirmation is received, unless such transmission occurs after normal business hours, in which case such notice shall be deemed to have been given on the next business day.

      **10.**    **Further Assurances.**  The Sellers and BACE hereby covenant and agree that at any time and from time to time they will promptly execute and deliver to each other such further instruments and documents and take such further actions as the other party may from time to time request in order to further carry out the intent and purpose of this Agreement.

     *11.*    **Amendments; No Waivers**

     (a) Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment by the Company, BACE or in the case of a waiver, by the party against whom the waiver is to be effective; provided that after the adoption of this Agreement by the Shareholders of the Company, there shall be no amendment that by Law requires further approval by the Shareholders of the Company without the further approval of such Shareholders.

     (b) No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

     **BACE 00947**

12.     **Specific Performance.**  The parties hereby acknowledge and agree that the failure of any party to perform its agreements and covenants hereunder, including its failure to take all actions as are necessary on its part to the consummation of the Merger, will cause irreparable injury to the other parties, for which damages, even if available, will not be an adequate remedy. Accordingly, each party hereby consents to the issuance of injunctive relief by any court of competent jurisdiction to compel performance of such party's obligations and to the granting by any court of the remedy of specific performance of its obligations hereunder.

13.     **Successors and Assigns**. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns, legal representatives, executors and heirs.  No party shall have the right to assign, delegate or otherwise transfer any of its rights or obligations, in whole or in part, under this Agreement without the consent of the other parties hereto, except that BACE may, in their sole discretion and without further approval of the Seller(s), assign, at any time, this Agreement and related Promissory Note(s) thereunder to another company, currently in existence or yet to be formed, of which BACE owns at the time of transfer, directly or indirectly, a controlling interest both as to equity and as to income. No such transfer shall serve, in any capacity, to diminish a party's position with regard to the collectability of any amounts, including any note(s) payable, hereby created, and no such transfer shall serve, in any capacity, to relieve Buyer of any of its or its assignees obligations under this Agreement and related note(s) payable thereunder.

14.     **Business Days.**  If any date upon which action is required under this Agreement shall be a Saturday, Sunday or legal holiday recognized by the Federal government or the state government of the state wherein the Assets are located, the date for such action shall be extended to the first business day after such date that is not a Saturday, Sunday or recognized holiday.

15.     **No Third Party Beneficiaries.**  There shall be no third party beneficiaries to this Agreement.

16.     **Expenses.**  All costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such cost or expense. Notwithstanding this provision, in the event that a party employs attorney(s) to enforce the provisions of this Agreement, the non-prevailing party agrees to pay the prevailing party's attorney fees and all expenses reasonably incurred at, before or after trial and on appeal, whether or not taxable as costs, or in any bankruptcy proceeding.

17.     **Counterparts.** This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received counterparts hereof signed by all of the other parties hereto.

**18.    Severability.** If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

**19.    Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

**20.    No Other Agreements.** This Agreement, (i) constitutes the entire agreement, and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter of this Agreement and (ii) except for the provisions of Section 8.3, is not intended to confer upon any Person other than the parties any rights or remedies.

**21.    Construction.** The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  Any references to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  Nothing in any attached Exhibit(s) shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the Exhibit identifies the exception with particularity and describes the relevant facts in detail.  The parties intend that each representation, warranty, and covenant contained herein shall have independent significance.  If any Party has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty or covenant.

**22.    Confidentiality.** All of the confidential information exchanged between BACE and Seller is confidential and is to be kept confidential by the parties, who may, however, disclose same, on a "need-to-know" basis, to their directors, officers, partners, employees, agents, advisors, attorneys, accountants, consultants, bankers and financial advisors.  Before disclosing any such information to such representatives or authorizing them to receive any such information, each party shall instruct them to keep that information confidential in the same manner.  Except with



respect to any financial information provided by one party to the other, the foregoing provisions of this section shall terminate at Closing if Buyer does in fact purchase the Shares. The term confidential information is all information provided by a party except information available in public records, information that is or becomes generally available to the public because of release by the respective party or information that must be released under applicable law or a valid, final judicial or administrative order.

[This page is left intentionally blank.]

**BACE 00950**

29

**IN WITNESS WHEREOF,** the Buyer has duly executed this Agreement under seal as of the date first above written.

**BUYER:**

**BACE INTERNATIONAL CORPORATION**

By: _____

William L. Baumgardner, Jr., President

**ATTEST:**

_____

Anna Baumgardner, Asst. Secretary

**[Corporate Seal]**

**BACE 00951**

30

**IN WITNESS WHEREOF,** the Sellers have duly executed this Agreement under seal as of the date first above written.

ASR Acquisition, Inc.

_____
R. J. Phillips, Jr., President and CEO

SELLERS:

Prairie Capital Mezzanine Fund Ł, L.P.
By: Daniels & King Capital, L.L.C
its general partner

_____
Stephen V. King,
its Managing Member

Remount Capital, LLC

_____       By: Stephen V. King, Pres
By:        CHRIS HUSS
Name:
Title:   EVP

_____       By: Stephen V. King, P.O.A.
Harrison I. Steans

_____       By: Stephen V. King, POA
George P. Bauer

**BACE 00952**

_Thomas Hunter_ By: _Stephen V. King, POA_
Thomas P. Hunter, III

_Susan M. Michaels_ By: _Stephen V. King, POA_
Estate of Richard D. Michaels

_Adeline Morrison_ By: _Stephen V. King, POA_
Adeline S. Morrison

_Jennifer Steans_ By: _Stephen V. King, POA_
Jennifer W. Steans

Ancor Holdings, LP
By: Ancor Partners, Inc.,
its general partner

_Timothy McKibben_
Timothy McKibben, Chairman of the Board

Eight Twenty Eight Trust

_R. J. Phillips_
R. J. Phillips, Jr., Trustee

_Mitchell Green by R. Phillips, Jr., POA_
Mitchell Green

32                    BACE 00953

_(signature)_ by _(signature)_ POA

Resources Trust Company TTEE FBO: IRA
Raymond H. Kingsbury DTD: 5-29-98

_(signature)_ by _(signature)_ POA

Sidney Echols

_(signature)_

Steven C. Mills

_(signature)_

Kyle C. Mann

_(signature)_ by _(signature)_ POA

Judy Renfrow

_(signature)_

Judy Renfrow, Ratified 9/26/02, effective as of 8/31/02

_(signature)_ by _(signature)_ POA

Tom Houk

_(signature)_

Tom Houk, Ratified 9/26/02, effective as of 8/31/02

_(signature)_ by _(signature)_ POA

Debbie Wheat

_(signature)_

Debbie Wheat, Ratified 9/26/02, effective as of 8/31/02

_(signature)_ by _(signature)_ POA

Larry Flint

_(signature)_

Larry Flint, Ratified 9/26/02, effective as of 8/31/02

_(signature)_ by _(signature)_ POA

Cathey Wilson

_(signature)_

Cathey Wilson, Ratified 9/26/02, effective as of 8/31/02

**BACE 00954**

**EXHIBIT A**

**SELLERS**

Prairie Capital Mezzanine Fund, L. P.
Eight Twenty Eight Trust
Adeline S. Morrison
Thomas P. Hunter, III
Harrison I. Steans
Sidney Echols
Steven C. Mills
Judy Renfrow
Debbie Wheat
Cathey Wilson
Ancor Holdings, LP
~~Prairie Capital, LLC~~
George P. Bauer
Estate of Richard D. Michaels
Jennifer W. Steans
Resources Trust Company TTEE FBO: IRA Raymond H. Kingsbury DTD:
5-29-98
Kyle C. Mann
Tom Houk
Larry Flint

BACE 00955

Exhibit B

# BACE International
### Suite 1500, 6000 Fairview Road
### Charlotte, North Carolina 28210.

Investment Banking
Mergers and Acquisitions .
Human Resource Management
Insurance Services
Nascar Motorsports

Business  704.365.0610
Facsimile 704.366.1022.

Direct   704.944.7614

July 11, 2002

R. J. Phillips, Jr. Chairman & CEO
ASR Acquisition, Inc.
2100 McKinney Avenue
Suite 1700
Dallas, Texas  75201·

Re: Purchase of ASR Acquisition, Inc., including all subsidiaries & affiliates

Dear Mr. Phillips:

Pursuant to our recent meetings and discussions, this letter serves to outline our understanding of the initial terms and conditions for our proposed purchase of the American Staff Resources group of companies including all of its subsidiaries and its affiliates (hereinafter collectively referred to as "ASR") by BACE International, or upon mutually agreed assignment, a wholly-owned subsidiary or affiliate thereof (hereinafter referred to as "BACE"). Our mutual understanding as to the terms and conditions of this transaction are as follows:

1. <u>Type of purchase:</u>  BACE will purchase from the ASR stockholders, free and clear of all liens and encumbrances, all of the outstanding stock, including all classes, of ASR; or, in the alternative and only by mutual agreement, selected assets. The purchase will close on  or before August 31, 2002 (such date is referred to as the "Closing Date").

2. <u>Purchase Price:</u>  BACE will pay to the shareholder(s) of ASR an amount equal to $7,500,000, plus commissions, payable in accordance with Exhibit A, subject to a reduction provision for liabilities or other costs or expenses which were or should have been known and disclosed by ASR prior to the closing e.g. undisclosed payroll tax liabilities for any period(s) prior to the Closing Date.

3. <u>Assumed liabilities:</u>  BACE will assume only those responsibilities, debts and/or obligations as specifically negotiated as part of the completed Purchase Agreement. These responsibilities, debts and/or obligations will specifically include balance sheet assets and liabilities as of the Closing Date, including cash on hand, CNA Northrock deposits and the outstanding balance of the Texas Capital Bank working capital line of credit with no changes outside of the ordinary course of business (which has a maximum availability of $1,700,000). In addition, BACE will secure the release of Ancor and Prairie from the $700,000 guaranty of the line of credit contemporaneously with the closing. Further, it is understood and agreed that certain warranties, etc. may be requested and/or required of ASR by BACE.

4. <u>Conditions precedent to Closing:</u>

   a. Shareholders' sale of ASR is contingent upon BACE's willingness and capability to furnish workers' compensation insurance coverage to ASR and/or to its affiliated companies for the period commencing on July 15, 2002 at midnight and ending on

Closing Date, if the purchase closes on Closing Date or, 180 days following the Closing Date, if the purchase does not close on Closing Date. The related cost of such insurance coverage provided by BACE and/or its affiliated companies, prior to the closing of this transaction, shall be equivalent to the rate paid by ASR during the period of time between July 15, 2002 and Closing Date and shall be solely the obligation of ASR and shall be paid or deposited into a separate bank account monthly as prescribed by BACE. During the interim period of coverage provided by BACE, ASR and/or its affiliated companies agree to conform with all workers' compensation underwriting guidelines provided to any of them by BACE or its insurance carrier(s).

ASR warrants and covenants, as a condition precedent to the providing of any coverage(s) by BACE and/or any of their carriers or providers, that ASR does not have any past due accounts payable to nor are they in dispute over any amounts with any of the carrier(s) or provider(s) of BACE.

b.  BACE's purchase of ASR is contingent upon BACE entering into an employment or consulting arrangement with primary members of ASR's management.

c.  The final Purchase Agreement shall contain non-competition, non-solicitation and exclusive efforts clauses whereby . . . . . . . . . . the shareholders and/or each senior member of the management of ASR shall be precluded from entering, directly or indirectly, into competition with BACE and/or any of its affiliated companies in any Professional Employer Organization or similar enterprise and shall further require devotion of his (hers/their) exclusive efforts and energies in the PEO field to the continued successful operation of ASR (or its successor if merged with BACE's other PEO entities or interests) and to no other PEO or similar interest or enterprise.

d.  BACE will receive from ASR and shareholders financial statements audited by an independent Certified Public Accountant and corporate federal and state income tax returns (U. S. Form(s) 1120 and applicable state(s) return(s)) for the years ended December 31, 2001, 2000, and 1999, as well as interim (compiled) financial statements for the latest quarter(s) available for the year ending December 31, 2002. Further, ASR and shareholder(s) agree to provide any additional material, documentation, etc. reasonably requested by BACE to facilitate the due diligence process and/or the EBITDA valuation formulation model.

e.  The purchase of ASR by BACE is contingent upon BACE complying with all state or federal legislative or regulatory bodies having jurisdictional and/or licensing approval authority over the contemplated transaction including, but not limited to, the Texas licensing and regulatory body for the PEO industry.

f.  The undersigned corporate officers, representatives or shareholder(s) have the necessary corporate authority to enter into this Agreement on behalf of the corporation(s) and/or their shareholder(s) and nothing contained herein nor by their execution hereof shall cause a violation of any warranty or covenant previously granted by any of them to any other party under any loan agreement, borrowing arrangement, stock or securities agreement, policy of insurance coverage, etc. ASR and BACE each stipulate that, except for the final approval of all of the shareholders, there are no parties who must approve, ratify, review or sanction the contemplated transaction, except those who are direct parties to and signatories of this Agreement or as otherwise set forth above.

5.  Due diligence: BACE promises to use their best efforts to perform the due diligence necessary for this transaction within a reasonable period of time commencing on the date of this Letter of Intent. ASR and shareholder(s) agree to cooperate with BACE and to provide

2                          **BACE 00957**

all materials, information and response to inquiries reasonably made by BACE in furtherance of this objective. In consideration of BACE's expenditures for pre-acquisition professional and other related efforts and their costs and BACE's willingness and capability to provide workers' compensation insurance coverage for the interim period, neither ASR (including any shareholder(s)) nor any agent for ASR or any shareholder(s) shall negotiate the sale, transfer, divestiture, assignment or otherwise encumber any stock in ASR with any party(ies) including, but not limited to, other prospective buyers, brokers, etc. during the term of this Letter of Intent or until all activities contemplated hereunder have been exhausted and this Letter of Intent irrevocably terminated.

6.  Limitations of Letter of Intent:  This letter is a memorialization of our negotiated understanding of the intent of the parties and the general business terms of the acquisition transaction. The terms and conditions of this Letter of Intent, and in particular paragraph (5) regarding the transfer or encumbrance of stock(s) and paragraph 4(a) regarding workers' compensation, shall constitute a legally binding obligation on the parties until we have entered into a mutually acceptable, definitive written agreement containing appropriate terms and conditions satisfactory to all parties or irrevocably terminated the transaction contemplated herein. Without limiting the foregoing, any expenses or costs incurred by any party in connection with this transaction shall be the sole responsibility of the party incurring such expense(s).

7.  S-Corporation election:  Should there currently exist and should BACE decide to maintain an S Corporation status, the parties will agree to make a IRC Section 1377(a)(2)(A) election in order to treat the allocation of income to the shareholder(s) as two separate short tax years.

8.  Assignability:  BACE may, in their sole discretion and without any further approval of the Seller(s), assign, at any time, this Letter of Intent or subsequently, the Purchase Agreement and related Note(s) Payable thereunder to another company, currently in existence or yet to be formed, of which BACE owns at the time of transfer, directly or indirectly, an absolute controlling interest both as to equity and as to income. No such transfer shall serve, in any capacity, to diminish ASR's position with regard to the collectability of any amounts, including any Note(s) Payable, hereby created, and no such transfer shall serve, in any capacity, to relieve BACE of any of its or its assignees obligations under this Letter of Intent, the Purchase Agreement and related Note(s) Payable thereunder.

9.  An executed facsimile copy of this Letter of Intent shall be considered as a fully executed original document.

*(Signatory page immediately follows)*

BACE 00958

If the foregoing correctly sets forth your understanding of the terms of our discussion and the mutual basis for our continued negotiations, please note your acceptance by (a) initialing each of the preceding pages, (b) signing in the space(s) provided below and (c) returning an executed copy of this letter by the close of business on Friday, July 12, 2002.

Respectfully submitted,

BACE International

William L. Baumgardner, Jr.
President & CEO

* * * * * * *

Confirmed and agreed to as set forth above:

Seller:

ASR Acquisition, Inc.

By: _____
R. J. Phillips, Jr., Chairman & CEO

Ancor Holdings, L.P.
Ancor Holdings, Inc., General Partner

By: _____
J. Randall Keene, President

Prairie Capital Mezzanine Fund, L.P.
Daniels & King Capital, L.L.C., Its General Partner

By: _____
Stephen V. King, Managing Member

4

BACE 00959

Exhibit "A"

Purchase Price and Terms of Payment

Purchase Price:

- One Million Dollars paid at closing.

- Five Hundred Thousand Dollars paid 90 days following closing.

- Six Million Dollars paid in the form of Promissory Notes, secured with collateral acceptable to Prairie Capital Mezzanine Fund, L.P. The first payment of Three Million Dollars will be paid on the first anniversary of the Closing Date. The balance of Three Million Dollars will be paid on the second anniversary of the Closing Date. The Promissory Notes will bear interest at the rate of 6.5% per annum.

- A Commission Participation of ten percent of the gross profit will be paid quarterly with an annual adjustment and reconciliat~~...~~ the audited financial statements. This Commission Participation will be paid only on the client contracts acquired at the time of the purchase but will be paid for as long as the client contracts are active and remain with the company. Gross profits for purposes of the commissions shall be from PEO and related activities determined using generally accepted accounting principles. Sellers are guaranteed to be paid the Commission Participation for a minimum of 48 months ("the Minimum Commission Period"). In the event that ASR is sold or controlling interest otherwise transferred to an outside third party within the Minimum Commission Period, ASR will, upon the sale, pay to the Sellers the previous month's commission multiplied by the number of months remaining in the Minimum Commission Period.

BACE 00960

**Exhibit C**

**Definitions**

Section A.  *Certain Definitions*.  For purposes of this Agreement, the following terms shall have the respective meanings set forth below:

"2001 Audited Financial Statements" shall mean the consolidated audited financial statements of the Company as of December 31, 2001 (and the notes thereto).

"Adverse Consequences" means all actions, suits, proceedings, claims, demands, judgments, orders, decrees, damages, penalties, fines, costs, amounts paid in settlement, Liabilities, obligations, Taxes, liens, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses.

"Agreement" shall mean this Stock Purchase Agreement.

"Balance Sheet Date" shall mean December 31, 2001.

"Basis" means any past or present fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction that forms or could form the basis for any specified consequence.

"Benefit Arrangements" shall have the meaning set forth in Section 4.12(a).

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Common Stock" shall mean the capital stock of the Company designated as common stock, $.01 par value.

"Company" shall mean ASR Acquisition, Inc. a Delaware corporation.

"Company Intellectual Property Rights" shall have the meaning set forth in Section 4.24(a).

"Company and Subsidiary Securities" shall have the meaning set forth in Section 4.5(d).

"Contracts" shall have the meaning set forth in Section 4.22(a).

"Controlling Person(s)" shall have the meaning as set forth by the Florida Department of Business and Professional Regulation.

"Disclosure Schedule" shall have the meaning set forth in Section 4.

"Employee Benefit Plan" shall have the meaning set forth in Section 3(3) of ERISA.

BACE 00961

"Employee Options" shall mean the outstanding options to acquire Shares granted to employees of the Company.

"Employee Plans" shall have the meaning set forth in Section 4.12(a).

"Environmental Laws" shall mean any and all applicable federal, state, local and foreign statutes, Laws, regulations, ordinances, rules, judgments, orders, decrees, codes, injunctions, Permits, relating to human health, natural resources, or the environment or to Releases of Hazardous Substances or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances or the notification, clean-up or other remediation thereof, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Section 6901 et seq., the Emergency Planning and Community Right to Know Act, 42 U.S.C. Section 11001 et seq., the Clean Air Act, 42 U.S.C. Section 7401 et seq., the Federal Water Pollution Control Act, 33 U.S.C. Section 1251 et seq., the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq., the Safe Drinking Water Act, 42 U.S.C. Section 300F et seq., and the Occupational Safety and Health Act, 29 U.S.C. Section 651 et seq., each as amended.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Expenses" shall have the meaning set forth in Section 16.

"GAAP" shall mean generally accepted accounting principles, as in effect in the United States, from time to time.

"Governmental Authority" shall mean any agency, public or regulatory authority, instrumentality, department, commission, court, ministry, tribunal or board of any government, whether foreign or domestic and whether national, federal, tribal, provincial, state, regional, local or municipal.

"Hazardous Substances" shall mean any wastes, substances, radiation, or materials (whether solids, liquids or gases) (i) which are hazardous, toxic, infectious, explosive, radioactive, carcinogenic, or mutagenic; (ii) which are defined as "hazardous materials," "hazardous wastes," "hazardous substances," "wastes" or other similar designations in any Environmental Laws; (iii) without limitation, which contain asbestos and asbestos-containing materials, lead-based paints, urea-formaldehyde foam insulation, and petroleum or petroleum products (including, without limitation, crude oil or any fraction thereof); or (iv) which pose a hazard to human health and safety, natural resources, or the environment.

BACE 00962

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Insurance Policies" shall have the meaning set forth in Section 4.19.

"Law" shall mean statutes, common laws, rules, ordinances, regulations, codes, licensing requirements, orders, judgments, injunctions, decrees, licenses, agreements, settlements, governmental guidelines or interpretations, Permits, rules and bylaws of a Governmental Authority.

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due), including any liability for Taxes.

"Lien" shall mean, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset.

"Material Adverse Effect" shall mean with respect to the same or any similar events, acts, conditions or occurrences, whether individually or in the aggregate, a material adverse effect on (i) the business, financial condition, results of operations, prospects, assets or liabilities of such party (together with its Subsidiaries, taken as a whole), (ii) the legality or enforceability against a party to this Agreement or (iii) the ability of a party to perform its obligations and to consummate the transactions under this Agreement, and that has an adverse financial impact of one hundred thousand ($100,000) dollars or more. An adverse change in the market price or trading volume of the Shares shall not be deemed, by itself, to constitute a Material Adverse Effect.

"Ordinary course" means the ordinary course of business consistent with the past custom and practice (including with respect to quantity, quality and frequency).

"Options" shall mean Employee Options, Director Options and any other options issued to purchase Common Stock or Preferred Stock.

"Pension Plans" shall have the meaning set forth in Section 4.12(a).

"PEO" means a Professional Employer Organization.

"PEO Form Contract" shall have the meaning set forth in Section 4.22(c).

"PEO Laws" means any Laws regulating PEOs in any State in which the Company does business.

"Permits" shall mean any licenses, franchises, permits, certificates, consents, approvals or other similar authorizations affecting, or relating in any way to, the assets or business of the Company.

"Person" shall mean any individual, corporation, limited liability company, joint stock company, partnership, association, trust, joint venture, an unincorporated organization or any other entity or organization, including any government or political subdivision or any department, agency or instrumentality thereof.

"Proceeding" shall have the meaning set forth in Section 4.10.

"Property" shall have the meaning set forth in Section 4.26(b).

"Proprietary Rights" shall have the meaning set forth in Section 4.17.

"Related Parties" shall have the meaning set forth in Section 4.25.

"Release" means any emission, spill, seepage, leak, escape, leaching, discharge, injection, pumping, pouring, emptying, dumping, disposal, or release of Hazardous Substances into or upon the environment, including the air, soil, surface water, groundwater, the sewer, septic system, storm drain, publicly owned treatment works, or waste treatment, storage, or disposal systems.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Shares" shall mean, collectively, the Common Stock and the Preferred Stock of the Company.

"Subsidiary" shall mean any corporation or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions are at the time directly or indirectly owned by such Person.

"Tax" or "Taxes" shall mean (A) all federal, state, local or foreign taxes, charges, fees, duties, levies, penalties or other assessments, including, without limitation, income, gross receipts, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Section 59A), customs duties, capital stock, franchise, real and personal property, sales, use, transfer, license, payroll, employment, withholding, social security (or similar), unemployment insurance, disability, workers' compensation, employer health tax, registration, value added, alternative or add-on minimum, estimated or other taxes, fees, assessments or charges of any kind whatsoever, imposed by any Governmental Authority and shall include any interest, penalties or additions to tax attributable to any of the foregoing, whether disputed or not; (B) any liability for payment of amounts described in clause (A) whether as a result of transferee liability, of being a member of an affiliated, consolidated, combined or unitary group for any period, or otherwise through operation of Law, and (C) any liability for the payment of amounts described in clauses (A) or (B) as a result of any tax sharing agreement, tax allocation agreement,

tax indemnity agreement, or other agreement that includes indemnification for an tax liability.

"Tax Return" shall mean all returns, declarations, reports, forms, estimates, claim for refund, information returns, statements or other documents (including any related or supporting information) filed or required to be filed with or supplied to any Governmental Authority in connection with any Taxes and including any amendment thereof.

"Third Party Acquisition" shall have the meaning set forth in Section 7.4(a).

*Terms Generally.* The definitions in Section A shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation" even if not followed actually by such phrase unless the context expressly provides otherwise. All references herein to Sections, paragraphs and Exhibits and Schedules shall be deemed references to Sections or paragraphs of or Exhibits or Schedules to this Agreement unless the context shall otherwise require. Unless otherwise expressly defined, terms defined in this Agreement shall have the same meanings when used in any Exhibit or Schedule and terms defined in any Exhibit or Schedule shall have the same meanings when used in this Agreement or in any other Exhibit or Schedule. The words "herein," "hereof," "hereto" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement.

BACE 00965

Exhibit D

# PROMISSORY NOTE

"Principal Amount"          Loan Date                "Maturity Date"
*******                    8-31-2002                2-1-2003

"Borrower"   BACE International Corporation    "Payee"    *******
             6000 Fairview Road, Suite 1500
             Charlotte, NC 28210

FOR VALUE RECEIVED the undersigned promises to pay or order, the Principal Amount less the amount of Payee's pro rata share of any and all breaches of that certain Stock Purchase Agreement dated as of August 31, 2002.

This Note shall bear simple interest in the amount of 6.5% per annum and shall be due and payable in lawful money of the United States of America at the Maturity Date. This Note may be prepaid in full or in part at any time without penalty or premium.

The collateral described in the Pledge Agreement dated of even date secures this Note.

This Note is to be governed and construed in accordance with the laws of the State of North Carolina.

IN TESTIMONY WHEREOF, each corporate maker has caused this instrument to be executed in its corporate name by its authorized corporate officer, all by order of its Board of Directors first duly given the day and year first above written.

BACE International Corporation

By: _____              RECEIVED and ACCEPTED:
    William L. Baumgardner, Jr., President

ATTEST:                                   By: _____

_____
Anna K. Baumgardner, Asst. Secretary

[Corporate Seal]

BACE 00966

Exhibit E

## CLIENT SERVICES AGREEMENT

This CLIENT SERVICES AGREEMENT (this "Agreement"), by and between American Staff Resources Corporation and/or its affiliates ("ASR"), acting by and through its duly authorized officer, and _____ ("Company"), acting by and through its duly authorized representative is effective _____ (the "Effective Date").

1.    EMPLOYEES

   Pursuant to the terms and conditions set forth in this Agreement, ASR shall co-employ with Company those individuals listed on each ASR Payroll Check Register (the "Employees") to work at Company's place of business and perform services for Company. Company desires to co-employee with ASR the Employees to further the business of Company, subject to the terms and conditions of this Agreement.

2.    TERM OF AGREEMENT

   The term of this Agreement shall commence on the Effective Date, in the first year, and the anniversary of the Effective Date in subsequent years, and end on the date of termination of this Agreement (the "Contract Term").

3.    RENEWAL

   Unless ASR notifies Company thirty (30) days prior to the end of a Contract Term that different rates and terms will be effective at the expiration of the Contract Term, this Agreement will automatically continue at the same rates and terms as in effect during the expiring Contract Term.

4.    TERMINATION

   a.    At Renewal.  Either party may terminate this Agreement, with or without cause, upon notice to the other party at least thirty (30) days prior to the end of the Contract Term.

   b.    Immediate Termination

      i.    Violation of Law or Policy.  If ASR has reasonable cause to believe that Company violated state or federal law, falsely reported payroll, provided incorrect job classifications to ASR for an Employee, or failed to report an occupational injury/disease occurrence within twenty-four (24) hours of occurrence ASR may terminate this Agreement upon notice to Company.

      ii.    Failure to Report Payroll or Default on Invoice. If Company fails to submit an ASR Payroll Check Register or defaults on a payroll invoice, ASR may terminate this Agreement upon notice to Company.

   c.    Failure to Comply with Safety Plan.  If Company does not comply with a safety plan pursuant to Section 6(c)(i), either ASR or Company may terminate this Agreement on the later of (i) five (5) business days after notice or (ii) the end of the pay period following notice.

   d.    Failure of ASR to exercise its remedies in any occurrence shall not be construed as waiver of ASR's remedies in any other occurrence.

5.    RIGHTS AND RESPONSIBILITIES OF ASR

   a.    Payroll Administration.  ASR is solely responsible for administering Employee payroll in accordance with the information provided by Company on the ASR Payroll Check Register and to comply with all applicable local, state, and federal laws regarding administration of such payroll.

   b.    Workers' Compensation.  During the Contract Term, ASR shall maintain a policy of workers' compensation insurance covering each Employee who has accurately and truthfully completed and submitted to ASR all ASR New Hire Employment Documents and is listed on the current ASR Payroll Check Register. ASR shall provide Company a Certificate of Workers' Compensation Insurance when requested.

CLIENT SERVICES AGREEMENT - Revised 7/24/02
Agreement not effective until signed by authorized ASR representative.

1

_____Client Initial_____ASR Initial

BACE 00967

c.    Insurance. If an insurance policy sponsored by ASR is terminated, ASR has the right, but no obligation, to replace such insurance.

d.    Safety. ASR shall furnish Company with a general safety plan ("ASR's Safety Plan") and have the right (but not the obligation) to make periodic safety surveys wherever Employees are working.

e.    Compliance with Texas Labor Code §91.032. ASR reserves the right of direction and control over Employees, assumes responsibility for the payment of wages to Employees without regard to payments by Company to ASR, assumes responsibility for payment of payroll taxes and collection of taxes from Employees' payroll, retains the right to hire, fire, discipline, and reassign Employees, and retains the right of direction and control over the adoption of employment and safety policies and the management of workers' compensation claims, claim filings, and related procedures.

6.    RIGHTS AND RESPONSIBILITIES OF COMPANY

a.    Payroll Data. Company shall provide ASR with accurate and complete data on the ASR Payroll Check Register at least five (5) days prior to pay day. Workers' Compensation Insurance and all other insurance coverage shall terminate for an Employee on the date of the ASR Payroll Check Register that last entitles the Employee to receive payroll from ASR. NO PAYROLL, NO COVERAGE.

b.    Workers' Compensation.

i.    Company shall provide correct job classifications to ASR for each Employee.

ii.    Company shall post workplace notices as required by law.

iii.    Company shall notify ASR of any occupational injury/disease occurrence to an Employee within twenty-four (24) hours of Company's discovery of such injury.

iv.    Company shall provide light duty work for an Employee upon authorized partial release from an attending physician after an occupational injury/disease occurrence, until the Employee is released to normal work duty. If Company fails to provide such light duty work, Company agrees to pay all amounts due the Employee.

v.    Company shall pay ASR the first two thousand five hundred dollars ($2,500) of expense associated with each occupational injury/disease occurrence related to an Employee that occurs during the Contract Term. ASR shall bill Company such amounts on a payroll invoice.

c.    Safety.

i.    Within thirty (30) days from the effective date of this Agreement, Company shall effect ASR's Safety Plan or provide ASR with a copy of Company's own safety plan which is in effect. Company shall be solely responsible for the implementation of and compliance with ASR's Safety Plan or Company's own safety plan.

ii.    Company shall provide and ensure the use of all personal protective equipment, as required by federal, state, or local law, regulation, ordinance, directive, or rule.

iii.    Notwithstanding any other term or condition in this Agreement, Company is the "Employer" with respect to the "Employees," as both terms are defined in 29 U.S.C. §652 (Occupational Safety and Health Act) (the "Act") and Company is solely responsible for necessary employee safety training and safety compliance under that Act and related statutes and regulations.

d.    Drug and Alcohol Policy. Company shall abide by ASR's Drug and Alcohol Policy or other drug and alcohol policy accepted in writing by ASR. ASR will provide drug and alcohol testing of all Employees involved in an occupational injury/disease occurrence.

CLIENT SERVICES AGREEMENT – Revised 7/24/02
Agreement not effective until signed by authorized ASR representative.

2

_____Client Initial _____ASR Initial

BACE 00968

e.   <u>Compliance with Laws.</u> Company shall, at its own expense, comply with all applicable federal, state and local laws and regulations not expressly addressed in this Agreement.

7.   <u>INDEMNITY</u>

a.   <u>ASR.</u> ASR shall reimburse Company for direct out-of-pocket expenses for penalties, damages and/or attorney's fees resulting from ASR's failure to withhold and pay payroll taxes. However, ASR is not liable for Company's lost profits, business goodwill, or any other consequential, special, or incidental damages.

b.   <u>Company.</u> Company shall reimburse ASR for all expenses resulting from claims (non-workers' compensation claims) related to a work site occurrence not covered by insurance as set forth within the scope of this agreement.

8.   <u>FEES</u>

Billing rates as set forth on the Billing Rate Schedule attached hereto include(s), but may not be limited to workers' compensation insurance, employment practices liability insurance, unemployment, social security and Medicare taxes, post-accident drug tests, direct deposit or delivery of paychecks, new hire documents, risk management consultation, claims management services, and employee benefit administration. ASR shall adjust the billing rate during a Contract Term without notice, for an expense included in the billing rate that increases during the Contract Term, such as an increase in unemployment, social security or Medicare taxes.

9.   <u>PAYMENT OF FEES</u>

a.   The billing rate charge is due and payable before paychecks corresponding to such amounts are delivered by ASR to Company.

b.   ASR shall charge one and one-half percent (1½%) per month (pro rated to the date of payment) on past due amounts from invoice date until payment, but in no event shall the amount of such service charge exceed the lawful rate of interest that may be charged on such debt. In addition, if Company fails to pay the amount due within one (1) day after the payroll date, Company shall pay ASR two percent (2%) per day on the payroll tax liability.

10.   <u>REPRESENTATIONS AND WARRANTIES OF COMPANY</u>

Company warrants and represents to ASR that:

a.   All wages and compensation owed by Company to the Employees have been paid by Company and any governmental ordered wage settlements will be paid by Company.

b.   No separate agreement or arrangement exists with respect to any Employee that would obligate ASR to any person or entity, except as set forth in this Agreement.

c.   All of Company's pension and profit sharing and employee welfare benefit plans in existence, if any, are funded and reported current, and are in compliance with applicable law, and this Agreement shall not be deemed a breach under the terms of any of those plans.

d.   Company will be responsible for paying all costs including wages, taxes, insurance premiums and accident claims associated with Company's usage of workers as independent contractors, contract laborers, or others not on the ASR Payroll Check Register and Company will file the proper state and federal notices related to same.

e.   All information provided to ASR by Employees on behalf of Company is complete and accurate.

**BACE 00969**

CLIENT SERVICES AGREEMENT - Revised 7/24/02
Agreement not effective until signed by authorized ASR representative.

_____Client Initial _____ASR Initial

3

11.   LIABILITY INSURANCE AND FIDELITY BOND

a.   ASR shall maintain insurance covering ASR's premises/operations during the Contract Term in the amount of at least $1,000,000 per occurrence for general liability and a fidelity bond of at least $100,000 to cover the handling of Company's payments to ASR. ASR shall, upon request, provide Company with proof of liability and fidelity bond coverage and Company shall be entitled to thirty (30) days written notice prior to cancellation of said insurance.

b.   Company shall maintain a general liability insurance policy covering Company's premises and business operations, products/completed operations and automobile liability insurance covering owned, hired and non-owned automobiles during the Contract Term in the amount of at least $1,000,000 per occurrence. Company shall instruct its insurer to name ASR as an additional insured and provide ASR with a Certificate of Insurance within thirty (30) days of the effective date of this Agreement. Company's insurance shall be primary and shall require no contribution from ASR. Company shall provide ASR with thirty (30) days written notice of cancellation.

12.   BUSINESS AND SALES TAX

It is agreed by ASR and Company that ASR is not providing any taxable services to Company and that ASR shall not be responsible for paying any sales or business tax on Employees or services provided to Company.

13.   CONFIDENTIALITY

During the Contract Term, Company will allow ASR (or its designated representative) to review Company's payroll files or records related to the Employees, and ASR shall allow Company the same privilege. Neither party shall disclose to any third party any of the aforesaid business information, either directly or indirectly, during the Contract Term, or at any time thereafter, except as required during the course and within the limited scope of this Agreement, or as required by law. Unauthorized disclosure, actual or threatened, shall give rise to all of the remedies available under law.

14.   DEFAULT

Upon a default under this Agreement, the non-defaulting party shall, in addition to the rights and remedies set forth in this Agreement, be entitled to recover its attorney's fees, and may pursue all rights and remedies available at law or in equity.

15.   MISCELLANEOUS

a.   This Agreement constitutes the entire agreement between the parties with regard to this subject matter, and no other agreement, statement, promise or practice between the parties relating to the subject matter shall be binding on the parties.

b.   This Agreement shall be binding on the parties, their affiliates and successors, heirs, and assigns.

c.   This Agreement may be changed only as provided in this Agreement or by written agreement signed by both parties.

d.   Failure or delay by either party to demand performance by the other party, or to claim a breach of any provision of this Agreement, will not be construed as waiver of any subsequent breach nor otherwise affect this Agreement, or any part hereof, or prejudice either party in any subsequent action.

e.   Any notice or demand pursuant to this Agreement shall be effected in writing by certified mail (and if by certified mail, shall be deemed communicated forty-eight (48) hours after mailing), personal delivery, electronic mail or facsimile. Notices shall be addressed to the party as the party's address appears in this Agreement, but each party may change its address by written notice in accordance with this subsection.

**BACE 00970**

CLIENT SERVICES AGREEMENT – Revised 7/24/02
Agreement not effective until signed by authorized ASR representative.

_____ Client Initial _____ ASR Initial

4

f.    If any provision of this Agreement, or the application thereof to any person or circumstance, shall be invalid or unenforceable to any extent, such provision shall be deleted or modified to the minimum extent necessary to make its application valid and enforceable, and the remainder of this Agreement, and the application of such provision to other persons or circumstances, shall not be affected thereby, and shall be enforced to the greatest extent permitted by law.

g.    The paragraph headings of this Agreement are for references only, and shall not be considered in interpretation of this Agreement.

16.   **ARBITRATION**

AT EITHER PARTY'S REQUEST, ALL DISPUTES ARISING UNDER OR RELATING TO THIS AGREEMENT SHALL BE SUBMITTED TO THE AMERICAN ARBITRATION ASSOCIATION ("AAA") FOR BINDING ARBITRATION AND PROMPT RESOLUTION PURSUANT TO THE FEDERAL ARBITRATION ACT (TITLE 9 OF THE UNITED STATES CODE) AND THE AAA'S PUBLISHED COMMERCIAL ARBITRATION RULES, IN EFFECT ON THE DATE OF THIS AGREEMENT. BOTH ASR AND COMPANY AGREE TO THIS EXCLUSIVE REMEDY, AND TO BE BOUND BY THE RESULTS OF ARBITRATION. ASR AND COMPANY ARE WAIVING AND RELINQUISHING THEIR RIGHT TO A JURY TRIAL IN ANY AND ALL DISPUTES BETWEEN THEM.

17.   GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, and all obligations of Company created hereunder are performable in Dallas County.

IN WITNESS WHEREOF, this AGREEMENT has been executed this _____ day of _____, 2002.

AMERICAN STAFF RESOURCES CORPORATION          COMPANY:

By: _____ (_____)          By: _____ (_____)
                        (Initials)                                  (Initials)
                                              Title: _____

    2100 McKinney Ave., Suite 1700            Address:
    Dallas, Texas 75201
    (214) 981-8600 Phone                      Phone:
    (214) 981-8601 Fax                        Fax:
                                              E-mail: _____
                                              Federal Tax I.D. #:
                                              SIC Code: _____

**BACE 00971**

CLIENT SERVICES AGREEMENT – Revised 7/24/02
Agreement not effective until signed by authorized ASR representative.

_____Client Initial _____ASR Initial

5

## BILLING RATE SCHEDULE

### FOR:

Billing rate(s) as set out below include(s), but may not be limited to workers' compensation insurance, employment practices liability insurance, unemployment, social security and Medicare taxes, post-accident drug tests, direct deposit or delivery of paychecks, new hire documents, risk management consultation, claims management services, and employee benefit administration. ASR shall adjust the billing rate during a Contract Term without notice, for an expense included in the billing rate that increases during the Contract Term, such as an increase in unemployment, social security or Medicare taxes.

Check Register Report, Labor Cost Distribution Report, time sheets and invoices will be provided automatically with each pay cycle. Additional reports are available upon request and may have additional costs according to ASR price schedule and subject to change.

The billing rate shall be equal to the following percentages of gross wages for the job classifications shown, subject to policy and classification code adjustments:

| Job Classifications | State | Code | Rate |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**BACE 00972**

**CLIENT SERVICES AGREEMENT – Revised 7/24/02**
Agreement not effective until signed by authorized ASR representative.

_____Client Initial _____ASR Initial

6

STATE OF _____ §
                                     §
COUNTY OF _____ §

## AFFIDAVIT

BEFORE ME, the undersigned authority, on this day personally appeared _____ who, after being placed under oath, stated that the following facts are true and correct based upon his/her personal knowledge

"My name is _____, and my permanent residence is ____ _____. I am over the age of eighteen and suffer from no legal disabilities. I am the _____ (title) of _____ ("Client Company"). In such capacity, I have the authority to make this affidavit on behalf of Client Company.

I acknowledge and affirm that (1) all incurred and unreported losses attributable to occupational injuries or disease have been disclosed to American Staff Resources Corporation and (2) neither American Staff Resources Corporation nor its workers' compensation insurance carrier is responsible for any work-related injury prior to the effective date of the Client Services Agreement. Such agreement will be entered into between Client Company and American Staff Resources Corporation subsequent to the date of this Affidavit."

This affidavit is given on this ____ day of _____, 2002.


_____
                                                                                     , AFFIANT

STATE OF _____ §
                                     §
COUNTY OF _____ §

On this ____ day of _____, 2002, before me, the undersigned authority, personally appeared _____, who, after being placed under oath, affirmed that he/she signed the foregoing affidavit, and that the statements made therein are true and correct based upon his/her personal knowledge.

[SEAL]

_____
Notary Public

BACE 00973

7

Client #_____

# ASR SERVICE AGREEMENT SCHEDULES

Client Name _____

Address _____

City _____ State_____ Zip _____County_____

Phone_____ Fax _____ EmailAddress_____

Owner_____ Decision Maker_____

Federal ID# _____ State ID#_____ SIC Code_____

_____

☐Corporation  ☐Sub (s) Corp  ☐Partnership ☐Proprietorship ☐Other_____

Number of Years in Business_____Other States doing Business In_____

# Full Time Employees_____ # Part Time Employees_____

Estimated Annual Payroll_____

D & B Obtained? ☐Yes  ☐No    If Yes, assigned rating_____

Description of Business_____

_____

Company:    ☐ASR     ☐ASR1     ☐ ASR3 (ASO)    ☐ASR4 (FL)    ☐ASR NS

ASR Sales Rep:_____ ASR Client Svc:_____

Contract Eff. Date:_____ Benefits Eff. Date:_____ 401(k) Eff. Date:_____

Renewal Contract Eff. Date: _____ Ancillary Eff. Date:_____

Monopolistic State? ☐Yes ☐No    *ASR Client Association _____    **BACE 00974**

Service Agreement Exhibits, Revised on 9/13/02, 3:37 PM          _____Company Initial _____ASR Initial

# PAYROLL SERVICES SCHEDULE

## FOR_____

## PAYROLL & BILLING PROCEDURES

Pay Frequency: ☐Weekly ☐Bi-Weekly ☐Semi-Monthly ☐Monthly

Payroll Begins: Day_____ Time_____AM

Payroll Ends: Day_____ Time_____AM

Payroll Pays: Day_____

Reporting Day: Day_____ Time_____AM

Reporting Method: ☐Electronic Input (Preferred) ☐Time Sheet ☐Time Clock ☐Phone ☐Fax

Invoice Day: Day_____ Time_____AM

Invoice Method: ☐Fax ☐Overnight Delivery ☐Courier

On Site Supervisor: _____

## PAYROLL PROCEDURES (LATE PAYMENT WILL RESULT IN LATE CHECK DELIVERY)

Method of Payment_____ (48 hours prior to release of checks)

Processing: Day_____ Time_____AM

Payroll Due to Company by: Day_____ Time_____AM

Method of Delivery: ☐Mail ☐Overnight ☐Courier

Direct Deposit Available to Employee? ☐Yes ☐No

Funds Available to Employees: Day_____ Time_____AM

## FEES

Initial Set Up Fee: $_____/Employee ☐Bill w/1st Pay Cycle ☐Attached

Initial New Hire Screening to Include:_____

New Hire Fee Includes the Following as Noted:

New Hire Screening: ☐Drug ☐SS Check ☐Criminal (Federal, State, County) ☐Other_____

A minimum Administrative Fee of $100.00 per pay period will be billed if the sum of the Administrative Fee x Gross Payroll does not equal the sum of the Minimum Administrative Fee x Gross Payroll per pay period.

BACE 00975

# BENEFIT PLANS & ADOPTION SCHEDULE

## FOR _____

### ADOPTION AGREEMENT – FLEXIBLE BENEFITS PLAN

I.    By execution hereof, Company adopts the ASR Flexible Benefits Plan ("the Plan"), a plan offered in conjunction with Section 125 of the IRS Code, as an adopting employer and agrees to the provisions of the Plan and the obligations, responsibilities and duties imposed with respect to the Plan. By execution hereof, ASR consents to the adoption of the Plan by Company.

The Initial Participation Year of the Company shall commence with the Effective Date of the Company's adoption of the Plan (as noted on the following page). Thereafter, subsequent Participation Years shall begin on the first day of the Plan Year. Company agrees that the coverages stated in this Schedule shall be made available to its Employees under the Plan and acknowledges that it is adopting the Plan for the benefit of its Employees (as such is defined in the Flexible Benefits Plan).

Company agrees and acknowledges that ASR has made no representations to the Company regarding the legal or financial impact of the adoption of the Plan by Company. Company shall hold ASR harmless for any claims, taxes or costs incurred by ASR at any time as a result of Company's failure to fulfill its obligations and duties with respect to the Plan.

Company recognizes that it is in its best interest to have the Plan reviewed by legal counsel to ensure that the Plan as adopted hereunder is suitable and appropriate for adoption by Company.

II.    American Staff Resources Corporation (ASR) is the named plan sponsor under a contract of insurance issued by PacifiCare Life Assurance Company, a health care insurance provider. As an ASR Company employee electing coverage under the health insurance program issued by PacifiCare, you are an insured participant under the health insurance program issued by PacifiCare. Like you, ASR and its employees are consumers of health insurance issued by PacifiCare. ASR is not an insurance company or a plan administrator. ASR is on a plan year, which may differ from the contract year. Rates may be changed by PacifiCare as provided by the insurance contract and certificate.

III.    Should Company not accept ASR's group health insurance coverage, Company retains all obligations for the continuation of coverage for any current COBRA participants as well as for any and all eligible Employees at the time of termination of the Agreement. If Company does accept ASR's group health insurance coverage for all former Employees, and shall assume from ASR all responsibility and obligations for the continuation of coverage for any COBRA participants listed in Exhibit F, as well as for any and all eligible Employees at the time of termination of the Agreement for the remainder of their COBRA eligibility period. In the event Company fails to provide said group health insurance or should any COBRA participant elect to remain covered by ASR's health insurance plan, Company shall pay an administrative fee to ASR in the amount of Five Hundred and no/100 ($500.00) Dollars per month, per former Employee (or any beneficiary of a former Employee) who is a COBRA participant under ASR's plans. Nothing in this provision shall be construed or interpreted as precluding or limiting ASR's right to pursue damages in a court of law or equity, which arose as a result of Company's failure to obtain and provide insurance as set forth herein.

| | Plan A 90/70 | Plan B 80/60 |
|---|---|---|
| PPO Network | PHCS | PHCS |
| Ind. Deductible In Network | $250 | $500 |
| Ind. Deductible Out Network | $500* | $1000* |
| Co-Insurance In Network | 90% | 80% |
| Co-Insurance Out Network | 70% | 60% |
| Office Visit Co-Pay | $15 | $15 |
| Individual Out of Pocket Max In Network/Out Network* | $1,000/$3,000* | $2,000/$6,000* |
| Prescription Drugs: | $10 Generic $20 Brand / $35 Formulary | $10 Generic $30 Brand / $50 Formulary |
| Lifetime Maximum | $2,000,000 | $2,000.000 |
| $15,000 Life, AD&D is included for the employee only in the attained rates. | | |

*plus co-payment and deductible
*See schedule of Benefits

BACE 00976

_____Company Initial _____ASR Initial

## BENEFIT PLANS & ADOPTION SCHEDULE, CONTINUED

### FOR _____

**HEALTH INSURANCE BENEFIT PLAN:**

High Option Plan U03 (90/70) ☐
Low Option Plan U17 (80/60) ☐

**Effective Date of Plan:** _____

| Class | Company Contribution | Class Description | Eligibility Criteria |
|-------|---------------------|-------------------|----------------------|
| 1 | | | 1st of Month after ___ days: 30 Hour Per Week Average |
| 2 | | | 1st of Month after ___ days: 30 Hour Per Week Average |
| 3 | | | 1st of Month after ___ days: 30 Hour Per Week Average |

Rehired Employees:  For benefit information regarding the eligibility period for rehired employees, please contact ASR.
Mandatory Company contribution of 50% for major medical (employee only) coverage and 75% participation requirement of entire group. 30 hours designates full-time employees.

**If not electing ASR Medical Plan, will ASR make payroll deductions and remit to Client for current Group Health Plan?**

☐ Yes ☐ No

**Company agrees and acknowledges that in the event of a default by employee of any benefit premium, the Company is responsible for payments to ASR for health insurance benefit plan premiums for said employee. Such amounts will be added to the next invoice to Company's amount due.**

☐ Waiver:  Company has been fully informed of the health insurance benefit plan available to Company and Company does not wish to participate in ASR's health insurance benefit plan. Being fully informed, Company waives participation and understands that by waiving participation in the benefits plan at this time, benefits may not be available except during an open enrollment period, if offered.

COMPANY:                                          ASR:
By:_____          By:_____

Date:_____          Date:_____

BACE 00977

# BENEFIT PLANS & ADOPTION SCHEDULE, CONTINUED

## FOR _____

**ANCILLARY BENEFITS:**

**All Regular Full Time Employees (FTE – 30 Hours):**

☐May be Offered    ☐Vision ☐Dental ☐ Long Term Disability ☐Term Life ☐Mini-Medical

☐May Not be Offered ☐Vision ☐Dental ☐ Long Term Disability ☐Term Life ☐Mini-Medical

| Ancillary Benefit Offered | Company Contribution | Class Description | Eligibility Criteria |
|---|---|---|---|
| | | | 1ˢᵗ of Month after ___ days: 30 Hour Per Week Average |
| | | | 1ˢᵗ of Month after ___ days: 30 Hour Per Week Average |
| | | | 1ˢᵗ of Month after ___ days: 30 Hour Per Week Average |

**Supplemental Products Information Requested:** ☐ Accident  ☐ Cancer  ☐ Short Term Disability
☐ Dependent Care Reimbursement  ☐ Medical Care Reimbursement    ☐ None

**Supplemental Products Representative will contact Company to set appointment for employee orientation and enrollment.

**Company agrees and acknowledges that in the event of a default by employee of any benefit premium, the Company is responsible for payments to ASR for ancillary insurance benefit plan premiums for said employee. Such amounts will be added to the next invoice to Company's amount due.**

☐ Waiver: Company has been fully informed of the benefit plan available to Company and Company does not wish to participate in ASR's benefit plan. Being fully informed, Company waives participation and understands that by waiving participation in the benefits plan at this time, benefits may not be available except during an open enrollment period, if offered.

Company Initial: _____         Date: _____

BACE 00978

## BENEFIT PLANS & ADOPTION SCHEDULE, CONTINUED

### FOR _____

**401(k) Retirement Plan:**

Does Company currently participate in 401(k)?                    ☐ Yes ☐ No

If yes will ASR make payroll deductions?                         ☐ Yes ☐ No

Or, will Company rollover funds to ASR plan?                     ☐ Yes ☐ No

Does Company want to offer ASR 401(k) plan?                      ☐ Yes ☐ No
Target Date _____

**If enrolling in ASR's 401(k) Retirement Plan, Company must complete appropriate designation forms.**

## CURRENT COBRA PARTICIPANTS

| Employee Name | Effective Date | Termination Date |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**BACE 00979**

_____Company Initial _____ASR Initial

# COMPANY WARRANTIES SCHEDULE

## FOR_____

**Collective Bargaining Agreements** affecting Company Work Location or ASR Employees...                                     ☐Yes    ☐No

**Pending or Threatened Government Investigations or Lawsuits** that may relate in any way to Employees, e.g., any working conditions of the Employees, any products produced by the Employees, etc...                                     ☐Yes    ☐No

**Hazardous Substances** used in Company's operations or otherwise present in or around the Company Work Location...                                     ☐Yes    ☐No

**Workers' Compensation Claims (See Attached Details):** The following events have occurred which may lead to workers' compensation claims during the time period between the effective date of the Agreement and the date of execution...                                     ☐Yes    ☐No

**Workers' Compensation Disputes:** Any unpaid money or disputes with former Workers' Compensation carrier.                                     ATTACHED

If yes, give details:_____

_____

_____

_____

_____

_____

_____

_____

_____

**BACE 00980**

## COMPANY BANKING SCHEDULE

FOR: _____

Banking Institution _____

Branch Location _____

Address _____ City _____ State _____ Zip _____

Banking Officer Name _____

Phone (_____) _____ Fax (_____) _____

Account # _____ Account Type _____

ABA Routing # _____

ASR Bank to be Used _____

Direct Debit  ☐Yes ☐No   Wire Transfer  ☐Yes ☐No   Other  ☐Yes ☐No
Exhibit Attached

Certified Check _____

Authorized Client Contact _____

**BACE 00981**

Client # _____

# ASR
# CLIENT PROFILE

Client Name _____

Address _____

City _____ State _____ Zip _____ County _____

Phone _____ Fax _____ EmailAddress _____

Owner _____ Decision Maker _____

Federal ID# _____ State ID# _____ SIC Code _____

| **CLIENT CONTACTS** | **ASR CONTACTS** |
|---|---|
| Payroll: | |
| Backup Payroll: | |
| Client Services: | |
| Loss Prevention: | |

## ADDITIONAL LOCATIONS

Address _____ City _____ State _____ Zip _____

Phone ( ____ ) _____ Fax ( ___ ) _____ Email _____

Contact/Authorization _____

Banking Info (If Applicable) _____

Address _____ City _____ State _____ Zip _____

Phone ( ____ ) _____ Fax ( ___ ) _____ Email _____

Contact/Authorization _____

Banking Info (If Applicable) _____

Address _____ City _____ State _____ Zip _____

Phone ( ____ ) _____ Fax ( ___ ) _____ Email _____

Contact/Authorization _____

Banking Info (If Applicable) _____

BACE 00982

# PAYROLL & FINANCIAL INFORMATION

|  | Start Date | End Date | Pay Date |
|---|---|---|---|
| Last Client Pay Cycle |  |  |  |
| 1st ASR Pay Cycle |  |  |  |

Certified Payroll? ☐Yes ☐No

Time Keeping? ☐Yes ☐No

**PAYROLL DELIVERY ADDRESS** (if different from address listed on page one)

Company Name: _____

Attn: _____ Title: _____

Address: _____

City: _____ State: _____ Zip: _____

Phone: (        ) _____ Fax: (        ) _____

Check Delivery to Corporate Office? ☐Yes ☐No

Check Delivery to multiple locations? ☐Yes ☐No   (If yes, list in special instructions.)

Special Instructions: _____

_____

_____

## INVOICING

Invoice delivery to Corporate Office? ☐Yes ☐No

Invoice delivery to check delivery locations? ☐Yes ☐No

**PAYROLL DEDUCTIONS (Advances, Garnishments, Child Support, Etc.)**
*Attach documents with reason for deduction, current balance and deduction amounts.*
Give description of all deductions with their code: _____

_____

GL Interface? ☐Yes ☐No
(Flat fee of $500 – additional cost may be necessary for fair compensation.)

## Standard Reports (Delivered with Payroll)

☐ Check Register
☐ Labor Cost Distribution
☐ Timesheets
☐ Invoices

## Standard Reports (Free Upon Request)

☐Labor Cost by Department by Location
☐Management Report
☐Vacation/Sick Accrual
☐Overtime Reports

☐Certified Payroll Reports
☐Loan Balance Report
☐Earnings History
☐Termination Reports

BACE 00983

**Additional Reports***

- ☐ Check Authorization Reports
- ☐ Earnings History
- ☐ Hours Report by Employee/Pay Period
- ☐ Hours Report by Location
- ☐ New Hires by Date
- ☐ Deductions Register
- ☐ List Rate Changes Within a Year

- ☐ New Hire Reports
- ☐ List Vacation Hours and Dollars Taken for Year
- ☐ Earnings History by Pay Type
- ☐ By Client/Location/General Ledger with Y-T-D
- ☐ By Client/Location/General Ledger Y-T-D Only
- ☐ By Client/Employee – Balance Fwd – Cut Off

*Note:  Additional reports may require programming and additional costs.*

**Additional Reports Requested*:**

| Report Name | Weekly | Bi-Weekly | Semi-Weekly | Monthly | Quarterly |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## DRUG SCREENING/BACKGROUND CHECKS

1. Is Client currently screening employees?  ☐Yes  ☐No

2. Does Client want to continue to use current provider?  ☐Yes  ☐No

   *if yes, please provide:*    Name of Provider _____
   Contact Name _____ Phone _____
   Address _____

3. DMV reporting required?  ☐Yes  ☐No

   Agreement: _____

4. DOT Drug Screening required?  ☐Yes  ☐No

5. Is the client interested in ASR's Sterling testing program?  ☐Yes  ☐No
   *If yes, please complete End User Form*

## CONTRACT COMPLIANCE

_____  ASR named as additional insured on Company's GL insurance policy; obtain certificate    of insurance.

_____  Certificate of insurance for EPLI; if applicable

## HUMAN RESOURCES

ASR provides a standard Employee Handbook to all Clients. The information requested below, is needed for your Company in order to customize your Employee Handbook. Please confirm this information at your earliest convenience to enable ASR to furnish your new Employee Handbook.

1. How is your workweek defined? _____

2. Does your company pay for Bereavement Leave? Yes or No

   If yes, how many days? _____

   What is the company policy?_____

3. Does your company pay for Jury Duty? Yes or No
   If yes, how many days? _____

   What is the company policy? _____

4. How do your vacation days accrue? (i.e. daily, weekly, monthly, anniversary date)

| | | |
|---|---|---|
| 6 months | Week(s) | a. Can vacation days be carried over from year to year? Yes or No |
| 1 year | Week(s) | b. Do you pay for unused vacation if not taken by end of year? Yes or No |
| 5 years | Week(s) | c. If a person resigns in good standing do you pay for unused vacation days? Yes or No |
| 10 years | Week(s) | |
| 20 years | Week(s) | |

5. Which of the following holidays are observed and paid by your company? (Please Circle)
   New Year's Day → Good Friday → Memorial Day → Independence Day→ Labor Day
   Thanksgiving Day→ Friday after Thanksgiving → Christmas Eve→ Christmas Day

6. If an employee works a holiday, how are they paid? Straight Time or Premium Time

7. Do you give your employees any sick days? Yes or No
   a. If yes, how many?_____
   b. How are sick days accrued? _____
   c. Can sick days be carried over to next year? Yes or No

7. Do you give personal days? Yes or No

   a. If yes, how many days?_____

   b. How are personal days accrued?_____

   c. Can personal days be carried over to next year? Yes or No

   d. If a person resigns in good standing do you pay for unused personal days? Yes or No

8. Are company vehicles provided to employees? Yes or No

9. Do employees drive their personal vehicles to perform company business? Yes or No

10. Are you a Government Contractor or Sub-Contractor? Yes or No

11. Does your company have surveillance (camera) equipment in the workplace? Yes or No

12. When your handbook is complete, how many copies would you like for your company?_____

BACE 00985

## HUMAN RESOURCES CONTINUED

13. Will Client use ASR forms? ☐Yes ☐No
    *If no, please explain*_____
    _____

14. **Have any charges/complaints been filed against Client by a regulatory agency?** ☐Yes ☐No
    *if yes, please give current status*_____
    _____

15. Who conducts interview for job openings?_____

16. Who is responsible for enrollment of new hires?_____

17. **Have Departments of Labor/Wage & Hour ever audited Client?** ☐Yes ☐No

    *If audited, please explain with dates, results and current status*_____
    _____
    _____

18. Who responds to State Unemployment Claims?_____

19. How many Unemployment hearings has Client had to attend in the past year?_____

20. What is Client's employee turnover ratio?_____

**Proof of identity and proof of right to work in the US must be provided and kept by ASR for good practice.**

# SERVICE FEE SCHEDULE

FOR: _____

| | | | |
|---|---|---|---|
| COMPOSITE BILLING: | ☐YES | | ☐NO |
| CUTOFF AFTER THRESHOLDS? | ☐YES | | ☐NO |

ADMINISTRATION FEE: _____

EXPENSE REIMBURSEMENT FEE: _____

FUTA: _____

FICA: _____

SUTA:

| State _____ | State _____ | State _____ | State _____ |
| Rate _____ | Rate _____ | Rate _____ | Rate _____ |

| State _____ | State _____ | State _____ | State _____ |
| Rate _____ | Rate _____ | Rate _____ | Rate _____ |

WORKERS' COMPENSATION:

| Job Classification | W.C. Code | State | W.C. Rate | Total Billing Rate |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

BACE 00987



# AUTOMATIC PAYROLL ACCOUNT DEDUCTION FORM

Please consider this to be American Staff Resources Corp' authorization to debit

_____ 's (Company) account for all costs of payroll and other services. This will remain in effect until notification in writing to cancel. If errors occur, I authorize correcting entries to the account:

**Please attach a voided check to ensure the proper information is used.**

Company Federal ID Number: _____

Bank Name: _____

Account Name: _____
(As it appears on statement)

Routing Number: _____

Account Number: _____

Restrict to specific location? _____

Signed by Authorized Signer of Company _____
Signature

_____
Printed Name & Title

OFFICE USE ONLY

_____
Client No.

_____                                    Location Name and Number

_____                              By: _____
Date Processed

2100 McKinney Avenue * Suite 1700 * Dallas * TX * 75201
Phone: 214-981-8600 * 800-889-6975 * Fax: 214-981-8601          **BACE 00988**

DISCLOSURE SCHEDULE
To
Stock Purchase Agreement between Shareholders of ASR Acquisition, Inc. and
BACE International Corporation entered into as of August 31, 2002

### Section 4.1. *Corporate Existence and Power*

| Subsidiary of ASR | % of Equity Interest Owned by ASR | Jurisdiction of Incorporation | States in which it is Qualified to do Business |
|---|---|---|---|
| American Staff Resources Corp. | 100% | Texas | TX, CA, CT, MD, SC, LA, NV, AR, NM |
| American Staff Resources Corp. I | 100% | Texas | TX, LA, AR, NM, CA, KY, MD |
| American Staff Resources Corporation III | 100% | Texas | TX |
| American Staff Resources Corporation IV | 100% | Florida | FL, CA |
| American Staff Resources Corporation V | 100% | Texas | TX |
| American Staff Resources Corporation VI | 100% | Texas | TX |
| American Staff Resources Corporation NS | 100% | Texas | TX |

### Section 4.5. *Capitalization*

With the consent of each person who had been granted options under the 2000 Stock Option Plan for ASR Acquisition, Inc. ("Plan"), the Board of Directors terminated the Plan effective as of August 31, 2002. Effective as of August 31, 2002, each optionee waived his or her right to exercise the options granted under the Plan.

Effective as of August 31, 2002, each warrant holder waived his or her right to exercise warrants issued under the ASR Acquisition, Inc. Stock Purchase Warrant and Repurchase Agreement dated as of December 20, 1999.

Pursuant to Section 9 of the Shareholders Agreement dated December 20, 1999, shareholders terminated the Shareholders Agreement effective as of August 31, 2002.

1

BACE 00989

**Section 4.8.** *Absence of Certain Changes or Events*

July 17, 2002, BACE provided workers' compensation insurance to the Subsidiaries' employees through BACE's subsidiary, Staff America, Inc.

During August 2002, the Subsidiaries substantially increased the number of client companies and corresponding gross payroll, gross revenue, and related expenses.

Small state tax issues are unresolved in following states:

Connecticut, Pennsylvania, North Carolina, and Nevada

**Section 4.9.** *No Undisclosed Material Liabilities*

No exceptions

**Section 4.10.** *Litigation*

**Lawsuits**

*Irvin R. Buchannan, Jr. vs. Texas Workforce Commission, American Staff Resources and Texas Burgess Marketing, Inc.*

*Jesus R. Arenas vs. Oakwood Property Company, and American Staff Resources Corporation*, Cause No. 2001-3875, County Court at Law No. Three, El Paso County, Texas

*Mayte Lopez, Ind. & as Rep. of the Estate of Sergio Ivan Santibanez Serrano, a/k/a Bennie Valdez and as N/F of Sergio Ivan Santibanez, Jr. and Maria Serrano vs. Mid Cities Erectors, L.L.C., Hill & Wilkerson, Ltd., Wells/McCoy Steel Services, Inc. and American Staff Resources Corporation*, Cause No. 153-192963-02, 153rd Judicial District Court of Tarrant County, Texas

*Robert D. Ledford, Jr. vs. Southern Hospice, Inc. d/b/a ProSource Medical, Inc. and American Staff Resources Corporation*, Case No. CIV-02-888-C, United States District Court for the Western District of Oklahoma, Federal Court

**Non-Judicial Claim**

Dennon Barron - Chartre Consulting

**Possible Claims**

2

*Patsy Clubb vs. Wells Asset Management and Jason Jeter*, Cause No. 01-5508-A, 25th Judicial District Court of Nueces County, Texas

*Champion Construction, L.L.C. vs. ASR*

Jose Hernandez; Texas Tree and Landscape Company

D. Patrick Joiner; Autoflex Leasing-Dallas, Inc.

*Rhodes vs. American General and U.S. Life*

Dallas General Life Insurance Company

**Section 4.11** *Taxes*

American Staff Resources Corporation, sponsor of the ASR Employees Savings Plan, has not filed the audit for IRS Form 5500 for 2000. The accompanying Form 5500 for this period was timely filed.

The Company benefits from one client company's employer tax credit.

**Section 4.12.** *ERISA*

No exceptions.

**Section 4.13.** *Labor Matters*

See Section 4.10. above.

**Section 4.16.** *Environmental*

No exceptions.

**Section 4.18.** *Subsidiaries*

No exceptions.

**Section 4.21.** *Customers*

Aztec Services, Inc. gave a Subsidiary notice of termination of its PEO Contract effective December 31, 2002.

**Section 4.22.** *Contracts*

No exceptions.

3

BACE 00991

**Section 4.24.** *Intellectual Property*

No exceptions.

**Section 4.25.** *Related Party Transactions*

No exceptions.

**Section 4.26.** *Assets*

No exceptions.

**BACE 00992**