1          IN THE DISTRICT COURT OF
           TARRANT COUNTY, TEXAS
2
           CASE NO. 67-202574-03
3

4

5

   PRAIRIE CAPITAL MEZZANINE
6  FUND, L.P., ET AL.,
7          Plaintiffs,
8  -vs-
9  BACE INTERNATIONAL
   CORPORATION, ET AL.,
10
           Defendants.
11  _____

12

13

14     VIDEOTAPE DEPOSITION OF DANNY L. PIXLER

15

16        Wednesday, February 25, 2004
            1:40 p.m - 4:05 p.m.
17             THE CURA GROUP
           5101 Northwest 21st Avenue
18          Ft. Lauderdale, Florida

19

20

21

   Reported By:
22  Thomas R. Neumann
    Notary Public, State of Florida
23  Network Reporting Corporation
    Phone:  888.358.8188
24          305.358.8188
25                  -   -   -

EXHIBIT
I

Page 2

1   APPEARANCES:
2   On behalf of the Plaintiff:
3       DOUGLAS M. POLAND, ESQUIRE
        BILL WARREN, ESQUIRE
4       KIRKLAND & ELLIS LLP
        200 East Randolph Drive
5       Chicago, Illinois 60601
6
7   On behalf of the Defendants:
8       DOUGLAS J. BUNCHER, ESQUIRE
        NELIGAN, TARPLEY, ANDREWS & FOLEY, LLP
9       1700 Pacific Avenue, Suite 2600
        Dallas, Texas 75201
10
11      JEFFREY S. LEVINGER, ESQUIRE
        CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, LLP
12      200 Crescent Court, Suite 1500
        Dallas, Texas 75201
13
    ALSO PRESENT: PETER CAMPITIELLO
14

15
16          I N D E X
17      DIRECT  CROSS  REDIRECT  RECROSS
    WITNESS
18  DANNY L. PIXLER
      By Mr. Poland    3        104
19  By Mr. Buncher         100
20
21
22
23
24
25

Page 3

1               P R O C E E D I N G S
2                       - - -
3       Deposition taken before Thomas R. Neumann,
4   Registered Reporter and Notary Public in and for the
5   State of Florida at Large, in the above cause.
6                   - - -
7   Thereupon,
8               (DANNY L. PIXLER)
9   Having been first duly sworn or affirmed, was
10  examined and testified as follows:
11          DIRECT EXAMINATION
12  BY MR. POLAND:
13      Q   Good afternoon, Mr. Pixler. Have you been
14  deposed before?
15      A   Yes.
16      Q   Then you probably know most of the rules
17  of the road. One thing I'm going to ask you is, if
18  you can, please keep your voice up so that the
19  reporter can hear it. You do need to answer
20  audibly.
21          Also I think that we have a stipulation
22  to get on the record about signatures in the
23  deposition.
24          MR. WARREN: It's my understanding that --
25      and this is Bill Warren that we are taking the

Page 4

1   deposition of Mr. Steen and Mr. Pixler within
2   the Texas rules of civil procedure, 20 days to
3   read and sign. Any unsigned copies of the
4   depositions can be used at hearings prior to
5   the time that there is a signature.
6           MR. BUNCHER: That's fine.
7   BY MR. POLAND:
8       Q   Mr. Pixler, you understand that we are
9   here in a lawsuit that's Prairie Capital versus BACE
10  International?
11      A   Yes.
12      Q   And you are familiar with the lawsuit?
13      A   Yes.
14      Q   And the complaint that's been filed in the
15  case?
16      A   Yes.
17      Q   You filed an affidavit in the case; is
18  that correct?
19      A   Yes.
20      Q   A copy of that affidavit has been marked
21  as Exhibit 1. I'm going to hand it to you now.
22          I'm going to ask you, if you would, to
23  turn to -- Exhibit 1 is actually the special
24  appearance and it has both your affidavit and Rick
25  Steen's affidavit.

Page 5

1       A   Correct.
2       Q   If you could flip to your affidavit, which
3   is Exhibit A?
4       A   Okay.
5       Q   That's a four-page affidavit?
6       A   Yes.
7       Q   That's your signature on the last page of
8   it?
9       A   Yes, it is.
10      Q   Are all of the statements in the affidavit
11  true and correct as of today's date, Mr. Pixler.
12          (Pause.)
13      A   Yes, it is.
14      Q   You could set that document to the side.
15          Mr. Pixler, you have -- we heard
16  testimony this morning from Mr. Steen. I'm going
17  to try my very best not to repeat those same
18  questions that were asked of Mr. Steen.
19          I wanted to ask you about your position,
20  though, with some of the various entities that are
21  involved in the case?
22      A   Fine.
23      Q   First of all, Certified Services, Inc. you
24  are its president; is that correct?
25      A   I'm the president, CEO.

2 (Pages 2 to 5)

Page 6

1    Q   Are you also a director?
2    A   Yes.
3    Q   How long have you been the president of
4   Certified Services?
5    A   I believe June of 2002.
6    Q   Have you also been the CEO and a director
7   since that same time?
8    A   Yes.
9    Q   Are there any specific duties or
10  responsibilities that you have in each of those
11  positions as president and CEO and director?
12    A   No. It covers a pretty broad spectrum so
13  I wouldn't say there were any specific duties.
14    Q   Could you generally describe for me what
15  you do in a broad sense?
16    A   Manage banking, manage finance, manage
17  insurance, manage most of the transactions that's
18  moving through the company and manage the company
19  under five senior managers.
20    Q   And who are the five senior managers of
21  Certified Service?
22    A   Tom Bean, Rick Steen, Tom Cunningham, and
23  Ivan Dobrin.
24    Q   We had some testimony this morning about
25  several of those gentlemen. I don't believe I have

Page 7

1   heard Ivan Dobrin's name. Can you tell me who Mr.
2   Dobrin is?
3    A   Ivan Dobrin is the managing director of
4   sales and marketing.
5    Q   That's for Certified Services?
6    A   No. The only Certified Services reporting
7   person is Tom Bean who is the chief operating
8   officer. All of the other senior persons report at
9   the operating sub levels.
10    Q   That would be The Cura entities?
11    A   The Cura Group.
12    Q   Does Certified Services have any offices
13  in Texas?
14    A   No.
15    Q   I'm not going to limit it just to business
16  offices. Do they have any offices in general?
17    A   No. Well, any offices generally where,
18  anywhere?
19    Q   In the State of Texas.
20    A   No.
21    Q   I have marked as Exhibit 11 a copy of a
22  form 8K for Certified Services.
23        I ask you if you have seen this document
24  before?
25    A   Yes.

Page 8

1    Q   Can you describe this document to me?
2    A   It's the summary of results for the third
3   quarter of 2002.
4    Q   And this is a document that Certified
5   Services filed with the Securities and Exchange
6   Commission?
7    A   That is correct.
8    Q   If you turn to page 3 of Exhibit 11?
9        MR. BUNCHER: I think for the record it's
10  2003.
11        THE WITNESS: Yes, 2003.
12  BY MR. POLAND:
13    Q   I was just going to get to the date. On
14  page three you see there is a date that says
15  November 19, 2003. This indicates that it was
16  signed by you?
17    A   Yes.
18    Q   If you turn to the next page, Mr. Pixler,
19  it has an Exhibit 99.1, do you see that?
20    A   Yes.
21    Q   I would like to direct your attention to
22  the fourth full paragraph.
23    A   Uh-huh.
24    Q   Of that page, Exhibit 99.1.
25    A   Yes.

Page 9

1    Q   And the very last sentence of that -- of
2   that paragraph that starts out, the company
3   distributes?
4    A   Yes.
5    Q   Could you please read that sentence?
6    A   Sure. "The company distributes
7   approximately $1 billion of payroll and related
8   benefits on behalf of 1,900 clients to over 50,000
9   work site employees from its five service centers
10  located in Florida, New Jersey and Texas."
11    Q   What is the service center that's located
12  in Texas?
13    A   It's a sales office.
14    Q   What sales office is that?
15    A   American Staff Resources.
16    Q   Has Certified ever applied for or obtain a
17  license to do business in Texas?
18    A   It's not required to.
19    Q   Has it done so?
20    A   It's not required to.
21    Q   I understand that it's not required to but
22  I'm just asking whether they have as a matter of
23  fact?
24    A   No. It's not required to.
25    Q   That's all I wanted to know. You can set

3 (Pages 6 to 9)

Page 10

1  that document aside.
2      A   Okay.
3      Q   I wanted to ask you about The Cura Group
4  as opposed to Cura Group II or Cura Group III.  I
5  understand there is an entity that's called The Cura
6  Group?
7      A   Yes.
8      Q   Is that a -- are you an officer of that
9  entity?
10     A   Yes.
11     Q   Are you president and CEO of that?
12     A   I believe just the president.
13     Q   President, okay.  Does that entity have
14  any directors?
15     A   I don't believe so.  I might have to refer
16  to counsel, but I don't believe we do.
17     Q   How long has The Cura Group been in
18  existence?
19     A   I believe 1997, but I would refer that to
20  counsel for the specifics.
21     Q   How long have you been an officer or
22  president of The Cura Group?
23     A   Since June of 2002.
24     Q   Were you affiliated with The Cura Group at
25  all before June of 2002?

Page 11

1      A   Yes.
2      Q   In what capacity?
3      A   I was instrumental in the formation of the
4  holding company that set up Certified Services.
5      Q   And within The Cura Group there is a
6  holding company that set up Certified Services?
7      A   No.  Cura Group was the second acquisition
8  that Certified made in June of 2002.
9      Q   So Cura was already in existence at the
10  time on behalf or along with Certified Services
11  acquired it?
12     A   Yes.
13     Q   I understand it.
14         Were you originally with Certified
15  Services up on the east coast in New Jersey?
16     A   Certified Services was a company that was
17  put together.  There was a shell acquired in
18  October, I believe it was October of 2001, and I was
19  instrumental in the formation of it and just worked
20  as a consultant until June of 2002.
21     Q   That's when you became the president and
22  CEO of the various entities?
23     A   Yes.
24     Q   Is The Cura Group a wholly owned
25  subsidiary of Certified?

Page 12

1      A   Yes.
2      Q   Does The Cura Group itself have any
3  offices in Texas?
4      A   No.
5      Q   Has The Cura Group ever applied for or
6  obtained a license to do business in Texas?
7      A   No.
8      Q   Does it have any employees in Texas?
9      A   No.
10     Q   Pay taxes in Texas?
11     A   No.
12     Q   Any bank accounts in Texas?
13     A   No.
14     Q   Own any property in Texas?
15     A   No.
16     Q   Moving on to The Cura Group II.  You are
17  president of that entity as well?
18     A   I believe so.
19     Q   Do you have any other positions with Cura
20  Group II?
21     A   I don't believe there are any other
22  positions.
23     Q   Do you have any duties specific to The
24  Cura Group II that you don't hold with respects to
25  the other entities?

Page 13

1      A   No.
2      Q   Again, it's overall management of the
3  business?
4      A   Correct.
5      Q   The Cura Group III, you were the president
6  of The Cura Group III?
7      A   I believe so.
8      Q   When did that entity come into existence?
9      A   I'm not quite sure.
10     Q   Was The Cura Group III a wholly own subsid
11  of Certified Services?
12     A   I believe so.
13     Q   And it's no longer in existence; is that
14  correct?
15     A   That's correct.
16     Q   It merged into The Cura Group II in
17  approximately June of last year?
18     A   Yes.
19     Q   Last entity I wanted to ask about is
20  American HR Holdings.  You are president of American
21  HR Holdings?
22     A   I believe that to be correct.
23     Q   Any other positions that you have within
24  American HR Holdings?
25     A   No.

4 (Pages 10 to 13)

Page 14

1    Q    That is an entity that has only been in
2  existence since June 30th of last year?
3    A    American HR Holdings?
4    Q    Correct.
5    A    That is correct.
6    Q    Mr. Pixler, I wanted to ask you about your
7  involvement or transactions with BACE International
8  Corporation and William Baumgardner.
9        When was the first time you met William
10  Baumgardner or anyone from BACE?
11    A    Sometime in October of -- October of 2002.
12    Q    And how did you come into contact with
13  Mr. Baumgardner?
14    A    Through our -- through an attorney here in
15  Florida by the name of Mike Miller, and our sales
16  manager Ivan Dobrin.
17    Q    What was the nature of the contact you had
18  with Mr. Baumgardner for the first time?
19    A    The first contact wasn't with
20  Mr. Baumgardner, it was through Michael Miller and
21  Ivan coming to me saying that Mr. Baumgardner had a
22  PEO business that was having some difficulties in
23  several aspects and in particular in insurance,
24  workers' comp insurance.
25    Q    What kind of difficulties was BACE

Page 15

1  having -- I'm sorry. Let me back up. Was it BACE
2  that was having the difficulties?
3    A    I'm not sure how it was recognized at
4  Bace's level. I couldn't tell you what their
5  relationship was with the insurance carriers.
6    Q    It was one of the entities that
7  Mr. Baumgardner was principal in?
8    A    I would assume so.
9    Q    What kind of difficulties were they having
10  with the insurance carriers?
11    A    They were being cancelled.
12    Q    Why is that a problem in the PEO business?
13    A    Because as PEO, a license PEO, we are
14  co-employers, which require us to provide, in most
15  cases, workers' compensation benefits along with the
16  other services we provide, normal HR services,
17  payroll tax payments, et cetera, et cetera.
18    Q    What help was it -- strike that question.
19        Was there some kind of assistance that
20  it was believed you or The Cura Group or Certified
21  could bring to Mr. Baumgardner's organizations?
22    A    I believe that was Mr. Miller's initial
23  impression. He had known Bill Baumgardner for quite
24  some time. I believe initially, because his
25  comments were he wanted to know if we would acquire

Page 16

1  the company, merge the company or whatever form be
2  helpful to him and after cursory discussions we said
3  no, we weren't interested.
4    Q    Was there -- did there come a time when
5  you did become interested in helping out
6  Mr. Baumgardner?
7    A    Well, we became interested from a
8  different level. Then Bill Baumgardner contacted a
9  small investment bank that we worked with, Brentwood
10  Capital, and asked for collateral and other sources
11  of support to keep CNA policy in place, and that he
12  was asking for temporary, short-term relief of 30
13  days.
14    Q    Excuse me. What was the 30 day relief
15  that he was looking for?
16    A    He just needed support, if he could find
17  someone who would provide collateral, financial
18  support, that CNA would stay on the policy for an
19  extension of 30 days.
20    Q    What were the entities that
21  Mr. Baumgardner needed to have the support for?
22    A    I can tell you what I believe to be
23  correct, and I'm not going to say that is one
24  hundred percent correct. I believe it was Staff
25  America, Meridian Management, Investment Management,

Page 17

1  Inc. something along that term. Core, CORE, and ASR
2  which was referred to American Staff Resources, Inc.
3    Q    Are all of those --
4    A    No, I take that back. Initially ASR was
5  never mentioned.
6    Q    When you say initially, you mean October
7  2002 time frame?
8    A    For a very, very long time. Not just
9  initially, for a very long time.
10    Q    When was ASR first mentioned?
11    A    Probably sometime starting in maybe
12  February, March, April of 2003.
13    Q    I'm going to hand you a document that's
14  been marked as Exhibit 16. This is a stock purchase
15  agreement.
16        Mr. Pixler, I have handed you a copy of
17  what has previously been marked as Exhibit 16. Is
18  this a document that you have seen before?
19    A    Yes, absolutely.
20    Q    If you flip to the last page, is that your
21  signature that appears on that document?
22    A    Yes, it is.
23    Q    And can you identify the document for the
24  record?
25    A    I believe this was our midnight oil

5 (Pages 14 to 17)

Page 18

1  document of October 31 which started at about 9
2  o'clock in the morning, and this was the second
3  extension of collateral support that had been given
4  to Mr. Baumgardner to get a second extension with
5  CNA, at which time we had been talking cursory over
6  the telephone, that if he went past the second
7  extension then we would expect him to fulfill his
8  obligation of putting together value on the company
9  and selling it to our company.  Or, replace and take
10  us out of those positions and go about and do what
11  he said he would do.
12        He was not able to do that.  So starting
13  at about 9 or 9:30 the morning of the 31st, we
14  were trying to complete a document, because he was
15  asking if I was going to keep insurance certs on
16  the street, and I said, absolutely not.  I said,
17  at midnight tonight our transaction is complete
18  and I will put you into default and I'll do
19  whatever I have to do to protect our company.
20     Q   If you turn to the -- this is going to be
21  hard because I'm working with a different version
22  than the one you are looking at.
23        MR. BUNCHER:  Here you go.  Just use that.
24        MR. POLAND:  Thank you.  I appreciate
25     that.

Page 19

1  BY MR. POLAND:
2     Q   If you look at the first page, it states
3  that the stock purchase agreement is by and between
4  BACE International, Inc. and The Cura Group III,
5  correct?
6     A   Yes.
7     Q   And if you look a little further down --
8  and the seller is BACE Internatinal, Inc. that's the
9  defined term in the first paragraph?
10    A   Yes.
11    Q   If you look a little further down in the
12  whereas clauses, third from the bottom says,
13  "Whereas seller is a licensed professional employer
14  organization, PEO in the state of North Carolina
15  operating as Staff America, Inc." Do you see that?
16    A   Yes.
17    Q   What was your understanding at the time,
18  this is as of October 31, 2002, what was your
19  understanding of the operations that were included
20  within Staff America, Inc.?
21    A   First of all, Bill Baumgardner had never
22  informed any of us that Staff America was not the
23  owner or parent of the subs, whichever subs he had,
24  or had not represented up to that time.  We at no
25  time understood BACE International was the holder of

Page 20

1  the PEOs and did not know that for quite sometime.
2        If you also look back on -- because I
3  know this document pretty well, he even asked us
4  to sign on one of the documents on page four
5  referring again to the shares of Staff America
6  instead of the seller, because Bill was then asked
7  to give us stock and there were stock certificates
8  that didn't even match.
9        So this is a very complicated document
10  that would require a lot of backup support.
11        So our understanding initially was that
12  Staff America was the owner of the PEOs.
13    Q   Which PEOs did you understand Staff
14  America to own at that time?
15    A   We understood initially it was Core,
16  Meridian and ABP, which has, I believe, like ABP, 1,
17  2, 3, 4 or something.
18    Q   Different subsidiaries?
19    A   It has different subsidiaries, yes, sir.
20    Q   I'm handing you another document that has
21  previously been marked as Exhibit 3.
22    A   Yes.
23    Q   Have you seen this document before,
24  Mr. Pixler.
25    A   Yes.

Page 21

1     Q   Can you identify it for the record,
2  please?
3     A   I believe -- well, this is the management
4  agreement which also I believe I probably referred
5  to at the time, that is, some co-management
6  agreements.
7     Q   If you turn to the page that is marked on
8  the bottom right hand corner Cura 1603?
9     A   Yes.
10    Q   Is that your signature that appears on
11  that page?
12    A   Yes, it is.
13    Q   By the way, I don't know if you heard this
14  term before, but Bates label, you heard that?
15    A   Yes, absolutely.
16    Q   Unfortunately.  The management agreement
17  in the first paragraph states that it's between
18  Staff America and Cura Group III, correct?
19    A   Yes.
20    Q   And would your comments as to the entities
21  that were owned by Staff America, was your
22  understanding the same with respect to the
23  management agreement as it was to the purchase
24  agreement that you just testified to a minute ago?
25    A   Yes, it was.  Very simply put we believed

Page 22

1 that we were buying the PEOs all of the PEOs that
2 Bill Baumgardner was in control of which we believed
3 at the time to be under Staff America.
4     Q   If you look in the -- under the background
5 section of the first page of this document, there is
6 a first recital that says, "Whereas the PEO provides
7 professional employer organization services
8 including staffing, payroll and insurance services
9 to customers within the state set forth on Exhibit A
10 here to the customer base."  Do you see that?
11    A   Yes.
12    Q   I'm going to ask you to turn to the last
13 page of Exhibit 3?
14    A   Yes.
15    Q   Where it says Exhibit A?
16    A   Yes.
17    Q   Do you see that there is nothing on that
18 page?
19    A   There never was.  I would like to expound
20 on that.
21    Q   I'm going to ask you to in just a second.
22    A   Okay.
23    Q   There are initials at the bottom of that
24 page, correct?
25    A   Absolutely.

Page 23

1     Q   And one of those sets of initials is
2 yours?
3     A   Absolutely.
4     Q   Can you identify the other set of
5 initials?
6     A   It's William Baumgardner.
7     Q   Now I'm going to ask you to explain why
8 Exhibit A is blank?
9     A   Because at about 4 o'clock in the morning
10 when I was keeping a staff of either 3, 4 or 5
11 attorneys on call in New York to negotiate this
12 document either being signed or given termination
13 for the insurance and then filing for our rights
14 under the default agreement, Bill kept going back
15 and forth about what he had to do and he wanted to
16 get an attorney and he wanted to negotiate.
17        I was very clear I wasn't in the mood to
18 negotiate.  I didn't have anything to negotiate
19 because I had already been eating his liability on
20 insurance for well over two and a half months.
21        Bill's daughter, Ana Baumgardner and
22 Brian Baumgardner got on the phone and begged me
23 to give Bill more time.  I said, you have exactly
24 until 5 a.m. and I'm catching a cab and leaving
25 the city.

Page 24

1        And around 4 or 4:10, whatever time it
2 was, Ana called and said, would you sign what we
3 have or will you take the documents.  I said, we
4 have no enclosures and no attachments to this.
5        And Brian and Ana said, my dad is a man
6 of his word and you will get the docks.  I said,
7 fine.  Sign what we have, send them to me and I'll
8 issue the insurance certs.
9     Q   Mr. Pixler, I'm going to ask you to go
10 back to what's been marked as Exhibit 2, which is
11 the stock purchase agreement.  I noted various
12 places in this document there are references to
13 schedules and things like that.
14    A   Yes.
15    Q   I'm going to ask you to turn to the last
16 page of Exhibit 2?
17    A   Yes.
18    Q   And there is a handwritten statement in
19 below the signature page.  Could you read that into
20 the record, please?
21    A   "This is the final page of this agreement.
22 There are no schedules, exhibits or amendments
23 attached."
24    Q   And those are your --
25    A   William Baumgardner and Dan Pixler.

Page 25

1     Q   Would your explanation of the reason there
2 are no exhibits attached to the stock purchase
3 agreement be the same explanation as the reasons you
4 just gave for Exhibit A of the management agreement?
5     A   Absolutely.  Predominantly we couldn't get
6 documents from Mr. Baumgardner until probably April,
7 May, June of the following year.
8     Q   Did there come a time when -- well,
9 withdraw that question.  I'll get back to that in
10 just a minute.
11        I'm going to ask you to turn back to the
12 management agreement that's Exhibit 3?
13    A   Yes.
14    Q   If you look at the -- again the recitals
15 1, 2, 3, 4, 5th one down.  I ask you to read that
16 one, please?
17    A   "Whereas, PEO desires that manager serve
18 as exclusive manager and operator of PEO's business
19 on an interim basis pending the consumption of the
20 transaction contemplated by the stock purchase
21 agreement."
22    Q   Was the management agreement intended to
23 be an interim agreement?
24    A   It was intended to be a co-manager
25 agreement where based upon the handshake of two

Page 26

1  business people, and that we would let the business
2  go forward, one from the insurance side that we
3  would issue the insurance certificates because at
4  that point in time the entire liability was ours.
5  The shift had left from being any concern of BACE
6  International, Staff America or any other company.
7  At that time the CNA liability became ours,
8  exclusively and entirely.
9      So what I agreed to do, because everyone
10  told me that we were all men of honor, shake
11  hands, let the company run status quo, even though
12  I felt that we had a co-management agreement,
13  meaning we could go on site if we gave proper
14  notice, look for record, et cetera, et cetera, et
15  cetera. So it was meant to be a co-management
16  agreement between the time of this document signed
17  and the time that we would come to a valuation and
18  a consummation of the transaction.
19      Q   And, in fact, Exhibit 3 contains a number
20  of provisions within it that gave the "manager"
21  which is defined as The Cura Group III essentially
22  management responsibilities; is that correct?
23      A   That is correct.
24      Q   Those are noted within this document and
25  set forth within this document?

Page 27

1      A   That is correct.
2      Q   I'm going to draw your attention to the
3  very first page of Exhibit 3 which says, management
4  responsibilities?
5      A   Yes.
6      Q   At the bottom of the page, and I will read
7  it into the record here, just correct me if I read
8  something wrong, starting on the second line it
9  states -- I will start with the first line, this is
10  sub A, "Commencing on the effective date of the
11  stock purchase agreement" and that was the one that
12  was effective October 31st, 2002?
13      A   Yes.
14      Q   "And until the termination of this
15  agreement as herein provided, managers shall manage
16  the servicing of PEO's customer base" and PEO is a
17  defined term there, that's Staff America, Inc.?
18      A   We believed it to be all of the PEO
19  operations.
20      Q   Fair enough, I understand.
21      A   Okay.
22      Q   "PEO's customer base and business
23  consisting of payroll administration, workers'
24  compensation coverage, customer service and support,
25  billing and other related endeavors in such manner

Page 28

1  as the parties may agree from time to time."
2      A   Correct.
3      Q   Was that your understanding from the time
4  as to what Cura Group III was going to be getting
5  out of this management agreement?
6      A   Absolutely.
7      Q   One aspect of it?
8      A   One aspect.
9      Q   If you turn to page two and subparagraph
10  B?
11      A   Yes.
12      Q   That indicates there that the, "PEO will
13  transition the PEO's customer base into managers
14  workers' compensation insurance policy in such
15  manner as the parties may agree."
16      A   Yes.
17      Q   It was your understanding at that time
18  that Cura Group III would have that right and
19  responsibility as to all of Mr. Baumgardner's BACE
20  International holdings?
21      A   That is correct, and that was a very
22  important issue, because we assume that on that
23  handshake and that agreement and the documents that
24  we had that that meant those clients would come very
25  quickly under our FEIN numbers because they were our

Page 29

1  responsibility from that point in time.
2      Q   You just used a term I'm not familiar
3  with?
4      A   Federal Employment Identification Number.
5      Q   A little further down the page,
6  Mr. Pixler, it says in paragraph D, I'm going to
7  read the second sentence in that sub paragraph D, it
8  states, "All customers, accounts information,
9  documents, customer lists and records and any other
10  materials, tangible or intangible, transfer given
11  to or managed by manager under this agreement shall
12  become the property of the manager upon the closing
13  of the stock purchase agreement." Was that a
14  provision that you were familiar with?
15      A   Yes.
16      Q   Did, in fact, all of those things I just
17  ran through that were mentioned in this eventually
18  become the property of The Cura Group III?
19      A   If you consider two days prior to us
20  consummating the transaction in June, yes, we got
21  them in June of 2003.
22      Q   I would like to direct your attention to
23  page 3 of what is Exhibit 3. Up at the very top of
24  the page it states, "PEO hereby grants to manager a
25  royalty free exclusive license to use -- I think

8 (Pages 26 to 29)

Page 30

1   this is a typo -- use the any of PEOs trade names,
2   trade marks, and service marks in connection with
3   the business and servicing PEO's customer base until
4   the termination of this agreement and the
5   consummation of the stock purchase agreement at
6   which time the marks shall be the property of the
7   manager." Did I read that correctly?
8      A   Yes.
9      Q   Was that your understanding about the
10  rights that The Cura Group III had under this
11  management agreement?
12     A   At this point in time, yes.
13     Q   You qualified it with at this point in
14  time. Why is that?
15     A   Well, there were circumstances that
16  changed. We found that Staff America was not the
17  owner, number one. We found that Staff America --
18  we would not even bring that company across because
19  of the numerous liability issues which were even
20  suggested by Mr. Baumgardner and his CFO not to
21  bring it across because of the hair around it.
22        So the name that we thought had the most
23  recognition, Staff America, was in fact ended up
24  being the company that had the least value as far
25  as the name. So it changed. I mean, this was a

Page 31

1   transaction that changed by the wind.
2      Q   We are going to get to that in just a
3   minute. We are going to take a look at the
4   addendum. I know we are going to get to that. I
5   wanted to finish running through this first.
6        Down at the bottom of that same page,
7   this is page 3 of Exhibit 3, under
8   representations, warranties and covenants, there
9   is a subparagraph D that says, "PEO shall not open
10  any new bank accounts without prior written
11  approval from the manager." That's a right that
12  Cura Group III had under this contract?
13     A   Absolutely.
14     Q   Did you ever have to exercise that right
15  during the time frame that this management agreement
16  was in effect?
17     A   It wouldn't only be that issue. We were
18  never asked about any of the transactions. They ran
19  their business as if we didn't exist.
20     Q   You mean they ignored the obligations?
21     A   They ignored the entire co-management
22  agreement.
23     Q   When did it come to your attention that
24  they had ignored the entire co-management agreement?
25     A   All along. We tried to correct it all

Page 32

1   along.
2      Q   Were there any specific steps that you
3   took in trying to correct it?
4      A   Shouting matches, dinner meetings, the
5   common things that you try to do.
6      Q   Were these, let's call them discussions,
7   that you were having with Mr. Baumgardner directly
8   or was there anyone else at BACE or Staff America
9   that you were having discussions with?
10     A   99.9 of the discussions were with Bill
11  Baumgardner and myself.
12     Q   This is consistently through from the
13  October 31, 2002 timeframe until the transaction
14  closed in June 2003?
15     A   Nearly exclusively with the exception of a
16  few meetings that our CFO would attend or Brian
17  Baumgardner would come into some of the meetings.
18  He would be there for a few minutes and leave. They
19  are involved in NASCAR racing, Bush racing, so they
20  always had lot of things going on in their building.
21        Ana Baumgardner would sometimes be there
22  and sometimes not. Sometimes his CFO would come
23  and sometimes not. Bill is a very private man.
24     Q   Turning back again to page 3. I'm just
25  going to direct your attention to the bottom of page

Page 33

1   3 and the top of page 4. There are number of
2   additional representations, warranties and covenants
3   that were set out there. Specifically I'm looking
4   at subparagraph D, E, then as you flip over to page
5   4, F, G, H, I. You see all of those statements on
6   there, things that the PEO is not supposed to do
7   without prior written approval from the manager?
8      A   I'm sorry, yes.
9      Q   Did Cura Group III ever try to exercise
10  its rights as to any of those rights and
11  representations that it had?
12     A   Again, it was on an ongoing basis. The
13  only thing that was ever followed in this agreement
14  was the fact that our company assumed the insurance
15  risk at the workmen's compensation level. We at
16  that point in time, which really began on the
17  initial policies all the way back to October. We
18  then assumed the liabilities, either reported or
19  nonreported, on work comp tails, and generally
20  speaking there were weekly conversations, when I
21  could find Bill, about what they were not doing.
22        We had continually asked for the normal
23  things. Check registers every week. We weren't
24  going to put somebody in this building and treat
25  him as a child because that's not how I would do

Page 34

1  anybody and we never had. We could not get check
2  registers. We asked for deposit information.
3  Again, just going through the checks and the
4  normal processes.
5      We asked for any adds or deletes of
6  clients, never received it. That was just an
7  ongoing process between myself and Bill at one
8  level, and the operating people, our operating
9  people and his operating people, trying to
10  probably take care of their own positions what
11  they were trying to do. Our company trying to do
12  what we thought was right and Bill's group doing
13  whatever they thought they were trying to do.
14      Q  I told you we were going to get to the
15  addendum and the Stock Purchase Agreement and that's
16  what I'm going to hand you now as an Exhibit 4.
17      Mr. Pixler, I have handed you a document
18  that's previously been marked as Exhibit 4. Can
19  you identify this document for the record?
20      A  Well, this was our climbing the mountain
21  with Moses finality. Beginning in mid May I was
22  putting an awful lot of pressure on Bill to do the
23  right thing or not do the right thing but to draw a
24  line in the stand. That we were either going to
25  take the position that we were acquiring the

Page 35

1  companies and finish the consummation, or I was
2  going to again, the same as I had to do four months
3  before, take whatever actions I would have to do to
4  protect our company, our shareholders and
5  particularly CNA.
6      CNA had a lot of risk on this thing in
7  liabilities, and it was just pulling teeth. There
8  were lots of meetings that Bill and I had. Each
9  time we would end up he would smoke his pipe and
10  we would be friends and say we were going to work
11  this out and we would leave.
12      So a week would go by or two weeks would
13  go by and there wouldn't be any additional
14  documents, there wouldn't be any movement on have
15  we agreed or have we not agreed on value,
16  et cetera, et cetera. There was nothing changed.
17      Then there became a point in time late
18  in May, starting in May, I said, listen, this is
19  it. I got no more time for this. I went to
20  Charlotte, had lengthy discussions with him. We
21  finally pushed the button and he said, okay, I
22  have to do something. I don't want to be in the
23  PEO business. I said, fine, then it's time to get
24  this done right and finished, not only right and
25  finished but finalized.

Page 36

1      Q  If you look at the second page of what's
2  been marked as Exhibit 4, there are two initials at
3  the bottom right hand corner?
4      A  At what page?
5      Q  It's the second page of the exhibit, it's
6  the one that's Bates stamped 28.
7      Do you see the initial on the lower
8  right hand corner?
9      A  Yes.
10      Q  If you kind of flip through the agreement
11  you will see those same initials on every page?
12      A  Yes.
13      Q  Are those your initials and
14  Mr. Baumgardner's?
15      A  Yes, they are.
16      Q  If you turn to the page that's been Bates
17  labeled Cura 0035?
18      A  Yes.
19      Q  There are -- oh, I'm sorry, actually make
20  that 0032?
21      A  Yes.
22      Q  Is that your signature on the two
23  signature lines for Certified Services and Cura
24  Group?
25      A  Yes, it is.

Page 37

1      Q  I would like to take you back to the
2  second page of this document which is the one Bates
3  stamped 28?
4      A  Okay.
5      Q  The parties to this addendum are Certified
6  Services and The Cura Group III on the one hand and
7  BACE International Corporation, correct?
8      A  Yes.
9      Q  And those parties are different than the
10  parties to the stock purchase agreement?
11      A  Yes.
12      Q  Why is it that the parties were changed on
13  the addendum from what they had been on the stock
14  purchase agreement?
15      A  Well, this is a very changing transaction.
16  It started in October supposedly under no agreements
17  other than financial and security relationships. It
18  then turned into what we thought was going to be an
19  agreement at October 31 under a co-management
20  agreement moving along until we finalized some
21  things.
22      And then all through that time we kept
23  finding out different things. Staff America was a
24  piece of crap at best and a problem at worst. We
25  found out that there were corporations that hadn't

10 (Pages 34 to 37)

Page 38

1  been discussed. We were just finding out
2  different things. It was just a bringing to
3  finality of all of that time and process.
4      Q   Mr. Pixler, what entities or corporations
5  of Mr. Baumgardner's were there that hadn't been
6  previously discussed or disclosed?
7      A   By this time?
8      Q   Let's say initially, initially as of
9  October 31, 2002?
10     A   What I knew at June 2003 of what I didn't
11  know in January of 2002?
12     Q   That's correct.
13     A   Notes to the Wilsons on ABP. Taxes that
14  weren't paid. Floats between banks. Payments made
15  to the president of ASR outside -- not only outside
16  of the scope of this co-management agreement, but
17  particularly probably outside of the scope of
18  fiduciary responsibilities of a president of a
19  company.
20         The list goes on and on and on. I
21  wouldn't try to list all my issues with him
22  because I think it may be litigation issues.
23     Q   Were any of the entities that hadn't been
24  disclosed as of October 31, 2002 any of the American
25  Staff Resource entities?

Page 39

1      A   ASR, American Staff Resources was
2  relatively complicated. We really didn't know that
3  American Staff Resources was a player until either
4  late March or sometime in April. That's one of the
5  push time lines when I said to Bill, I want to go
6  out and meet the people in these organizations,
7  because at that time the only place I had ever been
8  to was Charlotte, or I had meet Bill here in our
9  facility I believe two times, and all other meetings
10  were at Bill's offices in Charlotte, North
11  Carolina.
12         And so during that whole time line of
13  March it became obvious that there were some other
14  corporations, and I was concerned that no one in
15  his organizations knew who we were. So I insisted
16  that he take me to the facility and introduce me
17  to people.
18     Q   When you say you didn't know that they
19  were a player at the time, did ASR was a player at
20  the time? Did you know that it was an entity that
21  Mr. Baumgardner or one of his various corporations
22  owned?
23     A   I'm not sure if we did or not, because it
24  had been represented to us that all of the comp,
25  because, remember, so much of this transaction was

Page 40

1  assigned to us under the Staff America name. So we,
2  for a very, very long time, believed that Staff
3  America, for instance, was the holder of the CNA
4  insurance policy, and then we found out there were
5  other entities that were holders of insurance
6  policies. I wouldn't even try to guess at time
7  lines because I couldn't.
8      Q   Was ASR one of the holders of a CNA
9  insurance policy?
10     A   I believe they are. And were and not are
11  now, were.
12     Q   At the time?
13     A   Yes.
14     Q   While the management agreement was in
15  effect?
16     A   Yes.
17     Q   Do you know at what point in time you
18  found that out and learned that?
19     A   March, April.
20     Q   Would your knowledge about ASR and it
21  being an insured under the CNA policies have
22  coincided with the first trip you took to Texas?
23     A   That was the only trip I took to Texas
24  with Bill.
25     Q   Was that the -- I should let you testify

Page 41

1  to that. When was that first trip you took to Texas
2  with Bill?
3      A   I gave the calendar to Doug and so if you
4  could mark that.
5      Q   We will mark it as an exhibit.
6      A   I believe it was April, if I could refer
7  to it.
8      Q   Absolutely. Mr. Pixler, I am handing you
9  a copy of a document that has been marked as Exhibit
10  17.
11         Is this a document that you have seen
12  before?
13     A   Yes, it is.
14     Q   Can you identify that for the record?
15     A   Absolutely. This is April of 2003 and
16  July of 2003 calendar -- out of my personal
17  calendar.
18         On Saturday and Sunday of that weekend
19  Bill and I had many not very kind discussions,
20  again going back to all of the same things that we
21  had discussed, he from his perspective and me from
22  my perspective.
23         I said, well, Bill, I have just gone as
24  far as I am going to go. Again, I want to get
25  this thing resolved. So we met in Charlotte and

11 (Pages 38 to 41)

Page 42

1   we had a lot of discussion at his office all day,
2   and then out of the blue, toward the end of the
3   day he says, you know it's time -- something along
4   the line either it's either time to make this
5   thing right or let's go introduce you, something
6   along that line. It was a cordial thing.
7        He said, you know, my plane is here,
8   let's just go out take the plane and go to
9   Florida, go to Texas and I'll introduce you to
10  everybody so that you can see that they know who
11  you are. Because that was my concern. I have all
12  the liability on the street and any time any of
13  our people tried to call to ask for the time of
14  day, we couldn't get it. We were either referred
15  to Bill Baumgardner personally for the most part
16  or we were referred to Michael Aldridge on the
17  second part, or we were referred to their CFO, who
18  I forget their name.
19       So we took the flight, well remembered,
20  because flying in a King Air from Charlotte, North
21  Carolina is a thrill in itself, comfortable but
22  not very apotty worthy.
23       We get to Dallas, it's late and so Bill
24  and I checked in the hotel. We had dinner that
25  evening. The next morning Jim Phillips, who at

Page 43

1   that time was the president of American Staff
2   Resources picked Bill and I up. We went to a
3   little ho-down place and had breakfast, and I
4   heard all the rah, rah's from Mr. Phillips who
5   told me how great American Staff Resources was.
6   We then left that breakfast meeting, which may
7   have lasted two hours, and we went to the Dallas
8   offices of American Staff Resources.
9        Q   That was -- I'm going to have to share
10  this with you because I don't have another copy of
11  that. That was --
12       A   We arrived on Tuesday evening April 1st of
13  2003. We had the breakfast meeting with Jim
14  Phillips and Bill and myself on Wednesday morning
15  April 2003.
16       We then went to the office and there was
17  a cursory, you know, same things that people
18  always do, take you around and shake hands, here
19  is this person, here is that person. It was
20  not unlike what we would do, so I don't want to be
21  critical about this. It was pretty well
22  programed. Jim Phillips brought the departments
23  into a beautiful round conference room, put up the
24  power points, made the presentation on their
25  companies.

Page 44

1        At some point in time -- the only time I
2   probably became rude and made a comment is, they
3   were explaining all the wonderful things they do.
4   So I just abruptly asked if they understood my
5   relationship in the transaction.
6        They all looked a little stunned and
7   looked to Bill. And I said, let me inform you who
8   I am and what I'm here to do and why I'm here,
9   because of the liability situations. And that may
10  have taken five or ten or 15 minutes. I asked for
11  some information which was given to us in a very
12  formated manner. We asked for loss runs and
13  insurance information, financials, because we
14  still never had any of it all the way back to
15  whenever. And, again, it was given to us in a
16  either a formatted process and or we were given
17  the Ernst & Young audits which I believe were
18  either two or three years old.
19       Q   Were you finished with your answer?
20       A   Yes, because most of the rest of the day
21  was listening to everybody tell me how great a guy
22  Bill was. And he is a great guy. I'm just not so
23  sure I like the way he does business. But he is a
24  great guy and they were all bragging about how nice
25  of a time they had at the race track, because he had

Page 45

1   given a lot of tickets for people to go to the race
2   either the weekend before or a couple of weekends
3   before.
4        Q   Did you inform any of the managers of ASR
5   who were present of your rights and your
6   responsibilities under the management agreement?
7        A   Absolutely.
8        Q   Did you tell them that you expected them
9   to fulfill the obligations that Mr. Baumgardner had
10  under the management agreement?
11       A   I didn't tell them that they should be
12  responsible. I informed them that there was an
13  agreement and that we had the rights to have access
14  to information, and from that point in time we
15  determined that we would have the same.
16       Q   Did you, after that time that you had that
17  meeting on April 2nd, did you attempt to exercise
18  any of the rights -- when I say you, I mean The Cura
19  Group -- attempt to exercise any of the rights it
20  had under the management agreement with respect to
21  ASR's operations?
22       MR. BUNCHER: I'm going to object to the
23  form. The management agreement doesn't refer
24  anything to ASR's operation. It refers to
25  Staff America. So that misrepresents the

12 (Pages 42 to 45)

Page 46

1    record.
2  BY MR. POLAND:
3    Q   Can you tell me whether The Cura Group
4  exercised any management oversight responsibilities
5  with respect to ASR's operations?
6    A   No.
7    Q   None whatsoever?
8    A   None.
9    Q   Did you ever become aware of the notes --
10  let me ask you this -- strike that.
11       Did you ever become aware of the notes
12  that BACE International Corporation issued to the
13  plaintiffs in this lawsuit?
14    A   When did I become aware or was I aware?
15    Q   No, I asked you did you.  Did you become
16  aware?
17    A   Yes.
18    Q   When did you become aware of the existence
19  of those notes?
20    A   Sometime in March or April.  Most of the
21  things that were heating up were in March and April
22  between Bill and I.
23    Q   Is that something that you discovered on
24  your own or The Cura Group discovered on its own or
25  is it something that Mr. Baumgardner informed you

Page 47

1  about?
2    A   I'm not sure if it came out in the
3  discussion or if it was after a phone call.  I
4  couldn't tell you.
5    Q   What did you learn when you first learned
6  about the existence of the notes?  What did you
7  first learn about them?
8    A   Well, the first learning of it came from
9  Bill's perspective.  You know, he described what it
10  was -- well, actually I do know when I became aware
11  of it because I have been informed on secondhand
12  information that they had made -- that they, Bill's
13  PEO operations, one never knew who was writing
14  checks to whom, had made a payment to Prairie
15  Capital, and it was a large payment, and obviously I
16  was pretty concerned about that, considering the
17  company didn't seem to have enough money to run, and
18  they made that payment.
19       So probably myself that brought up the
20  subject, who is this and what is this?  In the
21  early discussions about Prairie Bill took -- Bill
22  was clear in the position that he felt he was --
23  and I don't want to speak for Bill because I'm not
24  sure what terminology he may or may not use, but
25  he felt that there were some problems with the

Page 48

1  transaction between BACE and Prairie.
2    Q   What did Mr. Baumgardner tell you about
3  the problems he felt there were in that transaction?
4    A   He never told me because it was pretty
5  close to his vest.  He actually got angry a few
6  times when he had heard of a couple of conversation
7  I had with Prairie that they were telling me things
8  that he felt were proprietary information between he
9  and Prairie under whatever agreements he had.  So it
10  wasn't pressed very much.
11    Q   I'm going to hand you a copy of an exhibit
12  that's been marked as Exhibit 6.  It's a thick one
13  but we are only going to look at couple of pages in
14  it.
15       Mr. Pixler, I'm going to ask you if you
16  can identify Exhibit 6 for the record?
17    A   Not immediately, so if you let me take a
18  few minutes I'll try.
19    Q   Absolutely.  Take as much time as you
20  need?
21       MR. BUNCHER:  Just so you know,
22    Mr. Pixler, the documents stamped Cura ware
23    documents we produced in the lawsuit, so if
24    that helps at all.
25       (Pause.)

Page 49

1    A   I'm assuming, but I don't see any dates,
2  I'm going to make a great assumption, that this
3  was -- the supposed completed due diligence
4  information after Bill and I reached our agreement
5  in June after I paid him the 350,000 and they either
6  supplied some documents on that day and/or finished
7  the supplying of documents after that June 2003
8  consummation of the transaction.
9    Q   Is that -- I think June 27th is the date
10  of the transaction.  Is that the date you are
11  talking about?
12    A   I believe so.
13    Q   Is it your belief that these documents
14  that are collected in Exhibit 6 are documents that
15  The Cura Group had before the June 27th date?
16    A   No, absolutely not.
17    Q   You believe that The Cura Group didn't
18  receive documents that are in Exhibit 6 until after
19  that date?
20    A   No.  We had received some documents.  So I
21  would never be able to say which document we
22  received at what time, because through counsel we
23  were asking for documents from the beginning, some
24  of which would come in, some of which would not.  It
25  was a process.  To try to say that document A we

13 (Pages 46 to 49)

Page 50

1 knew of in February would be unfair both to Bill and
2 myself and to say it was all June.
3     Most of the information that we received
4 was at or near the June closing.
5     Q   I'm going to ask you to turn in Exhibit 6
6 to -- I'll use the Bates stamp pages because that's
7 the easiest way of doing it.
8     A   Okay.
9     Q   To Cura 1282?
10    A   Okay.
11    Q   And do you see at the top that the
12 document identifies this pages as a promissory note?
13    A   Yes.
14    Q   This is one that is borrowers BACE
15 International corporation?
16    A   Yes.
17    Q   And the payee is listed as Prairie Capital
18 Mezzanine Fund LP?
19    A   Yes.
20    Q   If you page back from that page and you
21 will see a number of promissory notes --
22        MR. BUNCHER:  Page forward.
23        MR. POLAND:  Page back.  That's all right.
24 He is doing the same thing I am.
25        THE WITNESS:  Yes.

Page 51

1 BY MR. POLAND:
2     Q   And those promissory notes extend back to
3 page 1301?
4     A   Okay, yes.
5     Q   These are the promissory notes that we
6 were talking about a few minutes ago that BACE
7 International Corporation had issued to persons
8 including the plaintiffs in this lawsuit?
9     A   Issued to whom?
10    Q   To the payees that are listed on the
11 promissory note?
12    A   I assume they had.
13    Q   Which include some of the plaintiffs in
14 this lawsuit?
15    A   I assume they had.
16    Q   When was the first time that you saw these
17 promissory notes?
18    A   Personally?
19    Q   Yes.
20    A   After we sent in our team of accountants.
21 We sent people in there starting sometime in late
22 June or early July, that we were certainly going to
23 look at the detail of the company.  And I was aware
24 of Prairie prior to that.  I did not see the
25 promissory notes.  Those are two different

Page 52

1 questions.
2     Q   Fair enough.
3     A   Two different answers.
4     Q   Yes, I understand.  You were aware of the
5 existence of the notes, physically you hadn't seen
6 actual copies?
7     A   I was aware of the note to Prairie
8 Capital, not the menagerie of notes with
9 individuals.
10    Q   Had anyone at The Cura Group or Certified
11 Services been given copies of the promissory notes
12 before the transaction closed on June 27th?
13    A   They may have been given to Tony Russo who
14 was our CFO at the time.  I don't know that to be a
15 fact.
16    Q   I'd like you to turn to what's been
17 marked -- I'm sorry.  This page is Cura 1211, it's
18 in the same document Exhibit 6?
19    A   Okay.
20    Q   You will see up at the top this document
21 is identified as a Stock Purchase Agreement?
22    A   Yes.
23    Q   And this Stock Purchase Agreement in the
24 first paragraph says it's between ASR Acquisition
25 and BACE International Corporation?

Page 53

1     A   Yes.
2     Q   Is this a document that you have seen
3 before?
4     A   No.  I have seen it cursory after our
5 people went in in July.  I went through a lot of
6 documents since June and July and since we prepared
7 for our arbitration case.
8     Q   Do you know whether -- when you say
9 arbitration case, what arbitration case are you
10 referring to?
11    A   We filed an arbitration against BACE
12 International.
13    Q   Was that The Cura Group or Certified
14 Services?
15    A   I'm not sure at which level, I believe
16 Certified Services and American HR Holdings, I
17 believe.  Peter could slap me if I was wrong.
18    Q   Do you know whether anyone at Certified
19 Services or The Cura Group was given a copy of the
20 stock purchase agreement before June 27, 2003?
21    A   Not to myself.  Tony Russo certainly had
22 meetings with Bill Baumgardner because we were
23 trying to use liaison people to meet with Bill to
24 get all of the information.  Predominantly it was
25 Tony Russo and maybe three meetings.  They were

14 (Pages 50 to 53)

Page 54

1 pretty tenuous, and I believe maybe Tom Cunningham
2 went to one meeting in Charlotte, and perhaps Tom
3 Bean. I believe I sent Tom Bean down one time to
4 try to keep the flames from going crazy.
5    Q   If you turn the page that has been Bates
6 stamped Cura 1249 in Exhibit 6?
7    A   Yes.
8    Q   You will see in Exhibit A to the stock
9 purchase agreement?
10   A   Yes.
11   Q   If you look at the third bullet point, do
12 you see that states, purchase price in terms of
13 payment states, "$6 million paid in the form of
14 promissory notes secured with collateral acceptable
15 to Prairie Capital Mezzanine Fund LP." And it goes
16 on to list some of the terms of the promissory
17 notes?
18   A   Yes.
19   MR. BUNCHER: One second.
20   VIDEO OPERATOR: Do you want to go off the
21 record?
22   MR. LEVINGER: That's alright. Go ahead.
23 I have to leave.
24             (Discussion held off the
25             record.)

Page 55

1 BY MR. POLAND:
2    Q   Mr. Pixler, I just had read into the
3 record part of the third bullet point on page 1249?
4    A   Yes.
5    Q   Were you aware of that particular term of
6 payment, promissory notes before June 27, 2003?
7    A   I was aware from Steve King's perception
8 of that because I meet with the principal of Prairie
9 Capital prior to June.
10   Q   When you say Steve King, you mean the
11 principal of Prairie Capital?
12   A   Either the principal or one of the
13 managing partners of Prairie.
14   Q   When did you meet with Mr. King?
15   A   In April. Can I refer back to my
16 calendar?
17   Q   Yes, absolutely, please do.
18   A   Steve King called me to tell me about what
19 he thought challenges with this transaction were. I
20 told him what my opinion was and I thought we had
21 two very different opinions.
22        So we agreed to meet and I had meetings
23 in Chicago. So I agreed to meet him for dinner.
24 I flew into O'Hare and met he and another partner,
25 I am not sure, I forget his name. We met at a

Page 56

1 steak house about 15 minutes from O'Hare and had a
2 dinner meeting.
3    Q   I am sorry, which day was that?
4    A   July 15th of 2003.
5    Q   That was after the --
6    A   I'm sorry, it's July 22nd of 2003.
7    Q   Had you met with or spoken to Mr. King
8 before the date of the closing on June 27, 2003?
9    A   Yes.
10   Q   When did you meet or speak with Mr. King
11 before June 27, 2003?
12   A   I met him for dinner in Oakbrook in July
13 and prior to that I spoke to him maybe twice.
14   Q   Did you speak to him before?
15   A   Before the closing?
16   Q   Before the closing, that's specifically
17 the timeframe.
18   A   Yes.
19   Q   When did you speak with Mr. King before
20 the closing?
21   A   Well, no, let me think about that. I
22 didn't, because by the time we closed and Tom
23 Cunningham had gone to Dallas to do some of the
24 initial cursory reviews of things, it appeared there
25 was going to be a possible default issue on the note

Page 57

1 and so we were going through a lot of documents at
2 that time and chose to do the right thing and have
3 the conversation with Steve -- Mr. King.
4        So when Steve called me and gave me his
5 whole position of this, I said, I think we have a
6 lot of things to talk about. So when we met in
7 Chicago, he and his partner, we met in the lounge
8 for about an hour and a half because we were
9 waiting for someone else, and during that time he
10 went about his stories of meetings with Bill and
11 giving me background.
12       I gave him the background of ours. So
13 it was one of those cursory things. And then it
14 was Barry Blunt, I think it was his partner
15 actually said, here is what you owe us. I said,
16 well, I think I'll just go home. Here is my
17 address.
18       I actually got up to leave and then
19 Steve asked me to come back and, you know, discuss
20 this. So I went back. I said, I didn't come here
21 to be put into some box that I have nothing to do
22 with. You and Bill Baumgardner have a serious
23 issue to address. I said, from my perspective
24 either one of you or both of you or both of you in
25 conclusion represented a company that was

15 (Pages 54 to 57)

Page 58

1  underestimated in liabilities almost $15 million
2  and it was done under your watch when you were
3  majority shareholder and it was your audit firm
4  that was in the building. And I said, if you
5  would like to continue to discuss it then I'll
6  stay. And I said, if not, then I'll leave. He
7  said, no, let's discuss some other things.
8      By the end of the dinner meeting and
9  upon an agreement we agreed to send them a payment
10 for receiving from Prairie Capital a release on
11 the default so that our company could file it's
12 SEC quarter. I believe that was either the second
13 or third quarter, whatever the time lines are.
14     We made a cursory payment that we agreed
15 to and to this date have never received a release,
16 and then the rest is history.
17     Q   I want to go back just to the pre-closing
18 again, because I'm focusing on that date, the June
19 27th date. Is it your testimony that you did not
20 speak with Mr. King about the BACE related issues
21 before June 27, 2003?
22     A   Well, I probably have some cursory
23 telephone conversations with Steve.
24     Q   Do you recall any of those, again, this is
25 before June 27, 2003, do you recall any of those

Page 59

1  conversations with Mr. King?
2      A   I mean not specifically. I mean, Steve
3  and I only had -- we were very rarely able to catch
4  each other. It was always the phone tag system. I
5  don't keep track of phone calls. I may in the
6  future. I learn every day.
7      I doubt that I had more than three or
8  four phone calls with Steven and they were very,
9  very short and very to the point.
10     Q   During any of those phone calls were the
11 notes payable from BACE to Prairie Capital or any of
12 the other investors who hold those notes, were those
13 discussed between yourself and Mr. King?
14     A   He was indicating the note that BACE sold
15 him, absolutely. I mean, he was discussing the fact
16 that his company borrowed the money at that time and
17 maybe the funds were still under like small business
18 type of loans, and it was very important that this
19 company was not in default or nonperforming, and he
20 needed our help to fix that and I said, well, I need
21 somebody's help to explain to me this transaction.
22     Q   I'm still specifically focusing, though,
23 on the phone calls?
24     A   I understand, right.
25     Q   If you would turn to what's been Bates

Page 60

1  marked as page 1302 in Exhibit 6?
2      A   Okay.
3      Q   You see this as a document that's entitled
4  pledge agreement at the top?
5      A   Yes.
6      Q   And it says it's a pledge agreement that
7  is made as of August 31, 2002 by and among BACE and
8  the parties that are listed in the signature page?
9      A   Yes.
10     Q   If you flip to the signature page, it's
11 actually pages 1307 -- no, it's just one page 1307?
12     A   Yes.
13     Q   And you see that there are a number of
14 parties that are listed there?
15     A   Uh-huh, yes.
16     Q   Including Prairie Capital Mezzanine Fund?
17     A   Yes.
18     Q   And Ancor Holdings LP?
19     A   Yes.
20     Q   Have you seen this pledge agreement
21 before?
22     A   I haven't seen any of these agreements. I
23 said that I probably cursory looked at these
24 documents when they came in our building after the
25 closing in June and probably have looked at them

Page 61

1  more since the filing for the arbitration case,
2  because if this information was all that important
3  prior to it then I would assume Bill would have
4  given it to us long, long before.
5      So, no, we had asked for documents over
6  and over and over for almost 7 months and there
7  were reasons that he didn't provide them. And
8  that's okay, because after the fact we did the
9  proper disclosures, and we did the proper due
10 diligence in looking at that business and we
11 made -- we drew our line in the sand.
12     Q   Do you know whether Mr. Russo or anyone
13 else at Cura Group or Certified Services had seen a
14 copy of the pledge agreement before the June 27,
15 2003 closing date?
16     A   He may have, because I believe Tony may
17 have sent a response to Steve King a few times. I
18 mean, I'm positive Tony had one or two or three
19 conversations, very few, but certainly had a couple
20 of conversations with Steve King. Context of it I
21 couldn't tell you.
22     Q   Mr. Russo is no longer employed by
23 Certified Services; is that correct?
24     A   That is correct.
25     Q   When did Mr. Russo leave Certified

16 (Pages 58 to 61)

Page 62

1  Services?
2      A   He resigned sometime late December.
3      Q   Was he also employed by any of The Cura
4  entities, Cura Group, Cura Group II?
5      A   Well, when someone is employed by CSRV,
6  CSRV doest not issue checks, payroll checks, so all
7  of our payroll, salaries et cetera, et cetera are
8  through The Cura Group.  So his payroll would have
9  been through The Cura Group.
10     Q   I see.  So he resigned from any positions
11  that he held with The Cura Group?
12     A   Yes.
13     Q   As of December of 2003?
14     A   Yes.
15     Q   Do you know where Mr. Russo is living now?
16     A   No.
17     Q   Have you spoken with him since the time
18  that he resigned?
19     A   I haven't spoken to Tony since about the
20  first or second week of January.
21     Q   Do you know where he resided at the time
22  that he resigned?
23     A   Somewhere in New York.  I mean, he lives
24  in New York.
25     Q   Do you know where he lives in New York?

Page 63

1      A   No, not specifically.
2      Q   You can set that very thick document to
3  the side.
4          Mr. Pixler, as of the time of the
5  closing of the transaction on June 27, 2003, did
6  The Cura Group III -- I am sorry, The Cura Group
7  II make that, did they obtain any of the
8  intellectual property rights or tradenames or
9  trademarks of ASR or any of the ASR entities?
10     A   I don't know that specifically.  I would
11  assume by reference to the original document that
12  the trademarks would have or should have been
13  property of ours.  I don't know that we have
14  necessarily taken legal or professional steps to
15  make that.
16     Q   When was the first time that you learned
17  that -- maybe you testified to this before.  Was it
18  on April 1st or 2nd that you first learned that
19  American Staff Resources was part of
20  Mr. Baumgardner's holdings?
21     A   During discussions in March and April.
22     Q   Other than the trip that you had already
23  testified to Dallas on April 1st or 2nd, 2003 did
24  you make any other trips to Texas with respect to
25  American Staff Resources or the transaction with

Page 64

1  Mr. Baumgardner?
2      A   Not a single one.
3      Q   I'm going to ask you if you could, maybe
4  you want to consult your calendar?
5      A   Uh-huh.
6      Q   Did you make any trips to Texas in July
7  2003?
8      A   Oh, I'm sorry.  Thank you.  Yes, in July.
9  I thought you meant before June.
10     Q   That's fine.
11     A   I thought you -- yes, after June,
12  absolutely.  After the closing I sent accountants
13  down there.  I had an army there.
14     Q   I'll separate it out.  That's only fair.
15  I was doing that before hand.
16         Before the closing there was just the
17  one trip that you personally made down there on
18  April 1st and April 2nd?
19     A   That is correct.
20     Q   Did anyone else, to your knowledge from
21  Certified Services or Cura Group, travel down to
22  Dallas before the closing?  We will separate out
23  there?
24     A   Not a soul.  First of all, we weren't
25  invited.  So had we invited ourselves it wouldn't

Page 65

1  have helped.
2      Q   Even after you gave them the come to Jesus
3  speech?
4      A   No.  Bill is a unique guy.  I said he is
5  very private.
6          I would like to correct something.  If
7  we are referring did I ever make trips to Texas,
8  just please always ask did I make a trip to
9  American Staff Resources, because one of our
10  insurance carriers is in Texas.  So I certainly go
11  to Dallas and I certainly go to Austin, Texas to
12  visit insurance carriers.
13     Q   Actually I want to go back for a moment to
14  before the closing of the transaction, and I want to
15  talk about the due diligence, and I understand your
16  testimony that it was very difficult to get
17  materials from Mr. Baumgardner.
18         Did anyone other than yourself, did
19  anyone at Certified Services or Cura attempt to
20  conduct due diligence investigation of Mr.
21  Baumgardner's or Bace's PEO holdings before the
22  transaction closed on June 27th?
23     A   They tried cursorily, but they were not
24  able to.  Again, Bill was not going to deal with
25  anybody but me.  After the first 60 days when Bill

17 (Pages 62 to 65)

Page 66

1  was not able to replace the workers' comp insurance
2  and finding out the liability that we were sitting
3  on in the comp I certainly wasn't going away from,
4  so from that point in time it was important that we
5  were following whatever requirements we had as a
6  public entity. It was important that we were
7  keeping CNA informed of the transaction, which we
8  did through insurance offices of America, and it was
9  important that we kept everything as close to the
10  vest as we could to push this thing to a
11  consummation. We were not going to turn back after
12  that point in time. But it was never made easy by
13  Bill for whatever reasons.
14     Q   A while ago in your testimony you talked
15  about a million dollar payment that Mr. Baumgardner,
16  BACE, had made to Prairie Capital and it's
17  affiliated investors on the notes. Do you recall
18  that testimony?
19     A   I don't recall that I said that Bill
20  Baumgardner or BACE made it. I said a payment was
21  made to Prairie Capital that came to our attention
22  through Tom Cunningham, after the July visits that
23  our people went in there and started pulling docks
24  and he made me aware of that along with a lot of
25  other situations.

Page 67

1     Q   So it's your testimony that the July
2  timeframe was the first time that you learned that a
3  million dollar payment had been made to Prairie
4  Capital at that time?
5     A   Whatever the amount of the payment was.
6  I'm not sure if it was a million. I know it was
7  large because I raised a lot of havoc about it. But
8  the information came to me from Tom Cunningham and
9  Tony Russo.
10     Q   Fair enough. When was it since you now
11  mentioned Mr. Cunningham's visits a couple of times.
12  Let me ask about that. When was it that
13  Mr. Cunningham went down to ASR's offices?
14     A   I don't know the specific -- after we
15  consummated the transaction, we had a meeting here
16  and decided -- we were trying to decide who was
17  going to be our point person on the ground to get
18  some due diligence done. Now we had to finish it,
19  you know. We had our law firm, we had AK filings
20  due. We had a lot of transactional issues.
21     Tom has got the strongest background,
22  CPA, he had been an auditor for firms. So Tom
23  fortunately or unfortunately drew the short straw
24  that day and became our liaison and point person
25  in Dallas, Texas.

Page 68

1     So it was sometime in the first or
2  second week of July he started traveling to Dallas
3  as our liaison person.
4     Q   How long did Mr. Cunningham stay in Dallas
5  the whole time or did he go back and forth?
6     A   No. He went home on the weekends. He was
7  generally there three days a week.
8     Q   Do you know how long he stayed there for?
9     A   No. I would be guessing. I could guess,
10  but you have to confirm that through Tom. I think
11  he was there about four or five weeks.
12     Q   Mr. Pixler, I will hand you a copy of a
13  document that was marked as Exhibit 7.
14     I'm going to ask you to take a moment
15  to look at the document.
16     (Pause.)
17     A   Yes.
18     Q   Is this a document or collection of
19  documents that you seen before Mr. Pixler?
20     A   Absolutely.
21     Q   I'm going to ask you to turn -- actually,
22  first, let me ask you to identify it for the record,
23  please?
24     A   This was a letter from myself to Mr. King
25  at Prairie Capital providing my overview of what I

Page 69

1  thought the situation -- the status of this business
2  dispute was at this point in time.
3     Q   And as you page through -- this is the
4  form this was produced to us and that's why I marked
5  all of these documents together.
6     Do you know where all of these documents
7  that are included within Exhibit 7, are they all
8  attached to your September 24th letter to
9  Mr. King?
10     A   No.
11     Q   I'm going to ask you to turn to the page
12  Bates stamped Cura 00065?
13     A   Okay.
14     Q   Do you see that that document is an
15  invoice from Prairie Capital Mezzanine Fund to
16  William L. Baumgardner?
17     A   Yes.
18     Q   If you look in the upper right hand corner
19  you see the date is January 22, 2003?
20     A   Yes.
21     Q   And if you look on there there is a total
22  line there for the total amount owed?
23     A   Yes.
24     Q   Approximately 6.8 million?
25     A   Yes.

18 (Pages 66 to 69)

Page 70

1    Q   There is some handwriting below that that
2  appears to say, paid 2/25/03 it says minus a million
3  dollars?
4    A   Yes.
5    Q   Do you know whose handwriting that is?
6    A   I don't have a clue.
7    Q   Have you seen this invoice before?
8    A   No. I wish I had. I'm glad I do now.
9    Q   Sitting here today this is the first time
10  you have seen this invoice?
11   A   Yes.
12   Q   It does have a Cura Bates number on it
13  indicating it was produced from Cura's files. Do
14  you know how Cura would have come about getting this
15  document?
16   A   I would guess this is part of the
17  documents Tom Cunningham and their group, remember,
18  we had many people down there including our audit
19  firm Rosenberg Bridge Berman Banker was there.
20   Q   There was reference there to -- or appears
21  to be a reference to a million dollar payment. It
22  says as minus a million dollars. Is that consistent
23  with your understanding of approximately the amount
24  that Mr. Baumgardner paid?
25   A   Yes.

Page 71

1    Q   I'd like you also --
2    A   I would like to refer, I'm not sure
3  Mr. Baumgardner paid it.
4    Q   Fair enough.
5    A   That's very important because there is a
6  lot of things moving on there. Someone paid them
7  out of American Staff Resources.
8    Q   If you would flip to page Cura 00069?
9    A   Yes.
10   Q   Do you see that as another invoice from
11  Prairie Capital Mezzanine Fund LP?
12   A   Yes.
13   Q   This one is coming to The Cura Group
14  attention Dan L. Pixler?
15   A   Yes.
16   Q   If you look on the right hand side you see
17  the date is July 28, 2003?
18   A   Yes.
19   Q   And there is an amount -- a total amount
20  of interest $121,992.71?
21   A   Yes.
22   Q   Is this a document that you received on or
23  about July 20, 2003?
24   A   Absolutely. Can I refer to some other
25  things on this document? I'm a person really I

Page 72

1  would like to take all day to read them off, I think
2  it's pretty important to understand some things.
3    Q   Are you talking about this particular
4  page?
5    A   Yes, absolutely.
6    Q   Well, I'll tell you what, your counsel
7  will get a chance to ask you some questions in a few
8  minutes.
9    A   I think this is pretty important.
10   Q   I understand.
11   A   No, I don't think you do. I have some
12  real issues with all of these transaction. I'm an
13  old boy from Arkansas. So I have a problem
14  understanding when I go to dinner with somebody and
15  I shake hands, he sends me this. I don't have my
16  waiver, but they owe 7.2 million here, but back here
17  Ernst & Young and the world and whoever sent us
18  stuff out of American Staff Resources, which Prairie
19  Capital was in control of, said that they owe 5.8
20  million. So I would just like to know who is duping
21  who. I'm just, again, Arkansas has different
22  education processes.
23   Q   Where did you get the 5.8 million?
24   A   At the bottom of the invoice after the
25  million dollar payment. So just remind me to send

Page 73

1  my invoice to Prairie for what they owe me back.
2    Q   No, I'm talking about which page it is.
3  You are talking about Cura 00065?
4    A   No, I'm referring to the payment that was
5  made -- yes on 00065. Pretty amazing to me that
6  5.837 and there is lot more that goes along with
7  this transaction. So unfortunately you only got one
8  part of the story. We are not going through the
9  whole story. I'll be glad to when we get to court.
10  This is 5.837. He suddenly is charging me interest
11  at 6.5 percent, compounded for $7.2 million
12  dollars.
13        So I don't know who had all of the
14  meetings beside me and King. I don't know if Bill
15  Baumgardner met with him, Jim Phillips, but there
16  certainly was a party going on that I wasn't asked
17  to attend.
18   Q   Do you know who wrote the 5.837 million?
19   A   I don't have a clue. I'm sure you will
20  discuss that with your client before we go to trial.
21   Q   I've got one other document to mark here.
22  This is a document that's been previously marked
23  as --
24   A   Also, I would like to refer to Cura 0069
25  which you asked me to refer to. There was never an

19 (Pages 70 to 73)

Page 74

1  agreement that we were going to pay against his
2  note. The agreement was that we would pay a flat
3  amount which that was the amount, and for that
4  amount I was getting a release from a default so
5  that I would not be disclosing a default on a
6  disputed transaction. Our company
7  never received the waiver or the release.
8      Q   I'm going to show you a document that's
9  been mark as Exhibit 8. If you can take a look at
10 that, please.
11     Is Exhibit 8 a document that you have
12 seen before, and take a minute to look at it,
13 Mr. Pixler.
14     A   No. I may have in all of the documents,
15 we got a lot of documents in the file, but as a
16 document that I looked at and someone talked to me,
17 no.
18     Q   If you take a look at this document -- I
19 am just going to ask you to read it through if you
20 would, please. Not on the record, but it read it
21 through to yourself?
22     A   Okay.
23     (Pause.)
24     A   Okay.
25     Q   Were you aware before, and again I am

Page 75

1  going to compartmentalize it again before and after
2  the closing. Were you aware before the closing on
3  June 27, 2003 that Prairie Capital had been paid a
4  million dollars pursuant to the notes that BACE had
5  issued.
6      A   Absolutely not. I was not made aware
7  until Tom Cunningham's group went in and we started
8  pulling the checks and the wires and all the
9  transactions that had gone on from October 2002,
10 because we wanted to look at all transactions and of
11 particular interest any transaction that fell on
12 what I felt was a co-management agreement. It
13 doesn't say that. I believe it says managing
14 agreement, but what I considered to be a
15 co-management agreement.
16     Q   Were you aware of any of the negotiations
17 between Prairie Capital and Mr. Baumgardner about
18 the repayment of notes, this is before the closing?
19     A   Actually, Bill was probably the most
20 illusive to this whole transaction. His son, Brian
21 Baumgardner, actually indicated to me that they had
22 met or discussed, but I'm almost positive it was at
23 a dinner meeting and that they had discussed the
24 relationship between BACE and Prairie and that
25 everything was wonderful and that everything was

Page 76

1  going to be worked out.
2      Now what that meant, he may have meant
3  that was my problem or his dad's problem or
4  somebody's problem, but they had this great
5  relationship with Steven King and the principals
6  there, which certainly was not the case, but that
7  was what was referenced to me.
8      MR. POLAND: Can we take a break for just
9  a couple of minutes?
10     MR. BUNCHER: Yes.
11     VIDEO OPERATOR: We are off the record.
12     (Thereupon, a brief recess was
13     taken.)
14     VIDEO OPERATOR: We are on the record.
15 BY MR. POLAND:
16     Q   For the record, there are two documents
17 that are the same documents that were marked with
18 two different exhibit numbers. These are the
19 combined response of Certified Services, Cura Group
20 II and American HR Holdings to plaintiff's first set
21 of integrated discovery related to defendant's
22 special appearance. One is marked Exhibit 13 and
23 one is marked Exhibit 15.
24     I'm just going to refer to the one that
25 is Exhibit 13, just for the record, so that it's

Page 77

1  clear we won't be using Exhibit 15. I handed to
2  Mr. Pixler Exhibit 13. We will put 15 right up
3  here and we won't use it.
4      Mr. Pixler, have you seen Exhibit 15
5  before?
6      A   Yes.
7      Q   Can you tell me who at Certified Services
8  and The Cura Group assisted in preparing the
9  responses to Exhibit 13?
10     A   Well, I believe Peter and Mr. Campitiello.
11     Q   In terms of employees of certified
12 services and The Cura Group, people who had provided
13 information, do you know whether anyone -- not sure?
14     A   No, I'm not sure.
15     Q   I would like you to turn to the response
16 to -- or let me ask you. Did you personally provide
17 information that was used in the preparation of
18 Exhibit 13?
19     A   I would be pretty certain I did.
20     Q   If you would look at the response to
21 interrogatory 2, that's contained on page 6.
22 Interrogatory 2 says, "Identify each phone call,
23 facsimile, e-mail or other communication you
24 directed to any of the plaintiffs
25 from January 1st, 2000 to the present," Do you see

20 (Pages 74 to 77)

Page 78

1  that?
2      A   Yes.
3      Q   Do you see there is a response and it says
4  "Upon information and belief the intermittent times
5  from November 2002 through June 2003, defendant's
6  internal accountants and auditors went to Texas for
7  the sole purpose of conducting due diligence, their
8  relation to the transaction between BACE, Certified
9  and Cura III, they closed out about June 27, 2003."
10  Do you see that?
11      A   Yes.
12      Q   Can you tell me who the internal
13  accountants --
14      A   Are you on response to interrogatory --
15  no, I lost you.  Go back.  Are you on number 2?
16      Q   Yes, number 2.
17      A   Let's go through this again.  I was on the
18  wrong one, I am sorry.  I was on 1 and you are down
19  in response to interrogatory 2.
20      Q   Fair enough.  Let me reread that first
21  sentence again -- I will tell you what, you can just
22  read it to yourself if you like.  It's probably
23  faster.
24      A   Thank you.
25          (Pause.)

Page 79

1      A   Okay.
2      Q   Can you tell me who the internal
3  accountants and auditors are who went to Texas for
4  the purpose stated in the response to interrogatory
5  2?
6      A   Absolutely, however, it's wrong.  Our
7  people did not begin to go down until July, period,
8  unequivocally.  So the response that says upon
9  information and belief at intermittent times from
10  November 2, 2002 to 2003, defendant's internal
11  accountants and auditors went to Texas for the sole
12  purpose of conducting due dillegence in relations to
13  the transaction, that never occurred.
14      Q   When was the first time that occurred?
15      A   When Tom Cunningham went to Dallas, Texas.
16      Q   That was within the first couple of weeks
17  of July?
18      A   First couple of weeks of July.
19      Q   Was there anyone who accompanied
20  Mr. Cunningham when he went down to Texas in the
21  beginning of July?
22      A   I'm positive there were.
23      Q   Do you know who they were?
24      A   No, I don't.
25      Q   I need to ask Mr. Cunningham that

Page 80

1  question?
2      A   Yes, sir.
3      Q   The response goes on to state, the
4  accountants and auditors met with employees of
5  American Staff Resources as well as its auditors
6  Ernst & Young.  Do you see that; is that correct?
7      A   That is correct from my knowledge and Tom
8  Cunningham reporting to me the events of his --
9      Q   Again, that pertains to the first couple
10  of weeks in July as opposed to before the closing on
11  June 27th?
12      A   That is correct.
13      Q   There is -- the response goes on to state,
14  "In addition as further due diligence and risk
15  management representative of The Cura Group III,
16  Inc. went to Texas in connection with that certain
17  management agreement dated October 31, 2002 between
18  Staff American, Inc. and The Cura Group III, Inc."
19  Do you see that sentence?
20      A   In regards to the risk management
21  representatives?
22      Q   As stated in the response there?
23      A   On the combined responses of the
24  defendants.  The only people that went was Tom
25  Cunningham and whomever he took.  So the best is to

Page 81

1  get the list of persons which certainly included at
2  some point in time he invited our audit firm there
3  because we put them on notice of what we were
4  finding.
5      Q   Is that sentence incorrect, then, the one
6  that begins, "In addition as further due diligence
7  and risk management representatives from The Cura
8  Group III" and the sentence finishes, is that
9  sentence correct?
10      A   I don't know.  It's not referring to a
11  time line.  It says, "In addition as further due
12  combined responses of defendants Certified Services,
13  Cura Group and American HR to plaintiff's first set
14  of interrogatory discovery."  I don't know the date
15  of the interrogatory discovery.
16      Q   I think --
17          MR. BUNCHER:  That's a footer.
18          THE WITNESS:  Thank you, guys.  That's
19      what I thought.  I read that, I said this is
20      pretty bizarre.
21  BY MR. POLAND:
22      Q   Formating error.
23      A   There were no persons on the ground in
24  Dallas other than my one visit until Tom Cunningham
25  visited and he would be certainly happy to provide

21 (Pages 78 to 81)

Page 82

1  you the list of everyone that went.
2      Q   And, again, that was the first -- within
3  the first week of July?
4      A   First couple of weeks of July.
5      Q   Now, I'd like to get to your trips to
6  Dallas or trip to Dallas after the closing.
7      A   Okay.
8      Q   You mentioned that in July 2003, I
9  believe, that you went to Dallas with respect to
10  American Staff Resources; is that correct.
11     A   Yes, that's correct.
12     Q   That's indicated on Exhibit 17?
13     A   That's correct, yes.
14     Q   What was the date, Mr. Pixler?
15     A   July 15th of 2003.
16     Q   Did you go to Dallas by yourself on that
17  trip?
18     A   I think -- I believe so.
19     Q   What was the purpose of that visit to
20  Dallas?
21     A   Tom Cunningham had given me some cursory
22  information as well as Tony Russo about some of the
23  early findings. In particular -- the early findings
24  were obviously on the cash side because they were
25  doing the reconciliation and checking of bank recs,

Page 83

1  et cetera. They had some pretty severe things that
2  they thought they found early on in addition to a
3  large discrepancy in the liabilities posted on the
4  insurance.
5      Q   Was Mr. Russo down in Dallas with
6  Mr. Cunningham at that time?
7      A   I don't recall Tony -- Mr. Russo ever
8  going to Dallas. I'm sure he did. I don't recall
9  it. One thing I don't do very often is try to
10  babysit all the senior managers. They have a task
11  to do.
12     Q   You delegate to them and they do what they
13  need to do.
14     A   They delegate, but they are certainly
15  watched.
16     Q   Were there any -- did you have any
17  meetings with any employees of ASR at the time that
18  you went down on July 15, 2003?
19     A   At that visit I asked Tom to specifically
20  show me what he had found in regards to one the
21  liability, the lack of in our opinion the dispute
22  and the liability in the workers' comp claims which
23  was the reserve and liability section.
24         Number two, some large cash
25  disbursements I wanted that proven to me. I

Page 84

1  wanted to see where that information came from in
2  regards to the payment to Prairie in addition to
3  some payments made to some individuals.
4         I wanted to track if there were any
5  other bank accounts that we were not aware of,
6  because there were multitude of bank accounts we
7  were not necessarily aware of at the time.
8         I met -- we also had an employee by the
9  name of Tom Birdstrum which had given us some
10  pretty detailed information, which is in regards
11  to the liability in the insurance risk. He was
12  the risk manager.
13         So I met with Tom Bergstrum cursory. I
14  met with the payroll managers. I meet with Tom
15  Houk, who was the acting -- now he is our
16  collection manager. He was the acting treasurer
17  or cash manager at the time.
18         Since we had asked James Phillips, who
19  was the president, to leave immediately at the
20  closing of Bill Baumgardner and also Casey -- I
21  don't know Casey's last name.
22     Q   Mr. Mann.
23     A   Casey Mann, we asked -- almost
24  concurrently we asked him to leave and Bill informed
25  me that they were going to be working for him.

Page 85

1      Q   When were Mr. Phillips and Mr. Mann asked
2  to leave?
3      A   They were asked to leave concurrently when
4  Bill and I were doing the closing. I informed him
5  they were not going to be part of our company. He
6  informed me, well, they are going to be working with
7  me on other projects.
8      Q   That was even before Mr. Cunningham went
9  down to do the due diligence that you had decided
10  they were not going to be a part of the company any
11  more?
12     A   That's correct.
13     Q   Did you personally make the decision they
14  weren't going to stay on?
15     A   Absolutely.
16     Q   Was it just organizational differences,
17  you didn't see a part for them in your organization,
18  or competency?
19     A   It was certainly not organization.
20     Q   I'll make the assumption. There was one
21  other entry in the schedule if I could look at it
22  because I don't have it.
23     A   This schedule?
24     Q   If I could. There was one other reference
25  to Dallas that I saw here, Mr. Pixler, and it was --

Page 86

1    I'll find in it in just a second. It was actually
2    Austin, Texas on the 14th of July?
3        A    Yes.
4        Q    Can you tell me what that entry is?
5        A    Absolutely. We went to meet with Builders
6    Insurance Company in Austin, Texas that we were
7    trying to do an acquisition of, a Texas rated work
8    comp carrier, so I met with the Chairman of the
9    Board of the insurance company.
10       Q    Did that acquisition go through?
11       A    No.
12       Q    You mentioned before that there were other
13   times that you traveled to Texas not for the purpose
14   of ASR or BACE of this transaction, that's for
15   insurance purposes; is that correct?
16       A    That is correct.
17       Q    Are those insurance -- is that to
18   negotiate insurance coverage for the PEOs that The
19   Cura Group or Certified Services owns?
20       A    It's not to negotiate. Providence
21   Property and Casualty is one of our work comp
22   carriers and they are based in Dallas, Texas.
23       Q    Mr -- I think Mr. Steen had mentioned
24   Providence this morning. Is Providence the carrier
25   that has the coverage for the ASR entities, the

Page 87

1    worker's comp coverage for the ASR entities?
2        A    Now, currently?
3        Q    Currently, yes.
4        A    They are one of the carriers.
5        Q    Was Provident one of the carriers before
6    the transaction closed in June 2003?
7        A    No. CNA was still on the book of business
8    through June 30.
9        Q    Do you know outside of the employees of
10   Certified or Cura Group that you have already
11   mentioned, do you know of any other Certified or
12   Cura employees who traveled to Texas either before
13   or after the closing on June 27th for the purpose of
14   working with the people at ASR or meeting the people
15   at ASR?
16       A    I don't have any recollection that someone
17   did. Ivan Dobrin may have. I mean, he is a sales
18   manager. He may have gone down. I don't recall
19   that at all. I would be very surprised that I
20   didn't and no one else.
21       There may have been an IT. So you have
22   to ask that of Tom Bean or the IT people, because
23   we were trying to figure out if we were going to
24   download or copy the files or what we were going
25   to do between their payroll processing and ours.

Page 88

1    So there may have been a cursory visit from one of
2    them. Again, I don't believe so.
3        Q    Mr. Steen had given us some information
4    about that this morning so I covered that with him.
5        A    Okay.
6        Q    I saw a reference in this document to
7    Mr. Huff.
8        A    Yes.
9        Q    Who is Mr. Huff?
10       A    Anthony is my best friend.
11       Q    Do you have a business relationship with
12   Mr. Huff?
13       A    Over about 16 years.
14       Q    Was Mr. Huff involved at all in any of
15   the -- either in the transaction that closed on June
16   27th or in any of the PEO operations for American
17   Staff Resources?
18       A    Absolutely none.
19       Q    Did Mr. Huff ever travel to Texas as part
20   of this transaction?
21       A    Absolutely not.
22       Q    Mr. Pixler, I'm going to hand you a
23   document that was previously marked as Exhibit 9.
24       I'm going to ask you to take just a
25   minute to flip through the documents so you can

Page 89

1    see what's in it. This is, again, the way the
2    document was produced to us.
3        (Pause.)
4        A    Okay.
5        Q    There are a number of different documents
6    in here. I want to draw your attention to a
7    document Bates stamped Cura 0295. It's about the
8    fourth page in?
9        A    Uh-huh, yes.
10       Q    You see at the top it says CSRV's
11   acquisition of BACE International's PEO group of
12   companies?
13       A    Yes.
14       Q    If you flip to the next page which is page
15   296?
16       A    Yes.
17       Q    You see is that Mr. Russo's signature
18   there?
19       A    Yes, it is.
20       Q    What was Mr. Russo's position at the --
21   strike that question.
22       Do you know when this document was
23   prepared?
24       A    No, I do not.
25       Q    Have you seen it before?

23 (Pages 86 to 89)

Page 90

1    A · Yes. I have seen it in our files here.
2    Q    Do you know whether it was created before
3  or after the closing on June 27th?
4    A    No. I think -- I'm not sure.
5    Q    If you look at the first sentence you see
6  it states, and this is on page 295. "CVRV has
7  agreed to acquire the PEO operations of BACE
8  International which may be identified as ASR Dallas,
9  Meridian, Bradenton and maybe through Orlando." If
10  you look down three lines you see there is a
11  reference there, assumption of certain BACE step?
12    A    Uh-huh.
13    Q    And then there is a line item of $8
14  million?
15    A    Uh-huh.
16    Q    Do you know whether that reflects the
17  notes that were given to Prairie Capital and the
18  other investors?
19    A    Never reflected any specific -- Bill
20  Baumgardner never gave us a specific all the way
21  through the June closing.
22        Bill referenced and I finally agreed to
23  get to a valuation number which was 17.5. He gave
24  us the ballpark numbers which those are the
25  ballpark numbers. And I said, you know Bill,

Page 91

1  obviously, I had a problem with that. I said we
2  are going to give you an eraser for a million
3  dollars. If it's up or down either you win or I
4  win, okay, anything over the million or under the
5  million one of us will be contacting each other.
6  So we never knew what that included specifically.
7        I certainly wouldn't have an $8 million
8  note on a $5.8 million loan. It's also important
9  to keep in mind that whatever time line this is,
10  because I am not sure, I have to go to his other
11  documents first or at least concurrently because
12  he is referencing all of the mis reps and all of
13  the problems we found when we walked into the
14  building, which by coincidence couldn't have been
15  unknown to everybody because Prairie sold the
16  company, tried to sell the company, negotiated to
17  sell the company 15 days before Bill Baumgardner
18  came to somebody to get collateral for liability
19  on workers' comp. I'm not sure how that was not
20  recognized under Ernst & Young's audits for three
21  years.
22    Q    Do you know was the $8 million number
23  that's reflected on 295, is that a number then that
24  was given to Mr. Russo by Mr. Baumgardner?
25    A    Tony knew those numbers well. He sat with

Page 92

1  me in the last two meetings and he was at the
2  closing when we were trying to get the detail from
3  Bill. So those were the assumed numbers.
4        That was the same time that Tony, which
5  actually referred to the eraser theory, one of the
6  new theories that I heard, but it was interesting,
7  but I said that's nine. If that's the high water
8  mark and the low water mark of the transaction
9  then I'm fine with that.
10    Q    Does anything else in this, that is
11  included within this particular document that's at
12  page 295 to 296, does it help you to pinpoint the
13  time frame that this was written in?
14    A    No, because I don't know if this is an
15  internal document. I don't know if he sent this to
16  somebody. I couldn't tell you at all. I'm not, you
17  know, this shows a letter that -- the first cover
18  here shows it's a letter confidential memorandum of
19  July 2nd, 2003 to Bill Baumgardner from Tony Russo.
20  So if these are attachments to this I assume it was
21  July 2nd, 2003.
22        And by that time Tony had already
23  started cursorily looking through information that
24  we had because he was part of the decision-making
25  process to send Tom Cunningham down, and certainly

Page 93

1  Tony would say all of the schedules, all of the
2  tracking, these were all coming from the CFO, Tony
3  Russo, and through Tom Cunningham's efforts and
4  the people he took to confirm whether they were or
5  whether they were not, in fact, correct.
6    Q    Do you know whether all of these documents
7  were -- again, this is the way it was produced to
8  us.
9    A    I understand.
10    Q    Do you know whether the documents that are
11  attached were, in fact, attachments to this
12  confidential memorandum that's on the first page?
13    A    No.
14    Q    So you can set that document aside.
15        Mr. Pixler, I'm going to hand you a copy
16  of a document that's previously been marked as
17  Exhibit 10.
18    A    Yes, okay.
19    Q    I'm going to ask you to take a look at it.
20        Can you identify the document for the
21  record, please?
22    A    Let me see what date this is. This is one
23  of our quarterly filings, our 10Q filing, for who
24  knows? I can never find dates in these things, at
25  September 30, 2003, so third quarter of 2003.

24 (Pages 90 to 93)

Page 94

1    Q    Do you know the date that Exhibit 10 was
2  filed?
3    A    No. I assume either on the date that the
4  filling was due, whatever that date was due, or one
5  or two days before. We are usually within about a
6  72 hour window of filing.
7    Q    I will endeavor to help you out here. If
8  you look up at the top there is pagination. If you
9  turn to page 21?
10   A    Okay.
11   Q    Is there a date reflected on page 21 up at
12 the top?
13   A    November 14, 2003.
14   Q    And you signed it as the CEO of Certified
15 Services?
16   A    Yes.
17   Q    I would like to draw your attention to
18 page 8 of Exhibit 10?
19   A    Uh-huh.
20   Q    And there is a reference -- if you look
21 about half way down the page there is reference, it
22 says supplemental schedule of non-cash investing and
23 financing activities.
24   A    Uh-huh.
25   Q    You see the first line of that reads,

Page 95

1  notes payable for $12,800,000 were assumed in the
2  acquisition of Amer HR, which I believe is shorthand
3  for American HR Holdings during 2003. Do you see
4  that language?
5    A    Yes.
6    Q    Is that a reference to the notes that were
7  owed to Prairie Capital and the other investors from
8  BACE International Corporation?
9    A    It's not a note that references Prairie
10 Capital, it's a note that properly referenced the
11 $17 million bundle deal we did, because we could
12 never reach a detailed valuation with Bill. We
13 never received the detail from Bill, ever, until we
14 finally went to closing.
15       So obviously when they were finishing
16 the Q or Ks or anything else, by that time you are
17 talking November. They are going through the
18 documents and whatever the accountants have to do
19 to disclose properly they did.
20   Q    I understand. That number, though, would
21 include that liability to the note holders?
22   A    It may from an accounting viewpoint. It
23 certainly does not from mine.
24   Q    I understand. And then if you look at the
25 next page which is page 9 of 23.

Page 96

1    A    Yes.
2    Q    Under note 2, acquisition?
3    A    Yes.
4    Q    It describe the acquisition?
5    A    Yes.
6    Q    On June 27 and about 1, 2, 3, 4, 5 lines
7  down, there is a sentence that begins, "The purchase
8  price was comprised of $350,000 in cash, 4%
9  promissory note, insurance in the principal amount
10 of $3,500,000 payable over five years. The
11 assumptions were approximately $13,500,000 of Bace's
12 acquisition and capital requirement debt and the
13 balance represented by -- " and then the sentence
14 goes on, and again the reference there to Bace's
15 acquisition and capital acquirement debt, would your
16 answer to that be the same as the answer that you
17 just give in terms of accounting?
18   A    Absolutely. It's properly disclosed on
19 the amount, but also let's make sure that one caveat
20 is not disputed or forgotten, that's based upon reps
21 and warranties being at least somewhat accurate,
22 somewhat.
23       Let's use the million dollar theory. We
24 are talking about reps and warranties exceeding 15
25 million that we still are finding issues. And,

Page 97

1  again, I find it strange that in a 15 day window
2  of Mr. Baumgardner buying a company that that
3  entire world changed. So we will just make sure
4  that we keep all the records straight.
5    Q    You can set that document to the side.
6        I'm handing you a document that, for the
7  record, has been marked as Exhibit 12.
8    A    Okay.
9    Q    Mr. Pixler, have you seen Exhibit 12
10 before?
11   A    Yes. I'm aware of it. It's not something
12 I remember specifically. But, yes, I have seen it.
13   Q    It's a letter dated July 25, 2003 from Tim
14 McKibben at Ancor Holdings to yourself, correct?
15   A    Right.
16   Q    Did you receive this letter on or about
17 the date that it was authored, July 25, 2003?
18   A    I assume so.
19   Q    Do you see that Mr. McKibben states in the
20 letter, "Pursuant to recent conversations between
21 Mr. Steve King and you, this letter authorizes
22 Mr. King to represent Ancor Holdings, LP as to
23 negotiations regarding notes owed to us by BACE
24 International. We also authorized the wiring of
25 funds, interest or principal to Prairie Capital

25 (Pages 94 to 97)

Page 98

1  which will then be forwarded on to Ancor Holdings.
2  We appreciated Mr. King representing us. Thank you
3  for your consideration in this matter?"
4      A   Right.
5      Q   Did this relate to the invoice for
6  interest that was marked earlier as an exhibit, if I
7  can find one?
8      A   Also let's go back. We never agreed to
9  pay interest. We agreed to have an agreement that
10  they would provide a release or a waiver on a
11  default of a disputed claim.
12         We agreed also at the time Steve King
13  said they were the -- Prairie Capital was the
14  largest player in this transaction so we would not
15  have to deal with the secondary player which was
16  Ancor, which we never met, never talked to,
17  couldn't give you two hoots.
18         So upon the wiring of the 121, whatever
19  the exact amounts was, that it was Mr. King's
20  responsibility to distribute those funds
21  accordingly, whether he did, whether he did not, I
22  don't have any clue.
23      Q   Subsequent to the time that the invoice
24  was sent on July 22nd and Mr. McKibben letter was
25  sent on July 25th there was a payment of

Page 99

1  approximately $121,000, correct?
2      A   Yes.
3      Q   And to be fair we will put that into the
4  record. That's been marked as Exhibit 14.
5      A   Yes.
6      Q   Have you seen -- you have seen Exhibit 14
7  before, Mr. Pixler?
8      A   I'm aware of it, yes.
9      Q   Can you identify it for the record?
10      A   We were talking about responding to again
11  what they assumed to be a default that we had
12  something to do with, and we said we are absolutely
13  not taking that position.
14         We also wanted to put them on notice and
15  respond that we had not gotten the funds or what
16  our understanding of those funds were for the 121
17  for the waiver. So this was Tony's -- Mr. Russo's
18  response to the same.
19      Q   The first line in the letter states that
20  Prairie was sent a good faith deposit of $121,992.71
21  during July 2003?
22      A   Right.
23      Q   It goes on -- the rest of the sentience
24  goes on. Do you know when that payment was sent in
25  July 2003?

Page 100

1      A   No, but we certainly can provide the
2  records to you.
3      Q   Since that time you have received
4  additional invoices from Mr. King; is that correct?
5      A   Yes, I believe there is some sitting on my
6  desk.
7      Q   No payments have been made of the invoices
8  since this first payment was made?
9      A   Not only are there no payments to Mr. King
10  at Prairie Capital, there are no payments to any
11  person or company involved in what we believe to be
12  very, very substantial misrepresentation of
13  companies that were sold to a public entity.
14         MR. POLAND:  Give me just a second here
15  and I am going look at my notes.
16         THE WITNESS:  Thank you.
17         (Pause.)
18         MR. POLAND:  I think we are done.
19         MR. BUNCHER:  I just have a couple of
20  follow up questions.
21         VIDEO OPERATOR:  We have five minutes on
22  the tape just so you know.
23         CROSS (DAVID L. PIXLER)
24  BY MR. BUNCHER:
25      Q   Mr. Pixler, I just want the record to be

Page 101

1  clear.
2         If someone were to suggest to the court
3  that by virtue of that management agreement in
4  October of 2002, that from that point forward
5  American HR, Certified and The Cura Group were
6  controlling and managing these operations down in
7  Texas, would that be an accurate statement?
8         MR. POLAND:  Object to the form of the
9  question.
10         MR. BUNCHER:  And what's wrong with the
11  form of the question.
12         MR. POLAND:  Leading, hypothetical.
13         THE WITNESS:  There was no control on our
14  part at all. Bill Baumgardner did not allow
15  telephone contacts from any management levels.
16  Bill Baumgardner did not allow writing. Bill
17  Baumgardner did not allow access to computer
18  systems. The company was managed by all of the
19  people that had worked for American Staff
20  Resources other than Jim Phillips and Casey
21  Mann and they were all under the direction --
22  one hundred percent direction of Bill
23  Baumgardner.
24         The only companies that we had any ability
25  to walk in and talk to them and maybe get a

Network Reporting Corporation
(305) 358-8188  (888) 358-8188

Page 102

```
 1      straight answer was in Charlotte because I had
 2      visited Charlotte so often.  So sometimes in
 3      the halls people would talk to me.  Texas
 4      absolutely not.  That was off limits except for
 5      Bill Baumgardner.
 6   BY MR. BUNCHER:
 7      Q    And after the transaction closed at the
 8   end of June 2003, did American Staff Resources
 9   continue to have it's own management and control of
10   its own management in control of its day-to-day
11   operations in Texas?
12      A    American Staff Resources continues today
13   to have its own management on site.  We are
14   downsizing Dallas as we speak to right size it, if
15   you will.  They had their own management on staff.
16   Other than consolidating reporting financials under
17   a public SEC requirement that would be the only
18   involvement we had.
19      Q    So do officers, directors and employees of
20   Cura Group, American HR or Certified Services direct
21   or control the day-to-day activities of American
22   Staff Resources in Texas?
23          MR. POLAND:  Object to the forms of the
24      question.
25          THE WITNESS:  No.
```

Page 103

```
 1   BY MR. BUNCHER:
 2      Q    You were asked a question concerning the
 3   transferring of trademarks, and I think the
 4   reference was to the original stock purchase
 5   agreement of October 2002, and I believe the record
 6   will reflect that the question that was asked was
 7   whether or not you took possession of any trademarks
 8   of American Staff Resources, and let me ask you was
 9   this agreement in October with American Staff
10   Resources?
11      A    No.  This agreement in October 31 was with
12   Bill Baumgardner whom we thought we were acquiring
13   Staff America, whom we thought were the PEO
14   operations.
15      Q    And, in fact, if you look on page 9 of the
16   stock purchase agreement were the subsidiaries of
17   the company which is defined to be Staff America,
18   Inc. a North Carolina corporation, what subsidiaries
19   are listed there?
20      A    ABP, Inc, ABP3, Inc. ABP4 Inc. and
21   Meridian Investment Management, Inc.
22      Q    Do you see American Staff Resources
23   referenced anywhere in this agreement?
24      A    No, sir.
25          VIDEO OPERATOR:  You have one minute left.
```

Page 104

```
 1   BY MR. BUNCHER:
 2      Q    So could you have acquired any trademarks
 3   of American Staff Resources by virtue of this
 4   agreement to your understanding?
 5      A    No.
 6          MR. BUNCHER:  I'll pass the witness.
 7          FURTHER REDIRECT (DAVID L. PIXLER)
 8   BY MR. POLAND:
 9      Q    Just one other question, Mr. Pixler.
10      A    Yes.
11      Q    You mentioned that you are currently
12   engaging in some downsizing in Dallas; is that
13   correct?
14      A    I think I used the word right sizing,
15   which has been an ongoing process since October of
16   2001.
17      Q    What's the nature of the right sizing
18   that's going on in Dallas?
19      A    It will become more of a sales marketing
20   facility for the company.
21      Q    And who decided to engage in the right
22   sizing?
23      A    I did.
24          MR. POLAND:  That's it.
25          VIDEO OPERATOR:  This concludes the
```

Page 105

```
 1   videotape deposition.  We are off the record.
 2               - - -
 3          (Witness excused.)
 4          (Thereupon, the deposition was
 5          concluded.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

27 (Pages 102 to 105)

Page 106

```
1
2      THE STATE OF FLORIDA)
3      COUNTY OF DADE)
4
5          I, the undersigned authority, certify that the
6      aforementioned witness personally appeared before me
7      and was duly sworn.
8
9              WITNESS my hand and official
10             seal this 27th day of February
11             2004.
12
13
14
15
16
17
18
              Thomas R. Neumann
19            Notary Public - State of Florida
              My Commission Expires:  3/22/07
20            My Commission No.: DD187497
21
22
23
24
25
```

Page 108

```
1   DATE:    February 25, 2004
2   TO:      DANNY L. PIXLER
             5101 Northwest 21st Avenue
3            Suite 350
             Fort Lauderdale, Florida
4
    IN RE:   Prairie Capital v BACE International
5
6   CASE NO.: 67-202574-03
7       Please take notice that on Wednesday, the 25th
    of February 2004, you gave your deposition in the
8   above-referred matter.  At that time, you did not
    waive signature.  It is now necessary that you sign
9   your deposition.
        Please call our office at the below-listed
10  number to schedule an appointment between the hours
    of 9:00 a.m. and 4:30 p.m., Monday through Friday,
11  at the Esquire office located nearest you.
        If you do not read and sign the deposition
12  within a reasonable time, the original, which has
    already been forwarded to the ordering attorney, may
13  be filed with the Clerk of the Court. If you wish
    to waive your signature, sign your name in the blank
14  at the bottom of this letter and return it to us.
15          Very truly yours,
            NETWORK REPORTING CORPORATION.
16
17          THOMAS R. NEUMANN
18  I do hereby waive my signature:
19
20
    DANNY L. PIXLER
21
22  cc via transcript:  BILL WARREN, Esq.
                        JEFFREY S. LEVINGER, Esq.
23  file copy           DOUGLAS J. BUNCHER, Esq.
24
25
```

Page 107

```
1            C E R T I F I C A T E
2
3   THE STATE OF FLORIDA)
4   COUNTY OF DADE)
5
        I, Thomas R. Neumann, Registered Reporter,
6   State of Florida at large, do hereby certify that I
    was authorized to and did report said deposition in
7   stenotype; and that the foregoing pages, numbered
    from 1 to 105, inclusive, are a true and correct
8   transcription of my shorthand notes of said
    deposition.
9
        I further certify that said deposition was
10  taken at the time and place hereinabove set forth
    and that the taking of said deposition was commenced
11  and completed as hereinabove set out.
12      I further certify that I am not attorney or
    counsel of any of the parties, nor am I a relative
13  or employee of any attorney or counsel of party
    connected with the action, nor am I financially
14  interested in the action.
15      The foregoing certification of this transcript
    does not apply to any reproduction of the same by
16  any means unless under the direct control and/or
    direction of the certifying reporter.
17
        IN WITNESS WHEREOF, I have hereunto set my hand
18  this 27th day of February 2004.
19
20
21
22
         Thomas R. Neumann
23       Notary Public - State of Florida
         My Commission Expires:  3/22/07
24       My Commission No.: DD187497
25
```

Page 109

```
1            C E R T I F I C A T E
2            - - -
3
4   THE STATE OF FLORIDA)
5   COUNTY OF DADE)
6
7       I hereby certify that I have read the foregoing
8   deposition by me given, and that the statements
9   contained herein are true and correct to the best of
10  my knowledge and belief, with the exception of any
11  corrections or notations made on the errata sheet,
12  if one was executed.
13
14      Dated this ____ day of _____,
15  2004.
16
17
18
19
20  _____
    DANNY L. PIXLER
21
22
23
24
25
```

28 (Pages 106 to 109)

Page 110

```
1          E R R A T A   S H E E T
2    IN RE:  Prairie Capital v BACE International
3    DEPOSITION OF:  DANNY L. PIXLER
4    TAKEN:  2/25/04
5     DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
6    PAGE #  LINE #   CHANGE            REASON
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   Please forward the original signed errata sheet to this
     office so that copies may be distributed to all parties.
18
     Under penalty of perjury, I declare that I have read my
19   deposition and that it is true and correct subject to   any
     changes in form or substance entered here.
20
21   DATE: _____
22
23   SIGNATURE OF DEPONENT:_____
24
25
```

Network Reporting Corporation
(305) 358-8188  (888) 358-8188