```
1                    NO. 067-202574-03
2   PRAIRIE CAPITAL MEZZANINE   *   IN THE DISTRICT COURT
    FUND, L.P., ANCOR HOLDINGS, *
3   L.P., ADELINE MORRISON,     *
    THOMAS P. HUNTER, III,      *
4   HARRISON I. STEANS,         *
    JENNIFER W. STEANS,         *
5   REMOUNT CAPITAL, LLC,       *
    GEORGE P. BAUER, SIDNEY     *
6   ECHOLS, RESOURCES TRUST     *
    COMPANY, MITCHELL GREEN,    *
7   and THE ESTATE OF RICHARD   *
    D. MICHAELS,                *
8        Plaintiffs,            *
                                *
9   VS.                         *
                                *
10  BACE INTERNATIONAL          *
    CORPORATION, CERTIFIED      *
11  SERVICES, INC., THE CURA    *
    GROUP II, INC., AMERICAN    *   OF TARRANT COUNTY, TEXAS
12  HR HOLDINGS, INC.,          *
    and WILLIAM L.              *
13  BAUMGARDNER, JR.,           *
         Defendants,            *
14                              *
    CERTIFIED SERVICES, INC.,   *
15  THE CURA GROUP II, INC.,    *
    and AMERICAN HR HOLDINGS,   *
16  INC.,                       *
         Third-Party Plaintiffs,*
17                              *
    VS.                         *
18                              *
    ERNST & YOUNG LLP,          *
19  KYLE C. MANN, and ROBERT J. *
    PHILLIPS, JR.,              *
20       Third-Party Defendants.*  67TH JUDICIAL DISTRICT
21  --------------------------------------------
22          ORAL AND VIDEOTAPED DEPOSITION OF
23            WILLIAM L. BAUMGARDNER, JR.
                     VOLUME 3
24                 APRIL 7, 2005
25  --------------------------------------------
```

EXHIBIT
J

Prairie Capital vs Ernst & Young                04/07/05                William L. Baumgardner, Vol. 3

---

**Page 327**

1       ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM L.
2   BAUMGARDNER, JR., produced as a witness at the instance
3   of the Defendants, Certified Services, Inc., The Cura
4   Group II, Inc., and American HR Holdings, Inc., and duly
5   sworn, was taken in the above-styled and -numbered cause
6   on the 7th day of April, 2005, from 9:33 a.m. to 5:45
7   p.m., before Angela L. Mancuso, CSR in and for the State
8   of Texas, reported by machine shorthand, at the offices
9   of Carrington, Coleman, Sloman & Blumenthal, L.L.P.,
10  located at 200 Crescent Court, Suite 1500, in the City
11  of Dallas, County of Dallas, and State of Texas,
12  pursuant to the Texas Rules of Civil Procedure and the
13  provisions stated on the record or attached hereto.

---

**Page 328**

1                    A P P E A R A N C E S
2   FOR THE PLAINTIFFS:
3       MR. JASON C. NASH
        KELLY, HART & HALLMAN, P.C.
4       201 Main Street
        Suite 2500
5       Fort Worth, Texas 76102
        (817) 878-3552
6
    FOR THE DEFENDANTS, CERTIFIED SERVICES, INC., THE CURA
7   GROUP II, INC., AND AMERICAN HR HOLDINGS, INC.:
        MR. DOUGLAS J. BUNCHER
8       NELIGAN, TARPLEY, ANDREWS & FOLEY, L.L.P.
        1700 Pacific Avenue
9       Suite 2600
        Dallas, Texas 75201
10      (214) 840-5300
11
    FOR THE DEFENDANTS, BACE INTERNATIONAL AND WILLIAM L.
12  BAUMGARDNER, JR.:
13      MR. JEFFREY S. LEVINGER
        CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, L.L.P.
14      200 Crescent Court
        Suite 1500
15      Dallas, Texas 75201
        (214) 855-3000
16
    ALSO PRESENT:
17
        Mr. Brian Mazzola, Videographer
18      ELITE VIDEO PRODUCTIONS
        3024 Commerce Street
19      Dallas, Texas 75226
        (214) 747-1952
20
21
22
23
24
25

---

**Page 329**

1                    INDEX
2   Appearances ........................ 328
3   WILLIAM L. BAUMGARDNER, JR.
4       Examination by Mr. Buncher ................ 332
        Examination by Mr. Nash .................... 507
5
    Signature and Changes ......................... 563
6   Reporter's Certificate ......................... 564
7                    EXHIBITS
    NUMBER/DESCRIPTION              MARKED/IDENTIFIED
8
    116 - 8/28/02 fax from Ray McCartha to      349/350
9       Bill Baumgardner
    117 - 8/30/03 Loan Agreement                352/353
10  118 - 8/30/02 e-mail from Larry Brock to    363/363
        Bill Baumgardner
11  119 - 8/30/02 e-mail from Peter Campitiello 363/364
        to Bill Baumgardner
12  120 - 8/30/02 e-mail from Larry Brock to    365/365
        Bill Baumgardner
13  121 - 8/30/02 Guaranty                      367/367
    122 - 8/30/02 Stock and Collateral Pledge   368/368
14      Agreement
    123 - 9/3/02 e-mail from Howard Rosendale   369/369
15      to Bill Baumgardner
    124 - 9/16/02 e-mail from Larry Brock to    371/371
16      Bill Baumgardner
    125 - 9/17/02 e-mail from Howard Rosendale  372/372
17      to Bill Baumgardner
    126 - 9/18/02 Acknowledgment and Receipt    373/373
18  127 - 9/27/02 Correspondence Sheet from Bill 375/375
        Leyton to Ray McCartha and Bill Baumgardner
19  128 - 9/28/02 fax from Bill Baumgardner to  377/377
        Larry Brock
20  129 - 9/28/02 fax from Bill Baumgardner to  377/377
        Howard Rosendale
21  130 - 9/30/02 Loan Agreement                378/379
    131 - 9/30/02 Stock and Collateral Pledge   378/379
22      Agreement
    132 - 9/30/02 Guaranty                      378/379
23  133 - 9/30/02 BACE International Corporation 380/380
        Consolidating Trial Balance
24  134 - 10/18/02 letter from Peter Campitiello 416/416
        to Bill Baumgardner
25

---

**Page 330**

1                    EXHIBITS
    NUMBER/DESCRIPTION              MARKED/IDENTIFIED
2
    135 - 10/29/02 e-mail from Ivan Dobrin to   417/417
3       Bill Baumgardner
    136 - 10/29/02 fax memorandum from Dan Dobrin to 418/418
4       Bill Baumgardner
    137 - 11/1/02 e-mail from Ivan Dobrin to    422/422
5       Ivan Dobrin, Bruce Bailey
    138 - 11/1/02 e-mail from Ivan Dobrin to    424/424
6       Bill Baumgardner
    139 - 11/5/02 e-mail from Ivan Dobrin to    425/425
7       Anna Baumgardner
    140 - 11/5/02 e-mail from Ivan Dobrin to    426/426
8       Anna Baumgardner
    141 - 11/5/02 e-mail from Dan Pixler to     426/427
9       Bill Baumgardner
    142 - 11/7/02 e-mail from Ivan Dobrin to    444/444
10      Bruce Bailey
    143 - 11/7/02 e-mail from Ivan Dobrin to    445/445
11      Bruce Bailey
    144 - 11/8/02 e-mail from Dan Pixler to     447/447
12      Bill Baumgardner
    145 - 11/10/02 e-mail from Dan Pixler to    447/447
13      Bill Baumgardner
    146 - 11/26/02 fax memorandum from Dan Pixler 448/448
14      to Bill Baumgardner
    147 - 12/18/02 letter from Danny Pixler to  449/449
15      Bill Baumgardner
    148 - 3/6/03 e-mail from Dan Pixler to      478/478
16      Bill Baumgardner
    149 - 5/19/03 letter from Danny Pixler to   479/479
17      William Baumgardner
    150 - Handwritten note                      482/483
18  151 - 6/24/03 letter from Anthony Huff to   491/491
        Bill Baumgardner
19  152 - 6/27/03 BACE International, Inc.       498/498
        Officers' Due Diligence Statement
20  153 - 8/15/03 e-mail from Zenaida Ferrer to 498/499
        to Bill Baumgardner
21  154 - 9/12/03 letter from Anthony Russo to  499/499
        Bill Baumgardner
22  155 - Computer printout from BACE Motorsports 517/517
        Web site
23  156 - Order Granting in Part and Denying in 521/521
        Part Plaintiffs' Motion to Compel
24      Discovery Answers and Responses from
        Defendant BACE International Corporation
25

---

ALPHA REPORTING SERVICES, INC., DALLAS, TX (888) 667-DEPO

Prairie Capital vs Ernst & Young                 04/07/05                 William L. Baumgardner, Vol. 3

---

**Page 331**

```
              EXHIBITS
1    NUMBER/DESCRIPTION        ·MARKED/IDENTIFIED
2
     157 - 10/28/04 letter from Mark Pittman to    522/522
3        Jeffrey Levinger
     158 - 11/5/04 letter from Neil Burger to      522/523
4        William Warren, Mark Pittman
5              VIDEOTAPES
6    BEGINNING OF TAPE 1 ............................. 332
     BEGINNING OF TAPE 2 ............................. 365
7    BEGINNING OF TAPE 3 ............................. 400
     BEGINNING OF TAPE 4 ............................. 425
8    BEGINNING OF TAPE 5 ............................. 465
     BEGINNING OF TAPE 6 ............................. 505
9    BEGINNING OF TAPE 7 ............................. 547
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 333**

```
1    taking that?
2        A.  I am.
3        Q.  All right.  Has your medical condition improved
4    since that point in time?
5        A.  Yes.
6        Q.  In what way?
7        A.  Well, hopefully, the clot has largely dissolved
8    and things have tended to get back to a little more
9    normal.
10       Q.  At your prior deposition, you indicated that
11   the medication had some effect on your short-term
12   memory.  Is that -- would that still be true today?
13       A.  That would be true.
14       Q.  As far as -- I believe you testified about BACE
15   Motorsports that you had an interest in at that time; is
16   that right?
17       A.  Yes.
18       Q.  Do you still operate BACE Motorsports?
19       A.  BACE Motorsports has been significantly reduced
20   in size since we last met.
21       Q.  All right.  Do you operate any
22   income-generating businesses at this point in time?
23       A.  I'm -- I'm not sure what you mean by "operate."
24       Q.  Do you own an entity -- do you own an interest
25   in any businesses that generate an income at this point
```

---

**Page 332**

```
1              PROCEEDINGS
2        (April 7, 2005, 9:33 a.m.)
3        THE VIDEOGRAPHER:  This is Tape 1 for
4    Volume 3 of the deposition of William L. Baumgardner.
5    Today is April 7, 2005.  We're on the record at 9:33
6    a.m.
7            WILLIAM L. BAUMGARDNER, JR.,
8    having been first duly sworn, testified as follows:
9            EXAMINATION
10   BY MR. BUNCHER:
11       Q.  Mr. Baumgardner, my name is Doug Buncher.
12   You'll recall we met the last time in November of last
13   year at your deposition when we started it in North
14   Carolina.  Do you recall that?
15       A.  I recall, yes.
16       Q.  I'm going to try not to replow the same ground
17   that we went through at that deposition other than maybe
18   to put some things in context so that you can remember
19   what we did and didn't cover.
20       Did you review the deposition transcript of
21   your previous deposition, preparing for your deposition
22   today?
23       A.  I looked at it, yes.
24       Q.  Okay.  At the last deposition, you were on some
25   medication for your -- a blood clot.  Are you still
```

---

**Page 334**

```
1    in time?
2        A.  Yes.
3        Q.  What are those?
4        A.  Store Services Group.
5        Q.  What is that?
6        A.  We discussed that before.  It is a retail
7    merchandising service that does -- provides those
8    services to large retail chains.
9        Q.  And is BACE Motorsports profitable?
10       A.  BACE Motorsports is not competing at all,
11   currently, this year in the NASCAR touring series, any
12   series.
13       Q.  Are you employed currently?
14       A.  Gainfully, by implication?
15       Q.  Yes, sir.
16       A.  No.
17       Q.  Are you retired?  Do you consider yourself
18   retired?
19       A.  I guess there is a void between those two
20   questions, but I have a need to have an income, which I
21   do not currently enjoy.
22       Q.  All right.  And how old are you?
23       A.  Fifty-seven.
24       Q.  Since your deposition, we have taken additional
25   depositions of Jim Phillips, K.C. Mann, and Steve King.
```

---

Prairie Capital vs Ernst & Young                04/07/05                William L. Baumgardner, Vol. 3

Page 335

1  Have you read any of those depositions?
2      A.  I have not.
3      Q.  All right.  In Mr. King's deposition, he
4  indicated that he had done some research into this
5  Freddie Mac security that -- a copy of which was given
6  to him in connection with the pledge agreement, and he
7  said that his research indicated that the security had
8  no value.  Is that consistent with your understanding or
9  not?
10     A.  I don't think I can speak to an understanding
11 that I may have of Mr. King's understanding.
12     Q.  All right.  Well, I meant is that consistent
13 with your understanding of the value of the Freddie Mac
14 security?
15     A.  I don't know what the value is, was, nor have I
16 ever said what the value was.
17     Q.  All right.  Do you recall making any statements
18 to Mr. Dobrin or anybody from Certified Services or Cura
19 as to the value of that security?
20     A.  No.
21     Q.  Describe for me the due diligence process that
22 BACE went through prior to its acquisition of ASR.
23     A.  Upon the ASR Management Group's initial meeting
24 with me and other members of the BACE staff -- they came
25 to Charlotte in early July of 2002.  There were a number

Page 336

1  of them -- six, seven, eight people -- and with them
2  they brought several boxes.  I believe it was maybe six
3  boxes or more of records from their operations in
4  Dallas.  The initial due diligence, after a meeting with
5  them on a weekend right around July 4th, was to commence
6  to go through those boxes of records.
7      Q.  Who participated in the review of those
8  records?
9      A.  In our office or overall or --
10     Q.  Including -- well, first let's start with who,
11 that was employed with BACE, participated in reviewing
12 those documents?
13     A.  I believe on the first day there were a couple
14 of people, principally our loss control officer, me, and
15 my son.  On the second day of the meeting, it was, I
16 believe, solely me, the meeting in Charlotte.
17     Q.  Do you recall what day that occurred?
18     A.  I do not.  As I said, I believe it was early
19 July prior to -- right around the 4th, July 4th.
20     Q.  Your loss control officer was Mr. Bailey?
21     A.  That is correct.
22     Q.  What information was contained in the records
23 concerning the loss history at ASR or the setting of
24 reserves on the losses?
25     A.  I believe that there were records concerning

Page 337

1  those issues.  They were extracted from the boxes of
2  material and were commenced to be reviewed by
3  Mr. Bailey.
4      Q.  Were there any loss runs from CNA or any other
5  carrier of ASR?
6      A.  I cannot specifically speak to that.
7      Q.  Is Mr. Bailey still employed by you?
8      A.  He is.
9      Q.  In what capacity?
10     A.  Still operates the trail losses that we have
11 from earlier periods years past, which are, quite
12 candidly, minimal, and continues to work on our
13 international insurance project that we discussed
14 before.
15     Q.  Did you, yourself, review any of the loss
16 history or reserve information from ASR as part of the
17 due diligence?
18     A.  To the best of my recollection, I just had a
19 sum -- summary review with Mr. Bailey as to what his
20 opinions were.
21     Q.  Do you recall any of those opinions that he
22 had?
23     A.  Not specifically, except that nothing abnormal
24 jumped out, or anything from Mr. Bailey.
25     Q.  All right.  Do you recall any discussion with

Page 338

1  Mr. Bailey about whether the reserves were set
2  consistent with the loss history?
3      A.  There was a general discussion that ASR, to the
4  best of my recollection, had been on a first-dollar
5  coverage, had had no real need to set reserves -- that
6  would be the liability and exposure to the insurance
7  carrier -- and only for maybe a short period, a year,
8  give or take, had been in a program where reserves could
9  or would be more important, and that he felt those
10 reserves, based on their losses, were adequate.
11     I recall that they had a rather unusual
12 arrangement or set of arrangements -- "unusual" being
13 different than what we did at StaffAmerica in
14 Charlotte -- with their clients on reimbursement.
15     Q.  What do you mean by that?
16     A.  ASR had developed a methodology where they had
17 a loss-sensitive program, a higher -- as I recall, a
18 higher deductible program, and the clients agreed to,
19 basically, indemnify or participate in those exposures,
20 as was a trend beginning to grow at that time, and I
21 think even bigger today, not just in the PEO industry,
22 but across the board, where clients were willing to take
23 a more active or aggressive role in their loss control
24 management and therefore wanted to or were willing to
25 participate in any risk or -- financial risk or exposure

4 (Pages 335 to 338)

Page 339

1  in those claims; that is to say, if the client was able
2  to manage its claims down, put in safety programs,
3  et cetera, it got a benefit, an economic benefit. If it
4  didn't, and it was sloppy or it had lots of claims or
5  bad luck, it had to pay.
6      Q.  And what review did Mr. Bailey or yourself do,
7  to your knowledge, as to the methodology ASR was using
8  to set its reserves?
9      A.  Specific recollection here today is I did
10  minimal.  At the point where we are in our discussion of
11  that time frame, I became more concerned at the credit
12  underwriting of the clients.  If they agreed, in good
13  faith, to participate in this exposure, financially
14  participate, were they, quote, good for the money if
15  they suddenly had an exposure.
16      With an accounting background, that was much
17  more my concern than the reserve setting or amounts.
18  Reserves are so arbitrary anyway.  The methodologies
19  used are different from insurance company to insurance
20  company and reviewer to reviewer.
21      Q.  Did you or Mr. Bailey have any discussion with
22  the risk management people at ASR about their loss
23  histories and reserves?
24      A.  That weekend or generally over the ensuing
25  period?

Page 340

1      Q.  Yes.  From that point in time through the
2  closing on August 31st, 2002.
3      A.  I recall a very brief -- a reasonably brief
4  general discussion with the loss control people in
5  Dallas, maybe even in Charlotte.  I'm not sure whether
6  they were in the group that came or not.  Bruce went
7  down on more than one occasion.
8      I remember having -- him saying he was having
9  some difficulty aligning schedules and all with the
10  people in Dallas, and reviewed those -- went to Dallas
11  for the purpose of reviewing the losses and the
12  exposures and the risks and the reserves.
13      Q.  All right.  Do you -- do you recall the names
14  of the risk management people at ASR?
15      A.  I'm sorry.  As we sit here, I don't.
16      Q.  So Mr. Bailey went to Dallas with that specific
17  purpose in mind prior to August 31st?
18      A.  Don't want to say yes to your question.  That
19  was certainly one of the main reasons he went.  But was
20  it exclusive to all others?  No.
21      Q.  Did he report back to you as to what he had
22  found and what had occurred in Dallas when he went?
23      A.  I believe that he was generally satisfied as to
24  what he had found and how it had been applied.
25      Q.  So the due diligence period began in early July

Page 341

1  2002 with the review of these six boxes of records and
2  then continued on through the closing in August; is that
3  right?
4      A.  That is correct.
5      Q.  Other than the trip that Mr. Bailey took to
6  Dallas, who else from BACE went to Dallas for the
7  purpose of doing any due diligence?
8      A.  As discussed before, I don't remember the exact
9  people who -- who went, but on each or any given trip,
10  there were people from the IT function in Phoenix,
11  Arizona, and Charlotte that were there.  There were
12  people from operations, payroll procedures, processing,
13  sales and marketing, of course, as discussed, workers'
14  comp.  There were quite a number of people, as I recall,
15  going back and forth.
16      Q.  Do you remember any issues coming up during the
17  due diligence that caused any concern on the part of
18  yourself or BACE in connection with its acquisition of
19  ASR?
20      A.  I think one of the primary things was there
21  might have at least initially been some friction between
22  our staff arriving at their location and the pride that
23  they had had in their operation, and outsiders, if you
24  please, coming in.
25      Q.  Uh-huh.  But as far as -- I'm more interested

Page 342

1  in knowing, did any issues concerning their financial
2  statements or financial condition come up during the due
3  diligence?
4      A.  I'm sure they came up.  Things were discussed.
5  But, no, nothing glaringly stands out in my memory that
6  there were any problems or anything.  They had audited
7  financial statements, as I recall, on a consolidating
8  basis prepared by Ernst & Young, and we were quite happy
9  with that.
10      Q.  All right.  And I assume, given the time period
11  you were conducting due diligence, those would have been
12  the 2001 audited financials?
13      A.  I don't remember.  Probably.
14      Q.  So you don't recall any concerns or issues
15  coming up with respect to any of the items on their
16  financial statements prior to the acquisition?
17      A.  No, not that glaringly stand out.  I remember
18  that there were unusual -- circumstantially unusual
19  situations in that they had made some type of an
20  investment in a program with David Woods at -- who was a
21  competitor at an -- a small insurance company based
22  here, Dallas General or Dallas Indemnity or something.
23  I recall that being somewhat unusual since it was two
24  competitors seeming to meet at an insurance facility,
25  meet financially.  No.

5 (Pages 339 to 342)

Prairie Capital vs Ernst & Young                    04/07/05                    William L. Baumgardner, Vol. 3

Page 343

1    Q.  Any concerns about assets that were recorded on
2 the financial statements not being of the value
3 recorded?
4    A.  Your question as asked as to the value, the
5 answer would be no.
6    Q.  For example, receivables that were on the books
7 that were essentially uncollectible, do you recall
8 anything like that coming up?
9    A.  No, I don't. No, I don't.
10    Q.  And nothing ever came up or came to your
11 attention that indicated the reserves were substantially
12 underestimated on the workers' comp?
13    A.  Absolutely nothing, in answer to your question,
14 that would indicate that they were substantially, your
15 word, understated, no.
16    Q.  Okay. Well, let's leave out the word
17 "substantially." Any indication or -- that came to your
18 attention that the reserves on the workers' comp were
19 understated? .
20    A.  No.
21    Q.  Now, ASR had been on BACE or StaffAmerica's
22 work comp insurance since July of '02, correct?
23    A.  Well, we, I guess, are still in July, so I
24 believe they came on as of the date of the letter of
25 intent, around mid-July.

Page 344

1    Q.  All right. And once they came on to
2 StaffAmerica's insurance program, how was ASR charged
3 for that?
4    A.  How were they charged for the workers' comp
5 program?
6    Q.  Yes, sir.
7    A.  We were still trying to get a handle on their
8 recollection, the participations with clients and the --
9 the contracts that they had. They were charged a
10 percentage that we had to pay to CNA. I don't believe
11 that percentage was altered from what we had to pay to
12 CNA. And then basically they, ASR, were liable for
13 their claims that had to be paid and reimbursed to CNA
14 that would have been advanced by CNA.
15    Q.  All right. So ASR would reimburse BACE for a
16 percentage of the costs BACE would pay to CNA for the
17 insurance; is that correct?
18    A.  Don't want to mislead you. Generally, that's
19 correct, but we -- we had already started, very quickly,
20 to put our software operations into play in Dallas. We
21 had developed, over prior years, through our Phoenix IT
22 operation, the ability that we ran the actual manual
23 premium cost for each and every pay period at each and
24 every facility that we had so that we knew what the
25 reference point of manual premium was for any given

Page 345

1 client, payroll, week, period, subsidiary, however you
2 wanted to look at it. We could determine precisely what
3 that was, almost on a realtime basis. So we were very
4 interested in making sure what the premium generation
5 was by ASR.
6    Q.  All right. Starting mid-July 2002 and then up
7 through October 31st, 2002, when the agreement was
8 entered into between Cura and BACE, did ASR pay for
9 workers' comp coverage on a monthly basis to BACE or
10 StaffAmerica?
11    A.  I can't speak to that. I would say they paid
12 as -- other than to say I believe they paid as billed,
13 those billings were generated out of the Charlotte
14 office to them for their applicable portion.
15    Q.  And did they pay during that time period?
16    A.  As I said, I can't speak to that.
17    Q.  And was ASR instructed to account for their
18 workers' comp program, beginning in mid-July '02, as a
19 fixed-cost program as a result of the way they were
20 being charged by BACE?
21    A.  I don't have any clear recollection, but I want
22 to make sure that we don't get off on a -- a wrong foot
23 by slightly different nuances of the word. A fixed-cost
24 program is a program by which you have a fixed cost with
25 a provider and you know precisely what your costs are.

Page 346

1    We were billing ASR a fixed fee, being the
2 fronting fee, and it was probably in the nature of 25 to
3 35 percent, which I forget the time frames, but those
4 were the ranges they were in for the hard cost to the
5 carrier, CNA, and we were billing that to them. And as
6 I said, they were -- they, ASR, was then liable for
7 their claims. So they're not on a fixed-cost program.
8 You don't know what that cost may be.
9    Q.  I see.
10    A.  But a fixed fee, not necessarily a fixed cost.
11    Q.  All right. So they were still exposed for the
12 losses that were occurring, if any, during that time
13 period?
14    A.  I think I know what you're asking, but I have a
15 problem with the way you asked it, so let me take a --
16 if I may.
17    Q.  That's fine.
18    A.  They were exposed, yes, but exposed only to the
19 net difference. The exposure to ASR was only the net
20 difference of the claim advanced by CNA less what ASR
21 and its staff would have collected under their contract
22 with any given client, so the exposure may be much less
23 than the claim, for which there would be a reserve, and
24 the exposure would almost be as much a credit function
25 as necessarily a loss-reserve function.

Page 347

1   Q.  Was the policy that StaffAmerica had, that ASR
2   was placed on, a loss-sensitive policy?
3   A.  As that term was used in our Charlotte
4   deposition, the answer would be yes.
5   Q.  All right.  In other words, StaffAmerica did
6   not have a guaranteed cost program with CNA from the
7   time period July 15, 2002, through October 31st, 2002;
8   is that correct?
9   A.  That is correct.  I don't think there was a
10  guaranteed cost program for a PEO in existence in the
11  world in those days.
12  Q.  All right.  Are you aware -- strike that.
13      Do you recall instructing Mr. Mann and the
14  staff at ASR to account for the workers' comp at ASR as
15  though it were a guaranteed cost program after July 15,
16  2002?
17  A.  I have no clear recollection -- recollection of
18  that, no.
19  Q.  Do you know if ASR did, in fact, account for
20  its workers' comp after July 15, 2002, and up through
21  October 31st, 2002, as a guaranteed cost program?
22      MR. NASH:  I'll object to the form.
23  A.  No, I don't.
24  Q.  If they did, that could impact the setting of
25  the reserves; is that correct?

Page 348

1       MR. LEVINGER:  Object to form.
2       MR. NASH:  I'll join the objection.
3   A.  You asked me early on how old I was.  In 57
4   years, I've -- I've got a problem with iffin' questions.
5   Who knows what they would have done if something had
6   been different?
7   Q.  Well, you indicated, though, if the company's
8   PEO business is on a guaranteed cost program with a
9   carrier, they don't have a need to set reserves, is that
10  correct, because the cost is fixed with the carrier and
11  the carrier takes the risk on any losses?  Is that true?
12  A.  That is correct.
13  Q.  All right.  Mr. Phillips and Mr. King have both
14  testified that -- Mr. Phillips and Mr. King have both
15  testified that they were not made aware, at any time
16  prior to the August 31st, 2002, agreement whereby ASR
17  was sold to BACE, that the StaffAmerica policy was set
18  to expire on August 31st.  Is -- is that consistent with
19  your recollection?
20      MR. LEVINGER:  Object to the form.
21  A.  I can't speak to what I believe you said
22  Mr. King, or whoever else it was, was aware.
23  Q.  Mr. Phillips.
24  A.  I can't speak to what they knew or recollected
25  or -- or anything else.

Page 349

1   Q.  Well, is it your recollection that they were
2   informed that the StaffAmerica policy was set to expire
3   on August 31st, 2002, prior to the time the stock
4   purchase agreement was signed?
5   A.  I -- I don't have a clear recollection, as we
6   sit here today, that they knew or didn't know, or when
7   they knew it, but that was 45 days, and a lot happened
8   in the --
9   Q.  All right.
10  A.  -- PEO business in 45 days.
11  Q.  Now, you did testify, though, that about the
12  week before the closing on the August 31st, 2002,
13  agreement, that you had some discussions with people
14  connected with Certified Services about posting some
15  letters of credit on your behalf with CNA.  Is that
16  true?
17  A.  I believe that to be true as to the time frame.
18      MR. BUNCHER:  All right.  I'm going to
19  just take your stickers here.
20      (Deposition Exhibit 116 was marked.)
21  Q.  I'll show you what's marked Deposition Exhibit
22  116.
23      MR. BUNCHER:  I'm sorry, I only have three
24  copies.  How do we want to do this?  I need one myself,
25  so --

Page 350

1       MR. LEVINGER:  You can give him that, and
2   I'll -- I'll share with the witness.
3       MR. NASH:  Thank you.
4   Q.  Do you recognize Exhibit 116 as a fax from a
5   Ray McCartha at Brentwood Capital to you dated August
6   29th, 2002?
7   A.  I think your word was "recognize."  I don't
8   remember seeing this document, but it, from the
9   Bates -- Bates stamps, came out of our organization.  I
10  did speak with Mr. McCartha about that time.
11  Q.  All right.  And the message says, it was good
12  to talk to you today with Ivan and Anthony.  Attached is
13  our nondisclosure agreement.
14      Do you recall having a discussion around this
15  time period with Mr. Dobrin?  And I assume "Anthony"
16  refers to Anthony Huff.  Is that correct?
17  A.  I do recall having a discussion with Ivan, and
18  I would concur with you most probably that that was
19  Anthony Huff.
20  Q.  All right.  What led to the discussions with
21  Mr. McCartha, Mr. Dobrin, and Mr. Huff at this time?
22  A.  Simply stated, that we needed -- we had a need
23  to have a letter of credit posted with CNA to continue
24  an ongoing relationship with CNA.
25  Q.  And how did you get in touch with Mr. McCartha

Prairie Capital vs Ernst & Young                04/07/05                William L. Baumgardner, Vol. 3

Page 351

1  about that issue? And I don't mean did you call him up.
2  How did you know that Mr. McCartha was somebody that might be
3  able to help you?
4      A. Didn't. I had spoken with Mr. Dobrin, who
5  facilitated the transference and inclusion of
6  Mr. McCartha.
7      Q. All right. And when he says it was good to
8  talk with you today, was that a telephone call or a
9  meeting in person?
10     A. Best of my recollection, it was a telephone
11  call.
12     Q. Tell me what you remember about that call.
13     A. That was a reasonably brief phone call.
14  Mr. McCartha went on at some length about Brentwood
15  Capital -- Capital's capability and Mr. Huff's
16  capability and wealth and ability to put up letters of
17  credit, collateral for letters of credit, et cetera,
18  with a host of banks.
19     We chatted generally about what we were doing
20  and the nature. He was familiar with our company, had
21  heard of it, I presume, other than through Ivan, and was
22  interested in pursuing that aspect of the conversation.
23     Q. Did you understand what relationship, if any,
24  there was between Brentwood Capital, on the one hand,
25  and Cura or Certified Services, on the other hand, and

Page 352

1  Mr. Huff?
2      A. At August 29th?
3      Q. Yes. Did you come to understand or learn later
4  what the nature of that relationship was, if any?
5      A. The relationship, as I understand it, between
6  Brentwood, Cura, Huff, McCartha, et al., is so
7  convoluted, was our experience over the next ensuing
8  period, that the answer to your question is no.
9      Q. And we covered in your previous deposition that
10  letters of credit ended up being posted on behalf of
11  StaffAmerica with CNA; is that correct?
12     A. You're referring to the August and September
13  letter of credit?
14     Q. Correct.
15     A. Documents were posted with CNA.
16         (Deposition Exhibit 117 was marked.)
17     Q. All right. Let me show you what's marked
18  Exhibit 117.
19     Let me first ask you, before we go to that --
20  Exhibit 116, the disclosure -- or nondisclosure
21  agreement attached there is not signed. Do you know if
22  one was ever signed?
23     A. I do not.
24     Q. I'll show you what's marked Exhibit 117. This
25  exhibit is a -- it's an unsigned loan agreement dated

Page 353

1  August 30, 2002, between StaffAmerica and Brentwood
2  Capital, and it indicates in the first "whereas" clause
3  that StaffAmerica has requested that Brentwood procure,
4  on behalf of StaffAmerica, a letter of credit in the
5  amount of $3,860,000 for the purposes set forth in
6  Section 7.1.1. Do you see that?
7      A. I do.
8      Q. Do you know if this loan agreement was ever
9  signed?
10     A. A loan agreement was signed. Whether it's this
11  loan agreement or not, I haven't had a chance to review
12  it, and this one is not executed.
13     Q. All right.
14     A. So I don't know.
15         MR. BUNCHER: I would request if a loan
16  agreement that's signed is in your files, that it be
17  produced, because I've reviewed the BACE document
18  production and I don't find any signed version of this
19  loan agreement or any other loan agreement, and I just
20  note that request for the record.
21     Q. Was the loan agreement signed in order that
22  Brentwood could procure the letter of credit? Let me
23  rephrase that. Did Brentwood require StaffAmerica to
24  sign a loan agreement similar to this exhibit before it
25  would post a letter of credit with CNA?

Page 354

1      A. Brentwood Capital required us to sign a loan
2  agreement prior to its putting up the letter of credit.
3      Q. All right. And do you contend that there was
4  something wrong with the letters of credit that were
5  posted with CNA?
6      A. Do I contend?
7      Q. Yes.
8      A. Don't know that I'm in a position to contend
9  that there was or wasn't.
10     Q. Do you know --
11     A. I think that others have contended that there
12  were things wrong with it.
13     Q. Are -- are these letters of credit that were
14  posted on behalf of StaffAmerica with CNA the subject of
15  litigation between CNA and Certified Services or
16  Brentwood in Florida?
17     A. I am not firsthand informed enough to -- to
18  give you a definitive answer, but that was my
19  understanding from the news media and the stories going
20  around, yes.
21     Q. Did CNA -- did you ever speak to anyone with
22  CNA that contended that the letters of credit were
23  fraudulent or that there was some other problem with the
24  letters of credit?
25     A. There was some general discussion to that

8 (Pages 351 to 354)

ALPHA REPORTING SERVICES, INC., DALLAS, TX  (888) 667-DEPO

Prairie Capital vs Ernst & Young     04/07/05     William L. Baumgardner, Vol. 3

---

**Page 355**

1 effect, but whether or not -- I don't remember who it
2 would have been with or -- or not.
3    Q. Do you remember when?
4    A. No. Sub -- let's make sure we understand.
5 Substantially after the fall of '02 -- and it actually
6 started, I believe, with an article in the newspaper in
7 Florida. There was a gentleman down there who --
8 Brogga, something like that. And I recall that Brian
9 and I were out of town, and someone saw it on the
10 Internet and called us and said, you know, basically,
11 have you heard anything about this? No.
12    Q. When you heard about this, did you have any
13 discussions with anybody at Certified Services or
14 Brentwood Capital about this?
15    A. I don't have any clear recollection of anybody.
16 I believe that -- that what we heard was even after the
17 June 27, '03, closing. Had no reason to have a
18 conversation with anybody about it.
19    Q. Were you provided with copies of the letters of
20 credit that were posted with CNA after the first loan
21 agreement was signed on or about the end of August 2002?
22 And when I say "you," I'm referring to BACE or
23 StaffAmerica.
24    A. We never saw the original. It was handled by
25 Brentwood, McCartha, Huff, Spinelli law firm, and we

**Page 356**

1 did, subsequent to them posting it with CNA, I think,
2 get a fax copy or a copy.
3    Q. You testified in your previous deposition that
4 the funds that are referenced here in this loan
5 agreement, the $3.8 million, that none of that money
6 ever went to BACE or StaffAmerica; is that correct?
7    A. That is correct, and that is what I testified
8 to.
9    Q. And do you know for a fact that -- well, do you
10 know who Brentwood -- what Brentwood used that amount of
11 money for?
12      MR. LEVINGER: Object to form.
13    A. As we sit here today, no, I do not. I'm not
14 even sure that there ever was any money.
15    Q. You don't know what money, if any, they used to
16 procure the letters of credit; is that your testimony?
17    A. That is my testimony.
18    Q. StaffAmerica never repaid the loans that were
19 made prior to the issuance of the letters of credit,
20 correct?
21    A. If I understand your question, we would have
22 had no reason to repay the loan prior to the issuance of
23 the letter of credit. Once the letter of credit was
24 issued and the loan document and all signed as part of
25 the closing, yes, we were on a repayment schedule a --

**Page 357**

1 for the 3,860,000, an interest schedule, a management
2 soft cost fee schedule, as I recall, and a collateral --
3 monthly paid weekly collateral funding to provide
4 collateral for the 3,860,000.
5    Q. And who made -- who made those payments, and to
6 whom did they make the payments to?
7    A. Who made the payments? I'm going to generally
8 answer that by saying we did, the collective "we,"
9 whether it was StaffAmerica, BACE International, or
10 effectively or constructively, ASR and Meridian and all,
11 through amounts billed to them.
12      And the second part, I think, to your question
13 is answered by saying we in Charlotte at -- we in
14 Charlotte were instruct -- billed -- initially billed
15 and instructed as to where to send the money weekly.
16      The billing varied. The amount increased over
17 the ensuing weeks, and the inclusion -- what was
18 included in those items varied, and it was paid,
19 typically, if not without exception, by wire transfer,
20 collective funds.
21    Q. And to what entity was the money paid?
22 Certified Services or Brentwood Capital?
23    A. I have no clear recollection because I didn't
24 make that payment.
25    Q. How long did the payments continue on -- the

**Page 358**

1 payments you've just described?
2    A. In some form, fashion, or amount, up to,
3 through, and including the date of the closing at
4 27 June '03, and maybe even a week or two after that.
5    Q. As of June 27, '03, was BACE or StaffAmerica
6 current, as far as you knew, on the payments that were
7 billed -- current on the charges that were billed that
8 you've just described?
9    A. First, the amounts kept changing in an
10 increasing amount. There was no fixed schedule. Some
11 of the elements of that payment were fixed, such as the
12 repayment on this loan, the repayment on the subsequent
13 loan, et cetera, but there were no schedule of payments,
14 so it's hard to say whether you were current as to all
15 fees billed.
16      Secondly, we had sent, as instructed, via wire,
17 all monies that we had been notified to send weekly, and
18 that's easy to remember because often it was -- more
19 often than not it was extremely difficult to come up
20 with the amount of monies due, and we were constantly
21 reminded that if we didn't send the money, our insurance
22 would be terminated forthwith, immediately, et cetera,
23 and we would be -- et cetera, et cetera, shut down.
24    Q. Who was that that reminded you of that?
25    A. The least of these, if you please, would have

9 (Pages 355 to 358)

Prairie Capital vs Ernst & Young                    04/07/05                    William L. Baumgardner, Vol. 3

Page 359

1  been the accounting, billing, Beene and some other
2  people in the accounting department. The most
3  adamant --
4      Q.  Accounting department where? Certified
5  Services?
6      A.  Well, in Florida. Let's talk Florida, whether
7  it's Certified or Cura I, II, XXVI, or whatever. The
8  accountants in Florida.
9      Q.  All right.
10     A.  Wait a minute. And the most regular demander
11  and reminder of the money would have been Ivan, and the
12  most vocal of the demanders would have been Danny
13  Pixler.
14     Q.  How often did you have conversations with
15  Mr. Pixler about these billings for the letters of
16  credit and loans?
17     A.  I did not make those payments. Mike Aldrich in
18  our office made those payments and dealt with the group,
19  as did Bruce Bailey. As to -- Bruce as to the amounts
20  and how much the amount was going to be this week,
21  et cetera, et cetera.
22          Mr. Aldrich was charged with coming up with the
23  money and paying the money and actually wiring the
24  money, and my firsthand knowledge of that was typically
25  a very early phone call on the -- the middle of the

Page 360

1  week, whether it was Tuesday, Wednesday, that that money
2  was due, and very frequent phone calls every 25, 30
3  minutes -- have you sent the wire yet -- until the wire
4  was sent. We used a --
5      Q.  Those calls you just described came in to you?
6      A.  To me, to Mr. Aldrich, quite often to -- to
7  Mr. Bailey, and quite often those people having taken
8  those phone calls came to my office and said, what do we
9  do? And the -- the way to shut that down each week, the
10  act was the actual sending of the wire.
11          We used an Internet type connection to our bank
12  account, which generated a wire acknowledgment sheet,
13  and when we had that wire acknowledgment sheet as to
14  instruction amount and everything else, I believe Mike
15  and his staff -- Mr. Aldrich -- faxed it to Mr. Dobrin
16  or Mr. Pixler or Mr. Beene or Mr. Cunningham or whoever
17  was in the -- the loop that day.
18     Q.  What was Mr. Aldrich's position?
19     A.  At BACE staff, et cetera?
20     Q.  Yes.
21     A.  Mike's the first employee -- Mr. Aldrich is the
22  first employee I ever had. He's been with me longer
23  than anybody I've ever worked with in my life and is
24  probably the most trusted person I know on the face of
25  the earth.

Page 361

1      Q.  All right. Well --
2      A.  Didn't mean that to be nonresponsive. What his
3  title is?
4      Q.  Does he work in the accounting department, or
5  just kind of a jack-of-all-trades, does whatever he's
6  asked to do, or what?
7      A.  Well, by education, I believe his degree is in
8  computer mathematics. He's quite intelligent. By
9  experience, he has probably spent more time in the PEO
10  industry than anybody, certainly in our organization,
11  besides me.
12          He doesn't do as instructed. He does as
13  requested. He's not a robot, and he's not a
14  jack-of-all-trades, unless you mean that in the most
15  endearing sort of fashion. He is a professional
16  facilitation of things that I would otherwise be called
17  to do on a daily basis.
18     Q.  All right. And is it your understanding the
19  payments were always made at the corporate level at
20  either BACE or StaffAmerica from Charlotte and then
21  money would be obtained from the various PEO operations
22  in order to make those payments?
23     A.  That is my recollection.
24     Q.  So the -- the subsidiary entities like ABP,
25  Meridian, and ASR, they would be charged for the --

Page 362

1  these costs?
2      A.  That is correct.
3      Q.  And all three of those entities' operations
4  were covered by the policy with CNA for which these
5  letters of credit were posted?
6      A.  That is correct.
7      Q.  What is the purpose of the posting of these
8  letters of credit with CNA?
9      A.  We could talk for hours about that from the
10  different perspectives. I'm going to simply try to
11  answer your question by saying it's a condition in your
12  insurance policy with the carrier that they can demand
13  collateral, and a letter of credit is the most
14  acceptable means second to cash.
15     Q.  And if -- if ASR, ABP, and Meridian sustain
16  significant losses on work comp claims such that they
17  were unable to pay, the letters of credit could be
18  called upon by CNA to -- to pay those losses; is that
19  correct?
20     A.  I believe that to be the philosophy. I never
21  had one called, so I'm not sure exactly what they do.
22     Q.  But the party posting the letters of credit is
23  taking on some risk, is that true, that those letters of
24  credit could be called upon?
25     A.  Your question, as asked, I believe to be yes.

ALPHA REPORTING SERVICES, INC., DALLAS, TX (888) 667-DEPO

Page 363

1          (Deposition Exhibit 118 was marked.)
2     Q.  Let me show you what's marked Exhibit 118.  Is
3  this an e-mail from Larry Brock to you dated August
4  30 -- 30th, 2002?
5     A.  All right.
6     Q.  Is that an August 30th e-mail from Larry Brock
7  at Starcrest to you?
8     A.  Yes.
9     Q.  And does this relate to your efforts, at this
10 time, to try to secure an extension of the coverage with
11 CNA?
12    A.  It does.
13    Q.  Was this -- were the terms of this extension
14 that are being discussed in this e-mail something
15 different than the efforts you were making to have
16 Brentwood or Certified or Cura post letters of credit on
17 your behalf, or was it all part of the same thing?
18    A.  I believe it to have all been part of the same
19 thing, as you used the terms.  Brentwood, Cura, McCartha
20 knew Larry Brock, Howard Rosendale, CNA had done
21 extensions, they said -- McCartha said, for other
22 people, and were quite familiar with what Howard
23 Rosendale wanted, CNA would accept; carrier, lender, et
24 cetera.
25          (Deposition Exhibit 119 was marked.)

Page 364

1     Q.  Let me show you what's marked Exhibit 119.
2  Is -- is this an e-mail from Peter Campitiello to you
3  dated August 30th, 2002?
4     A.  Is -- is -- I'm sorry.  Is the question is this
5  an e-mail from him?
6     Q.  Yes.
7     A.  It would certainly include that.  I notice at
8  the top right corner it says page 3 of 3.  I'm not sure
9  what the other two pages is.
10    Q.  All right.  At the very top, it looks like
11 there is a response from you saying this is the
12 information you requested.  See that?
13    A.  I do.
14    Q.  Apparently, Mr. Campitiello was needing some
15 information about StaffAmerica, its subsidiaries, and
16 affiliates.  Do you know who Mr. Campitiello was
17 representing?
18    A.  This e-mail seems to say that Mr. Campitiello
19 needs some information, that it was about subsidiaries
20 and affiliates and everything else.  I don't see that
21 from this e-mail, do I?
22    Q.  No.  I'm just asking you do you know who he was
23 representing as a lawyer when he was asking for this
24 information?  Was he representing Brentwood Capital?
25    A.  It was my understanding at this juncture that

Page 365

1  Mr. Campitiello was a lawyer with Levy, Boonshoft &
2  Spin -- Boonshoft & Spinelli, and he was -- had been
3  tasked to work on this project, and we were
4  communicating with him.
5     Q.  "This project" being the obtaining of the
6  letters of credit?
7     A.  Yes, sir.
8          (Deposition Exhibit 120 was marked.)
9     Q.  I'll show you now what's marked Exhibit 120.
10         THE VIDEOGRAPHER:  Excuse me, counsel.
11 Can I have 60 seconds to change tape, please?
12         MR. BUNCHER:  Sure.
13         THE VIDEOGRAPHER:  We're off the record at
14 10:32.
15         (A recess was taken.)
16         THE VIDEOGRAPHER:  This is the beginning
17 of Tape 2.  We're back on the record at 10:41.
18    Q.  Mr. Baumgardner, Exhibit 120 is another e-mail
19 from Larry Brock, on August 30, 2002, referencing the
20 extension you were trying to negotiate with CNA; is that
21 correct?
22    A.  I believe it is part of -- yes, another e-mail
23 with ongoing dialogue.
24    Q.  Now, the subject referenced here is 60-day
25 extension.

Page 366

1     A.  Right.
2     Q.  In fact, what happened was a 30-day extension
3  and then another letter of credit posted for another
4  30-day extension; is that correct?
5     A.  No.
6     Q.  Okay.  Why is that not correct?
7     A.  Because that's not what happened.  What -- what
8  we ultimately agreed to do is to have a 60-day
9  extension, the first 30 days of which were guaranteed by
10 the placing of the letter of credit.  A second letter of
11 credit had to be placed during that first 30 days to
12 automatically roll the second 30 days of the 60-day
13 extension in play.
14    Q.  Okay.
15    A.  And if it wasn't done, then we knew and
16 understood that CNA would issue a, basically,
17 termination of the 60-day.
18    Q.  And the first letter of credit expired at the
19 end of September, is that correct, and that's why
20 another one had to be posted for the month of October?
21    A.  I don't -- I don't believe you mean to say what
22 you just said.  The first -- the coverage for the first
23 letter of credit expired.  I think you said the first
24 letter of credit expired.  I don't --
25    Q.  Okay.

11 (Pages 363 to 366)

Prairie Capital vs Ernst & Young            04/07/05            William L. Baumgardner, Vol. 3

Page 367

1    A.  I think it went for quite some time.  May still
2    be going.
3    Q.  The first letter of credit covered only the
4    period August -- or excuse me -- September 1 through
5    September 30th, 2002?
6    A.  I'll agree with that.
7    Q.  All right.  You can set that aside.
8    A.  (Witness complies.)
9        (Deposition Exhibit 121 was marked.)
10   Q.  Exhibit 121 is a guaranty that's unsigned,
11   dated August 30, 2002.  Do you know if a guaranty such
12   as this was signed, in fact, prior to the posting of the
13   first letter of credit?
14   A.  You know, I have no clear recollection that we
15   did or didn't, as we sit here today.  Things, as you can
16   see from your e-mails, were flying pretty hectic around
17   that time.
18        MR. BUNCHER:  All right.  Again, I would
19   request, if there is a signed guaranty, that it be
20   produced.  It wasn't produced.
21   A.  There is an implication in your request on the
22   record.
23   Q.  I'm not -- I'm not suggesting there is or isn't
24   a signed copy.  I'm saying if there is one, I want to
25   have it, because I don't have it.

Page 368

1    A.  If there is one in our possession?
2    Q.  Correct.
3    A.  Okay.
4    Q.  Yes.
5    A.  I understand that.
6    Q.  Yes.  Obviously, you can't produce something
7    you don't have.
8        (Deposition Exhibit 122 was marked.)
9    Q.  Show you what's marked Exhibit 122, which is a
10   stock and collateral pledge agreement, again, unsigned,
11   dated August 30, 2002, that appears to be an agreement,
12   again, relating to the issuance of the first letter of
13   credit.  And my question to you is, do you know if this
14   agreement was signed, or something similar to it?
15   A.  I believe that it was.  How similar it was to
16   this document, I don't know.
17        MR. BUNCHER:  Okay.  And I make the same
18   request, if there is a signed one in your files, that it
19   be produced.
20   A.  May I ask a question?
21   Q.  Sure.
22   A.  You don't have another version of this that has
23   been signed?
24   Q.  I do not.
25   A.  Never has been one produced or anything like

Page 369

1    that?
2    Q.  Well --
3    A.  I'm just asking for my own purpose.
4    Q.  As you see, the secured party -- these
5    documents are for the benefit of Brentwood Capital.  I
6    don't represent Brentwood Capital.  I've produced
7    documents that Certified and Cura had in their files,
8    which I don't believe contain these -- signed versions
9    of these documents.  Now, Brentwood Capital may have
10   them.  I don't -- I have not checked with them.
11   A.  Okay.
12   Q.  I've shown you the stock and collateral pledge
13   agreement, this guaranty, and then earlier I showed you
14   the loan agreement.  Do you know who drafted those?
15   A.  No.
16   Q.  Do you know if it was Mr. Campitiello?
17   A.  I do not know that.  They came to Charlotte
18   from New York, and somebody up there was doing the
19   drafting, and as you referenced, Mr. Campitiello asked
20   for information early on, and I pretty much assumed that
21   he had been task-assigned to do it.  Do not have an idea
22   for a fact, firsthand, who was doing the drafting.
23        (Deposition Exhibit 123 was marked.)
24   Q.  Show you now what's marked Exhibit 123.  Is
25   this a fax from Howard Rosendale at CNA to you, on

Page 370

1    September 3rd, 2002, indicating that they had received a
2    faxed copy of a letter of credit in the amount of
3    $3,860,000?
4        MR. LEVINGER:  You referred to this as a
5    fax.  You mean an e-mail?
6        MR. BUNCHER:  I thought I said e-mail, but
7    if I didn't --
8    Q.  Is this an e-mail from Mr. Rosendale to you, on
9    September 3rd, 2002, referencing the fact he had
10   received a copy of the letter of credit?
11   A.  That is what it appears to be.
12   Q.  And it says, let us know when you believe the
13   actual LOC will be going out so I can advise the home
14   office to keep an eye out for it.
15        Do you know when the actual LOC was sent to
16   CNA?
17   A.  I do not.
18   Q.  The copy he references that had been faxed to
19   him, had you faxed it to him, or someone on your behalf?
20   A.  I guess, constructively, one would say someone
21   on my behalf, but that someone would have been someone
22   in New York; McCartha or whoever.  It was nobody -- it
23   was not me or anyone on my staff.
24   Q.  I see.  Okay.
25   A.  Keep in mind, looking at the date, September

12 (Pages 367 to 370)

ALPHA REPORTING SERVICES, INC., DALLAS, TX (888) 667-DEPO

Prairie Capital vs Ernst & Young                    04/07/05                    William L. Baumgardner, Vol. 3

Page 371

1   3rd --
2   Q.   Yes, sir.
3   A.   -- as previously stated, McCartha was dealing
4   direct with CN -- McCartha, et al., was dealing direct
5   with CNA. We had been assured that there had been
6   comfort CNA had extended, that we still had coverage,
7   et cetera. We had had no such comfort from CNA. We
8   wanted to know from CNA that they did have the LOC, that
9   they were happy, and we were rolling forward.
10  Q.   But they had -- CNA hadn't sent any notices
11  that your coverage had been terminated at that point?
12  A.   I'm sorry. Say it again.
13  Q.   CNA had not sent any notices in early September
14  indicating your coverage had been terminated, had it?
15  A.   I don't clearly recollect.
16         (Deposition Exhibit 124 was marked.)
17  Q.   All right. Look at Exhibit 124. This is an
18  e-mail dated September 16, 2002, from Mr. Brock to you,
19  forwarding an e-mail from Mr. Rosendale; is that
20  correct?
21  A.   I believe that to be correct.
22  Q.   Mr. Rosendale's e-mail says, today is the 16th.
23  If we do not get the highlighted items today we will be
24  sending out cancellation. We will not reinstate
25  coverage.

Page 372

1         Do you know what the highlighted items were
2   that he was referring to?
3   A.   I do not.
4   Q.   Does this indicate to you they had not yet
5   received the original letter of credit?
6   A.   I -- I don't know what this indicates --
7   Q.   Okay.
8   A.   -- other than absolute alarm and chaos into my
9   life that day.
10  Q.   Do you know that the original letter of credit
11  was, in fact, posted at some point with CNA in
12  September?
13  A.   I can't say yes or no to that. I know that it
14  no longer became an issue for me from CNA.
15         (Deposition Exhibit 125 was marked.)
16  Q.   I'll show you what's marked Exhibit 125. Is
17  that an e-mail from Mr. Rosendale to you, indicating
18  they had not yet received the $2.7 million LOC or the
19  additional $750,000 that was part of the extension
20  agreement and was to be received on or prior to 9/15/02?
21  A.   This is what that appears to be.
22  Q.   All right. Now, September 18th, 2000 -- you
23  can set that aside.
24         September 18, 2002, the day after this e-mail
25  from Mr. Rosendale --

Page 373

1   A.   I'm sorry. Which e-mail?
2   Q.   The one we just looked at.
3   A.   It's dated September. Okay. The day after
4   September 17.
5   Q.   All right. On September 18, the next day --
6   A.   Okay.
7   Q.   -- is when you closed the acquisition of ASR in
8   Charlotte, correct?
9   A.   I don't remember the date of the closing in
10  Charlotte.
11  Q.   Okay. You recall, though, the closing occurred
12  a couple of weeks after August 31st, which was the date
13  on the stock purchase agreement. Do you recall that?
14  A.   No, I don't recall the date of the closing.
15         (Deposition Exhibit 126 was marked.)
16  Q.   All right. Let me show you what's marked
17  Exhibit 126. You see that these are a series of
18  acknowledgment and receipts that are signed by Stephen
19  King, on behalf of Prairie Capital and some of the other
20  shareholders of ASR that he signed as power of attorney
21  for, all dated September 18, 2002. Do you see that?
22  A.   That is what they appear to be.
23  Q.   And in the acknowledgments it says he's
24  received the various promissory notes, and it says that
25  he hereby accepts the notes as payment in full of that

Page 374

1   certain senior subordinated promissory note in the
2   amount of -- and then the amounts vary.
3   A.   I'm sorry. I'm missing something. Where are
4   you?
5   Q.   Looking at -- well, let me just ask. Do you
6   know what these acknowledgement and receipts were for?
7   A.   It's -- okay.
8   Q.   Do you know what they were for?
9   A.   It -- it would appear -- I have no clear
10  recollection as we sit here. It would appear that these
11  are the receipts for the promissory notes issued at the
12  time of the closing.
13  Q.   All right. Does this refresh your memory that
14  the closing occurred September 18th, 2002?
15  A.   No, it doesn't, but it makes me think it does.
16  Doesn't refresh my memory.
17  Q.   Did -- had CNA been satisfied by the time of
18  the closing?
19  A.   I have no clear recollection that they had or
20  hadn't as to the time of the closing. The assurances
21  had been given from the people in New York that they
22  were coming through with the letters of credit and we
23  would go forward and the CNA coverage extension would be
24  taken care of.
25  Q.   All right. What was your intention if CNA

13 (Pages 371 to 374)

ALPHA REPORTING SERVICES, INC., DALLAS, TX (888) 667-DEPO

Prairie Capital vs Ernst & Young                 04/07/05                 William L. Baumgardner, Vol. 3

---

Page 375

1  didn't come through or something fell through with the
2  letters -- the posting of the letters of credit? How
3  were you going to cover your worker -- your PEO
4  operations including ASR, which you had just acquired,
5  with workers' comp coverage?
6      A.  At that moment in time, I don't remember what
7  we were doing or going to do, because we had relied on
8  the assurances from McCartha and Brentwood and the
9  people up there that the problem would be issued.
10  That's why back over here when you said a 30-day
11  extension, we said, no, we want a 60-day extension.
12      Q.  All right.  And, in fact, the letters of credit
13  ended up being posted, and the extension was -- was
14  granted; is that correct?
15      A.  Whatever was done in New York was done, and CNA
16  continued our coverage.
17      Q.  And -- and they continued your coverage through
18  September 30th -- excuse me.  They -- they continued
19  your coverage through October 31st, 2002, correct?
20      A.  I believe that to be correct.
21      Q.  You can set that aside.
22      A.  (Witness complies.)
23          (Deposition Exhibit 127 was marked.)
24      Q.  I'll show you what's marked Exhibit 127.  Is
25  this a fax to Mr. McCartha and to you from a Bill Leyton

---

Page 376

1  with Strategic Bancorp, B-a-n-c-o-r-p, in Beverly Hills,
2  California, dated September 27th, 2002?
3      A.  It is a piece of paper.  It is a piece of paper
4  bearing a Bates stamp, that does not have any
5  letterhead, that does have that writing to which you
6  make reference.
7      Q.  All right.  The fax cover sheet indicates it's
8  coming from Bill Leyton, L-e-y-t-o-n, at Strategic
9  Bancorp in California, attaching documentation, and the
10  documentation that's attached purports to be a September
11  30, 2002, irrevocable letter of credit, beneficiary,
12  Continental Casualty Company.  Do you see that?
13      A.  I do.
14      Q.  And this says it's effective September 30,
15  2002.  Do you see that in the first paragraph?
16      A.  I do.
17      Q.  And on the second page of that document, it
18  says the amount of it is $3,860,000.  See that?
19      A.  I see that on 314.
20      Q.  Was this the second letter of credit that was
21  posted with CNA on behalf of StaffAmerica?
22      A.  I believe that to have been correct.  I'm -- I
23  believe that to have been correct.  I'm trying to -- to
24  reason out the dating and everything.  I don't remember
25  which one came first.  And one of the things that's

---

Page 377

1  confusing me is -- trying to deal with the dates, is the
2  letter of credit's dated September 30th of '02.  The
3  transmittal you asked about is dated September 27th of
4  '02, but the fax masthead on the top of all three pages
5  is dated February 24th of '02, which is, you know, six
6  or eight months prior to the date of any of that.
7      Q.  All right.  Do you have any explanation for why
8  the fax header has a different date?
9      A.  No, I don't.
10          (Deposition Exhibits 128-129 were marked.)
11      Q.  All right.  Let me show you what are marked
12  Exhibits 128 and 129, and I'll just show you these
13  together.  It appears from these Exhibits 128 and 129
14  that upon your receipt of the fax from -- that we just
15  looked at from Mr. Leyton, you forwarded the letter of
16  credit on, by fax, to Mr. Rosendale with CNA and Larry
17  Brock with Bouchard, B-o-u-c-h-a-r-d, Insurance,
18  correct?
19      A.  I'm sorry.  Do you mind saying that again?  May
20  I have a second to look at this?
21      Q.  Sure.  And while you're looking at them, you
22  see that both fax sheets from you to Mr. Rosendale and
23  Mr. Brock are dated September 28th, 2002, which is the
24  day after the date on the previous exhibit I showed you
25  from Mr. Leyton.

---

Page 378

1      And all I'm asking you is, from these two
2  exhibits, 128 and 129, it looks like you went -- you
3  forwarded, by fax, what you had received from Mr. Leyton
4  to Mr. Rosendale and Mr. Brock the next day, on
5  September 28th, because each of these faxes has a copy
6  of the same irrevocable letter of credit that was
7  attached to Mr. Leyton's fax sheet.  Do you see that?
8      A.  I do.
9      Q.  All right.  Do you recall doing that?
10      A.  No.  This is not my handwriting on the front on
11  the transmittal.
12      Q.  Okay.  Did you recall instructing somebody to
13  do that, since CNA was obviously waiting for the letters
14  of credit to come in?
15      A.  I do not recall instructing somebody, but I'm
16  sure, based on this, that I did.
17          (Deposition Exhibits 130-132 were marked.)
18      Q.  I'll show you what's marked Exhibit 130,
19  Exhibit 131, Exhibit 132.
20          MR. BUNCHER:  Here is Exhibit 130.  Here
21  is Exhibit 131.
22      Q.  And -- and if you're looking for the previous
23  ones, these are different.  They have a different date.
24  They're all dated September 30th, 2002.
25      A.  Okay.

14 (Pages 375 to 378)

ALPHA REPORTING SERVICES, INC., DALLAS, TX  (888) 667-DEPO

Page 379

1        MR. BUNCHER: Here is Exhibit 132. This
2   is 131, 132.
3        Q. And do you see that Exhibit 130 is another loan
4   agreement -- again, it's unsigned -- between Brentwood
5   Capital and StaffAmerica, and Exhibit 131 is an unsigned
6   stock and collateral pledge agreement, and then Exhibit
7   132 is an unsigned guaranty? All these bear a date of
8   September 30, 2002. Do you see that?
9        A. I don't see a date on 132. Am I missing that
10  somewhere?
11       Q. It's on the last -- it's on the second-to-last
12  page above the signature line.
13       A. I do.
14       Q. All right. Do you recall having to sign
15  another loan agreement, stock and collateral pledge
16  agreement, and guaranty in connection with the issuance
17  of the second letter of credit?
18       A. Yes.
19       Q. Okay. Do you know why these are unsigned from
20  your files?
21       A. I do not.
22       Q. Do you know if you have signed copies?
23       A. I do not.
24       Q. Okay.
25       A. I thought we did.

Page 380

1        Q. All right.
2        A. When I get back, we will double-check. I
3   apologize.
4        Q. That's all right. If you do, I just ask that
5   they be produced.
6        MR. BUNCHER: What number are we on?
7        THE REPORTER: 133.
8        MR. BUNCHER: 133?
9        THE REPORTER: Uh-huh.
10       (Deposition Exhibit 133 was marked.)
11       Q. I'll show you now what's marked Exhibit 133.
12       A. We through with these?
13       Q. Yes. This was another document produced by
14  BACE in this lawsuit that says, at the top, "BACE
15  International Corporation, Consolidating Trial Balance,
16  September 30, 2002." Do you see that?
17       A. I do.
18       Q. What operations are consolidated in these --
19  this document? And my question really is, does this
20  include ASR? I guess it does. If you look to the right
21  on the first page, it shows numbers for American Staff
22  Resources Group. Do you see that?
23       A. I do.
24       Q. Who prepared this?
25       A. With the input of numerous people, probably I

Page 381

1   did.
2        Q. What was the purpose for this to be prepared?
3        A. We have, since inception, prepared a financial
4   statement. I, the collective I, me, have prepared a
5   financial statement on a consolidating basis to get a
6   one-shot picture of as much as we could of the detail of
7   each of the things that we were -- we owned or were
8   invested in.
9        It is prepared for internal use only and
10  management's use only, who are familiar with the
11  operations. Not many people have a copy of this. It's
12  not a widespread, circulated document.
13       Q. Do you know if -- if this document or any
14  similar financial information like this was shared with
15  Cura or Certified Services before the signing of the
16  October 31st, 2002, stock purchase agreement?
17       A. I do not have a clear recollection of any such
18  sharing.
19       Q. Okay.
20       A. There was a discussion, but what was shared, I
21  just don't remember.
22       Q. Okay. Do you believe the information contained
23  within this exhibit is true and accurate -- a true and
24  accurate representation of the financial condition of
25  BACE's PEO businesses as of September 30th, 2002?

Page 382

1        A. For our purposes, I do.
2        Q. All right. Tell me what led to this October
3   31st, 2002, stock purchase agreement that was marked as
4   Exhibit 19 in your previous deposition.
5        MR. LEVINGER: Do you want him to see it?
6        MR. BUNCHER: Yes. You can set that
7   exhibit aside.
8        MR. LEVINGER: Here is 19.
9        Q. My question is, what led to the stock purchase
10  agreement between BACE and Cura Group dated October
11  31st, 2002?
12       A. The long answer or short answer?
13       Q. I'd like just sort of your recollection of --
14  from the beginning. You had these letters of credit
15  that had been posted, the -- the last one of which the
16  coverage expired at the end of October 2002. So in the
17  midst of that, did some discussions arise about the
18  purchase of BACE's PEO businesses by Cura?
19       A. You were spot on until you said "purchase" in
20  the last sentence. What we discussed -- and I believe
21  it to have been frequently and culminated in a trip that
22  three or four of us went to New York, met with Huff and
23  Pixler, McCartha, and several other people were there,
24  and we literally used the analogy rather than a purchase
25  acquisition takeover at that point.

Prairie Capital vs Ernst & Young                    04/07/05                    William L. Baumgardner, Vol. 3

**Page 383**

1    What we discussed was the operations being not
2 unlike a cupcake tin with a dozen holes, their
3 operation, and a dozen holes, our operations, rather
4 than try to superimpose -- just push them together,
5 because the synergy was natural. It certainly appeared
6 to be at the time.
7    Mr. Pixler didn't know -- without being
8 disrespectful, didn't know a lot about the PEO business.
9 He had an extensive background in the trucking industry,
10 was learning, as best he could, the PEO industry, but
11 was, as perceived by us at that point, chest deep in an
12 alligator swamp. Had surrounded himself with a
13 management team that might be -- they're not people we
14 would pick, with one or two exceptions.
15    And we thought that we brought -- excuse me --
16 staying with Pixler, et al., apparently vis-a-vis Huff
17 and their relations and everything, long-time standing
18 friendship, they had wealth untold; virtually, as
19 McCartha says, unlimited. A $500 million check could be
20 handled today. And I said, what about over 500 million?
21 And he said, that would be earlier tomorrow. Wow,
22 that's stout. Even in Dallas terms, that's stout.
23    What we then began to talk about was a synergy
24 of putting the units together. We certainly had no kind
25 of financial depth like that, but we had an operational

**Page 384**

1 expertise, a system of proven template and information
2 technology system and all, that they were woefully short
3 on, and the -- the systems at that point seemed to --
4 rather than do this, had a natural dovetailing that
5 could really work.
6    Q. When you say "we had a system," are you
7 referring to BACE?
8    A. Staff -- BACE's holdings in the PEO industry
9 had a natural synergistic ability to be combined, we
10 thought.
11    Q. And when you referred to "our management team,"
12 do you include within that the management of ASR?
13    A. Absolutely.
14    Q. All right.
15    A. Absolutely. And may -- may I give you --
16    Q. You can finish, yes.
17    A. You wanted the long answer.
18    Q. I do.
19    A. There was a -- not near the diversity as
20 between Cura and BACE, et al., okay, but there was an
21 even -- there was a distinctive difference between
22 StaffAmerica Charlotte and ASR Dallas. Mr. Phillips had
23 done an outstanding job developing -- let me back up.
24    In Charlotte, we were an operation that was
25 very sophisticated but maybe not as fancy, in a banker

**Page 385**

1 town, as bankers might be. All right. We just got the
2 job done. We had spent everything in the way of money
3 on IT systems and everything.
4    Conversely, over here, Mr. Phillips had a
5 controller, a chief financial officer, a banking
6 relations person, much more of a higher level of
7 sophistication than we had. There was a natural synergy
8 there, which we had been driving to buy the ASR program.
9    It had -- that had been a driving concern, that
10 we could professionally bring ourselves up,
11 bootstrapping the operational capability and capacity we
12 had with the professionalism that they had in Dallas.
13 Natural synergy.
14    Now we're with Cura with that two-legged stool
15 in place, and you have what appears to be -- appeared to
16 me and appeared to Mr. Huff and appeared to Mr. Pixler
17 and appeared to McCartha to be a natural combining of
18 the efforts, influences, talents, and capabilities into
19 what could be a very strong organization, and they were,
20 as stated at that time, very, very desirous of, A,
21 creating a very large PEO and, B, doing it with us,
22 utilizing our systems and everything.
23    Q. When did the meeting occur in New York?
24    A. Between LOC 1 and LOC 2, maybe. I forget the
25 time frame exactly, the date exactly.

**Page 386**

1    Q. September '02 or August? Excuse me. September
2 or October '02?
3    A. I believe maybe to have been October. I have
4 no clear recollection of the date. It was cold.
5    Q. We know the stock purchase agreement was signed
6 October 31st, 2002. How long before that had this
7 meeting occurred?
8    A. Don't recollect.
9    Q. Had they indicated they were not going to --
10 had CNA indicated they weren't going to give any further
11 extensions, or had Cura or Brentwood said, we're not
12 going to put up another letter of credit to get any more
13 extensions?
14    A. To us?
15    Q. Yes.
16    A. Don't recall, as we sit here today, that that
17 was even a point of discussion. We had pretty much
18 taken on a new tact to go down the road together, and at
19 that point there were other people involved, other than
20 McCartha, dealing with CNA.
21    Pixler was -- and -- Pixler was very specific
22 that they had a powerful outside, external, third-party
23 broker who was representing their, Cura, CSRV,
24 et cetera, interest with CNA. And I've heard it, but I
25 don't recall the man and his company's name.

16 (Pages 383 to 386)

Prairie Capital vs Ernst & Young                04/07/05                William L. Baumgardner, Vol. 3

Page 387

1    But they had taken on -- they, Certified,
2   et al., had taken on a whole new tact to continue to
3   push the CNA program, which they thought they could do,
4   this third-party person, contractor, thought clearly he
5   could do, and while we had hoped to be -- to be one to
6   change CNA's mind some months ago and be continued by
7   CNA, certainly this man had expressed to Pixler, et al.,
8   that he could cause that to happen for all of us.
9       In fact, we were a major part of making that
10  happen in that we brought the expertise and the
11  operational platforms that CNA was most familiar with
12  and happy with to the financial clout that Pixler and
13  the group at Certified had.
14      MR. BUNCHER: I'm going to have to object
15  as nonresponsive because I think all I asked you was how
16  long before the meeting did that meeting occur -- or how
17  long before the agreement did that occur.
18      Q.  And I'd just ask, Mr. Baumgardner -- I've got
19  limited amount of time to finish up my deposition, and
20  if I could have you confine your answers to my question,
21  I would appreciate it.
22      A.  I apologize. I will endeavor to do that,
23  refine your time, and give you yes and no answers, and I
24  was trying to be informative or educational. You figure
25  the rest of it out yourself with a yes and no.

Page 388

1       Q.  I appreciate that, and I had asked you for a
2   narrative answer to the question before, but anyway.
3       Where was the October 31st, 2002, agreement
4   signed that's marked Exhibit 19?
5       A.  Don't recollect.
6       Q.  Do you recall that the agreement was signed in
7   the middle of the night on October 31st?
8       A.  Excuse me. I stand corrected. Yes, I do.
9   November 1st is my birthday, and it was a miserable day.
10      Q.  Okay. Do you remember --
11      A.  It was in the middle of the night in Charlotte,
12  North Carolina, handled back and forth by fax.
13      Q.  Okay. Back and forth between Charlotte, North
14  Carolina, and where?
15      A.  Wherever the other parties were. I believe it
16  to have been New York at that time --
17      Q.  Okay.
18      A.  -- that night.
19      Q.  If you had not agreed to sell the PEO
20  businesses to Cura at that time, why did you sign a
21  document, marked Exhibit 19, called "Stock Purchase
22  Agreement"?
23      A.  One of the overriding concerns in the PEO
24  business at that time was a -- an unscrupulous
25  practice -- you asked the question -- of piggybacking in

Page 389

1   the marketplace. We, StaffAmerica, had no interest in
2   piggybacking. Dan Pixler and CSRV and Cura and their
3   people with their relationship with CNA had no interest
4   in piggybacking, and CNA was quite well -- fully aware
5   of what we were doing.
6       And this was an effort to move forward, with
7   the combining that we were talking about, with one or
8   two major aspects left open, undetermined. Pursuant to
9   our meeting in New York and the telephone conversations
10  and all around then, it was an expression by Huff that
11  we get something reduced to a writing to indicate that
12  we were going forward together and we will work out the
13  purchase price of the consideration and all at a later
14  date but you'll be happy with it.
15      Q.  Other than the purchase price, which I believe
16  the agreement says would be resolved in the next 60
17  days -- do you recall that?
18      A.  Do I recall what the agreement says? No.
19      Q.  Look at Section 2.3 on page 5 of the agreement.
20      A.  Okay.
21      Q.  Do you see it says, at the closing, as
22  consideration for the transfer of the assets, purchaser
23  and seller shall determine a purchase price for the
24  shares within 60 days from the date of this agreement as
25  mutually agreed upon?

Page 390

1       A.  Okay.
2       Q.  Did you read that when you signed it?
3       A.  Possibly. Didn't matter. As you referenced to
4   2.3, at the closing, as consideration for the transfer
5   of the assets -- this was never intended to be an asset
6   sale. We had never discussed an asset sale. It was a
7   combining.
8       That it'll be settled within 60 days -- what we
9   got, in the middle of the night, as you pointed out to
10  me a few minutes ago, was this document. I started to
11  go through it, said, Danny, we need a while to review
12  this. He said, well, that's fine. Let's go through it.
13  I said, well, we need the time to review it off the
14  phone. There is no sense to sit here.
15      We went through about four or five items, 25
16  minutes or so, some -- some short of period of time
17  later, and Mr. Pixler jumped up, bowed up on the phone
18  and -- bowed up on the phone and said, are you going to
19  go through every word -- word of this document? I said,
20  well, if that's what it takes.
21      Well, I'm telling you I'm not going to sit here
22  and do it. Either sign it or not. We'll work out the
23  details. It doesn't have all the terms of the contract.
24  It doesn't have a purchase price, et cetera, et cetera.
25  Sign it so we're not in trouble --

ALPHA REPORTING SERVICES, INC., DALLAS, TX (888) 667-DEPO

Prairie Capital vs Ernst & Young                    04/07/05                    William L. Baumgardner, Vol. 3

Page 391

1    Q.  And -- and --
2    A.  -- or we're terminating your coverage, not
3    going through with the deal.
4    Q.  Right.  Your -- your coverage was set to
5    terminate on November 1st, or the end of the business
6    day, October 31st?
7    A.  I don't specifically remember whether it was
8    12:01 a.m. on November 1st or October 31st, but I can
9    tell you, as of the time that we executed this
10   agreement, it had happened, whatever it was --
11   Q.  Okay.
12   A.  -- because I think we were at the 3:00, 4:00
13   time -- a.m. time.
14   Q.  And you needed to have this agreement signed
15   and in place in order to continue the workers' comp
16   coverage for your PEO operations; is that correct?
17   A.  Well, I think that may be a way to say it.  I
18   think that's an unfair characterization.
19   Q.  Why?
20   A.  We needed to have this document in place, just
21   like they did, to continue to combine operations and go
22   forward together.
23   Q.  All right.  Well, prior to that time, there
24   hadn't been any, quote, combined operations, right?  All
25   they had done is posted letters of credit, correct?

Page 392

1    A.  That is what they had done.  What I meant when
2    I said go forward together with the combined operations
3    was as we had continued to discuss combining the
4    operations.
5    Q.  All right.  You knew on October 31st, 2002,
6    that the intent of the parties was that you would sell
7    your PEO operations to Cura, correct?
8        MR. LEVINGER:  Object to the form.
9        MR. NASH:  Object to the form.
10   A.  Say it again.
11   Q.  You knew when you signed this document that the
12   intent of everybody, including yourself and the Cura
13   people, was that Cura was going to combine the
14   operations of -- the PEO operations of StaffAmerica?
15       MR. LEVINGER:  Object to the form.
16   A.  If we could get together on the missing terms,
17   the amount of the purchase price, the philosophy of
18   going forward, and any inclusion by us or compensation
19   to be received in the form of a consultancy or anything
20   else, that is what we had discussed.
21   Q.  Was it part of the discussions and part of this
22   agreement, to your understanding, that you and the
23   people at BACE would continue to have some role in the
24   ongoing operations of the company -- of these combined
25   operations, if the sale were to take place?

Page 393

1    A.  Yes.
2    Q.  Okay.  So it --
3    A.  Moreover, they had talked about moving the
4    headquarters from Fort Lauderdale to Charlotte.
5    Q.  Okay.  So it was not your understanding that if
6    the sale were consummated as contemplated in this
7    agreement, that Cura would have the PEO operations or
8    acquire the PEO operations and you and the rest of the
9    folks at BACE would sail off into the sunset, so to
10   speak?
11   A.  That was not, at this time, what we had
12   contemplated.
13   Q.  Okay.  Look now, if you would, at Exhibit 26.
14   I believe it's in that same notebook.
15   A.  (Witness complies.)
16   Q.  This is a management agreement that was also
17   signed October 31st, 2002, by yourself and Mr. Pixler.
18   Do you see that?
19   A.  Yes.
20   Q.  What's your understanding of this management
21   agreement and what led to this?
22   A.  Management agreement also came down from
23   New York, prepared by them, no review time by us, as did
24   the stock purchase agreement, and basically it turned
25   over operational management to them.  We had -- to them,

Page 394

1    Pixler, et al., Cura Group, and that's what it did.
2    Q.  All right.  And you say that you didn't have
3    any time to review it.  What time was it when you
4    received the draft of the management agreement?
5    A.  I believe it to have been after the close of
6    business well into the evening.
7    Q.  And when -- what time was it signed?
8    A.  I don't recall, but sometime in the early hours
9    of the next morning.
10   Q.  Did you have counsel with you looking over
11   these documents before they were signed?
12   A.  No.  We'd been instructed that there was really
13   no need to do that.  We'd work any changes out at a
14   later date.  And it doesn't matter.  You're going to
15   sign them tonight or we're going to cancel your
16   insurance anyway.
17   Q.  All right.  Were, in fact, operations of the
18   PEO businesses owned by BACE turned over to Cura as of
19   October 31st, 2002?
20   A.  I'm not sure what you mean by "turned over,"
21   but they were certainly in operational involvement, if
22   not total control.  They had that right and came to
23   Charlotte very frequently, Pixler himself.  McCartha
24   came less frequently.  Ivan came.  They were in and out.
25   The accounting people were there very frequently, and

18 (Pages 391 to 394)

ALPHA REPORTING SERVICES, INC., DALLAS, TX  (888) 667-DEPO

Prairie Capital vs Ernst & Young                    04/07/05                    William L. Baumgardner, Vol. 3

Page 395

1   Danny was there probably two, three days a week. In
2   fact, he started his Monday -- he started his week off,
3   almost every week, in Charlotte.
4       Q.   When was the first time that you informed the
5   people at ASR that -- that Cura was in control of the
6   operations of ASR?
7       A.   I don't have a clear recollection as to a date
8   of such an uninformative statement.
9       Q.   Isn't it true that you did not even tell
10  anybody at ASR, including Mr. Phillips, that you had
11  even executed this management agreement and this stock
12  purchase agreement on October 31st, 2002, until sometime
13  much later?
14      A.   I don't have a clear recollection as to when I
15  told him anything.
16      Q.   Do you recall Mr. Phillips contacting you,
17  saying he had discovered a copy of the agreement
18  attached to one of Certified Services' SEC filings, and
19  wondered what was going on?
20      A.   No.
21      Q.   Okay. Do you recall informing Mr. Phillips, in
22  response to his phone call to you, that you had not sold
23  the business to Cura?
24      A.   No, I don't recollect that.
25      Q.   Do you recall telling Mr. Phillips not to

Page 396

1   supply any information directly to anybody with Cura or
2   Certified Services pursuant to their request for such
3   information?
4       A.   I have no recollection whatsoever of telling
5   him that. In fact, quite the contrary is my
6   recollection.
7       Q.   After the management agreement and stock
8   purchase agreement, did issues arise concerning
9   Certified's or Cura's inability to get information that
10  they were requesting?
11      A.   Reword your question, if you would. I don't
12  understand your question.
13      Q.   Do you recall instances where Certified
14  Services or Cura was requesting information about the
15  operations of ASR and the loss runs from ASR and that
16  they were refused the information they requested?
17      A.   I do not have any clear recollection of CSRV or
18  Cura ever having been refused any documentation. There
19  was often confusion in the request from Certified about
20  what they were asking for and what format they wanted it
21  in and when they got it, not understanding the
22  ramifications.
23          As we discussed in Charlotte, Mr. Dobrin came
24  to head up the workers' comp function. And Ivan, while
25  he was one of the very best sales and marketing people

Page 397

1   in the country, probably knew less about workers' comp
2   than my puppy.
3           MR. BUNCHER: Object as nonresponsive.
4       Q.   Are you -- are you stating -- is it your
5   testimony that AS -- that Certified and Cura were never
6   blocked from getting information about ASR?
7       A.   That is my recollection and my testimony.
8       Q.   Okay.
9       A.   There may have been others. And -- and, in
10  fact, I may have participated. To say -- you know, in a
11  facilitative fashion, not a blocking fashion, whatever
12  they were requested directly. I know for a fact that we
13  had asked Certified to make their request to Charlotte,
14  to wit, Mr. Bailey.
15          We had asked Certified -- strike that -- ASR to
16  provide us copies or data or request information so we
17  could make sure we were all on the same page.
18      Q.   You never told Mr. Phillips, during the time
19  that Certified was doing its due diligence in 2003
20  leading up to the June '03 agreement, that he was not to
21  supply information directly to Certified and that,
22  instead, all those requests should be directed to
23  North Carolina?
24      A.   I have no recollection of saying that.
25      Q.   Okay.

Page 398

1       A.   And if -- period.
2       Q.   All right. Turn, if you would, to Exhibit 30.
3   Do you see that is an agenda for a meeting dated April
4   2nd, 2003? It has your name and Mr. Pixler's name at
5   the top. Do you see that?
6       A.   It does.
7       Q.   Prior to April 2nd, had Mr. Pixler been
8   requesting that you introduce him to the management team
9   in Dallas?
10      A.   I have no recollection of what -- the way
11  you've asked the question, I have no recollection of a
12  specific and unfulfilled -- since this was the first
13  request -- weekly, daily -- he was in the -- Danny was
14  in the Charlotte office two, three days a week.
15          We have got to go down to Dallas. Yes, we do.
16  Let's go now. I got to go to Fort Lauderdale. I got to
17  go to New York. I got to go to Chicago. Never a
18  mutual -- never a mutual opportunity to get together.
19  Was there a deliberate constructive blockage? Never.
20      Q.   All right. Ultimately, you went to Dallas on
21  April 2nd, 2003, correct?
22      A.   No. I believe ultimately we came to Dallas on
23  April 1st, because that week I said, Pixler, enough is
24  enough. You leave -- I don't remember what date.
25  Wednesday, obviously. You leave Charleston -- where he

19 (Pages 395 to 398)

Page 399

1  was living -- you come to Charlotte.  That week you're
2  mine.
3      When you get to Charlotte, we're getting on the
4  airplane -- spending the day together, catching up,
5  getting on the airplane on Tuesday, going to Dallas.
6  We're going through the whole presentation.  You're not
7  calling anybody.  We're leaving Dallas.  We're going
8  to -- I believe the next stop was Orlando.
9      We spent the night -- first night -- the night
10 of April 1st here in Dallas.  We spent the night of
11 April 2nd in Orlando.  We made a short, quick drop down
12 to Sarasota-Bradenton.  He said he had seen enough.
13 That was, by that point, Friday.  We hopped from there
14 over to Fort Lauderdale.  He went to dinner.
15      He was just overflowing at what-all he had
16 seen, overflowing with Dobrin and all the staff, how
17 great it was, but the problem is I've now -- you've
18 occupied so much of my time, we've done all this stuff,
19 I've missed my flight.  I said, not a problem.  Home to
20 Charleston.
21      And, again, after dinner, on, I believe, Friday
22 night, we took off from the Fort Lauderdale
23 International -- Executive Airport, landed at
24 Charleston, South Carolina, in the middle of the night,
25 to where there was no cabs, no nothing.  We stayed on

Page 400

1  the ground there long enough to make sure Danny had
2  arranged transportation home, waited for the ride to
3  pick him up, took back off and went back to Charlotte,
4  getting into Charlotte just before daylight Saturday
5  morning.
6      Q.  Okay.  So --
7          THE VIDEOGRAPHER:  Excuse me, counsel.
8  Can I have a moment to change tape, please?
9          MR. BUNCHER:  Sure.
10         THE VIDEOGRAPHER:  We're off the record at
11 11:42.
12         (A recess was taken.)
13         THE VIDEOGRAPHER:  This is the beginning
14 of Tape 3.  We're back on record at 11:43.
15     Q.  Mr. Baumgardner, the meeting in Dallas, then,
16 occurred on April 2nd; is that correct?
17     A.  Based on this document and the notes, yes, I
18 believe that to be correct.
19     Q.  Prior to that meeting, had you informed anyone
20 at ASR who Mr. Pixler was and why he was coming?
21     A.  Your question is had I informed anyone at ASR,
22 and we're talking April.  By that time I think everybody
23 at ASR had talked to Pixler, Dobrin, everybody, all
24 along.  That goes back and kind of refreshes my mind.
25     Did I ever inform the people at ASR about

Page 401

1  Cura's involvement with us?  Keep in mind that back on
2  November 1st, 2002, the people at ASR had worked with us
3  and directly with the people -- Ivan Dobrin,
4  specifically -- and the people in the insurance
5  department to issue the new insurance certifications to
6  all the clients, and that had been a multi-day
7  situation.
8      People in the insurance department at ASR had
9  had a difficult time getting some of the certs to some
10 of the -- some of the unique certs to some of their
11 clients, and things had gotten rather testy and all with
12 Cura and Certified.
13     Yes.  They -- April 1st, everybody in top
14 management and probably middle management at ASR knew
15 exactly who the Certified people were -- Danny Pixler --
16 and they probably by that time had a pretty substantial
17 argument with them at that time.
18     Q.  Well, had they been informed that -- that
19 Certified was going to purchase ASR?
20     A.  As I recall, Mrs. Salhanick, the attorney at
21 ASR, had early on -- and maybe that's what you were
22 alluding to earlier -- had -- in the course of doing
23 some other unrelated research, found the filing of the
24 stock purchase agreement and the management agreement on
25 her Edgar research and had circulated it throughout the

Page 402

1  office.  So, yeah, most of the people in -- and I say,
2  again, in middle management and above knew, back in
3  probably October or November, of the arrangement.
4      Q.  Had they been informed that Cura would
5  ultimately be the owner of ASR and that Cura had the
6  rights that they had received under this management
7  agreement?
8      A.  I cannot sit here and tell you today that that
9  is a true statement because I wasn't even sure the sale
10 was going through because the 60 days had come and gone.
11 We still had not arrived at a purchase price or any part
12 thereof.  Nobody wanted to talk about it.  Everybody
13 wanted us to keep sending money to Florida.
14     Q.  Money to Florida for what?
15     A.  The 15-minute conversation we had earlier this
16 morning about the workers' comp cost, the premium cost,
17 the claims cost, et cetera, et cetera.  Everybody was --
18 in Florida was concerned about have you sent the wire.
19 Let's talk about how much you're buying for this thing
20 that you're draining the money out of.  Well, we don't
21 have time to do that just yet.
22     Q.  Between October 31st, 2002, and April 2nd,
23 2003, had Mr. Pixler been asking for financial
24 information concerning BACE's PEO operations so that
25 they could arrive at a purchase price?

Prairie Capital vs Ernst & Young                    04/07/05                    William L. Baumgardner, Vol. 3

Page 403

1        MR. LEVINGER: Object to form.
2    Q.  Or a proposed purchase price?
3    A.  Mr. Pixler -- I remember no specific date,
4    time, place that he said, give me this or this. But
5    generally Dan Pixler had been inundated with financial
6    information, loss run information, sales and marketing
7    information.
8        And Dan Pixler, bless his heart, told me, on no
9    less than probably a hundred occasions, I am not an
10   accountant, I am not a finance person, but I am the best
11   cash manager in America. Everything runs on cash. You
12   don't need financial statements, blah, blah, blah.
13       Had been offered -- was in the office one, two,
14   three days a week in Charlotte where it was kept, had --
15   one of the largest offices on our floor had been
16   provided from (sic) him. It was a second or third move
17   up, in the recognition of what we had done with them.
18       Danny was originally in a very small office.
19   We moved him to an office that he picked. And later,
20   unbeknownst to him, until his arrival the following
21   Monday, we had moved him in a corner office that was
22   probably the second-largest, third-largest office on our
23   floor, and moved his personal effects and everything
24   else into that office.
25   Q.  Did he have access to the financial information

Page 404

1    like the financial information reflected on Exhibit 133
2    that we looked at earlier, the consolidating trial
3    balances?
4    A.  He had access to every bit of the information
5    on here, the raw document source documents that this was
6    prepared from, having anything directly or indirectly to
7    do with our PEO operations. No, he did not have any
8    access to Motorsports or BACE International, per se, or
9    anything else that was unrelated.
10   Q.  Did he have -- you say he had access to the raw
11   data. Did he have access to financial statements of
12   BACE's PEO operations, whether in electronic format or
13   physical format, from October 31, 2002, through April 2
14   of 2003?
15   A.  Absolutely.
16   Q.  Okay.
17   A.  And to the people who had created those records
18   and the staff in Charlotte to answer any questions he
19   might have.
20   Q.  What about audited financial statements of any
21   of the entities, ASR in particular? Did he have access
22   to that between October 31, '02, and April 2nd, 2003?
23   A.  On more than one occasion, Dan had been given
24   summaries and complete copies attached to every
25   financial statement we had for -- your question was

Page 405

1    specifically ASR -- ASR.
2        That information was included in the six boxes
3    that came up in July of '02 on the airplane, and even to
4    the point Danny was given a draft of the E&Y
5    statement -- I'm almost positive, given a draft of the
6    E&Y statement of the '02 calendar for which the footnote
7    verbiage was being worked out as we were here in Dallas
8    for this meeting.
9    Q.  Right. And I understand that. I'm just -- I
10   was asking about the time period -- what he got before
11   that or had access to before that, and you're saying he
12   had access to the prior year's audited financials of ASR
13   prior to the April 2nd meeting?
14   A.  That is correct. And as you said that, I just
15   remembered K.C. Mann did probably one of the most
16   admirable jobs in a form -- format that he called a
17   financial brief used at ASR that we were trying to get
18   the IT people in Phoenix to implement systemwide. Danny
19   Pixler had a stack of those, knew -- knew where and had
20   access to every financial -- monthly financial brief
21   prepared by ASR in our office in Charlotte.
22   Q.  From October 31 through April 2nd every month?
23   A.  Each and every month, they are stacked on a
24   shelf in the file room in the financial area of our
25   company, which is where Danny Pixler's biggest --

Page 406

1    second-biggest office on the floor was located and the
2    biggest in that section other than mine.
3    Q.  Did you ever see him reviewing the financial
4    information from ASR between October 31st, '02, and
5    April 2nd, '03?
6    A.  With all due respect, and particularly at this
7    time, I really liked Danny Pixler. It would be like
8    giving me the format to a trucking company's log route,
9    all right? Giving Danny Pixler a financial statement
10   does not arm him with financial data.
11   Q.  Okay. My question, though, is, did you ever
12   see him looking at the monthly financial books that
13   Mr. Mann put together on ASR during the period October
14   31st, '02, to April 2nd, '03?
15   A.  I have no clear recollection of him sitting
16   looking at the financial briefs, other than on one
17   occasion me sitting down and going over the financial
18   brief, per se, with Danny, saying this is what we need
19   to get to for everybody. Your companies, my companies,
20   our companies, we need to go to this format.
21       And I might add that after the June 27th
22   closing -- which he concurred when I said that. And
23   after the June 27th closing, they went to a weekly --
24   they -- Certified Services went to a weekly financial
25   brief, bullet point booklet -- monthly, not weekly --

21 (Pages 403 to 406)

Prairie Capital vs Ernst & Young                    04/07/05                    William L. Baumgardner, Vol. 3

Page 407

1  based on the financial results, the comparative data
2  very, very, very much tailored -- intended to be
3  tailored after what K.C. Mann had done.
4      Q.  All right.
5      A.  And, in fact, I was on the distribution list
6  for that document for quite a while until I was
7  terminated off that list.
8      Q.  Now, I appreciate your answer, but I'm trying
9  to focus in just on a period right now, October 31,
10  2002, through April 2nd, 2003. Did Mr. Pixler review
11  financial -- monthly books prepared by Mr. Mann and --
12  up there in North Carolina, where you say they were
13  located, during that time period?
14          MR. LEVINGER:  Object to form.
15      Q.  You said you sat down and went through one with
16  him. Was it during that time period or later?
17      A.  Yes. It was during that time period that I
18  went through him (sic) as an informative, educational,
19  illustrative conversation. I was often on the floor or
20  not, when Danny was there or not. He often came in
21  early and stayed. Some days would fly in late in the
22  day and stay. What Danny Pixler did in his office I
23  don't know. But while in that office, on that floor, in
24  Charlotte, North Carolina, 35- to 40-foot walk, he had
25  access to each and every one of them.

Page 408

1      Q.  Did he know where they were?
2      A.  Not only did he know where they were, if he had
3  leaned his head over, he would have been able to see
4  them from the desk chair in his corner office.
5      Q.  Okay. You know he knew where they were because
6  you pointed them out to him?
7      A.  Yes.
8      Q.  Okay.
9      A.  And everybody --
10      Q.  Did you ever have any discussions, prior to
11  April 2nd, 2003, with Mr. Pixler about the lose -- the
12  loss experience at ASR or the reserve setting at A --
13  ASR?
14      A.  No --
15      Q.  Okay.
16      A.  -- not that I recollect.
17      Q.  What happened at the April 2nd meeting in
18  Dallas?
19      A.  We flew into town on April 1st, went to dinner
20  with, as I recall, Phillips. Stayed at the hotel, the
21  same one I'm staying at today, right across the street,
22  The Crescent. We walked by here. ASR's office was in
23  the Texas Capital Bank building, which is a short walk,
24  right across the outside. We went there.
25          We intro -- took Dan through the office,

Page 409

1  introduced him to virtually everybody there, went back
2  to the conference room where he sat for several hours
3  while all these people presented their wares.
4          They knew that Danny was the man in charge,
5  taking over, and they were all basically strutting their
6  stuff and auditioning for jobs. Knew I was leaving.
7  They'd been told that. Anna and Brian were here at
8  various times; my son and daughter -- oldest daughter.
9  They were quite aware of what was going on.
10      Q.  Did Mr. Phillips make some statement about the
11  fact that Mr. Phillips would have to go if the deal was
12  done?
13      A.  Wait a minute. Do what?
14      Q.  Did Mr. --
15      A.  I'm sorry for the confusion. Did I say, ten
16  minutes ago, that Danny had always gotten financial
17  statements and that I thought he had even been given a
18  draft of the E&Y financial statement?
19      Q.  Yes, sir.
20      A.  I just happened to have looked down on this
21  materials list, on the very last item of the front page
22  of Exhibit 30, and lo and behold, it says, 2002 E&Y
23  draft audit.
24      Q.  Right. We don't dispute that he received that.
25      A.  I was having trouble recollecting. Thought

Page 410

1  that I did, and there it documents that it did. That's
2  all I'm saying.
3      Q.  Right. I don't -- I don't dispute he received
4  that at the meeting on April 2nd. What I was -- and the
5  reason I was focusing my questions previously on the
6  time period between October 31st and April 2nd is I was
7  trying to get an understanding of what financial
8  documents and data he had access to prior to April 2nd.
9          At the April 2nd meeting, or thereafter, did
10  Mr. Pixler make some statement to the effect that
11  Mr. Phillips would have to go if they went through with
12  the deal, or did you hear him make such a statement
13  directly to Mr. Phillips?
14      A.  The answer to the second question is no. The
15  answer to the first question is I have no recollection
16  of him saying that Phillips had to go. What I have a
17  very clear recollection on is me saying that I would
18  like Phillips and K.C. Mann to stay with us -- with me
19  and the new company that we were working on for the
20  purposes of the new project. I liked their style. I
21  liked their diligence. I liked their professionalism.
22  I liked the way they had worked and we had worked
23  together.
24      Q.  Are you aware that Mr. Pixler, subsequent to
25  the June '03 agreement, fired Mr. Phillips?

22 (Pages 407 to 410)

Prairie Capital vs Ernst & Young                    04/07/05                    William L. Baumgardner, Vol. 3

Page 411

1    A.  I'm -- I'm sorry.  What did you say?
2    Q.  Are you aware that Mr. Pixler, subsequent to
3  the June 27th, 2003, agreement, fired Mr. Phillips?
4    A.  Are you smoking crack?  Mr. Phillips never
5  worked one second past the June 27th closing.  He
6  resigned prior to that, by mutual consent.  Danny
7  Phillips -- excuse me -- Danny Pixler never fired Jim
8  Phillips on or for any occasion, period.
9    Q.  Okay.
10    A.  There are not many things I remember with as
11  much specificity as I do the fact that Jim Phillips and
12  K.C. Mann were leaving the June 27th closing in my
13  employ, not to ever work for that organization again.
14  There had been some harsh feelings between Phillips and
15  Pixler on multiple occasions in the '03 time segment
16  coming up.
17    Q.  Why?
18    A.  You asked the question.  I'll tell you, at the
19  risk of being offensive to somebody.  Jim Phillips is a
20  very polished, very precise, to some unappealing to the
21  eye, professional attorney, manager, executive, who's
22  traveled the world.
23        Danny Pixler is a great cash-managing,
24  truck-driving fool who is uneducated, unpolished,
25  unsophisticated, and you're going to do it my way or the

Page 412

1  highway.
2    Q.  Uh-huh.
3    A.  They just don't get along.
4    Q.  All right.  Look, if you would, at Exhibit 31,
5  please.
6    A.  Exhibit 31.  I'm sorry.  Catching up here.
7    Q.  Is this the E&Y audited financial statement
8  given to Mr. Pixler at the April 2nd meeting?  It's a
9  draft, obviously.
10    A.  Says, 4/1/03, Bill, this is the draft to be
11  shared with Pixler.
12        I would imagine it is.
13    Q.  Now, prior to this April 2nd meeting, you had
14  authorized some bonus payments to the management
15  employees at ASR, correct?
16    A.  Yes.
17    Q.  Mr. Phillips got over $300,000.  Are you aware
18  of that?
19    A.  I believe I am.
20    Q.  All right.  And the bonuses these folks got
21  just happened to be slightly above the amount of the
22  promissory notes that were payable to them that were
23  executed in connection with the August 31st transaction.
24  My question is, weren't the bonuses intended to repay
25  the notes?

Page 413

1        MR. LEVINGER:  Object to the form.
2        MR. NASH:  Object to the form.
3    A.  No.
4    Q.  Okay.  And is it the case that BACE funded the
5  money into ASR to pay the bonuses?
6    A.  I believe that to be my recollection, yes.
7    Q.  So ASR's cash was not used to pay the bonuses;
8  is that true?
9    A.  It was not negatively impacted.  I think BACE
10  funded the money into ASR.  The money was in ASR, and
11  the checks were probably written on ASR, so one could
12  then take your question and say, see, it says here that
13  was not the net effect.
14    Q.  And would you be able to produce documentation
15  establishing the funding of the bonuses from BACE?
16    A.  I believe not only can we, I believe that we
17  have provided that to Danny and Mr. Pixler and Mr. Russo
18  and the other accountant guy that came down here and
19  stirred up all kind of trouble.
20    Q.  Was that Mr. Cunningham?
21    A.  That would be Mr. Cunningham.
22    Q.  Okay.
23    A.  In fact, that happened, I'm almost certain, in
24  my office that they were provided a copy the first time
25  Mr. Cunningham's allegations were confronted to us, at

Page 414

1  which time we broke for lunch, after a pretty stout
2  argument with Mr. Cunningham.  He was not feeling well
3  and went back to the hotel, and the next day he had
4  become so ill he had left town, at Pixler's
5  instructions, gotten sick.
6    Q.  Where -- when is that -- when did that meeting
7  occur?  After June 27th?
8    A.  Oh, yeah.  We were not friends then.
9    Q.  And were you presented a copy of
10  Mr. Cunningham's notes and so forth about all the items
11  he felt were erroneous with the financials of ASR?
12    A.  Unlike we had been with Mr. Pixler in the
13  financial briefs, the answer to your question is no.
14  And I'm not going to let you get away with a no.  I'm
15  going to explain.
16        I had been given bullet point pages, summary --
17  one summary sheet and bullet point pages, and it's my
18  opinion that is all Cunningham's notes said.  I said,
19  you allege to be an accountant.  Well, I happened to
20  have been one of those.  I want the work papers, copies
21  of everything you had to come up with this conclusion.
22  That's when he got sick.
23        Pixler had guaranteed me that he would provide
24  me -- he -- Cunningham would be made to provide me with
25  a copy with the information.  He never did it.  The next

23 (Pages 411 to 414)

Prairie Capital vs Ernst & Young                04/07/05                William L. Baumgardner, Vol. 3

Page 415

1  day, he left town. Subsequent to that, Mr. Russo,
2  Mr. Pixler, and I met at Mr. Pixler's Gatlinburg house,
3  whereupon I was supposed to be given all of that
4  documentation in tabulated, ring-bound form.
5      Q. Were you given the information?
6      A. No. I was given a new list that was even
7  bigger, without one shred of documentation, even though
8  we had already supplied responses to the bulk of that.
9  Phillips was aware of that. Mr. Mann was aware of
10  that -- of that being the allegations. Mr. Mann was
11  aware of the allegations, and they had worked furiously
12  and diligently to respond to that. When given the
13  response, Pixler threw the book up to the wall, threw it
14  out to -- up against the wall, and said, what do you
15  expect from them?
16      Q. From who?
17      A. Mr. Mann and Mr. Phillips.
18      Q. Okay.
19          MR. LEVINGER: Doug, it's about ten after
20  12:00. Do you want to break for lunch at some point?
21          MR. BUNCHER: Yeah. Why don't we do that
22  and come back and -- say at one?
23          MR. LEVINGER: Yeah.
24          MR. BUNCHER: We'll go off the record.
25          THE VIDEOGRAPHER: Going off the record at

Page 416

1  12:07.
2          (A recess was taken.)
3          THE VIDEOGRAPHER: We're back on the
4  record at 1:23 p.m.
5          (Deposition Exhibit 134 was marked.)
6      Q. Mr. Baumgardner, I want to back up in time a
7  little bit here. Let me show you what's marked Exhibit
8  134. This appears to be a letter from Mr. Campitiello
9  to you, on October 18, 2002, indicating that you are
10  required to deliver collateral in the form of endorsed
11  stock certificates representing 80 percent of the issued
12  and outstanding stock of StaffAmerica and its
13  subsidiaries and that you had not done so and had
14  therefore breached the loan agreement. And I'm
15  summarizing what it says in the second and third
16  paragraphs of the letter. Do you recall this?
17      A. Yes, sir.
18      Q. Were you supposed to deliver stock certificates
19  as collateral?
20      A. No, sir.
21      Q. Okay. How was this resolved?
22      A. It was one of the key bullet points of our
23  visit to New York between the first and second LOC. I
24  took copies. We had discussed this several times on the
25  phone -- that would be Mr. Huff, Mr. Pixler, and I --

Page 417

1  and I just looked at him and said, look, if you want to
2  take over the company, that's what you're going to do.
3  But simply stated, if you're going to do that -- you
4  haven't established a purchase price, and we're going to
5  work real hard to get out of this deal.
6          With that, Huff took the copy of the stock
7  certificate for StaffAmerica -- I think it was just the
8  stock certificate for StaffAmerica -- and signed it
9  right across the face, countersigned or whatever, as
10  representing or referencing that it had been delivered,
11  returned to me. He said, we don't want the stock
12  certificate. We want y'all.
13          (Deposition Exhibit 135 was marked.)
14      Q. Okay. I'll show you now what's marked Exhibit
15  135. This is an e-mail from Mr. Dobrin to you, October
16  29th, 2002; is that correct?
17      A. Yes, sir.
18      Q. Is that your handwriting on it?
19      A. It is.
20      Q. There are several bullet points there, one of
21  which says, F/S three years. What is that referencing?
22      A. Give me a minute to look at this, if I may.
23  Okay.
24      Q. This list of items with the bullet points that
25  you noted on here, were those items requested by

Page 418

1  Mr. Pixler?
2      A. I believe they were requested by Ivan.
3      Q. Okay. Do you see the initial D there on the
4  sheet?
5      A. No.
6      Q. Looking right here. What is that?
7      A. I believe that to be the Dobrin mark.
8      Q. I see. I see. Who was needing financial
9  statements for three years?
10      A. Ivan.
11      Q. For what purpose?
12      A. I don't know. Ivan was -- was telling me what
13  he needed when I called him back sometime, presumably,
14  that day.
15      Q. Was the information listed in the bullet points
16  supplied as requested?
17      A. To the best of my knowledge, because Ivan would
18  have kept asking for it.
19          (Deposition Exhibit 136 was marked.)
20      Q. Hand you what's marked Exhibit 136. This is
21  another copy of the same e-mail without your handwritten
22  notes. You see there in the e-mail it references that
23  attached is a draft of the term sheet. You see that?
24      A. Right.
25      Q. And if you turn to the second page, you find

24 (Pages 415 to 418)

Page 419

1  the term sheet?
2      A.  Okay.
3      Q.  And are those your initials on each one of the
4  pages of the term sheet and then your signature on the
5  last page?
6      A.  Yes.
7      Q.  Now, the dates on your signature there are
8  October 29th, 2002. Mr. Pixler's signature is dated
9  October 28th, 2002. Was this signed before the signing
10  of the stock purchase agreement dated October 31st?
11      A.  I don't remember.
12      Q.  Where were you when you signed this? We know
13  the signing of the stock purchase agreement was in the
14  wee hours of the morning of -- I guess it would be
15  November 1st. So was this something signed up a couple
16  days before that?
17      A.  Well, it's dated a couple days before that, but
18  your question was, where were you when you signed it,
19  and I honestly don't remember.
20      Q.  All right. Well, you indicated the stock
21  purchase agreement was signed while you were in
22  North Carolina and they were in New York or Florida.
23  Why was this term sheet executed?
24      A.  I don't understand the nature of your question.
25      Q.  Okay. Why was this term sheet executed?

Page 420

1      A.  To set forth the -- an -- an understanding of
2  the terms of the go-forward drafts and everything to be
3  handled in the October 31/November 1 agreement.
4      Q.  Okay. Look at the second page of the term
5  sheet. There is a section called "Definitive
6  Agreement." Do you see that?
7      A.  Yes.
8      Q.  It says, the staff acquisition is subject to
9  and conditioned upon the following, and Number 1 says,
10  the delivery of audited and unaudited financial
11  statements of the PEO operations to Cura.
12          Was that done?
13      A.  I believe that it was.
14      Q.  When?
15      A.  I don't know.
16      Q.  Well, how long did -- did the financial
17  statements get supplied immediately after the October
18  31, 2002, agreement, or was it sometime later when the
19  audited financial statements were supplied?
20      A.  I don't know.
21      Q.  All right. Look at Item 4 under that section.
22  There is a Roman Numeral II that is crossed out with
23  your initials next to it. Do you know why you crossed
24  that out and initialed that? That section had read --
25      A.  Yeah, I can read it. It looks like it's

Page 421

1  double ii instead of Roman Numeral II or whatever, if
2  I'm looking at the right place.
3      Q.  That's correct.
4      A.  Yeah. There were no audited financial
5  statements of BACE and -- of BACE and StaffAmerica. The
6  other entities had audited financial statements, but we
7  didn't.
8      Q.  All right. It said that you were to deliver
9  audited financial statements of BACE and the PEO
10  operations substantially in conformance with the
11  unaudited financial statements of BACE and the PEO
12  operations previously delivered.
13          Had you delivered unaudited financial
14  statements prior to this term sheet?
15      A.  It certainly would look like it has from that
16  wording, wouldn't it? They drew it.
17      Q.  But then you crossed it out. So my question
18  is, had you or had you not supplied any unaudited
19  financial statements of your PEO businesses to Cura
20  before the term sheet was signed?
21      A.  I have no specific recollection of whether the
22  unaudited consolidating financial statement for '02 or
23  '01 was delivered prior to the crossing out. The
24  crossing out had no -- had nothing to do with the
25  unaudited versus audited financial statement

Page 422

1  requirement.
2      Q.  You're saying it had to do with the fact BACE
3  doesn't have --
4      A.  -- audited financial statements, nor was it
5  going to pay to get prepared audited financial
6  statements.
7          (Deposition Exhibit 137 was marked.)
8      Q.  Okay. I'll show you Exhibit 137. Is this an
9  e-mail you got from Mr. Dobrin on November 1, 2002,
10  authorizing the release of certificates of insurance for
11  your PEO businesses?
12      A.  I'm sorry. Your question again?
13      Q.  Is this an e-mail authorizing the release of
14  certificates of insurance for your PEO businesses that
15  you received after the stock purchase agreement was
16  signed? You'll note the time is 5:34 a.m. on the
17  e-mail.
18      A.  Right. I could also note that Mr. Dobrin sent
19  the e-mail to himself. John Ritenour -- you see the
20  name up there?
21      Q.  Yes, sir.
22      A.  That's the special contractual consultative
23  agent with CNA that I was referring to earlier in some
24  of your answers.
25      Q.  Okay. Who would draft and then issue the

25 (Pages 419 to 422)

Page 423

1 certificates of insurance to the clients?
2 A. Normally?
3 Q. Yes.
4 A. The insurance company.
5 Q. Okay.
6 A. Don't get away that short.
7 Q. Is that what happened in this case?
8 A. No. We had so many certs and all --
9 certificates to go out that we had been allowed in the
10 past by CNA to issue our own certs. I do not believe --
11 I don't know if Cura had been so allowed.
12      We had developed a software program that
13 integrated with other permanent file programs with
14 clients' names and addresses, everything, to go into the
15 file, marry the two tasks, and create the cert and
16 electronically file it with CNA.
17 Q. Did CNA allow the --
18 A. After October 31/November 1 morning, Dobrin
19 realized they didn't have the capacity to get out all
20 the new certs for them and us, and they asked us and
21 were asking us here to get them out for everybody.
22      Now, I also note that -- we talked at great
23 length this morning about we only had 45 days before
24 the -- our policy expired. They only had 60 days before
25 theirs expired.

Page 424

1 Q. Who -- who is that? Who are you referring to?
2 A. I think -- think Ivan and them at that point.
3 Look down at the pre -- the originating part that this
4 is in response to --
5 Q. Yes, sir.
6 A. -- from Bruce Bailey, our loss guy. Policy
7 effective, expiration date's 12/31/01 to 12/31/02.
8 Q. All right.
9 A. So November 1, '02. They only had 60 days
10 until theirs expired.
11 Q. All right. Do you know what arrangements they
12 had for coverage after December 31, '02?
13 A. Well, since I lived through it, sort of. It
14 was a week-to-week, 30-day maximum extension at any
15 given time. I don't think they ever got to a 60-day
16 extension until maybe the summer, and sometimes it was
17 week to week and after the fact.
18 Q. You're speaking going into '03 now?
19 A. Yes, sir.
20      (Deposition Exhibit 138 was marked.)
21 Q. All right. Looking at Exhibit 138 now, is this
22 another e-mail dated November 1 that you received from
23 Mr. Dobrin about the certificates of insurance for ASR,
24 ABP, and Meridian?
25 A. It is. It's, in fact, one that I referred to

Page 425

1 in my earlier testimony in Charlotte and, I think, maybe
2 earlier here today.
3 Q. And this one indicates that he needs copies of
4 the purchase agreements to be sent to CNA. Was that
5 done?
6 A. No.
7 Q. Why not?
8 A. We didn't believe he needed copies to go to
9 CNA.
10 Q. Why not?
11 A. Because CNA already had them and we had
12 acquiescence that CNA had them and had acquiesced to
13 each and every PEO acquisition we had made.
14      (Deposition Exhibit 139 was marked.)
15 Q. All right. Let me show you Exhibit 139. This
16 is another e-mail dated November 5th, 2002, from
17 Mr. Dobrin and others, indicating, in the first
18 point, that a file containing all the certificates -- he
19 says he needs some information. Do you see that?
20 A. Uh-huh.
21 Q. Was this information supplied?
22 A. It had been repeatedly.
23 Q. To who?
24 A. Dobrin and Certified Services in Florida.
25 Q. The files with the certificates, those were

Page 426

1 sent?
2 A. Sure.
3 Q. Client lists?
4 A. Sure. Repeatedly.
5 Q. And with purchase -- purchase agreements?
6 A. Repeatedly. Their software would not interact
7 with our information because they had not spent the time
8 and money on it, and they couldn't get from the files
9 the answers they needed, but they had it right there.
10 We finally sent them, I think, paper copies of
11 everything.
12      (Deposition Exhibit 140 was marked.)
13 Q. Is Exhibit 140 another e-mail from Mr. Dobrin,
14 on November 5th, referencing the need for the client
15 list?
16 A. Yes, sir.
17 Q. When was the client list supplied?
18 A. Don't know, as we sit here.
19      (Deposition Exhibit 141 was marked.)
20 Q. Show you Exhibit 141.
21 A. Can we go back to that answer?
22 Q. Yes, sir.
23 A. Keep in mind CNA had a client list.
24 Q. Because they were the same carrier?
25 A. Sure. They had a cert list. They had it

26 (Pages 423 to 426)

Prairie Capital vs Ernst & Young                    04/07/05                    William L. Baumgardner, Vol. 3

Page 427

1  electronically. They had everything. What we thought
2  and what we believed all the way through was the people
3  who wanted a copy of all the clients and what they did
4  and where they were located was the sales and marketing
5  staff at CSRV, since they hadn't told us how much they
6  were going to pay us for our company.
7     Q. That was just a suspicion on your part?
8     A. Strong suspicion.
9     Q. Did anybody at Certified or Cura ever tell you
10  that's what they were trying to do?
11    A. No, they wouldn't tell us when they wouldn't
12  tell us how much they were going to pay us, either.
13    Q. All right. Exhibit 141, this is an e-mail from
14  Mr. Pixler to you on November 5th, correct?
15    A. Right.
16    Q. Says he's left several -- several messages and
17  he would like to follow up on several items. Did you
18  follow up with Mr. Pixler?
19    A. Oh, I'm sure.
20    Q. Are you a difficult man to get ahold of from
21  time to time?
22    A. I am.
23    Q. Why is that?
24    A. I travel a lot. I'm in and out of the office a
25  lot. I'm on my cell phone a lot. And probably am

Page 428

1  surpassed by difficulty only by Danny Pixler. I can
2  probably get 20 people in here that have been summoned
3  to Fort Lauderdale for an emergency meeting at 2:00 this
4  afternoon. Go down -- Cura pay, fly them down there,
5  for Pixler only to be gone, changed his mind, gone on to
6  something else, can't remember why, et cetera.
7     Q. All right.
8     A. Yes, I'm a difficult person to get.
9     Q. Do you know if you were out of pocket at this
10  point in time in early November 2002?
11    A. No, I don't.
12    Q. Show you --
13    A. I think it's interesting that the first item he
14  asks on there, even though -- though all the elements
15  are critical, is, where is my money you owe me for the
16  insurance premium?
17    Q. You don't fault them for wanting to be paid for
18  the supplying of the insurance, do you?
19    A. No. I feel the same way about supplying the
20  company they bought. I'd like to get paid, too.
21    Q. All right.
22    A. They got paid every week. I ain't been paid in
23  two years. Let's don't go there.
24    Q. Well, now, you -- you did receive some cash at
25  the closing?

Page 429

1     A. Yes, 300 grand.
2        THE WITNESS: Can we take a break?
3        MR. LEVINGER: Yeah.
4        MR. BUNCHER: Yeah.
5        THE WITNESS: We're off the record.
6        THE VIDEOGRAPHER: We're off the record at
7  1:43.
8        (A recess was taken.)
9        THE VIDEOGRAPHER: This is the beginning
10  of Tape 4. Back on the record at 1:50 p.m.
11    Q. Mr. Baumgardner, is there other cash
12  consideration that you were supposed to be paid under
13  the June 27, 2003, agreement that you haven't been paid?
14    A. Virtually all of it.
15    Q. Could you explain that? What is it that you
16  haven't been paid?
17    A. There was a $300,000 payment at closing that I
18  was given, which I immediately endorsed back into the
19  company, from a company called Midwest Merger
20  Management. As part of that closing, I got a note for a
21  couple million dollars, a consulting fee, a NASCAR
22  consulting fee, several items.
23        They made, I think, one payment on each -- one
24  monthly payment on each item, and Pixler said, due to
25  cash flow, could I cut it down to a weekly deal. I

Page 430

1  agreed to facilitate that. And by the end of the -- I
2  think it was the second month, they had defaulted on
3  each and every one of them, with all of their
4  allegations.
5        There was -- at that point, by the middle to
6  end of August, I believe, maybe September, there had
7  ceased to be any form of payment to anybody for any
8  value that they had received and continued to enjoy from
9  that time until today, period.
10    Q. All right. Aside from the issue about the
11  notes, the assumption of the notes that's at issue here
12  in the case, do you --
13    A. They didn't pay those people, either.
14        MR. BUNCHER: Objection; nonresponsive. I
15  haven't even finished my question.
16    Q. I understand that this is upsetting to you, but
17  I'm just trying to get -- get an understanding of the
18  facts here.
19        Aside from the notes that are at issue that
20  plaintiffs are suing on in this case, how much do you
21  contend you are still owed by Certified under the June
22  27 agreement?
23    A. Notwithstanding the amount of notes that they
24  assumed and we were extinguished from to Prairie,
25  et al., to expand that assumption and extinguishment to

27 (Pages 427 to 430)

Page 431

1   the notes that they assumed from Meridian acquisition
2   and from ABP acquisition, the aggregate of those three
3   groups, probably in the $9 million range. I think the
4   amount that they still owe us is somewhere in the 15 to
5   $17 million range.
6       Q.   Above and beyond the notes?
7       A.   Yes, sir.
8       Q.   And how do you -- how do you get that number?
9       A.   I didn't get that. We came up with all kind of
10  valuations -- you asked -- for the company on -- based
11  on financial statements and financial models and
12  everything else, and there came a time when Mr. Pixler
13  said, look, we're never going to get there doing it this
14  way.
15      I've been to Charlotte twice. This is -- I
16  just don't understand. Let -- let me tell you. Let's
17  just sit down here. I don't understand your models. I
18  don't understand your valuations or any of that. Let --
19  let me just tell you what we've done in the past and
20  what I'd like to do here.
21      And I said, Danny, you're out of time. I'm out
22  of time. Tell me what you want to do, and let's go from
23  there. And he sat down and came up with a number, and
24  he wrote it all out, and I think it was about 17, 18, 20
25  million bucks.

Page 432

1       That begs the question that -- in that same
2   piece of paper was the promise of a $20 million letter
3   of credit by Huff that we could use to fund and reserve
4   up, shore up our offshore operation that we had been
5   working on for three or four years, and that's all I
6   wanted to go do at that point.
7       And from that, I was floored at the value that
8   he came up with, because it wasn't any longer based on
9   any financial statements or any models or any going
10  concern or any cash flow analysis or anything. It was
11  purely based on what he was willing to do. And simply
12  stated, we pretty much agreed to go through the night
13  and the next day on that basis -- or go through the --
14  what became the closing dates on that basis.
15      Having said that, one of the concerns that I
16  had was under no circumstances can you ever argue to
17  diminish that like you've done in some of the
18  acquisitions you've made. Full settlement, bottom-line
19  price paid over a term, short term, and he agreed to
20  that.
21      Q.   All right. Would you look at Exhibit 15? I
22  think it's in the book in front of you.
23      A.   Okay.
24      Q.   That's the June 27 addendum?
25      A.   I believe it is.

Page 433

1       Q.   Look at page 3.
2       A.   Bates stamp?
3       Q.   30.
4       A.   Okay.
5       Q.   This describes the purchase price in Paragraph
6   3.3, correct? Is that correct? That's what sets out
7   the purchase price for your PEO businesses, correct?
8       A.   Okay.
9       Q.   Is that correct?
10      A.   I believe it to be.
11      Q.   The first part of the purchase price is the
12  assumption by the purchaser of seller's acquisition debt
13  currently estimated at $8 million. What was that a
14  reference to?
15      A.   The acquisition debt.
16      Q.   Of who?
17      A.   The acquisition debt that was -- I don't
18  understand your -- the acquisition debt referred to in
19  3.3(ii) is the debt -- debts, plural, collective -- that
20  were assumed by the buyer in this transaction --
21      Q.   Right. The seller --
22      A.   I'm not finished.
23      Q.   All right.
24      A.   -- from the earlier acquisitions we had made as
25  referenced to include ASR Group, Meridian Group, ABP

Page 434

1   Group, the Core book of business, and for which we were
2   to be extinguished, released.
3       Q.   The Core --
4       A.   They were to pay.
5       Q.   The Core business was part of this transaction?
6       A.   Sure.
7       Q.   All right. How much of the acquisition debt
8   was the ASR debt, related to the acquisition of ASR?
9       A.   I don't remember.
10      Q.   How much was related to Meridian and ABP?
11      A.   As we sit here, I do not remember what the
12  roll-up had been, the adjustments had been, et cetera.
13      Q.   But the total was estimated at eight million of
14  all of that?
15      A.   It was estimated at eight million, but I think
16  a million dollars, give or take, somewhere.
17      Q.   Then Item 2, the assumption of seller's
18  obligations in Loan 1 and Loan 2 currently estimated at
19  $4,800,000. Loan 1 and Loan 2 are defined on the first
20  page to be the loans of 3,860,000 in connection with the
21  letters of credit; is that right?
22      A.   I believe that to be correct.
23      Q.   Has anybody ever tried to collect on the loan
24  agreements, the 3.8 million?
25      A.   Pardon?

28 (Pages 431 to 434)

Prairie Capital vs Ernst & Young                04/07/05                William L. Baumgardner, Vol. 3

Page 435

1    Q. Has anybody ever tried to assert that you still
2  owe the 3.86 million on the loans that were made for the
3  letters of credit, Loan 1 and Loan 2 as defined in this
4  contract?
5    A. No one has tried to collect from me the amount
6  still owed and assumed hereunder for Loan 1 and Loan 2,
7  nor have they refunded the payments that we made
8  thereunder.
9    Q. Well, the current estimated amount of
10  4.8 million, was that the amount still owing on Loan 1
11  and Loan 2 at that time?
12    A. That amount was supplied by Mr. Russo and
13  Mr. Pixler.
14    Q. All right. And those were the loans from
15  Brentwood Capital, correct?
16    A. They were the loans in connection with the LOC
17  creation.
18    Q. Right. So as far --
19    A. I don't think the loans were ever funded, so I
20  hesitate to call it "the loan from."
21    Q. Well, what -- on what basis do you claim the
22  loans were never funded?
23    A. I said earlier today, we never got the money.
24  They used it to do whatever. I don't know that they're
25  funded, so I'm saying that that was the -- the loan

Page 436

1  agreements are the ones we talked about in here.
2    Q. Right. But you just said -- okay. You don't
3  know whether those actual dollars were spent or not,
4  correct, in connection with the --
5    A. I -- I do not know that.
6    Q. Okay. The next -- Item 3 is a promissory note
7  in the amount of 3,500,000. Was that a note -- and a
8  copy of it's attached. It's a note payable to BACE
9  International, correct?
10    A. Looking for Exhibit A.
11    Q. It's on CURA 34.
12    A. Okay.
13    Q. See that?
14    A. I do.
15    Q. Were any payments made on that note?
16    A. I think there were a couple.
17    Q. Do you know what amounts due and owing were
18  currently on that note?
19    A. No.
20    Q. Do you contend there is an amount due and owing
21  on that note?
22    A. I contend that the amount owing under the note
23  is probably greater than 3.5.
24    Q. The cash amount of $350,000, is that what you
25  received at the closing?

Page 437

1    A. I did.
2    Q. 650,000 shares of CSRV's common stock, did you
3  receive that?
4    A. No.
5    Q. An option to purchase 100,000 shares of CSRV
6  stock, did you receive that?
7    A. Well, yes and no. Actually, when we got around
8  to getting what I think they called the certificate for
9  the option to purchase, or whatever, it had all kind of
10  strike prices in it, achievement prices in it, but,
11  moreover, it was not even the publicly traded stock. It
12  was a special category use legend stock that couldn't be
13  traded public. Couldn't be traded. It was worthless.
14    Q. The Exhibit B is a certificate for option to
15  purchase common stock of Certified Services, Inc. Do
16  you see that? CURA page 36.
17    A. Okay.
18    Q. Do you see that?
19    A. I do.
20    Q. Do you see, under Paragraph 1, it says, the
21  option may be exercised if and only if the closing price
22  of the company's common stock reaches or exceeds the
23  price of $12 per share on the NASDAQ OTC bulletin board
24  for three consecutive trading days?
25    A. Right.

Page 438

1    Q. That's never occurred, has it?
2    A. No. I think about $11 short.
3    Q. Okay. And so when you received this option,
4  you knew the share -- the option wasn't exercisable at
5  that time, correct?
6    A. No. When we went through the Pixler
7  calculation, I thought we were getting the dollar shares
8  of publicly traded stock, and that's why in his
9  calculation of the value that we were receiving was
10  $650,000 included for these options.
11    I thought we were getting an option to buy
12  stock that was trading at a dollar, that was worth a
13  dollar, that was $650,000 in value to me, not something
14  that had to grow 1,200 percent before I even got an
15  option.
16    Q. All right. Well, I think we're mixing apples
17  and oranges here. Go back to Paragraph 3.3. The
18  650,000 was actual stock you were to receive, correct?
19    A. Right.
20    Q. Not an option?
21    A. Right.
22    Q. You never got that?
23    A. No, I did not get that.
24    Q. That, assuming CSRV stock was trading at a
25  dollar per share, would be worth $650,000, correct?

Prairie Capital vs Ernst & Young          04/07/05          William L. Baumgardner, Vol. 3

---

Page 439

1   A. That's correct.
2   Q. Now, a separate item you were to receive was
3 the option to purchase 100,000 shares, correct?
4   A. Correct.
5   Q. And -- and you received that option, and it's
6 attached as Exhibit B; is that right?
7   A. Not correct. That's where we lose each other.
8 Exhibit B is attached here. I did receive that option.
9 That is correct. But what came down from the date we
10 negotiated the purchase price and the sale and the value
11 and this option was, dollar for dollar, just like
12 3.3(v). There was no discussion, no differentiation
13 between the 650,000 granted and the additional option
14 for an additional hundred, until this document at
15 CURA 0036 arrived.
16   Q. Now, underneath these items in Paragraph 3.3,
17 it says, notwithstanding the foregoing, the purchase
18 price shall be reduced dollar for dollar to the extent
19 that, subsequent to the closing, the liabilities assumed
20 pursuant to 3.3(i) and (ii) exceed $9 million and such
21 excesses due to the willful and deliberate effort of
22 seller to misstate the amount assumed.
23   Do you know what, ultimately, the amount
24 assumed was?
25   A. Number one, I think that's wrong. I think --

---

Page 440

1 you read it precisely correct, but at least one copy, I
2 think -- and look at it for reasonableness. I'm looking
3 at the -- the liabilities assumed pursuant to 3.3(i) and
4 (ii) exceed $9 million? 3.3(i) and (ii) are already in
5 excess of $9 million.
6   Q. Was that meant to just be a reference to
7 3.3(i)?
8   A. Yes, sir.
9   Q. Do you know if those liabilities ended up
10 exceeding $9 million?
11   A. I don't believe they exceeded $9 million. And,
12 furthermore, it certainly wasn't my willful act, or
13 whatever the word was.
14   Q. Okay.
15   A. And such excesses due to the willful and
16 deliberate effort of seller to misstate. Was never --
17   Q. Look at Paragraph 3.7, the release conditions,
18 please.
19   A. Yes, sir.
20   Q. The first condition was correspondence from
21 Steve King agreeing to a meeting with you and Mr. Pixler
22 concerning the renegotiation of the obligation. Did you
23 ever deliver such correspondence to Mr. Pixler?
24   A. Not only was it delivered to Mr. Pixler, I
25 believe that all the contact, as we previously

---

Page 441

1 testified, information for each of them had been
2 exchanged.
3   King had been in town as early as 48 -- into
4 Charlotte as early as 48 hours before that, and the
5 $350,000 referenced in 3.3, which was basically the only
6 cash paid at closing, was paid, in fact, to me because
7 all the deliverables set forth in 3.7 had been met.
8   Q. Okay. The second --
9   A. Just -- just for the record -- not just for the
10 record. I'm not making a record, but -- I guess
11 Concerning the renegotiation of the obligation, not the
12 assumption.
13   Q. Okay. Why is that significant to you?
14   A. I think the renegotiation as used in 3.7(a) was
15 fully intended to represent the fact that the notes --
16 the original acquisition indebtedness notes --
17 promissory notes had been extinguished and the new notes
18 to be issued pursuant to the closing of June 27th were
19 to be negotiated or renegotiated through Danny L. Pixler
20 and Steve King of Prairie Capital for 3.78.
21   Q. What --
22   A. That is to say, BACE released out of the
23 middle, extinguished, dissolved.
24   Q. I'm familiar with the debt, obviously, as a
25 result of this lawsuit, owed to the ASR plaintiffs, the

---

Page 442

1 noteholders in this case. What debt is owed on Meridian
2 and ABP and Core? Who owns the notes on that, if there
3 are any, or what debt --
4   A. Well, sure there were. We acquired -- I mean,
5 you're asking me to explain that to you.
6   Q. Yes, I am.
7   A. Okay. We acquired a company called ABP Group
8 in 1998/1999, owner finance sellout of the PEO, wanted
9 to retire, move to the coast of Florida. It's based in
10 Apopka, Florida, North Orlando. Those were five-year
11 notes, four-year notes, and there was maybe one year --
12 some small amount, as a percentage of the whole, still
13 due on those.
14   Meridian Investment and Management, the group
15 of companies at Meridian in Sarasota --
16 Sarasota-Bradenton -- Peggy Cline, John Lehman, et al.,
17 about 20 shareholders there, as opposed to two at ABP --
18 those notes were assumed. We had been paying on them
19 maybe two years. There was maybe two years left to go
20 on those.
21   Q. Do you know if those -- if payments have been
22 made on those notes?
23   A. I don't -- I think they were assumed. I think
24 the shareholders in at least some of them have been in
25 direct touch with Pixler, Dobrin, their attorneys,

---

30 (Pages 439 to 442)

Prairie Capital vs Ernst & Young          04/07/05          William L. Baumgardner, Vol. 3

Page 443

1  et cetera, in Florida. What status they enjoy with one
2  another right now, I don't know, but I believe it to be
3  unfavorable.
4      Q.  Has the ABP debt been paid off?
5      A.  I have no idea.
6      Q.  Okay. What about Core?
7      A.  Core was a company that we had purchased right
8  before ASR. We discussed that at length, I think, in
9  Charlotte. And it was not a corporate stock
10  acquisition. It was a book-of-business conveyance,
11  transfer, into one of our companies under the ABP Group,
12  I believe, of the numbered companies, ABP-X. And there
13  is a balance due on those.
14      Q.  Do you know if it's been paid?
15      A.  Excuse me. Not a balance due. That is an
16  ongoing percentage participation of the gross margin,
17  net margin, whatever.
18      Q.  Do you know if that's being paid?
19      A.  I have no idea.
20      Q.  All right.
21      A.  Certified is the economic beneficiary of all
22  three of those acquisitions.
23      Q.  The last condition is a statement from you to
24  cooperate fully, on a best-efforts basis, with Pixler to
25  secure a line of credit from Texas Capital Bank. Did

Page 444

1  you do that?
2      A.  Slight misnomer there; Danny L. Pixler, in
3  securing a line of credit. ASR had had a line of
4  credit. When we purchased ASR, I came down and met with
5  Texas Capital Bank. They continued with our new
6  ownership absent Prairie, everybody, to operate that
7  line of credit for ASR's benefit. And after we went to
8  contract with Pixler, this became a condition.
9      I came down -- I talked to on the phone,
10  introduced Pixler and the bank executive from Texas
11  Bank. Came down and met with the banker at least once
12  by myself and offered to take Pixler to meet him when we
13  were here April 1, and I believe Texas Capital Bank did
14  carry that line of credit through for some time after
15  the 27 June closing.
16      Q.  Okay.
17      A.  I am under the impression that at some time
18  Texas Capital Bank, for whatever reasons, called the
19  line of credit and had it shut down.
20      (Deposition Exhibit 142 was marked.)
21      Q.  All right. Go back -- I handed you earlier
22  one -- Exhibit 142, but I didn't ask you about it. Is
23  it sitting there?
24      A.  It is.
25      Q.  Is that another e-mail from Mr. Dobrin dated

Page 445

1  November 7th, 2002, referencing the certificates for
2  ASR's clients?
3      A.  I believe the answer to your question to be
4  yes.
5      Q.  And below that is an e-mail from Mr. Bailey,
6  indicating that -- that he's sending a complete list of
7  all certificates of insurance which have been issued to
8  date. This list, including all certificates of record
9  for our clients, includes the complete address and
10  client locater number for each client. Is that correct?
11      A.  I see that.
12      Q.  All right. Set that aside.
13      A.  (Witness complies.)
14      THE WITNESS: That is the provision within
15  two days of your client list or cert list off of
16  reference points and the fact that --
17      MR. LEVINGER: You're on the record.
18      Q.  Mr. Baumgardner, there is no question pending.
19      (Deposition Exhibit 143 was marked.)
20      Q.  I'll show you what's marked Exhibit 143, also
21  an e-mail from Mr. Dobrin on November 7th. He says
22  there, thank you for the info last night. However, I
23  understand that getting the info from ASR is more
24  difficult. When can I expect that?
25      Do you know what the problem was in getting the

Page 446

1  ASR info?
2      A.  Sure.
3      Q.  What?
4      A.  Our system had not been fully integrated into
5  the ASR that -- which I believe Mr. Dobrin refers to as
6  the -- look at your -- if I may, your Exhibit Number
7  142 --
8      Q.  Uh-huh.
9      A.  -- at the very top, it does not appear that
10  this list, second sentence -- this is Ivan -- Ivan
11  talking. I know that they, ASR, are not yet on Pay
12  Plus, but I need their list also.
13      ASR had not yet rolled on to our computer
14  system; therefore, Ivan acknowledged the day before it
15  was going to be more difficult. He had already been
16  supplied by Jim and the guys in Dallas the list, but it
17  was in a completely different format due to their
18  software system.
19      Q.  All right.
20      A.  He couldn't read it, either.
21      Q.  So you contend the list had already been
22  supplied by November 7th, just in a different format?
23      A.  Sure. I think that's also what's alleged,
24  looking at 142, below Ivan's e-mail response to Bruce
25  Bailey, where Bailey's sending it to Ivan. Ivan,

31 (Pages 443 to 446)

Page 447

1  attached please find a complete list of all the
2  certificates of insurance, blah, blah, blah, right on
3  through.
4       All of those had rolled through from each
5  respective unit in one form or another.
6       (Deposition Exhibit 144 was marked.)
7  Q. All right. Look at Exhibit 144. This is an
8  e-mail from Mr. Pixler to you, asking that certain
9  issues be corrected. See that?
10  A. Yes.
11  Q. And it says, Anthony and I will be visiting you
12  in Charlotte Tuesday morning the 12th of November.
13       Do you recall a meeting with them?
14  A. I do not believe that they came.
15  Q. All right. Did the --
16  A. I don't remember.
17  Q. Were the issues corrected?
18  A. I believe that they were.
19  Q. In a timely manner?
20  A. I believe that they were.
21       (Deposition Exhibit 145 was marked.)
22  Q. I'll show you what's listed as Exhibit 145 --
23  or what's marked as Exhibit 145. Do you remember
24  receiving Exhibit 145? And take a moment, if you would,
25  to look at it.

Page 448

1  A. Okay.
2  Q. Did you address these items with Mr. Pixler?
3  A. Repeatedly.
4  Q. He appears to be upset about not receiving
5  information, true?
6  A. Yes.
7  Q. Okay. Is it your contention that the
8  information had been sent or was sent soon thereafter?
9  A. Had already been sent.
10       (Deposition Exhibit 146 was marked.)
11  Q. I'll show you what's marked Exhibit 146. This
12  is a fax from Mr. Pixler to you on November 26, 2002,
13  correct?
14  A. Okay. Go ahead.
15  Q. Is that what it is?
16  A. I'm not sure. Repeat your question.
17  Q. Is that a November 26, 2002, fax from
18  Mr. Pixler to you?
19  A. It would appear that 797 is.
20  Q. And the first bullet point says, prepare
21  response to due diligence document production, attached.
22       And attached to this fax is a November 6, 2002,
23  letter from Mr. Campitiello to you with an enclosed list
24  of due diligence documents they are requesting. Do you
25  see that?

Page 449

1  A. I do.
2  Q. Was this information supplied?
3  A. The -- most of it was supplied. The remainder
4  was waived, and prior to the actual closing, repeatedly
5  working with us, Danny said, we don't need all this
6  stuff. We don't need all this stuff. And he finally
7  wrote down, in his hand, as I recall, a 12-, 15-item
8  list of things that they needed to close the
9  transaction. He had a suspense date for it to be
10  supplied, and I think I recall seeing that it had been
11  supplied in that -- within that suspense date timely,
12  and it had been released.
13  Q. Who supplied it?
14  A. People on our staff. I think the person that
15  headed it up was my daughter, Anna.
16       (Deposition Exhibit 147 was marked.)
17  Q. Okay. I'll show you what's marked Exhibit 147.
18  A. Are we through with this one?
19  Q. Yes. Whenever I move on to another one, you
20  can set the one aside, the previous exhibit aside.
21       Exhibit 147, is that a letter agreement dated
22  December 18, 2002, between BACE and The Cura Group,
23  extending the date by which a purchase price would be
24  reached for the acquisition of your PEO operations?
25  A. Yes.

Page 450

1  Q. Is that your initial and signature on it?
2  A. At the bottom?
3  Q. Yes.
4  A. It is.
5  Q. Out to the left there, it looks like some
6  handwritten initials with different dates. Do you see
7  there there's -- looks like Mr. Pixler's signature and
8  then a July 1, 2003, date. Do you know what that is?
9  A. No, I do not remember.
10  Q. And then another -- then your initials appear
11  there, too, correct?
12  A. Uh-huh.
13  Q. And then a date of April 30 and Mr. Pixler's
14  signature again. Do you know what that's for? Let me
15  see if I can help you. Looks like it was extended to
16  January 29th, as typewritten.
17  A. Right.
18  Q. Then apparently April 30th and then finally
19  July 1. Do you recall that?
20  A. No. But I acquiesce to your interpretation of
21  the growth here.
22  Q. You don't recall that there were several
23  extensions of time?
24  A. I do.
25  Q. You do?

32 (Pages 447 to 450)

Prairie Capital vs Ernst & Young                04/07/05                    William L. Baumgardner, Vol. 3

Page 451

1    A.  I do.
2    Q.  And each time there was such an extension,
3  did -- did you guys initial this letter?
4    A.  It would appear that that was the case.
5    Q.  All right.  Tell me the process that was --
6  that occurred between December 2002 and June 27th, 2003,
7  whereby a purchase price was arrived at and the terms of
8  the agreement were arrived at.
9        You went to Dal -- as a point of reference, you
10  went to Dallas on April 2nd.  Had there been any
11  negotiations of purchase price before you went to
12  Dallas?
13    A.  Just like the letter, it had been going on
14  since October of '02.  I was just trying to think how to
15  encapsulate into a very short response a very broad
16  question.
17    Q.  I understand that.  I'm trying to be broad just
18  so I can understand what happened from your perspective.
19  Did anything concerning negotiation of the purchase
20  price happen prior to April 2nd when you went to Dallas?
21    A.  Sure.
22    Q.  Tell me what happened.
23    A.  We were in a constant state of working on what
24  the companies were worth, trying to work on different
25  models.  We had had a business model valuation, going

Page 452

1  concern, five-step method, done by outsiders.  We had
2  looked at that valuation.
3    Q.  What outsiders had done that?
4    A.  You know, I don't really remember.  There are
5  copies of it around here.
6    Q.  Look at Deposition Exhibit 62.  May be in the
7  other book.  This is a memo from Mr. Mann to you and
8  Mr. Phillips and your daughter dated May 2nd, 2003,
9  enclosing valuation models as of March 31, 2003, for
10  ASR, ABP and Meridian, and then the ASR model based on
11  the ASR 2003 operating budget.  Are these the valuation
12  models you're referring to?
13    A.  That's one set.
14    Q.  Who else did valuation models?
15    A.  Anna had previously been with SunTrust Bank,
16  and I think maybe she had had a set run down there based
17  on the same submission of data, but it came down to
18  about three or four things because of -- of -- not being
19  disrespectful -- who we were dealing with.
20        We started with a going-concern model,
21  capitalized cash flow models, various different efforts
22  we had made earlier on, and before -- we then made the
23  trip in April, and when it was all over, from April 2nd
24  until June 27th, at various times, we tried to meet with
25  Danny and go over these things, and he had Russo in and

Page 453

1  out, and other people and everything.  He finally just
2  said, look, I don't understand all this stuff.
3        If you go back and look way back into your
4  earlier stuff, Mr. Huff didn't have any problem
5  identifying, back in October, in the meeting in
6  New York, that he understood what a business model was,
7  buying valuation, enterprise valuation, or anything.  I
8  think he referenced at least some of those in his
9  correspondence that we had talked and we would include
10  that or arrive at that.
11        By May -- end of April, first of May, we were
12  getting nowhere.  We were running out of time.  We were
13  trying.  Danny was trying.  I won't take that away from
14  him.  He just didn't understand.  And it finally came
15  down, having gone through everything, the -- the day the
16  light came on, that what we were talking about, based on
17  several different approaches, were all in the 85 to $100
18  million range.  And what Pixler was talking about was
19  way down in the floor.
20        And, actually, Russo became involved at one
21  point near the end there, and Russo did a valuation
22  that, in his inimitable New York fashion, figured out
23  that, I think, we owed them some large amount of money
24  for taking our company.  Big blowup that day, in
25  particular, at the office.

Page 454

1    Q.  Do you remember when that was?
2    A.  Not exactly.  I can dig around, find the date,
3  but it was in --
4    Q.  May?
5    A.  Yeah, probably in the May time frame.
6    Q.  Did you supply this Exhibit 62, share this with
7  Mr. Pixler and the folks from Certified?
8    A.  Well, I'm not sure who "the folks from
9  Certified" mean, but certainly Pixler.
10    Q.  You gave it to them to look at?
11    A.  Personally went down, impressed over
12  everything, the whole nine yards.
13    Q.  How is it that you acquired the business for --
14  how much did you pay for it?
15    A.  For what?
16    Q.  ASR.
17    A.  I'd have to go back and look at the numbers.
18  What, $9 million?
19    Q.  And you paid a million five in cash, right?
20    A.  I think over -- from the day we met them until
21  the day we sold it to ASR, I think we paid probably --
22  excuse me -- to Certified, we probably paid closer to
23  two and a half.
24    Q.  You made one $1 million payment on the note in
25  February of '03 in order to get an extension, right?

33 (Pages 451 to 454)

ALPHA REPORTING SERVICES, INC., DALLAS, TX  (888) 667-DEPO

Prairie Capital vs Ernst & Young                    04/07/05                    William L. Baumgardner, Vol. 3

Page 455

1    A.  There was a million-dollar payment.
2    Q.  Okay.  So you paid two and a half million cash,
3    and then you passed the notes on to Certified.  They
4    agreed to assume them and -- as part of the June 27th
5    agreement, correct?
6    A.  Are you saying that?
7    Q.  Is that right?
8    A.  No and yes.  Certified did not assume the
9    notes.  Certified, vis-a-vis the personage of Danny
10   Pixler, was very emphatic that they didn't want our
11   deal.  They wanted to negotiate their own deal,
12   firsthand, with Prairie.
13   Q.  Did Prairie agree to that?
14   A.  Prairie, in the person of Mr. King, was made
15   aware that they wanted to do that.  That was fine.  And
16   as the time evolved -- trying to not be laboring here --
17   King became more and more of a mind to do a transaction,
18   of course, directly with CSRV.
19       When he had learned that they had put up, you
20   know; 25, $30 million, 35 million, whatever it was, with
21   CNA, letters of credit, deep pockets, publicly traded
22   company, et cetera, et cetera, that weighed way
23   different than what we had.
24       What we wanted to do was go on, do our
25   international insurance thing.  We wanted out of the

Page 456

1    middle, didn't want to be in this play anymore, and most
2    assuredly weren't going to be in this play between two
3    book ends that were both bigger than us.
4    Q.  All right.  But my question is a little
5    different.  I don't think you answered it.  That is, did
6    Mr. King ever say to you that he would agree to
7    renegotiate the notes with Pixler and -- and that you
8    were off the hook, basically?
9    A.  He had no need to say that to me.  He asked for
10   Pixler's information, how to get in touch with him.  He
11   came -- flew to Charlotte as late as June 25th -- in
12   June.  We had phone conversations, 25th, 26th, 27th.  In
13   the June meeting, we met in Charlotte with -- Brian and
14   I, my son and I.
15       Simply stated, they wanted collateral for the
16   note, security, et cetera, to work on through the thing
17   and go forward.  We just wanted out.  We didn't want
18   CSRV, by that point, to assume the notes.  We wanted
19   them to assume the acquisition indebtedness, there being
20   a distinct difference.
21       Certified wanted to negotiate -- Pixler said --
22   wanted to negotiate their own deal with King, et al.,
23   because they would put up -- could put up letters of
24   credit, which we had conveyed to King, bankable letters
25   of credit to secure the notes, but they were going to

Page 457

1    get a discount for doing that, and adding security to
2    the transaction, et cetera.
3       And we came to the June -- end of June time
4    frame, everybody's schedules hadn't fit.  King had come
5    to Charlotte, like I said, some very, very, very short
6    time before the closing, and I was off to London to work
7    on the insurance thing, with Phillips, I might add.
8    Q.  All right.  So is it --
9    A.  Let me --
10   Q.  Okay.  I didn't mean to -- I thought you were
11   done.
12   A.  There -- there was no doubt that King
13   understood that we wanted out of the middle.  There was
14   no doubt that King wanted us out of the middle.  There
15   was no doubt at all that this deal could not close on
16   June 27th, the last day of the quarter, for Certified to
17   include our numbers in their quarterly numbers, which
18   was their big driving force at that point, without the
19   acquiescence of King on behalf of the Prairie Group,
20   et al., and Pixler's acquiescence to the King side of
21   the deal on the other side.  They -- they knew they were
22   dealing directly with one another --
23   Q.  Okay.
24   A.  -- that we were extinguished.
25   Q.  So was it your understanding, based on your

Page 458

1    negotiations with Mr. Pixler, that they did not agree to
2    assume the notes?
3    A.  No.
4    Q.  Well, you just told me that they -- all they
5    agreed to was to assume the acquisition and not -- they
6    never agreed to assume the notes.
7    A.  I don't want to get into the semantics.  I'm
8    not an attorney.  There was no intent -- no
9    misunderstanding of anything.  The prevailing, the
10   overwhelming, the clear intent was that the acquisition
11   indebtedness, part of which was the promissory notes
12   issued by us to Prairie, was all -- to include Meridian
13   and -- and ABP, was all being assumed by Certified
14   Services, et al,
15       Number two, Pixler/Certified wanted to do their
16   own deal to, if you please, carve out, substitute,
17   replace, renegotiate -- I think's what the contract
18   calls, or one of the things that we pointed out earlier.
19   Says -- uses the word "renegotiate the deal."
20       Well, what they meant was and what everybody
21   understood and what's referenced in several places is
22   we're going to put up bank -- bankable letters of
23   credit.  We, Certified, is going to put up bankable
24   letters of credit to Prairie Capital, Ancor, et al., for
25   the new renegotiated amount notes.  That was all to be

34 (Pages 455 to 458)

Prairie Capital vs Ernst & Young                04/07/05                William L. Baumgardner, Vol. 3

Page 459

1   between them, gone.
2      Q. Was there ever -- did you ever hear anything
3   about what these renegotiated notes would be in terms of
4   their amount?
5      A. Not only did I not hear anything about what the
6   amounts were or anything, it was none of my business.
7   That's between them. I'm out. The deal's closed.
8      Q. Did Mr. Pixler represent to you that -- that
9   he -- that he would put up letters of credit to secure
10  the notes?
11     A. He did.
12     Q. Regardless of what their amount was and
13  regardless of whether Mr. King agreed to revise the
14  terms of the notes, or would it be something he would be
15  willing to do as part of the renegotiation of the notes?
16  Is that what he told you?
17     A. I think it was all interwoven and wrapped
18  together to occur simultaneously.
19     Q. How is it that you purchased ASR, a company you
20  contend in these valuation models had value in the range
21  of $100 million, for $9 million?
22     A. I don't think anybody at this table, certainly
23  not here, has ever said that ASR was worth $100 million
24  and I bought it for nine, as you just stated in your
25  question.

Page 460

1      Q. Well, look at Exhibit 62, and look at page 22,
2   which is BACE 2487. You see it? Are you on that page,
3   Mr. Baumgardner?
4      A. 2487, I am on that page.
5      Q. All right. What does that page indicate the
6   value of ASR is?
7      A. It would indicate that -- in this model, ASR's
8   value average among the four or five techniques that it
9   had used was ninety-two five-forty-one.
10     Q. Do you agree with that?
11     A. ASR by itself?
12     Q. Yes, sir. Is that what this is modeling?
13     A. I -- I would have to go through and study these
14  again. I, candidly, did not remember it being that
15  high, but I hadn't seen these in a long time.
16     Q. Look at the next page. See there is
17  modeling --
18     A. Are we at 2488?
19     Q. Yes, sir. This is a different model, isn't it,
20  for ASR?
21     A. Well, each one of these models uses different
22  assumptions and everything, different factors, to come
23  up with all the typical market -- reasonable valuation
24  techniques to come up with a model, and I'm looking at a
25  copy, and you're right.

Page 461

1      Q. Okay. This page shows a value --
2      A. This page which -- I'm sorry.
3      Q. 2488, what is the value of ASR shown on that
4   page? Doesn't it show weighted average cost of capital
5   value, 72,661,000?
6      A. It does.
7      Q. Do you believe ASR was -- had that kind of
8   value at the time it was being sold to Certified?
9      A. ASR?
10     Q. Yes, sir.
11     A. No.
12     Q. We know you paid $9 million or agreed to pay
13  $9 million for the company, correct?
14     A. Uh-huh.
15     Q. Only two months before you signed the October
16  31st, 2002, agreement to sell it to Certified, or Cura,
17  correct?
18         MR. LEVINGER: Object to the form.
19     A. I'm sorry. Restate the question.
20     Q. You agreed to pay $9 million for ASR two months
21  before you agreed to sell ASR to my client in the
22  October 31st agreement, right?
23         MR. LEVINGER: Object to form.
24         MR. NASH: I'll join that objection.
25     Q. Well, look. I'll withdraw the question. I

Page 462

1   don't want to argue about whether you agreed to sell it
2   or didn't sell it. The document speaks for itself, the
3   October 31 agreement. So let's just go with the June
4   27th agreement.
5         You agreed to sell it to my client for a total
6   consideration of about $17 million, correct?
7         MR. LEVINGER: Object to form.
8      A. We, ultimately, as a very one-sided negotiation
9   with Mr. Pixler, did two things. After the first day
10  blew up with -- Russo told us we owed them money,
11  Mr. Pixler sat down and said, here's what we'll do. We
12  don't want to do any more than that. We're not going to
13  do any more than that. We'll cancel your insurance if
14  you don't do it. My question was simple: Are you going
15  to pay me any less than that? Is there going to be a
16  fight? Is there going to be an argument? He said, no,
17  not at all.
18     Q. What was Russo's theory about how you owed them
19  money?
20     A. Unique.
21     Q. No. I'm asking you specifically, under -- how
22  did he come to the conclusion that you owed them money?
23     A. I -- I don't remember the exact gyration right
24  now that we went through -- that he went through, but he
25  had a little worksheet, and -- and let's assume this,

35 (Pages 459 to 462)

Page 463

1  let's assume that, and went right through the worksheet.
2  And we literally ended up, I think, owing him 20 million
3  bucks for taking the company.
4      Q.  Okay.  Was ASR worth $9 million when you agreed
5  to pay $9 million for it on August 31st, 2002?
6      A.  No.
7      Q.  What was it worth?
8      A.  Probably 25 to 40.
9      Q.  Then why did -- how do you explain the fact the
10  ASR shareholders agreed to sell it for nine?
11          MR. LEVINGER:  Object to form.
12      A.  I don't know that I could ever tell you why the
13  ASR shareholders did anything or what their logic or
14  rationale was.
15      Q.  So you --
16      A.  You asked me what it was worth to me, and
17  that's what it was worth to me.
18      Q.  All right.  If you had just paid $9 million for
19  something you believed was worth 20, then why did you
20  even consider selling it to Cura at that point?
21      A.  At the June 27th point?  At the --
22      Q.  Well, you agreed --
23      A.  -- October?
24      Q.  Let's try to get this straight.  You agreed to
25  sell it October 31st, 2002, provided y'all could come to

Page 464

1  terms on a purchase price; isn't that correct?
2      A.  That's -- that's still not -- as we spent a lot
3  of time talking today, earlier this morning and other
4  times, that's still not what the intent of the parties
5  was in October.  It was not for us to sell it to them.
6  It was to push the two pie tins up next to each other,
7  go forward together.  We had the systems.  We had the
8  template.  We had the operations.  We had the
9  experience.  We had the knowledge.  They had the bucks.
10  It's that simple.
11      Q.  Why didn't you do a merger agreement, then?
12      A.  Because I don't think that facilitates what CNA
13  wanted to carry the insurance the way that their
14  consult -- CSRV's consultant wanted it done.
15      Q.  So were you trying to pull a fast one on CNA,
16  then?
17      A.  Sure.  That's why we called them in the middle
18  of the night and had them involved in every step.  I
19  resent the "fast one."  And that goes back to my crack
20  to you.
21      Q.  All right.  Well, then, what did you tell CNA?
22  Did you tell them that you were -- did you -- you sent
23  them a copy of the purchase agreement.
24      A.  CNA knew everything about this transaction all
25  the way through, as they'd known about every one of our

Page 465

1  PEO acquisitions and everything, including waking
2  Rosendale up in the middle of the night to do the Core
3  deal.  They knew all about it.
4      Q.  Who at CNA was involved with these last-minute
5  negotiations on October 31st that, quote, knew what the
6  deal was?
7      A.  I had no involvement in that aspect.  What was
8  the name we saw on the fax a little while earlier that I
9  pointed out was the CNA guru for Certified that knew all
10  about the transaction?  Well, I had -- I'll take the
11  time to look for it.
12      Q.  I don't know.  I mean --
13      A.  I'll take the time to look for it.
14          THE VIDEOGRAPHER:  Excuse me, counsel.  I
15  need to change tape.
16          MR. BUNCHER:  That's fine.
17          THE VIDEOGRAPHER:  We're off the record at
18  2:49.
19          (A recess was taken.)
20          THE VIDEOGRAPHER:  Beginning of Tape 5.
21  We're back on the record at 2:51 p.m.
22      Q.  You were looking for somebody's name before we
23  took a break.  Whose name is it?
24      A.  Before I give you the name, what was the
25  question, again, lest I give the name as an answer to

Page 466

1  a misunderstood question?
2      Q.  Okay.  You say CNA was involved in these when
3  y'all were negotiating this October 31 agreement; is
4  that right?
5      A.  CNA was informed.
6      Q.  Who at CNA was informed?
7      A.  I do not know.
8      Q.  Who informed someone at CNA?
9      A.  A consultant that we've previously talked about
10  that was employed, retained by Certified Services to
11  handle their relation -- ongoing relationships with CNA.
12  His name, as best I can recollect, was John Ritenour,
13  and that's from an earlier e-mail, one of the famous
14  Dobrin e-mails we talked about earlier, specifically
15  Exhibit 137.
16      Q.  Thank you.  You just testified a minute ago,
17  though, that CNA knew what the deal was, or something to
18  that effect --
19      A.  Right.
20      Q.  -- is that right?  How do you know what CNA
21  knew if you didn't talk to them yourself?
22      A.  I don't know.  You've been asking me all day
23  what they knew.  Simply stated, CNA had to be a party to
24  this deal, had to know what was going on, had to be
25  informed by somebody.  I was told that person was

Page 467

1  Ritenour.
2       Look at the logic of the situation. They knew
3  about the September letter of credit -- the September
4  letter of credit. They knew about the October letter of
5  credit. They knew about the cancellation notice. They
6  knew about October 31 deadline. They had a copy of the
7  agreement. Draw your own conclusion. Of course, they
8  knew.
9       Q. Well, if I look at the agreement, it says
10  that -- that Cert -- or Cura is going to buy your PEO
11  businesses. Now, that's what I look -- that's what I
12  see. Tell me why -- why I'm wrong about that --
13          MR. LEVINGER: Object to form.
14       Q. -- and why somebody at CNA, who's given a copy
15  of that agreement, wouldn't conclude the same thing?
16       A. Didn't mean to say that somebody -- and I don't
17  know that they hadn't, but I had not supplied a copy of
18  that agreement to CNA at that point.
19       Q. Well, you knew it was going to be supplied to
20  CNA, correct, because, otherwise, if it wasn't, you knew
21  that your coverage was about to be terminated? Remember
22  the lists of what CNA had to have? One of them was the
23  purchase agreement.
24       A. There you have it.
25       Q. All right. So what leads you to believe that

Page 468

1  CNA thought that the deal was something different, that
2  it really wasn't a purchase; it was just this nebulous
3  agreement to go forward with these two tins like you've
4  described? Where -- where do you -- how do you conclude
5  that?
6          MR. LEVINGER: Object to the form.
7       A. I'm simply telling you what was my perception
8  of what was going on at the time. You have a way of
9  making it sound so onerous as to be offensive.
10       Q. Well, I don't intend to be onerous or
11  offensive, but I don't see how you can look at that
12  agreement and say it's anything other than an agreement
13  to sell the stock of your companies to Cura with an
14  agreement that they're going to work the price out or
15  try to work the price out over the next 60 days. That's
16  what the agreement says, doesn't it?
17       A. Well, did it happen?
18       Q. No. You guys agreed to extend the date. Okay?
19  But where is this -- where -- show me in the documents
20  anywhere where it says there's some agreement that
21  you're going to, like, go forward together with this
22  business. Anywhere?
23       A. Counselor, I guess you had to be in your
24  client's office in New York or repeatedly with your
25  client in my office or anything else.

Page 469

1       Q. All right. You can't show me anywhere in the
2  documents where that is evidence, can you?
3       A. Nothing comes to mind as we sit here.
4       Q. All right. Now, let's get off of the October
5  31 agreement. You agreed to pay $9 million for this ASR
6  business at a time you believed it was worth 20,
7  correct?
8       A. Okay.
9       Q. Is that -- that was your testimony, right? In
10  August of 2002, you think it was worth about 20 million,
11  correct?
12       A. Is that right?
13       Q. You tell me.
14       A. I think we were talking about May of 2003.
15       Q. No. I'm talking about August 31, 2002. You
16  agreed to pay nine.
17       A. Right.
18       Q. What did you believe the value of it was at
19  that time?
20       A. At least nine.
21       Q. Okay. Well, how did it get from nine, at that
22  time, to twenty in May of 2003?
23       A. That's an easy answer. The evolution and the
24  realize -- not realization, but the -- the perfection of
25  what we knew we had and what it brought to the fold,

Page 470

1  the -- the not necessarily raw, stand-alone value, which
2  is what we were talking about, but the value added to
3  the sum of the parts made it worth every bit of 20, in
4  my opinion.
5       Q. What, in your opinion, was the value of all of
6  your PEO businesses that you sold to Certified on June
7  27th, 2003?
8       A. Well, we did a capitalized cash flow in a
9  multiple of five, just -- not on pure cash, not on
10  operational cash, or anything. Just what Certified had
11  taken out in these weekly and more frequently e-mails
12  for their cost for their workers' comp, for their
13  collateral payment, for their interest payment, for
14  their management payment, what have you, just the money
15  that Certified took out, I think, came to a capitalized
16  value of about 97, $98 million, which, ironically, is
17  about what we, I think, had to -- copy that I remember
18  most of these things, the business enterprise value
19  done, which if you come back to a net operating
20  capitalized return on equity type situation, you came
21  back to within, I think, about a million, million and a
22  half dollars.
23       And if you came back and adjusted -- I think
24  there was another method whereby we came back and
25  adjusted what Huff wanted to do -- strike that -- what

37 (Pages 467 to 470)

Prairie Capital vs Ernst & Young                    04/07/05                    William L. Baumgardner, Vol. 3

Page 471

1  Russo wanted to do, and tried to -- to spend, we came
2  back within just literally a couple million dollars of
3  the same thing, and that was approximately ten times,
4  eight times what Mr. Pixler had in his mind.
5     Q.  Okay.  Why did you agree to sell it for
6  approximately $17 million in consideration at that point
7  if you thought it was worth that much?
8     A.  It was to be sold for a price certain, not to
9  be less than that price, no further negotiations about
10 that price, no offsets, discounts, or nothing taken from
11 that price, guaranteed a respite of two to three years
12 while I was free to work on something else, the
13 international insurance project, believed to provide
14 $20 million worth of bankable letters of credit from
15 Mr. Huff to further that project, and allowed me to go
16 focus on something I wanted to do while letting the
17 well-heeled PEO moguls of Fort Lauderdale go their way,
18 and, keeping in mind, they had asked me to stay in a
19 consultative fashion so I could stay and help them, kind
20 of noodle them along, nudge them along in the right
21 direction.
22    Q.  Did you agree to -- was the consultant
23 agreement terminated?
24    A.  No.
25    Q.  Were you paid what you were owed?

Page 472

1     A.  No.  What do you mean, was it terminated?
2     Q.  How long -- how long was the agreement to last?
3     A.  Year, year and a half.
4     Q.  Were you paid anything on that agreement?
5     A.  Yeah, I think there was one payment made, maybe
6  two.
7     Q.  How much were you to be paid?
8     A.  Which exhibit is it?
9     Q.  It may be in Exhibit 15.  It says --
10    A.  We haven't even talked about part of the other
11 things here.
12    Q.  I see a strategic marketing alliance agreement,
13 dealing with BACE Motorsports, for $900,000.  Was that
14 ever paid?
15    A.  No.
16    Q.  Paid in 12 equal monthly installments of
17 $75,000.  Did they make any payments?
18    A.  I think not, but maybe one.  I just don't have
19 a --
20    Q.  The consulting agreement is CURA 48.
21    A.  Okay.
22    Q.  It says, $250,000 per annum, monthly payments
23 of $20,833.
24    A.  Right.
25    Q.  And for a period of four years unless earlier

Page 473

1  terminated as set forth herein?
2     A.  Okay.
3     Q.  And then the termination says, the company may
4  terminate this agreement at any time for cause.  If it's
5  other than cause, then difference between amount paid
6  and $1 million shall --
7     A.  Whoa, whoa, whoa.  Let's not -- do we have to
8  skip over that?
9     Q.  Well, I'm just setting the stage.  Then I want
10 to ask the question.
11    A.  I thought you set the stage to include the
12 definition of "cause," but that's all right.
13    Q.  All right.  What do you want to say about that?
14    A.  Well, I think it defines it right there where
15 you were reading.  The company may terminate this
16 agreement at any time for cause, which in the drafts
17 sent down from New York had about ten or fifteen or
18 eight or nine or what -- a large number of causes.
19    Pixler and I sat down, and I said, Danny, you
20 know we're not going to do that.  This is just an
21 assignment of part of the allocable purchase price that
22 you came up with.  He said, okay, then the only thing
23 we'll leave in there is -- which shall be defined as
24 cause -- conviction of a crime involving moral
25 turpitude.  Well, I am reasonably sure I have never been

Page 474

1  convicted of moral turpitude, nor am I likely to be.
2     Q.  All right.  Have they ever purported to
3  terminate this agreement?
4     A.  Have they what?
5     Q.  Has -- has Certified ever terminated the
6  agreement, sent you notice of termination?
7     A.  They have sent me no notice of termination.  I
8  have never received a notice of termination.  I did quit
9  getting payments.
10    Q.  When did you quit getting payments?
11    A.  Probably August of '03.
12    Q.  All right.
13    A.  And that was not on advice or information, that
14 I know of, that I had committed moral turpitude.  They
15 just chose to quit making the payments.
16    Q.  Have you sued Certified for the amounts you
17 contend are owing under this agreement?
18    A.  I would have to go back and refresh my memory,
19 but I think all of that is included as part and parcel
20 to a lawsuit that's filed in North Carolina, in the
21 federal courthouse, in the Western District of
22 North Carolina.
23    You were setting up a question earlier when I
24 asked you about moral turpitude.  You never got around
25 to the question.

ALPHA REPORTING SERVICES, INC., DALLAS, TX (888) 667-DEPO

Prairie Capital vs Ernst & Young            04/07/05            William L. Baumgardner, Vol. 3

Page 475

1    Q.  No, I've asked you now.
2    A.  Okay.
3        MR. BUNCHER:  Why don't you take your
4    short break, and let me see -- I may have just a few
5    questions left, and then we'll be done.
6        MR. LEVINGER:  All right.  Let's go.
7        THE VIDEOGRAPHER:  We're off the record at
8    3:04 p.m.
9        (A recess was taken.)
10       THE VIDEOGRAPHER:  We're back on the
11   record at 3:15 p.m.
12   Q.  Mr. Baumgardner, you mentioned, in doing these
13   valuations, that somebody did a valuation based on the
14   amount taken out by Certified or Cura, or something to
15   that effect.  I was wondering what you were referring
16   to.
17   A.  A simple mathematical calculation, not a
18   full-blown appraisal, was done to capitalize what
19   Certified had taken out, as demonstrative of the fact
20   that the company was generating that much nonoperating
21   cash flow.
22   Q.  Are you talking about the payments that were
23   made for the coverage, the workers' comp, before the
24   company was sold?
25   A.  I'll leave my answer as stated.  The cash flow

Page 476

1    that Certified had taken out.
2    Q.  During what period?
3    A.  Well, the only period I had accounting for.
4    Q.  Which was what?
5    A.  Sometime in September of '02 to sometime in
6    June or July of '03.
7    Q.  All right.  Look at Exhibit 45, please.
8        THE WITNESS:  This one?
9        MR. LEVINGER:  Yes.
10       THE WITNESS:  These are tabbed?
11       MR. LEVINGER:  Yes.  You got it.
12   Q.  These are Mr. Cunningham's notes of interviews
13   and findings when he went to ASR, and they're dated
14   August 18, 2003.  Have you seen these before?
15   A.  No.
16   Q.  All right. .Now, you mentioned, after the June
17   27th, 2003 agreement, at some point Certified came back
18   and alerted you to issues they claimed to have with the
19   financial condition of ASR; is that right?
20   A.  Yes.
21   Q.  When was that that they first came to you and
22   said there was -- they had a problem with something at
23   ASR?
24   A.  Summer of '03.
25   Q.  Obviously, after June 27th?

Page 477

1    A.  That is correct.
2    Q.  Look at Exhibit 63.  Have you ever seen that?
3    A.  I believe this to be one of the versions of the
4    Cunningham/Russo accounting.
5    Q.  Look at Exhibit 64.  Well, first of all, have
6    you seen Exhibit 63 before?
7    A.  There were multiple -- excuse me, please.
8    There were multiple versions of this, but I'm -- I'm not
9    sure, specifically, I've seen this one, but probably.
10   Q.  Look at 64.  Is -- do you recognize that?
11   A.  Same thing.  Again, I don't recognize this
12   specific one, but it's just part of the ever-increasing
13   one.
14   Q.  Now, you indicated, though, in one of these
15   meetings or discussions you had with Pixler about these
16   issues that somebody had prepared a book responding to
17   these issues, and you mentioned, I think, Pixler
18   throwing it against the wall or throwing it --
19   A.  Yes.
20   Q.  -- down or something to that effect.  When did
21   that happen?
22   A.  That was the very first version.  It was maybe
23   9 million, $10 million, and that would have been the
24   start of all of this, and I would say, again, late
25   summer of '03.

Page 478

1    Q.  But --
2    A.  About the time the second payment was due.
3    Q.  Who prepared the book responding to it?  Was it
4    Mr. Mann?
5    A.  No.  It was all of us.  We took the list, as
6    Pixler asked us to do, total innocence.  Hey, man, I
7    don't know, but if you'll just take them one, two, and
8    see if you can come up with an answer.  Well, we come up
9    with an answer, tabbed documentation and everything, and
10   sent it to them.
11   Q.  Do you have a copy of that?
12   A.  I do not.
13   Q.  Okay.  Who else was present when this happened,
14   when the book was presented to Mr. Pixler and you say he
15   threw it down, or something to that effect?
16   A.  Predominantly, Anthony Russo.
17   Q.  Any -- yourself?
18   A.  Oh, yeah.
19   Q.  Anybody else?
20   A.  May have been.  Don't recall.
21       (Deposition Exhibit 148 was marked.)
22   Q.  I'll hand you what's marked Exhibit -- I'm
23   sorry to throw that at you.
24   A.  I'm getting used to it.
25   Q.  Exhibit 148, do you recognize that as an e-mail

39 (Pages 475 to 478)

Prairie Capital vs Ernst & Young                04/07/05                William L. Baumgardner, Vol. 3

---

Page 479

1  from Mr. Pixler to you on May 6th, 2003?
2      A.  Go ahead.
3      Q.  Do you recognize that as an e-mail you received
4  from Mr. Pixler about May 6th, 2003?
5      A.  I don't distinctly have any recollection
6  whatsoever of this e-mail.
7      Q.  Is that your e-mail address up there?
8      A.  Not the one that I use, no.  Not the one that
9  anyone would send stuff to me and -- and expect me to
10  get it.
11      Q.  Are you saying you've never seen this before?
12      A.  I am saying that.  I'm saying I have no
13  recollection of having seen it.
14      Q.  You can set that aside.
15      A.  (Witness complies.)
16          (Deposition Exhibit 149 was marked.)
17      Q.  I'll show you this next exhibit marked 149.
18  There is a handwritten note at the top that says, Pixler
19  draft, and it appears to be a draft of a letter from
20  Pixler to you, May 19th of '03.  And do you recognize
21  the telephone number underneath the handwriting, Pixler
22  draft, (843) 832-8213?
23      A.  No.
24      Q.  Look at the second page.  Do you know if this
25  was ever sent to you?

Page 480

1      A.  I do not recall ever having seen this.  I'm not
2  saying I didn't.  I'm just saying I don't recall.
3      Q.  In this draft letter, it says, in the second
4  paragraph, BACE has repeatedly failed to timely produce
5  such books, records, inventories and appraisals as it
6  deems fitting to accommodate a reconciliation of its
7  expectations of consideration with an economically --
8  economically equitable resolution to Cura.  As a result
9  of BACE's consistent and sustained avoidance of Cura's
10  entitlement to timely and objective exchange of
11  thoughts, BACE has benefited by drawing profits and
12  other distributions from StaffAmerica while Cura's costs
13  and exposure to future liabilities have compounded.
14          Did -- did you have discussion with Mr. Pixler
15  where he expressed those thoughts to you?
16      A.  Do not recall ever having seen this.
17      Q.  Well, okay.  Even if you haven't seen that, do
18  you recall him expressing those sentiments to you at
19  that time, that BACE --
20      A.  No.  No.  This is May 19th?
21      Q.  Yes, sir.
22      A.  No.
23      Q.  Throughout the time from October 31 through
24  June 27th, 2003, did BACE continue to draw out fees from
25  ASR for management of the business?

Page 481

1      A.  Don't remember.  I just think it's interesting,
2  on May 19th, after Kyle just did the May 2nd, I think it
3  was, appraisal and sent it to us, a valuation, and we
4  had had a meeting with Danny right around this time.
5  Accordingly, we request your presence at our
6  Fort Lauderdale office on Tuesday afternoon.
7          I went to Fort Lauderdale.  They immediately
8  took me to South Beach for a drink.  We didn't have
9  anything else to talk about.  References made -- blah,
10  blah, blah.  This is a typical Pixler, sit down, have it
11  the way I would want it rather than to talk about it the
12  way it is.
13          And I can assure you -- not to be ugly -- BACE
14  has repeatedly failed -- I read -- to timely produce
15  such books, records, inventories and appraisals.  Sound
16  like Danny Pixler?  I don't guess I can ask you
17  questions.
18          Well, since he's had financial statements for
19  eight months and not one of them has an inventory on it,
20  not one of them has a fixed asset to be appraised, I'd
21  say that's probably the same letter he used in the
22  trucking business.
23      Q.  All right.  You're saying, around that date of
24  May 19th, y'all had a meeting?
25      A.  We met regularly.  Danny was in the office the

Page 482

1  whole -- Danny would leave the office and, on the
2  airplane, dictate an e-mail or generate an e-mail.  It's
3  difficult to get ahold of you.  We're brothers.  We're
4  family.  We're doing all this for you.  All -- we're
5  just trying to move money again.  I'm sure I can sit
6  right here -- and I haven't even looked at this thing --
7  and find 50 percent of the stuff.  Just --
8          MR. LEVINGER:  Well, his question was just
9  did y'all meet?
10      A.  I'm sorry.  The answer is yes.
11      Q.  All right.  Did you meet at that time for the
12  specific purpose of concluding the discussions about
13  what purchase price would be appropriate for ASR and the
14  other PEO businesses?
15      A.  Yes.
16      Q.  Who was present for that?
17      A.  Me -- me, Danny Pixler, Russo, from time to
18  time.
19      Q.  All right.  So there were more than one meeting
20  to discuss that issue in the May 2003 time frame?
21      A.  Counselor, he was in the office two to three
22  days a week.
23      Q.  All right.
24      A.  Yes, sir.
25          (Deposition Exhibit 150 was marked.)

40 (Pages 479 to 482)

Prairie Capital vs Ernst & Young                    04/07/05                    William L. Baumgardner, Vol. 3

Page 483

1    Q.  Look at Exhibit 150.  Do you recognize these
2    notes?
3    A.  Is 150 referring to everything attached here?
4    Q.  Yes, sir.
5    A.  Okay.  You had all this stuff.  Why did you let
6    me talk?
7    Q.  They're all handwritten, and I'm wondering if
8    this is your handwriting.
9    A.  Let's go through them.
10   Q.  All right.  The first page, is that your
11   handwriting?
12   A.  BACE 00179?
13   Q.  Yes, sir.
14   A.  It is.
15   Q.  And it's dated May 27, 2003.  Looks like you
16   met with Mr. Pixler and Mr. Russo to discuss valuation
17   of your businesses, correct?
18   A.  The valuation, the amount of the valuation, the
19   security for the arrived-at valuation, the second
20   thing -- yes.
21   Q.  Where did that meeting happen?
22   A.  My office in Charlotte.
23   Q.  Next page, BACE 180, whose notes are those?
24   A.  I think this was the outline that we were
25   referring to just a little bit ago that Mr. Russo did

Page 484

1    that he brought with us and said, you owe us money.
2    Q.  All right.
3    A.  And I thought it interesting that, just like
4    00180, with no numbers filled in, he came to the meeting
5    with the term "negative net worth" prewritten on the
6    page, so no matter what number you filled in, starting
7    out with a $20 million hypothetical price, you ended up
8    with a loss because he was going to offset that by the
9    debt and the negative.
10   Q.  Next page, 181, whose notes are those?
11   A.  Those are my handwriting scratch notes.
12   Q.  When did you make those notes?
13   A.  Pardon?
14   Q.  When did you make those notes?
15   A.  All -- all of these would have been the same
16   week.
17   Q.  What was the purpose of this note?
18   A.  Same purpose.  Trying to arrive at a -- a
19   valuation technique or model to come up with a -- a
20   value, a purchase price for Staff.
21   Q.  Next page, 182, are those your notes?
22   A.  They are.
23   Q.  183?
24   A.  Well, I notice on 182 the valuation we came up
25   with was 114,876,400, and we did that sitting there with

Page 485

1    them.  That's just off two items.  But the answer to
2    your question is yes.
3    Q.  All right.  And that would be a value you put
4    on all of your PEO businesses that were being discussed?
5    A.  It was.
6    Q.  Next page, 183, is that your note?
7    A.  183 is my note.  It is a calculation that
8    utilizes the enterprise valuation that -- that I
9    recollected, not the -- the one you had.
10   Q.  The one from Mr. Mann?
11   A.  Yeah.  May have been the one.  We just -- I
12   don't remember.  It is an enterprise model valuation.
13   Q.  Actually, if you look at Exhibit 62 --
14   A.  Yes, sir.
15   Q.  -- on page 2463, you find --
16       MR. LEVINGER:  Let's get it first.  Hold
17   on.  162.
18   Q.  Look at page 2463.  You see the number
19   $96,385,830 on that page?
20   A.  I do.
21   Q.  That's the number you started with on this note
22   here on page 183 that we were looking at --
23   A.  Okay.
24   Q.  -- is that right?
25   A.  Well, mine's a deteriorated generation company,

Page 486

1    but it appears to be.
2    Q.  Okay.  What is the -- what's the point of this
3    calculation on page 183?  It arrives ultimately at a net
4    cost of acquisition.  What does that mean?
5    A.  Well, we were trying to figure out what it's
6    going to cost Danny to buy our company and what he's
7    going to have to show and what the impact is, because by
8    this point it had become more a mind game with Dan than
9    an accounting or financial statement game.
10       The valuation was never going to come across --
11   never, ever, ever -- based on financial statements and
12   work papers and everything else.  It was going to come
13   down to something that Danny could understand.  And
14   that's the only way we were going to get across the
15   hurdle.
16       And what we did was took the 96,385,000, said,
17   okay, ballpark guessing, $10 million worth of
18   acquisition debt.  Don't know what the exact payoff is,
19   but there it is.  The Brentwood Capital notes,
20   4,000,850, subtract those from the valuation.
21       Allocable expenses that you've told us about
22   that you previously haven't allocated to us but are
23   allocable between Certified and us, total, million
24   bucks -- for purposes here today, we'll take the whole
25   million bucks.  Subtract that number.

ALPHA REPORTING SERVICES, INC., DALLAS, TX  (888) 667-DEPO

Prairie Capital vs Ernst & Young                04/07/05                William L. Baumgardner, Vol. 3

---

Page 487

1    And you know -- you say you got $36 million
2  worth of collateral at CNA? He said, yeah. I said, we
3  just pay for part of it. But I tell you what. Take the
4  full face amount, even though it's not fully funded,
5  take that off our value.
6    You got 836. We'll take half of it, 18,
7  because the two, CSRV and Staff are about the same size.
8  So, theoretically, half of it's for us. So subtract 18.
9  That gives you 62,535,000 grand. That's way less than
10  we ever dreamed of or had talked to other people about,
11  hypothetically, that they had sold their PEOs for, and
12  everything.
13    I said, take that number, Danny, and cut it in
14  half. He said, all right. I said, that's 31,267. So
15  right off the bat, to a going-concern model and what you
16  say you've got in the wealth, you can double your money.
17  31,267. He said, yeah.
18    I said, okay. Take the adjustments up there
19  that'll tick; 4,850,000, a million, and 18 million. He
20  said, yeah. I said, add them together because they're
21  payable to you. One side of the balance sheet goes down
22  in value; one side goes up. See what I'm saying? Take
23  those off because you're paying yourself. That doesn't
24  go out of the circle, if you please, flow-wise.
25    Your net cost of buying this company is

Page 488

1  7,417,000, not the value. Your net cost of buying this
2  company out of your cash that you've already taken out
3  here and generated on your own and other sources is
4  $7,417,915.
5    Q. All assuming that 96 million that you started
6  with is truly the value, correct?
7    A. I don't know that you've got to assume that 96
8  is the value anymore, then they put up the four million
9  eight-fifty. You got to assume that.
10    Q. Look at BACE 184. Whose notes are those?
11    A. Well, that's the next day, I believe. That's
12  the day Danny Pixler came back, and these are in his
13  hand.
14    Q. Okay.
15    A. Please ask me what they say.
16    Q. What do they -- I don't know what they say.
17  What do they say?
18    A. It's Danny Pixler's handwriting.
19    Q. All right. Look at the next page, 193.
20    A. (Witness complies.)
21    Q. Whose list is this?
22    A. Danny Pixler.
23    Q. Is that the one you referred to earlier about
24  what he really wanted from the due diligence --
25    A. Yes, it is.

Page 489

1    Q. -- list? And it continues on 194. And then
2  195 appears to be a duplicate of the page we looked at
3  before, correct?
4    A. Yes, sir.
5      MR. LEVINGER: Doug, let's substitute
6  another 150. We tore this one. Have you got a clean
7  one down there?
8      MR. BUNCHER: You can just mark -- we'll
9  just mark mine here.
10      MR. LEVINGER: All right.
11      MR. BUNCHER: Just cover up my handwriting
12  on it.
13      MR. LEVINGER: All right. I'll give you
14  that one back. Thanks.
15    Q. When was the last time you ever had contact
16  with anybody at Certified Services prior to this
17  lawsuit?
18    A. We -- I don't remember the exact date, so let
19  me put it into circumstance for you. I agreed to go to
20  Gatlinburg to meet Pixler at his home. Russo flew in
21  from New York. That would have maybe been a Thursday.
22  And we met up there all day.
23    I left there and went -- I personally went to
24  Bristol, Tennessee, to the race -- fall race of '03, I
25  guess. Pixler and his son joined me the next day. I

Page 490

1  spent the day with them, going through the NASCAR arena
2  in an effort to comply with the sponsorship agreement,
3  consulting agreement. Introduced him to everybody, from
4  the president of NASCAR to Earnhardt to -- you name it.
5    The next day they were there was Sunday. I
6  have a recollection maybe of one more meeting because
7  Russo was supposed to bring to Gatlinburg the notes that
8  had been promised to back up the schedule of items.
9  He didn't.
10    Q. The schedule of items in the agreement?
11    A. Whatever we call this exhibit with the 15
12  million, the 14 million, the 11 million, the 10 million.
13    Q. Oh, okay.
14    A. Whatever those things that the accountant had
15  promised quite some time ago and had gotten sick and
16  left on. And then I think we had a follow-up meeting
17  shortly after that in Charlotte.
18    Q. How was it ultimately left with respect to
19  these issues they had raised with respect to ASR's
20  financials?
21    A. We had, on a couple of occasions, tried to sit
22  down and respond to those items, and anything you said
23  was wrong, meaning Russo was there protecting the --
24  accountant guy was there protective of his opinions and
25  everything else, and everybody had just suddenly

ALPHA REPORTING SERVICES, INC., DALLAS, TX  (888) 667-DEPO

Prairie Capital vs Ernst & Young                    04/07/05                    William L. Baumgardner, Vol. 3

**Page 491**

1   developed this big fear of -- of what they had had done
2   to them, at least that was their story.
3       It's funny. They -- I asked them then did they
4   want to give it back to me. They said no. Well, would
5   you send me some money? Well, we're looking into that.
6   We're having a hard time right now.
7       Q.  This was when?
8       A.  Fall of '03. Danny is -- about that time asked
9   that we split the monthly payments into weekly payments
10  because it was easier on the cash flow. Didn't make
11  most of -- didn't make any of those, as I recall, and
12  that was pretty much the last time.
13      Q.  All right. I've just got four documents I want
14  to show you, and then I'll be finished.
15          (Deposition Exhibit 151 was marked.)
16      Q.  Let me show you Exhibit 151. This is a June
17  24, 2003, unsigned letter from Mr. Huff to you. It
18  references this Midwest Merger Management commitment of
19  $20 million relating to InterProm -- or, actually,
20  AmeriProm?
21      A.  Yes, sir.
22      Q.  Is that the same thing as InterProm?
23      A.  No, sir.
24      Q.  What's -- what's -- what's AmeriProm?
25      A.  It is the offshore international insurance

**Page 492**

1   program that I'm talking about.
2       Q.  All right. Did you -- did you actually
3   receive -- I assume you did, because it's in your
4   document production -- this exhibit?
5       A.  I did receive this exhibit.
6       Q.  And --
7       A.  I don't know that I received it June 24th. I
8   don't know that I received it June 24th, but I do
9   remember seeing it.
10      Q.  What ever came of this commitment?
11      A.  What commitment?
12      Q.  Well, the one that's attached to the letter.
13  It says, financing commitment.
14      A.  BACE 00345?
15      Q.  Yes.
16      A.  Okay. Mr. Huff was quite familiar, with 25
17  years, 30 years, whatever he expressed, in the insurance
18  industry and as a financial advisor. He was quite
19  familiar, he said, with offshore captive insurance
20  companies, sales and everything else, that they couldn't
21  be owned by -- that they were very particular and unique
22  in the way they had to be set up. He knew how they set
23  capital. He knew how they set collateral. He was an
24  expert on all of these things. And keep in mind this is
25  a valuation key ingredient to our June 27th closing.

**Page 493**

1       Q.  What is?
2       A.  This $20 million.
3       Q.  Okay.
4       A.  You didn't understand that?
5       Q.  No.
6       A.  So you don't think I'm pulling your leg, would
7   you look at 150?
8       Q.  All right.
9       A.  Would you look at that page labeled BACE 00184?
10      Q.  All right.
11      A.  In Mr. Pixler's handwriting --
12      Q.  Yes, sir.
13      A.  -- he said, here's the way we did America's
14  PEO; here's the way we did Cura; here's how we're going
15  to do Staff. Underscore, what are the major deal points
16  to make this deal happen? Star Number 1, AmeriProm,
17  $20 million letter of credit, as referenced by your
18  Exhibit 151.
19      Q.  Why was that not referenced in the June 27th,
20  2003, addendum?
21      A.  It was my first question, and Mr. Pixler said,
22  a-ha, the addendum is an addendum to a contract between
23  buyer, Cura, Cura III, Certified Services. The
24  $20 million has to be supplied by Anthony Huff and
25  Midwest Merger Management, which they own each other,

**Page 494**

1   all right.
2       And that's why I was explained that the
3   $20 million, number one deal point on Mr. Pixler's
4   sheet -- so he acknowledged that it was and was
5   discussed; it was the number one item, other than the
6   payment of the deal -- it couldn't be in the contract.
7       So then we look over and we get this
8   commitment. That's why I said, yeah, I remember. I
9   knew right then I was in trouble. Borrower is AmeriProm
10  Insurance Services. That's a Canadian company. SPC
11  stands for segregated protected sale.
12      Up to $20 million cash or letter of credit.
13  Well, it wasn't up to. It was $20 million. Well, you
14  really don't need that. It's Midwest Merger Management,
15  L.L.C., an affiliated party, as to whom Midwest
16  Management Merger will act as the finder.
17      Okay. Use of proceeds -- well, okay. Capital
18  and surplus as required in jurisdiction of certificate
19  of authority as reinsurer. Well, that's neat, Mr. Huff.
20  You said you understood all about the insurance
21  business. You got to have the $20 million surplus in
22  order to get the certificate of authority as a
23  reinsurer.
24      So with -- if you put this condition in there,
25  that it's as required in the jurisdiction of certificate

ALPHA REPORTING SERVICES, INC., DALLAS, TX  (888) 667-DEPO

Prairie Capital vs Ernst & Young                04/07/05                William L. Baumgardner, Vol. 3

Page 495

1  of authority as a reinsurer, you can't get that without
2  the $20 million. Which comes first, the chicken or the
3  egg? You lose.
4         A hundred percent collateral -- whoa, stop.
5  Collateral? This is part of the deal value over here.
6  No, I'm requiring that as collateral, 100 percent of
7  borrower -- borrower? Okay.
8         A hundred percent of borrower's capital stock
9  and lien -- and a lien against all uninvested loan
10 proceeds and assets acquired with loan proceeds, which
11 meant, A, effectively everything we'd worked on since
12 1999, for the second time that week, went to Huff and
13 Pixler, all right, as meaning the second to
14 StaffAmerica.
15        A hundred percent of the proceeds were
16 collateral, 100 percent of all the assets, and, by the
17 way, 100 percent of all the stock. If he understood the
18 insurance business and the offshore insurance business,
19 you cannot pledge a Class A or Class B insurer or
20 reinsurer's license as collateral for the reserve
21 collateral. One can't -- one can't prop up the other.
22 So this was a totally -- totally meaningless letter.
23        And I took the opportunity -- and I don't have
24 a copy of it. Probably doesn't exist. I took the
25 opportunity to whack off the top and whack off the

Page 496

1  bottom, and at the next meeting, looking back at your
2  150, when Mr. Russo was in the office, specifically
3  filling out BACE 00180, I said, well, we just want to
4  get out, man.
5         We -- we've got a commitment for our collateral
6  to go forward, and he said -- he, Russo, said, no
7  kidding. Pixler is sitting there, and I said, yeah,
8  boy, we're close. Flicked it over to him like that,
9  having it redacted, the top and bottom.
10        I said, there it is. And Mr. Russo said,
11 quote -- and I apologize -- that's the most worthless
12 piece of shit I've ever seen in the form of a
13 commitment. You're counting on that? And I said, I
14 don't know. It's from your Anthony Huff. And I showed
15 him the top copy. I said, but that's my sentiments
16 exactly. I never spoke to Mr. Huff again.
17     Q.  Well, did you see this before you signed the
18 June 27th agreement?
19     A.  Sure, about an hour before. That's why when
20 you said June 24th, I said that ain't the day I got it.
21     Q.  All right. But you saw it before you signed
22 the June 27th agreement?
23     A.  Sure.
24     Q.  And you still went forward and signed the
25 agreement?

Page 497

1     A.  Well, I'm down to 7 instead of 27, or 11
2  instead of 31. I really needed that $20 million to go
3  forward with the AmeriProm thing.
4     Q.  So, basically, you concluded that this
5  commitment was worthless before you signed the June 27th
6  agreement?
7     A.  I assumed that this was worthless to me,
8  knowing that I had to go forward with the June 27th --
9  or, quite honestly, since Mr. Pixler had already
10 announced to the world that he had closed the deal, if
11 we hadn't closed it, Danny had had some serious
12 problems. And we were still caring for one another
13 then.
14     Q.  So you never spoke to Mr. Huff after receiving
15 this?
16     A.  To the best of my recollection, no.
17     Q.  Did you ever speak to him or anyone at Midwest
18 about this document?
19     A.  No. You mean after the June 27th or when I got
20 this document?
21     Q.  At any time.
22     A.  After I received this document --
23     Q.  Yes.
24     A.  -- I talked to Mr. Huff and said, this is not
25 what I expected, and he's all -- you know this is going

Page 498

1  to have collateral requirements. I said, I thought you
2  understood all that. You said you understood the
3  offshore insurance, reinsurance. They'll be here in a
4  little while, and we'll go through it. And to my
5  knowledge -- to my recollection, I've never spoken to
6  him after that.
7     Q.  And that conversation occurred before June
8  27th?
9     A.  Sure.
10        (Deposition Exhibit 152 was marked.)
11    Q.  All right. 152, this came out of the documents
12 BACE produced, and it appears to be a BACE International
13 officers' due diligence statement dated September 27 --
14 well, excuse me -- dated June 27, 2003, with a signature
15 for you, but it's unsigned. Do you know if you ever
16 signed such a document?
17    A.  I don't have a clear memory of having signed
18 it.
19    Q.  Do you remember what the purpose of this
20 document was?
21    A.  Didn't write it. Their attorneys up there
22 wrote it. Don't know what the purpose was. I'm not
23 even sure that document ever made it to the stock
24 purchase agreement.
25        (Deposition Exhibit 153 was marked.)

44 (Pages 495 to 498)

Prairie Capital vs Ernst & Young ·       04/07/05       William L. Baumgardner, Vol. 3

---

Page 499

1   Q. Exhibit 153, is this an e-mail from
2 Ms. Ferrera, who's, I believe, Mr. Pixler's assistant,
3 to you, on August 15, 2003?  And it says, per Tony
4 Russo, please find the attached for your review.  And
5 attached is something called "Summary of Significant
6 Valuation Issues," date August 1, 2003.
7   A. And the question was?
8   Q. Is this -- is that what this is?
9   A. I believe that's what it is intended to be.
10   Q. Do you recall getting this and looking at this
11 summary attached to it?
12   A. Yeah. I think that this was the very first of
13 the list of items.
14   Q. All right.
15   A. And I thought it interesting that a careful
16 review coming up was, roughly, ten -- you know, eight,
17 ten, twelve items -- happened to be precisely
18 $10 million, in total.
19   Q. What's the significance of that?
20   A. I just thought it was a nice, round number.
21 Round numbers make me very nervous.
22     (Deposition Exhibit 154 was marked.)
23   Q. All right. My last exhibit, 143 -- or excuse
24 me -- 154, this is a -- looks to be an unsigned letter
25 from Mr. Russo to you dated September 12, 2003, with

Page 500

1 some handwritten notes on it. Do you recognize this
2 document?
3   A. No. I just don't have a clear recollection of
4 that document.
5   Q. It references a planned meeting on Monday,
6 September 15, 2003. Do you see that?
7   A. Sir?
8   Q. References a planned meeting for September
9 15th, on the first page in the "regarding" line. Do you
10 see that?
11   A. I see that.
12   Q. Did you have that meeting?
13   A. Don't recall.
14   Q. And it says, following our meetings in
15 Tennessee two weeks ago.
16    What meetings did you have in Tennessee?
17   A. That would have been the Gatlinburg meetings
18 with Russo at Pixler's house.
19   Q. And when this book was presented and all and --
20 is that when that happened?
21   A. No. The book was in Charlotte.
22   Q. Okay.
23   A. The consultant's work papers and notes were all
24 to be delivered to Pixler and I by Russo on his trip
25 from New York to Gatlinburg, and that didn't happen,

Page 501

1 either.
2   Q. Was Cunningham at the Tennessee meeting?
3   A. No, sir.
4   Q. Was he at the Charlotte meeting that's
5 referenced next, which says, Charlotte last week?  And
6 then it references another meeting -- our adjourned
7 meeting this week. Which one of those was the meeting
8 Mr. Cunningham was at?
9   A. Don't know that it was either one of those. It
10 may have been prior to both of them.
11   Q. Okay. Whose notes are these written on here?
12   A. Not mine.
13   Q. Do you recognize them?
14   A. It would be speculation on my part.
15   Q. Who do you speculate the notes are?
16   A. Mr. Pixler or Mr. Russo. I don't know.
17 Interestingly -- I hadn't noticed it before -- the
18 mailing address is 5830 Ronegal Drive, off Rama Road. I
19 live at 5830 Donegal, D, like dog, Drive, which is off
20 Rama Road. But that doesn't mean -- I don't know why
21 this would have been addressed to my home, and, more
22 assuredly, if it was sent in some other fashion, why it
23 would have probably -- possibly not been delivered.
24   Q. Item 8 references an -- it says, agree upon
25 dollar value of BACE's claims against -- and then

Page 502

1 somebody handwrote "Prairie and Ancor, ASR's
2 principal" -- selling shareholders, executive officers,
3 directors and others, with the exception of Phillips.
4    Are you aware of any claims that BACE had
5 against those parties?
6   A. Ask your question again. I'm sorry.
7   Q. Are you aware of any claims that BACE had
8 against the parties referenced there:  Prairie, Ancor,
9 executive officers, directors, and others?
10   A. I'm aware that other people believed that BACE
11 could or should have a claim against these people and we
12 would be better served, and trying to talk me into
13 joining that effort.
14   Q. Okay. And who were the parties that believed
15 that you had such a claim?
16   A. Mr. Russo. And simply stated, if you would
17 hook up with us on this list, the list you looked at a
18 minute ago of 10 or 12 items, and go after Prairie and
19 Ancor and Phillips and K.C., blah, blah, blah, we would
20 be a lot better off. You have a right, better than we
21 do, against them.
22    And I said, I don't think they've done anything
23 wrong, and I will not go after Jim Phillips. Y'all keep
24 trying to make him some bad guy because of the
25 accounting visitor out here. What was his name?

45 (Pages 499 to 502)

Page 503

1  Cunningham? And so apparently somebody else wrote "with
2  the exception of Phillips" as to this.
3     Q. Okay. What -- what do you know about
4  Mr. Bergstrom, as far as his abilities and the things
5  Mr. Cunningham noted as far as what Mr. Bergstrom told
6  him about how the loss reserves were set at ASR?
7     MR. LEVINGER: Object to form.
8     A. You showed me a document earlier today and
9  asked me did I recognize it, had I read it, was I
10  familiar with it, and I told you no. That appeared to
11  be -- and I think you said it was Cunningham's notes of
12  his meetings with Bergstrom and the review of the losses
13  and all that. I've never seen that, all right, other
14  than today.
15     Q. I understand that, but had -- you may have --
16  have you ever heard from any source, including in these
17  meetings, what Mr. Bergstrom supposedly told
18  Mr. Cunningham about how loss reserves were set?
19     A. I would not believe either one of those people
20  if they told me it was raining.
21     Q. Either one of which people?
22     A. Mr. Bergstrom, Mr. Cunningham.
23     Q. What's wrong with Mr. Bergstrom?
24     A. General meeting in -- first time, second time
25  in -- here in Dallas, just did not get along real well

Page 504

1  with him, and I knew he would not be coming with us.
2     Q. Was he let go?
3     A. I think -- not by us. He just went with the
4  sale. I think he continues or continued to work or
5  worked for a while.
6     Q. So was he employed as the risk manager between
7  August 31st and October 31st, 2002, and then continuing
8  through June 27th of '03?
9     A. Yes.
10     Q. Okay. If you didn't think he would continue,
11  why did you keep him on during that time period?
12     A. Because of the situation methodology that had
13  been developed at ASR, the uniqueness of their approach
14  with their clients in the reinsurance and the
15  participations and everything, Bergstrom knew more about
16  that than anybody. He became a thorn in the side of
17  Bruce Bailey and the efforts down here.
18     Q. Why? What did he do?
19     A. Just -- when I say that, maybe that's a poor
20  choice of words. They did not get along. Bruce did not
21  like working with him and just had very difficult --
22     THE VIDEOGRAPHER: Excuse me, counsel.
23  Can I have a minute to change the tape?
24     MR. BUNCHER: How much time is left?
25     THE VIDEOGRAPHER: Like 30 seconds on this

Page 505

1  tape.
2     MR. BUNCHER: All right. Go ahead.
3     THE VIDEOGRAPHER: We're off the record at
4  4:03 p.m.
5     (A recess was taken.)
6     THE VIDEOGRAPHER: This is the beginning
7  of Tape 6. We're back on the record at 4:04 p.m.
8     Q. All right. Did Mr. Bailey ever comment that he
9  felt Mr. Bergstrom was incompetent in any way, or
10  anything to that effect?
11     A. I don't have a clear recollection of the use of
12  the word "incompetent." Would not fit well in our
13  organization, was often said.
14     Q. What due diligence did you do or anybody at
15  BACE do with respect to the competency and experience of
16  the management there at ASR?
17     A. Each member of the BACE management team was
18  instructed to review and carefully -- as they did in
19  Florida -- evaluate the merits and the values of their
20  counterpart at ASR.
21     Q. All right. Well, when you talked about this
22  methodology that Mr. Bergstrom had, was -- was this
23  methodology something that Mr. Bailey didn't understand?
24     MR. LEVINGER: Object to the form.
25     A. We talked about that, I think, a great while

Page 506

1  this morning. It was not that he didn't understand or
2  anything of the like. It was just totally different
3  than the way we did things, and when Bruce tried to talk
4  to him about the -- the methodology they had used and,
5  you know, switching over to our methods, or vice versa,
6  there was no play there, no sharing, no latitude, no
7  elasticity.
8     Q. Well, if you didn't get along with
9  Mr. Bergstrom and Mr. Bailey didn't get along with
10  Mr. Bergstrom and Mr. Bailey was competent enough to do
11  what Mr. Bergstrom did, why didn't you just fire him?
12     A. Every one of those things that you just said
13  probably would be true, okay?
14     Q. Okay.
15     A. But Mr. Bailey's in Charlotte with a huge
16  operation in Florida, and you could manage Mr. Bergstrom
17  easier than you can get rid of Mr. Bergstrom and manage
18  all of ASR, from a loss control standpoint. So it's
19  easier to manage Mr. Bergstrom and keep him there. I
20  didn't have to work with him every day.
21     MR. BUNCHER: I'm going to pass the
22  witness. Thank you very much for your time, sir.
23     MR. NASH: Do we need to get up and
24  stretch a little bit or --
25     MR. BUNCHER: I need to call my office,

46 (Pages 503 to 506)

Prairie Capital vs Ernst & Young                04/07/05                William L. Baumgardner, Vol. 3

Page 507

1    but y'all can go ahead, if you want.
2              MR. LEVINGER:  You ready to start in?
3              THE WITNESS:  Yeah. How long we going to
4    be, ballpark?
5              MR. NASH:  Forty-five minutes to an hour,
6    at the most.
7              THE WITNESS:  Okay.
8              MR. BUNCHER:  Y'all go ahead.
9              EXAMINATION
10   BY MR. NASH:
11        Q.  Okay. Mr. Baumgardner, I know we met earlier
12   this morning, but for the record, again, my name is
13   Jason Nash. I'm with the Kelly Hart firm in Fort Worth,
14   here on behalf of the plaintiffs, the various
15   noteholders in the lawsuit. Is it okay if I just refer
16   to them as the plaintiffs or the noteholders?
17        A.  As you wish.
18        Q.  Are you okay with that?  You'll know what I'm
19   talking about?
20        A.  I will.
21        Q.  As well, there is one other term. Is it okay
22   if I refer to the notes, which are the subject of this
23   lawsuit, as just the notes? Will you understand that,
24   as well?
25        A.  I will.

Page 508

1        Q.  Okay. Let's turn to Exhibit Number 15, which
2    is the addendum to the stock purchase agreement. We
3    looked at that a little bit earlier today.
4        A.  (Witness complies.)
5        Q.  Okay. If you'll flip to page 3, which is
6    Article III, Section 3.3, Purchase Price. Do you see
7    that section?
8        A.  I do.
9        Q.  Okay. Do you see the (i)?
10       A.  I do.
11       Q.  Do you see that it indicates that part of the
12   purchase price was the assumption by the purchaser of
13   seller's acquisition debt currently estimated at
14   $8 million?
15       A.  I do.
16       Q.  Okay. I believe you testified earlier,
17   Mr. Baumgardner, that the ASR acquisition indebtedness
18   was included within that $8 million amount; is that
19   correct?
20       A.  I did.
21       Q.  Mr. Baumgardner, wasn't it your intent that,
22   under this addendum, Prairie Capital and the other
23   noteholders would receive payment of principal and
24   interest, under the notes, from Certified and Cura?
25       A.  That was my understanding. It was our intent.

Page 509

1        Q.  Mr. Baumgardner, did Danny Pixler or anyone
2    else with Certified or Cura express to you that it was
3    also their intent that, under this addendum, Prairie
4    Capital and the other noteholders would receive payment
5    of their notes from Certified and Cura?
6              MR. BUNCHER:  Object to form.
7        A.  Yes.
8        Q.  Mr. Baumgardner, are you aware of any writing
9    signed by any of the noteholders whereby any of those
10   noteholders agreed to look to Cura or Certified rather
11   than BACE for payment on the notes?
12       A.  The question as asked, it references to a
13   writing, and nothing comes to mind at this time.
14       Q.  Are you aware of any documents signed by any of
15   the noteholders releasing BACE from its obligations
16   under the notes at issue in this case?
17       A.  Their actions and deeds, but no writing, no.
18   No document.
19       Q.  You're not aware -- as you sit here today, you
20   are not aware of any writing signed by any of the
21   noteholders which would release BACE from its
22   obligations under the notes at issue in this case?
23       A.  Nothing comes to mind as I sit here.
24       Q.  Mr. Baumgardner, I want to talk a little bit
25   about BACE International Corporation, which, if it's

Page 510

1    okay with you, I'll just refer to as BACE.
2        A.  That would be fine.
3        Q.  It's my understanding that BACE is a holding
4    company; is that right?
5        A.  Yes.
6        Q.  Purely a holding company?
7        A.  Well, it has done and may do some financial
8    consulting or other things, but predominantly it's a
9    holding company.
10       Q.  It may do a little bit of operational work on
11   its own, directly?
12       A.  In the financial field, financial consulting
13   field.
14       Q.  Financial consulting, mergers and acquisitions?
15       A.  Maybe.
16       Q.  What does BACE hold today?
17       A.  It holds 100 percent of the stock in BACE
18   Motorsports, which is an inactive, currently, NASCAR
19   racing organization, and it is working on other
20   projects.
21       Q.  Doesn't hold -- doesn't hold any interest in
22   any other entities?
23       A.  I don't really remember right now.
24       Q.  Are you the president and CEO of BACE
25   International Corporation, as we sit here today?

47 (Pages 507 to 510)

Prairie Capital vs Ernst & Young                    04/07/05                    William L. Baumgardner, Vol. 3

Page 511

1    A.  I am.
2    Q.  Are you the sole shareholder?
3    A.  I am.
4    Q.  You don't know what else it holds?
5    A.  As we sit here today, I don't.  There are some
6    things being worked on with the offshore insurance thing
7    and everything that could be in and out, whatever.  I
8    don't know.
9    Q.  Okay.  Let's talk a little bit about BACE
10   Motorsports.  You said that's 100 percent owned by BACE
11   International Corporation?
12   A.  That's correct.
13   Q.  Which, in turn, is 100 percent owned by you,
14   yourself?
15   A.  That is correct.
16   Q.  So you indirectly own 100 percent of BACE
17   Motorsports?
18   A.  I don't know that that's a fair statement as to
19   the legal structure or whatever, but I own the company
20   that owns BACE Motorsports.
21   Q.  Okay.  Are you an officer and director of BACE
22   Motorsports?
23   A.  I am.
24   Q.  Are you the only officer and director of BACE
25   Motorsports?

Page 512

1    A.  I don't remember.  No, I'm not.
2    Q.  Who else is an officer or director of BACE
3    Motorsports?
4    A.  There are several.  I think my son is a vice
5    president of administration or -- maybe administration,
6    and then I think we have to have a VP of marketing to
7    enter into contracts as a NASCAR team with sponsorships
8    and all, but we don't have one -- a sponsor.
9    Q.  BACE Motorsports owns a NASCAR team; is that
10   right?
11   A.  Uh-huh.
12   Q.  Right now, as we sit here today, BACE
13   Motorsports is the owner of a NASCAR team?  I'm not --
14   I'm not trying to trick you up.  It's --
15   A.  I don't know how to answer your question.
16   Q.  Okay.  Let me see if I can clarify it.
17   A.  We're the most successful Busch Grand National
18   team in history, who discontinued operations at the end
19   of last race season, after my deposition in Charlotte,
20   coincidentally, because we don't have a sponsor.  We
21   didn't get paid.  We don't have any money.  All right?
22        So we are currently a licensed NASCAR race
23   team, who's won three national championships, 31 races.
24   Texas Motor Speedway, first day of a race here was BACE
25   Motorsports Day.  And we don't have but a couple

Page 513

1    employees and a race team with a couple of cars, and
2    don't go to races.  So I don't quite know how to answer
3    your question this year.
4    Q.  How does -- how does a multi-time Busch Series
5    champion -- is that right?  Is that what you said?
6    A.  We won the national championship in the United
7    States 1995, '96, '97, won Rookie of the Year in '94,
8    '99.  In approximately 31 races, led one out of every
9    four laps run for two years in the NASCAR series, Busch
10   series.
11   Q.  Did it ever -- did your team ever run on the
12   NEXTEL or Winston Cup?  What do they call it down here?
13   A.  NEXTEL Cup.  The answer to your question as
14   asked is no.  We did run a full Winston Cup schedule the
15   last year of the Winston Cup series.  We missed
16   qualifying for only one race, and that was Daytona, in
17   July.
18   Q.  How does a team with all those accolades lose
19   its sponsorship?  Is that your prevailing question?
20   A.  I'm going to be nice and say we didn't lose it.
21   All right?  We never had a sponsor in Cup, all right,
22   couldn't land one, and lost it in Busch.  That's a good
23   question.  That's why we don't have a vice president of
24   marketing.
25   Q.  So you still have a NASCAR license -- excuse

Page 514

1    me -- not you.  BACE Motorsports still has a NASCAR
2    license?
3    A.  Yeah.  The corporation, if you ask anybody at
4    NASCAR, is one of the best-known teams in the business.
5    We just have chosen not to compete this year.
6    Q.  In a nutshell, how do you get a NASCAR license?
7    A.  Send in about $2,500 and get approved by
8    NASCAR, and they send you a license.
9    Q.  Really?
10   A.  Yeah.
11   Q.  Is that your nutshell, or is it really that
12   simple?
13   A.  It's really that simple.  Then you get to load
14   your car on a truck and come to the racetrack.  Then you
15   go through -- you'll probably never see the racetrack.
16   Q.  You got to qualify, got to do all --
17   A.  It's not just that.  You got to get through all
18   the templates and everything else.  You've got to be
19   approved.  Your driver's got to be approved.  Your
20   crew's got to be approved.  If you've got enough money,
21   you can get there.
22   Q.  If you've got enough money, you can get there.
23   Is that what you just said?
24   A.  I did.
25   Q.  Okay.

48 (Pages 511 to 514)

Page 515

1    A. Today.
2    Q. What do you mean by that?
3    A. I mean that money will buy anything in time, in
4    motorsports. Money buys speed is one of the oldest
5    axioms in the business. If you keep spending money, you
6    will keep hiring better and better and more and more
7    people, and finally you'll get a combination that will
8    get to a track and you'll make a race. We chose not to
9    do it that way, but --
10   Q. So you're not racing this year. Excuse me.
11   BACE Motorsports is not racing this year, this season,
12   due to a lack of sponsorship?
13   A. Let me make sure it's perfectly clear. Neither
14   William Baumgardner nor BACE Motorsports are competing
15   in, entering into, nor have attended any NASCAR event in
16   the 2005 season, at any track, at any place, for any
17   purpose, at any time, and I haven't even watched all of
18   them on TV.
19   Q. Does BACE Motorsports intend to get back into
20   the NASCAR circuit?
21   A. Got a sponsor in your pocket?
22   Q. I don't.
23   A. If we had the money, as provided by a sponsor,
24   I'd love to go back to racing.
25   Q. So that's -- that's the outlook for BACE

Page 516

1    Motorsports? It's going to be back on the NASCAR
2    circuit when a sponsor comes knocking on the door?
3          MR. LEVINGER: Objection; form.
4    A. If a sponsor came along today with appropriate
5    money, we could get back into racing. Not like
6    that. Neither is the sponsor coming along like that,
7    nor when they did, would you get back like that. Ain't
8    happening. It would take quite a while, now. We had 68
9    people, I think it was, on the race team. We have two.
10   Q. If the right sponsorship came along, the right
11   terms, BACE Motorsports would be back on the NASCAR
12   circuit when -- when you got all the different measures
13   worked out -- crewmembers, all of your equipment, your
14   race cars, you got all of that stuff back where it
15   should be to enter back onto the circuit, BACE
16   Motorsports -- would you -- would you consider that a
17   fair statement, that --
18         MR. LEVINGER: Objection.
19   Q. -- BACE Motorsports would be back on the
20   circuit after all those measures were taken?
21         MR. LEVINGER: Object to form.
22   A. And -- and I don't know that it's a true
23   statement, and I'm not avoiding it. I'm 57 years old.
24   For 13, roughly, years, I went to 34 Busch races and as
25   many as 38 Cup races on the weekend.

Page 517

1          Now, if you sit down and add up all the
2    weekends -- there are 52 weeks in the year. There are
3    36 race events. There's three weeks at Daytona, two
4    weeks at Charlotte, then add you another four or five
5    championship banquets, everything else, it basically
6    takes, out of a 52-week year, 44 weeks to run a
7    full-time racing organization; testing, that type of
8    thing.
9          I have really, really enjoyed having a life,
10   from a personal standpoint, a life with my wife and kids
11   this year. No money to go anywhere, but be at home and
12   working in the yard ain't all bad. Something I haven't
13   done in a long time.
14   Q. Me neither, Mr. Baumgardner, on the working in
15   the yard.
16   A. Come to North Carolina when they play golf, and
17   I'll let you work in my yard.
18         (Deposition Exhibit 155 was marked.)
19   Q. I'm going to mark as Exhibit Number 155 -- I
20   believe we left off at 154 -- excuse me. I believe Doug
21   left off at 154. I just quickly want to talk about
22   this.
23         Mr. Baumgardner, that's a printout of an
24   Internet Web site, www.bacemotorsports.com. Do you
25   recognize that?

Page 518

1    A. I wondered who the one hit on the Web site was.
2    Yes, sir, I do.
3    Q. Do you recognize that statement right there
4    towards the middle of that press release? And, again,
5    this is a January 19, 2005, press release --
6    A. Uh-huh.
7    Q. -- titled "Race Report."
8    A. Uh-huh.
9    Q. So I guess that was just under three months
10   ago; is that right?
11   A. Well -- sure.
12   Q. Okay. You're quoted as -- as team owner right
13   there, I believe it's the third full paragraph.
14   A. Right.
15   Q. You want to read that for a second?
16   A. Okay.
17   Q. Okay. So just to follow up on what we talked
18   about just a second ago, it says here you're
19   searching -- we are searching for a corporate partner
20   that would like to reap the benefits of being involved
21   with a successful family operation like BACE.
22         Are you referring to BACE Motorsports or BACE
23   International Corporation?
24   A. Motorsports.
25   Q. Okay. When that partnership materializes,

49 (Pages 515 to 518)