Page 519

1  we'll invest in it and be back to chase our fourth
2  title.
3       So, in other words, is it fair to say when the
4  right partnership comes along, you'll invest in it and
5  be back to chase your fourth title?
6    A.  No, that's not necessarily an extension from
7  this. This is a Web site press release type thing done
8  by the marketing people. I don't recall ever having
9  said that.
10      If one of your lawyers walked up to you and
11 said, golly, Mr. Nash, do you aspire someday to be on
12 the U.S. Supreme Court? and you said, well, of course, I
13 do, and he goes to the partner next door and says, did
14 you hear that, Nash is leaving, that wouldn't exactly be
15 parallel, would it? And that's all I'm trying to make
16 by illustration here.
17      What would I say? What would they say? We're
18 not looking for a sponsor. We're not racing now. We
19 don't ever care to go back. That's not what we meant.
20 I can tell you one other thing, too, and then I'll hush.
21   Q.  Go ahead.
22   A.  What I want to do may be way different than
23 what the race team would like to do, the guys that have
24 gone to other teams, or what the marketing guys would
25 like to do that said this.

Page 520

1    Q.  Is there a possibility, if the right
2  partnership comes along, you'll be back on the NASCAR
3  circuit?
4       MR. LEVINGER: Objection; form.
5    A.  If there were a possibility, over his
6  objection, I would take it under serious advisement, but
7  it'd take some serious bucks to get me back to a
8  racetrack.
9    Q.  So your statement has changed since this
10 January 19, 2005, press release; is that right?
11      MR. LEVINGER: Object to form.
12   Q.  If BACE Motorsports put a press release on its
13 Web site today, April 7, 2005, it wouldn't say this,
14 would it?
15   A.  It probably would.
16   Q.  But you would be -- but you wouldn't really
17 mean it?
18      MR. LEVINGER: Object to form. You got a
19 lot more BACE Motorsports questions? I've been pretty
20 flexible here. I'm about -- I'm about to shut you down.
21      MR. NASH: I don't think I've got too
22 many.
23   Q.  Does BACE Motorsports own any other entities?
24   A.  Any other entities?
25   Q.  Does it own any other -- any ownership interest

Page 521

1  in any other entities?
2    A.  No.
3    Q.  No subsidiaries of BACE Motorsports?
4    A.  No.
5       (Deposition Exhibit 156 was marked.)
6    Q.  I'm going to hand you, Mr. Baumgardner, what is
7  marked as Exhibit Number 156.
8       MR. BUNCHER: Here.
9       MR. NASH: Thank you.
10   Q.  Mr. Baumgardner, this is an order from the
11 Court dated October 6th of last year. Have you ever
12 seen this order?
13   A.  I -- I have no recollection of specifically
14 seeing this order --
15   Q.  Okay.
16   A.  -- as we sit here today.
17   Q.  If you'll flip to page 2, in the last
18 paragraph, the very bottom of the page, the paragraph
19 that cuts off --
20   A.  Wait. Page 2 begins, "On October 1." You
21 don't have Bates stamps or anything on this.
22   Q.  No. This is an order from the Court. It
23 wasn't -- I'm sorry. It wasn't produced in the lawsuit.
24   A.  Okay.
25   Q.  It's an order directly from the Court.

Page 522

1    A.  Okay.
2    Q.  Page 2 of the order, do you see the footer that
3  says page -- page 2?
4    A.  Okay.
5    Q.  The very last paragraph, very last sentence of
6  the last paragraph reads, in accordance with this order,
7  BACE shall produce to plaintiffs all of its financial
8  statements and balance sheets for the years 2002 and
9  2003 and its monthly ledger sheets from August 2002 to
10 April 2003 on or before October 15, 2004.
11      You see that it says that, Mr. Baumgardner?
12   A.  I do.
13      (Deposition Exhibits 157-158 were marked.)
14   Q.  Mr. Baumgardner, I'm going to hand you what
15 I've marked as Exhibits Numbers 157 and 158,
16 respectively. The one marked 157, have you ever seen
17 this letter before, Mr. Baumgardner? Do you recognize
18 this letter, Mr. Baumgardner?
19   A.  I'm looking at 157?
20   Q.  157.
21   A.  No.
22   Q.  It is an October 28, 2004, letter from Mr. Mark
23 T. Pittman, of Kelly, Hart & Hallman, to Mr. Levinger
24 and Mr. Neil Burger, following up on the Court's October
25 6, 2004, order that we just looked at a second ago,

Page 523

1  which was Exhibit Number 156.
2       And Mr. Pittman notes that as of October 28,
3  2004, BACE still had not produced the documents required
4  by the order. If you'll flip to Exhibit Number 158 that
5  I just handed you --
6     A. Okay.
7     Q. Have you seen that letter, Mr. Baumgardner?
8  Take a minute to take a look at it.
9     A. All right, sir. I have read 158.
10    Q. Have you ever seen Exhibit Number 158 before?
11    A. Not prior to this.
12    Q. Okay. Appears to be a letter dated November
13  5th, 2004, from your attorney, Neil Burger, to William
14  Warren and Mark Pittman, of Kelly, Hart & Hallman, in
15  follow-up to Mr. Pittman's October 28th letter that we
16  just marked as Exhibit Number 157.
17       I want you to focus on the last sentence of the
18  first full paragraph, where Mr. Burger writes: The
19  following will further explain the reasons why BACE has
20  not yet prepared financial statements for that period.
21       And what he's -- what he's apparently referring
22  to, that period, is years ending 2002 and 2003; is that
23  correct?
24    A. I don't know what he's referring to. It
25  would -- could be read that way.

Page 524

1     Q. Is that the way you would read it? Is that the
2  way you would read the letter?
3     A. That -- that is a way to read it.
4     Q. It's -- that's a fair reading of what his
5  statement is, is just that BACE has not yet prepared
6  financial statements for that period?
7     A. (Witness nods head up and down.)
8     Q. Okay. Do you know that to be true at the time
9  he sent the letter?
10    A. What?
11    Q. BACE had not yet prepared financial statements
12  for years ending 2002 and 2003?
13    A. At November 5th, 2004?
14    Q. Back -- November of last year, that's correct.
15    A. I believe that to be correct.
16    Q. Is that still correct today?
17    A. I believe that still to be correct today.
18    Q. What about BACE Motorsports? Did it prepare
19  financial statements for years ending 2002 and 2003?
20    A. It would have prepared no independent --
21    Q. None.
22    A. -- stand-alone statements, no.
23    Q. There would be nothing that exists?
24    A. Not that I know of.
25    Q. Nothing would exist, financial statement-wise,

Page 525

1  for the years ending 2002 and years ending 2003, for
2  each of BACE International Corporation and BACE
3  Motorsports?
4     A. I believe that to be correct.
5     Q. Does NASCAR have any kind of financial
6  reporting requirements?
7     A. No.
8     Q. None whatsoever?
9     A. No.
10    Q. They didn't care whatsoever what their team
11  owners' finances were?
12    A. They're pretty much like Pixler. You send a
13  check, you keep coming.
14    Q. You pay your entry fees, you run that car, you
15  qualify for those races, and we'll put you on FOX
16  Television and let you run those races?
17    A. No. They will not put you on FOX Television
18  for an entry fee. If you pay the entry fees, you can
19  come attempt to qualify for the race.
20    Q. But they just don't have independent reporting
21  requirements, financial-wise?
22    A. That is correct.
23    Q. Okay. Mr. Baumgardner, let's take a step back
24  in time just a little bit to the time period of August
25  2002. That would have been about the time that the

Page 526

1  notes, which are sub -- which are the subject of this
2  litigation, were issued by BACE to the plaintiffs,
3  August -- roughly, August 31st, 2002; is that correct?
4     A. (Witness nods head up and down.)
5     Q. Let's talk about BACE International Corporation
6  at that time. Do you have, in your notebook, Exhibit
7  Number 4 -- Plaintiffs' Exhibit Number 4 from your depo
8  back -- excuse me -- your deposition back in October of
9  last year?
10       THE WITNESS: In here?
11       MR. LEVINGER: (Attorney nods head up and
12  down.)
13    A. I have a 4.
14    Q. Okay. I really want to focus on the letterhead
15  of this document. This document appears to be a July
16  11, 2002, letter of intent. And I know it's been
17  discussed extensively, but really all I want to focus on
18  is the letterhead. It's on BACE International
19  Corporation letterhead; is that right?
20    A. Uh-huh.
21    Q. That's the holding company?
22    A. It is.
23    Q. Do you see these five categories listed up to
24  the left -- the top left of the document, which is the
25  left part of the letterhead?

Page 527

1　A.　Right.
2　Q.　Are those the various businesses and operations
3　of BACE International Corporation?
4　A.　That it has been in or -- and/or has a
5　developed expertise in and/or has contacts in.
6　Q.　As of July 11, 2002?
7　A.　No, we don't get that letterhead done every
8　letter. It's been like that for quite a while.
9　Q.　In or about July 11, 2002, that's -- that's --
10　that would have been the nature of the holdings of BACE
11　International Corporation?
12　A.　I didn't say the nature of the holdings. That
13　is the nature of the expertise or demonstrated
14　capability of BACE International as about that time
15　frame. That letterhead has not changed.
16　Q.　In other words, it had investment banking
17　capabilities. It didn't -- it didn't necessarily have a
18　subsidiary that was --
19　A.　It was not an investment bank, but it could
20　help you with investment banking services.
21　Q.　Which entity would have done that at that time?
22　A.　I mean, BACE International --
23　Q.　The holding company?
24　A.　-- which does financial consulting from time to
25　time.

Page 528

1　Q.　And that -- and that's what you said a little
2　while ago?
3　A.　That is what I meant.
4　Q.　It's primarily a holding company, but it'll
5　do -- it does, and I take it -- or it did, and perhaps
6　it still does, some independent work directly on its
7　own?
8　A.　That's correct.
9　Q.　Mergers and acquisitions, is that kind of the
10　same concept?
11　A.　Yeah.
12　Q.　Human resources management and insurance
13　services, I take it that was the PEO operations?
14　A.　Pretty much.
15　Q.　Those aren't there anymore, today, as we sit
16　here?
17　A.　No. They're still on the letterhead.
18　Q.　Are they still on your letterhead as of April
19　7, 2005?
20　A.　They're on the letterhead if I wrote you a
21　letter today, because I wouldn't change it.
22　Q.　In or about July of 2002, human resources
23　management and insurance services would have been --
24　those -- those services or operations would have been
25　conducted by and through the PEO operations? Are those

Page 529

1　PEO types of services?
2　A.　Yes.
3　Q.　Okay. BACE International Corporation today, is
4　it still engaged in the PEO business?
5　A.　No.
6　Q.　Are any of its subsidiaries engaged in the PEO
7　business?
8　A.　Not to any knowledge that I have sitting here,
9　except -- no. I'll leave it at no.
10　Q.　None?
11　A.　I'll leave it at no.
12　Q.　None of its subsidiaries are engaged in the PEO
13　business today?
14　A.　That is correct. To the -- you're going to
15　make me clarify what I started to say. To the exception
16　that Bruce Bailey -- that was one of the conditions of
17　our sale. Bruce Bailey, as we've talked about
18　ad nauseam here, has some runoffs on some claims from
19　Hartford back in -- a long time ago. Those are PEO type
20　functions that we do today.
21　Q.　He works out of a subsidiary of BACE
22　International Corporation?
23　A.　Bruce works out of the hall down the other side
24　of the -- east side of the building.
25　Q.　Who is his -- who writes him a paycheck?

Page 530

1　A.　I don't know. I don't get one, so I don't look
2　at everybody else's.
3　Q.　Does StaffAmerica, Inc. -- StaffAmerica, Inc.,
4　does that still exist on the corporate chart or
5　structure of BACE International?
6　A.　I believe that as a corporation it still exists
7　and is fighting tax liens and unpaid tax allegations and
8　everything around the country as late as yesterday
9　afternoon in the cab between DFW and Carrington,
10　Coleman.
11　Q.　StaffAmerica, Inc., still exists today?
12　A.　Still yes.
13　Q.　Is it owned by BACE International Corporation?
14　A.　I believe it to be.
15　Q.　A minute ago I thought you said BACE
16　International Corporation only owns BACE Motorsports and
17　no other subsidiaries or entities?
18　A.　All right. I'll give you that one. It owns a
19　shell that's sitting out there that, as we've talked
20　about for probably 35 hours now, that has some tails and
21　trails. It is not actively involved in a business. It
22　has, as asked earlier, no source of revenue, and it has
23　some expenses.
24　Q.　Does it have any assets?
25　A.　Got a hell of a receivable from Danny Pixler.

### Page 531

1  No, it has no tangible assets.
2  Q. Does it have a receivable on its books from
3  Danny Pixler?
4  A. No. I don't know. I would have to go through
5  the list of receivables and everything else.
6  Q. So it wouldn't have -- and "it," being
7  StaffAmerica, Inc., which is 100 hundred percent owned
8  by BACE International Corporation --
9  A. Right.
10 Q. -- its only assets would be a receivable from
11 Danny Pixler, if it's on the books?
12 A. I'm not going to let you put words in my mouth,
13 and I'm going to quit joking with you. To the best of
14 my knowledge, StaffAmerica has no operations, no
15 revenue, no value, and no assets, and if it did, there
16 are several state tax liens that would preexist your
17 claim.
18 Q. Okay. Mr. Baumgardner, are there any other
19 subsidiaries of BACE International Corporation besides
20 BACE Motorsports, StaffAmerica, Inc.?
21 A. As of when?
22 Q. Today.
23 A. To the best of my knowledge, nothing comes to
24 mind, sitting here, that I'm aware of.
25 Q. You talked a little bit about Store Services a

### Page 532

1  little while ago, and I -- perhaps Store Services Group?
2  A. Uh-huh.
3  Q. The retail merchandising --
4  A. I did.
5  Q. -- operation?
6  A. I did.
7  Q. Is that a company? Is that a legal entity?
8  A. It is.
9  Q. Who owns it?
10 A. Do you remember when Mr. Buncher asked the
11 question this morning and I started to ask that question
12 twice and paused both times and he looked at me funny?
13 I could not remember at the time whether BACE
14 International owns it or I own it. And I believe most
15 recently that I possibly individually own it, but I'm
16 not sure. You want an explanation of that? I answered
17 your question.
18 Q. Sounds to me that it's either you or BACE
19 International Corporation that would own Store Services
20 Group. Is that -- is that a fair statement?
21 A. Can't speak to how it sounds to you.
22 Q. I'm asking you is it a fair statement -- do
23 either you or BACE International Corporation own Store
24 Services Group?
25 A. As I sit here today, to the best of my

### Page 533

1  recollection, it is one or -- one of the -- it is one of
2  the two of us. I believe it to be me, individually, but
3  that is subject to change.
4  Q. Were you just making a time-out symbol?
5  A. Yes, sir.
6  Q. You need to take a break?
7  A. You got it.
8     MR. NASH: Okay. Let's go off.
9     THE VIDEOGRAPHER: We're off the record at
10 4:46.
11    (A recess was taken.)
12    THE VIDEOGRAPHER: We're back on the
13 record at 5:03.
14 Q. Mr. Baumgardner, I think shortly before we took
15 our last break I was asking you about kind of a snapshot
16 of BACE International in or about July 2002. Take you
17 back to that period. We were talking about BACE
18 International's operation, so to speak, in or about July
19 of 2002. Will you turn to Exhibit Number 133?
20    THE WITNESS: Over here?
21    MR. LEVINGER: Uh-huh.
22 A. I have 133.
23 Q. 133 is BACE International Corporation's
24 consolidated trial balance, which has a date of
25 September 30, 2002; is that right?

### Page 534

1  A. Yeah. I -- I'm not sure. You said a what
2  trial balance?
3  Q. I'm just reading off the -- the exhibit, first
4  page of the exhibit. There is a title up here at the
5  top. Top left-hand corner of the page, it says, BACE
6  International Corporation Consolidating Trial Balance.
7  A. That's all we --
8  Q. I'm sorry.
9  A. That is correct.
10 Q. Good. This lists all the different
11 subsidiaries of BACE International Corporation as of
12 September 30, 2002; is that right?
13 A. Yes.
14 Q. Okay. If you look to the bottom left-hand
15 corner of this page -- this first page, which is
16 Bates-numbered BACE 02250, where it says, total assets,
17 on consolidated -- under the "Consolidated" column.
18 A. Uh-huh.
19 Q. You got that? What were those total asset?
20 Will you read that?
21 A. $55,704,676.14.
22 Q. Okay. Will you flip to the next page?
23 A. Okay.
24 Q. Do you see where -- the portion of the page
25 dealing with stockholders' equity?

Page 535

1   A. Uh-huh.
2   Q. Okay. Will you read the consolidated amount of
3 stockholders' equity?
4   A. The consolidated stockholders' equity?
5   Q. The column "Consolidated," will you read the
6 amount of -- excuse me. Under the column
7 "Consolidated," will you read the amount listed for
8 stockholders' equity?
9   A. I'm -- I'm not being cute. Stockholders'
10 equity is a section, and the amount listed is no such
11 thing.
12   Q. I'm sorry.
13   A. There are several numbers within that section.
14   Q. Good point. Good point. Under the
15 "Consolidated" column, and particularly under the
16 stockholder -- stockholders' equity section, there is a
17 total. Do you see the total?
18   A. I presume you're talking about $8,520,012.03.
19   Q. That's what I'm talking about.
20   A. Okay.
21   Q. Was that the -- was that the stockholders'
22 equity as -- as according to this trial balance in
23 September of 2002 for BACE International Corporation?
24   A. I believe it to be.
25   Q. What is the stockholders' equity of BACE

Page 536

1 International Corporation today?
2   A. I have no idea.
3   Q. Do you have an approximate idea?
4   A. I don't even get close.
5   Q. Do you think it's somewhere in the neighborhood
6 of $8,520,012.03?
7   A. No.
8   Q. Higher?
9   A. No.
10   Q. Lower?
11   A. Substantially. But I don't know what it is
12 because of the accounting for the money that flowed out
13 in the gross payments to Certified Services over the
14 years, and, quite candidly, as alluded to and/or
15 explained to you, in 158, in that paragraph, that is the
16 why, and the reason you can't lock that down is -- we
17 don't have an answer from Certified at all.
18   Q. You can't even give a ballpark answer, as you
19 sit here today?
20   A. Not within $25 million.
21   Q. As president, CEO, sole shareholder of BACE
22 International Corporation, you can't give me an
23 approximate stockholders' equity value today? You don't
24 know what your value is in BACE International
25 Corporation?

Page 537

1   A. That's two questions. You want both answered
2 or one?
3   Q. How about both. You want me to read them back?
4   A. As president, director, sole shareholder,
5 individual, and Christian fella sitting here today,
6 through no fault of my own, within a $20 million margin
7 of error, I cannot tell you what stockholders' equity
8 is. Does that cover them all?
9   Q. Do you own any other companies besides BACE
10 International Corporation?
11   A. Not that I can think of. There might be, as
12 already -- other than as already discussed. I'm not
13 quite sure, as we sit here today, who owns Store
14 Services, whether it's me or BI, "BI" being BACE.
15   Q. "BI" being BACE International?
16   A. That is correct.
17   Q. So there is a possibility that you only own
18 BACE International Corporation, as we sit here today?
19   A. That is correct.
20   Q. And let me clear that up. I'm -- I'm referring
21 to 100 percent ownership or a substantial majority
22 ownership. I'm not really -- I'm not necessarily
23 referring to indirect pieces of mutual funds that you
24 might own in a 401(k) fund.
25        I'm talking about private investments,

Page 538

1 businesses, companies that you own 100 percent or a
2 majority of, whether directly or indirectly. It's just
3 BACE International Corporation?
4        THE WITNESS: Hurts when he says it like
5 that.
6   A. Let me help you understand. The answer to the
7 question is -- the answer to your question is yes,
8 period.
9   Q. Okay. That's all I want. Now, you don't know
10 the approximate value of your ownership interest in BACE
11 International Corporation, as we sit here today?
12        MR. LEVINGER: Object to the form.
13   A. And -- and I've already told you, within a
14 $20 million margin, through no fault of our own, as
15 explained in 158, no, I don't. And -- and with all due
16 respect -- and I mean that's a lot. You can ask it 50
17 different ways, counselor, and it ain't going to change.
18 It's not something we're hiding. It ain't our fault.
19   Q. Okay. I want you to flip back to Exhibit
20 Number 133. I think you still have it out in front of
21 you. Let's flip to the first page of that exhibit,
22 Bates-numbered BACE 02250.
23   A. Got it.
24   Q. Okay. Let's look at the column on BACE
25 Motorsports off to the far right of the page. Do you

Page 539

1  see that?
2  A. I do.
3  Q. Okay. I believe that first listing is for
4  $456,798.68. I believe that's referring to cash on hand
5  and in banks; is that right?
6  A. It is.
7  Q. What kind of cash on hand and cash in banks
8  does BACE Motorsports have today?
9  A. I would have to call Charlotte, but my
10 guesstimate is something south of $300.
11 Q. Did you say your estimate or -- what did you
12 say?
13 A. My estimate.
14 Q. Okay. It's somewhat -- something south of
15 300,000?
16 A. Something less than $300.
17 Q. Did you say $300? I want to make sure I'm
18 following you.
19 A. Yes, sir.
20 Q. Three hundred dollars?
21 A. Dollar mark three zero zero point zero zero
22 U.S.D.
23 Q. What happened to the other $456,000 over the
24 last two and a half years?
25 A. How about over the last two and a half -- never

Page 540

1  mind. Well, I guess one would need to look at the
2  financial statement. $456,000, trade payables. The
3  engine build's $135,000 -- strike that -- $95,000 a
4  week.
5  Q. You don't know what happened to the $456,000 in
6  cash on hand over the last two and a half years?
7        MR. LEVINGER: Object to form.
8  A. And I thought I just answered your question to
9  make that an untrue question. I can tell you precisely
10 what happened to it, but not as we sit here today.
11 Q. But today it's down to about $300?
12 A. That is correct.
13 Q. Do you see the next entry under BACE
14 Motorsports, dollar amount is $500,000?
15 A. Sure.
16 Q. Looks like it's referring to accounts
17 receivable sponsors?
18 A. It does.
19 Q. Do you know if it collected that accounts
20 receivable?
21 A. It did.
22 Q. When did it collect it?
23 A. Probably when due.
24 Q. Who was that from?
25 A. Outdoor.

Page 541

1  Q. What kind of sponsors?
2  A. Outdoor Channel network, that thing you turn on
3  TV and watch. We were the Outdoor Channel then, I
4  think, 2000 -- yeah, 2002.
5  Q. The Outdoor Channel paid BACE Motorsports
6  500,000?
7  A. Sure. No. They paid us a total of about a
8  million six that year, million three.
9  Q. Did you invest that in the company?
10 A. Invest it in the company?
11 Q. Did you plow it back in the company?
12 A. There is no investment. You don't know how
13 much it costs to run a NASCAR race team.
14 Q. When I say "invest in the company," I mean your
15 equipment, your race cars, your equipment, your shop
16 equipment, the various things it takes to run a NASCAR
17 team.
18 A. A race car, a NASCAR, Busch Grand National, or
19 Winston Cup, NEXTEL Cup race car, sitting on the grid,
20 costs about $156,000 and can be converted to 13 and a
21 half cents a pound in a bat of an eye. And I think our
22 record was two in nine minutes one day at Bristol.
23 That's 300 grand in less time than it talk you to go --
24 took you to go to the restroom and come back.
25 Q. Those cars are insured, aren't they?

Page 542

1  A. You got to be kidding. No.
2  Q. Not a lick of insurance on those race cars?
3  A. No. I'm trying to stay away from the
4  "crackhead" comment.
5  Q. I don't know anything about NASCAR.
6  A. No.
7  Q. I'm trying to learn a little bit.
8  A. If you had a $156,000 race car, the insurance
9  premium would be about $220,000 a week to insure it.
10 The IRS treats them as expendable noncapital assets.
11 Q. As it stands today, if BACE International
12 Corporation were to produce a trial balance today, what
13 would the accounts receivable balance be?
14 A. From?
15 Q. Today.
16 A. Repeat your question.
17 Q. Okay. If BACE Motorsports were to produce a
18 trial balance, what would its accounts receivable
19 sponsors' balance be today?
20 A. Zero.
21 Q. Okay.
22 A. Not one penny.
23 Q. Okay. I want you to continue on down that same
24 BACE Motorsports column --
25 A. Sure.

Page 543

1  Q. -- and I want you to look -- do you see the
2  $671,379 amount?
3  A. I do.
4  Q. Okay. I believe that's referring to race cars?
5  A. It is.
6  Q. Do those race cars still exist today?
7  A. The answer to your question is, as asked, a
8  yes. Not with us. We sold them.
9  Q. Okay.
10 A. But they still exist today.
11 Q. Did you receive, in proceeds, $671,379?
12 A. No. We probably received, over the last year,
13 year and a half, probably in the neighborhood of 360,
14 380. Fifty cents on the dollar.
15 Q. You got 50 cents on the dollar back after
16 selling those --
17 A. And this is pure speculation, so to speak, on
18 my part.
19 Q. Are those proceeds under the corporate solution
20 of BACE Motorsports right now?
21 A. Under the corporate solution? Don't understand
22 the comment.
23 Q. Are those proceeds from the sale of those race
24 cars, are they sitting in a BACE Motorsports bank
25 account right now? That 360-something-thousand-dollar

Page 544

1  figure you just threw out a second ago, what -- where
2  have those proceeds gone?
3  A. That's five questions. I'll try to hit them
4  generally.
5  Q. Okay.
6  A. Gone back -- in reverse order, gone back into
7  operations, plowed back in to pay trade payables. I
8  have never taken a penny out of the race team.
9      Second thing is, is that $360,000, or, roughly,
10 50 cents on the dollar, sitting somewhere in a bank
11 account? The sum total -- not even the net -- the sum
12 total in bank accounts at BACE is somewhere south of
13 $300, in the aggregate, not one account, not the blue
14 account, not the bank at the corner. That's what it
15 has. So, yes, it was plowed back in at paid payables,
16 paid operational costs, and went away.
17 Q. Mr. Baumgardner, if you'll look back towards
18 the left-hand side of this page, under the "Assets"
19 column, and move down, and specifically under the
20 property, plant, and equipment section, do you see the
21 aircraft entry?
22 A. I do.
23 Q. Do you see that?
24 A. I do.
25 Q. Do you see where it's listing it at a $990,903

Page 545

1  value?
2  A. I do.
3  Q. Okay.
4  A. No. You're not an accountant. That's not a
5  990,000 -- $990,903 value.
6  Q. You're correct, I'm not an accountant. Why is
7  it not a -- why is it -- why is that --
8  A. It's a historical cost and accumulated capital
9  cost. It's not its value.
10 Q. Okay. Just a book value, in other words?
11 A. It's not a book value. That -- not playing
12 semantics with you. You're asking. A book value would
13 be the difference between that 990 and its depreciated
14 value.
15 Q. Is that -- is that the dollar amount that BACE
16 International paid for that aircraft? Is that what
17 you're telling me?
18 A. I'll tell you the same thing I told
19 Mr. Buncher, your esteemed fellow professional there,
20 earlier. It matters not what we paid for anything. It
21 is what we paid. It is improvements to it. It is items
22 taken off from it, like allocable cost of old radios and
23 navigational systems and everything.
24 Q. Tell me this. Does the aircraft -- excuse me.
25 Strike that.

Page 546

1      Does BACE International still own that
2  aircraft?
3  A. Yeah, boy.
4  Q. That's an asset of BACE International
5  Corporation?
6  A. Yeah.
7  Q. Okay. In your prior deposition back in October
8  of 2004 --
9  A. Yeah.
10 Q. -- there was a mention of a Bloomberg valuation
11 report. Do you recall that?
12 A. In my early -- rephrase your question. I'm
13 sorry. I was still thinking about the airplane.
14 Q. In your deposition back in October of 2004,
15 there was some discussion about a Bloomberg valuation
16 report.
17 A. Okay.
18 Q. Do you -- do you recall that at all?
19     MR. LEVINGER: Object to form.
20 A. Do I recall a Bloomberg -- I guess, yes.
21 Q. Do you have a copy of your transcript from that
22 deposition back in October of 2004? Do you have a copy
23 of that sitting over there?
24 A. No, not that I know of.
25 Q. Not at all?

**Page 547**

1  MR. LEVINGER: No.
2  MR. NASH: See if I have an extra copy.
3  THE VIDEOGRAPHER: Can I have a minute to
4  change tape?
5  MR. NASH: Sure.
6  THE VIDEOGRAPHER: We're off the record at
7  5:21 p.m.
8  (A recess was taken.)
9  THE VIDEOGRAPHER: This is the beginning
10 of Tape 7. We're back on record at 5:22 p.m.
11 Q. Mr. Baumgardner, I've just handed you a copy of
12 Volumes 1 and 2 of the transcript taken from your
13 deposition back in October of 2004. Does that look like
14 what I've handed you?
15 A. Stack of paper with four pages to the page. I
16 see a Volume 1 and 2.
17 Q. Do you want to peruse the front page of it just
18 to make sure?
19 A. No. Ask your question. I'll peruse there.
20 Q. Okay. Can you find page 211? It is in
21 Volume 2.
22 A. May be a challenge, but I'll give it a go.
23 Q. Are you there, Mr. Baumgardner?
24 A. I'm at what I think is 211.
25 Q. Will you read lines 23 through 25 of page 211?

**Page 548**

1  A. I did.
2  Q. Okay. And then where it moves on into page
3  212, will you read lines 1 through 9?
4  A. Okay.
5  Q. I believe at this point in your deposition in
6  October of 2004, Mr. Buncher was asking you about
7  various securities you may have owned at the time, and
8  particularly Bloomberg valuations for those securities;
9  is that correct?
10 A. Not exactly, but generally, yes.
11 Q. Well, you stated: I owned securities for which
12 the Bloomberg valuations for those securities was in
13 excess of $100 million. Is that right?
14 A. That is what it says at 212.
15 Q. Is that true to this day?
16 A. No.
17 Q. Was it true about that time when you took the
18 deposition?
19 A. Was it true at the time I took the deposition
20 in November? Don't know. I believed in November that
21 it had been true at a time in the past.
22 Q. How distant past?
23 A. Distant back to the time in question.
24 Q. And then, as you -- as I pointed out to you, in
25 lines 1 through 9, on page 12, Mr. Buncher asked you

**Page 549**

1  about the Freddie Mac securities.
2  A. He did.
3  Q. Do you know what Freddie Mac securities he was
4  asking you about?
5  A. Well, since the answer to the previous question
6  that we just talked about says I owned, I presume he's
7  talking about the Freddie Mac securities I owned.
8  Q. Which were represented -- or are represented,
9  maybe, by Certificate Number 32 that he references?
10 A. That would be included in them.
11 Q. Just to speed things up, I've got a copy of
12 Plaintiffs' --
13 A. We through with this?
14 Q. -- Plaintiffs' Exhibit Number 10. You probably
15 have it in your notebook, but just to speed things
16 along.
17 A. We through looking at your reference on 211 and
18 212?
19 Q. You can hang on to it, if you want.
20 MR. LEVINGER: Here's 10.
21 Q. Mr. Baumgardner, what I've just handed you is
22 Exhibit Number 10 marked from your deposition back in
23 October of last year.
24 A. Uh-huh.
25 Q. This is a pledge agreement; is that correct?

**Page 550**

1  A. That's what it says at the top.
2  Q. Will you flip to the last two pages of this
3  exhibit that I presented to you, which are Bates-stamped
4  PCMF/ANCOR 00130 and 00131.
5  A. Okay.
6  Q. Are you there?
7  A. Yes.
8  Q. Okay. Now, back at your deposition, on page
9  212, lines 1 through 9, when Mr. Buncher was asking you
10 about the Freddie Mac securities and he specifically
11 referenced Certificate Number 32, was he referring to
12 this Certificate Number 32 that I've just pointed you --
13 pointed you to?
14 A. I believe that he might have been or thought he
15 was.
16 Q. This Certificate Number 32 lists you as the
17 registered holder, "you" being William M. Baumgardner,
18 Jr. The date of initial issue of this certificate was
19 March 30th, 1993, for multiclass mortgage securities,
20 Series G008; is that correct?
21 A. Yes.
22 Q. Do you still have possession of this
23 certificate, the original of this certificate?
24 A. Possession, with me?
25 Q. Not here today. Under your custody -- custody

Page 551

1  or control?
2   A.  I don't honestly know.
3   Q.  If you went back home, if you went back to your
4  office tonight, could you put your hands on this
5  certificate?
6   A.  I don't know.
7   Q.  Why don't you know?
8   A.  I'm weak. I don't know. I don't know where it
9  is. So many people have looked at it and talked about
10 it and made pictures of it and photocopied it. I don't
11 know where it is.
12  Q.  But wasn't this certificate of substantial
13 concern when you sold -- excuse me. Let me back up.
14 Strike that.
15  A.  It's a simple question. I'm starting to sound
16 like Mr. Buncher earlier. You said if you went home
17 tonight and went to your office or went to your house,
18 or wherever, could you put your hands on it? That's
19 what the simple question is. I don't know.
20  Q.  Mr. Baumgardner, my question now is, wasn't
21 this certificate of extreme importance to you when you
22 purchased the stock of ASR -- excuse me -- when BACE
23 purchased the stock of ASR in August of 2002?
24  A.  Yes.
25  Q.  And you're telling me today you don't know

Page 552

1  where the certificate is?
2   A.  No.
3   Q.  Is that not what you just told me?
4   A.  I don't think so.
5   Q.  Then where is it?
6   A.  And maybe we're talking semantics. I don't
7  mean to. I believe when I got home, I could find it.
8  You said, if you went home, could you put your hand on
9  it. Maybe we're splitting hairs, and I don't mean to.
10 I do not, as we sit here, close my eyes and envision
11 precisely or exactly or even approximately where it is,
12 but I could come up with it.
13  Q.  Is it at your house?
14  A.  Don't think so.
15  Q.  Is it at your office?
16  A.  It was last time.
17  Q.  Is it in a safety -- safety deposit box at a
18 bank?
19  A.  No.
20  Q.  May be at your office?
21  A.  Speculate all day. Let's get in the car and
22 go -- go -- my point is, I could find it. It's
23 unencumbered. It's there.
24  Q.  Okay. Okay. Good enough for me.
25  A.  If it's on the blue shelf, I don't know.

Page 553

1   Q.  The bottom line is you are still the registered
2  holder --
3   A.  Thank you. Yes.
4   Q.  -- of this Certificate Number 32?
5   A.  Yes. Yes. For its value, whatever it is.
6   Q.  What are those shares -- what are those
7  securities worth represented by Certificate Number 32?
8   A.  I have no idea. I am not in the valuation
9  worth business.
10  Q.  Million dollars?
11  A.  Are you in the --
12      MR. LEVINGER: Object to form.
13  A.  Are you in the valuation business? Then how
14 did you come up with a million dollars?
15  Q.  I'm asking you what they're worth.
16  A.  You didn't ask me a question. You asked me a
17 question; I answered it. And then you said "a million
18 dollars."
19  Q.  I'm asking you are they worth a million
20 dollars?
21  A.  I have no idea. I'm not in the valuation
22 business. Bloomberg was in the valuation business.
23 Bloomberg had a printout that I took to mean the value
24 of that business.
25      Subsequent to the summer of 2002, both

Page 554

1  Freddie Mac, Fannie Mae, and several other government
2  type subagencies have gone through massive accounting
3  restructurings as to policies, methods, principles,
4  applications, and everything. Let me finish. And as a
5  result of those and the GAO findings, Bloomberg no
6  longer quotes a value for the certificates in question,
7  among many, many others.
8   Q.  Let me ask you this, Mr. Baumgardner. What was
9  the last reported value you saw as issued by Bloomberg
10 with respect to these securities?
11  A.  I don't recall, as we sit here.
12  Q.  You just don't recall?
13  A.  (Witness shakes head from side to side.)
14  Q.  You don't have the slightest clue?
15  A.  No.
16  Q.  The same securities that were of extreme
17 importance to you in August of 2002 at the closing of
18 BACE's purchase of ASR, you don't recall the last
19 valuation report you saw with respect to those
20 securities?
21      MR. LEVINGER: Object to form. Look. I'm
22 giving you extra time here. You're just asking the same
23 question, this time more argumentatively. I'm about
24 that close to shutting it down.
25      MR. NASH: Jeff, I'm getting into

Page 555

1 valuations of securities that were purportedly pledged
2 in this August 31st, 2002, stock purchase transaction,
3 and I -- and I -- frankly, that's exactly what I'm
4 getting to.
5   Q. I'll ask you one more time, Mr. Baumgardner.
6       MR. LEVINGER: I'll give you a little bit
7 of leeway, but I'm about to shut your time down. You --
8 you already exceeded the one hour that you had.
9   Q. Mr. Baumgardner, you don't recall the last
10 valuation report you saw issued from Bloomberg with
11 respect to these securities, do you?
12  A. No, I do not.
13  Q. But as you stated a minute ago, you're still
14 the registered holder of those securities?
15  A. That is correct.
16  Q. Have you received any proceeds with respect to
17 those securities over the last two years?
18  A. Can't speak to that.
19  Q. Why can't you?
20  A. Okay. I'll play. Define "proceeds."
21  Q. Monies.
22  A. For what? Is that a redemption? A partial
23 redemption? An interest? A dividend? What?
24  Q. Any monies.
25  A. Then the answer to your question is yes.

Page 556

1       We have a break here in the noise, so let me
2 just add to my last answer. Any amounts that I would
3 have received would have been dividends or interest and
4 are materially inconsequential or immaterial as to
5 amount.
6   Q. Are you holding those amounts today in trust?
7   A. Huh?
8   Q. Are you holding those amounts of proceeds you
9 have received in trust with respect to this litigation?
10  A. With respect to this litigation? Are you
11 kidding? No. We're talking less than $50, son.
12  Q. What is InterProm?
13  A. What is InterProm?
14  Q. There was some mention of a company called
15 InterProm.
16  A. Yeah.
17  Q. And I believe -- I believe that mention came
18 about in your deposition back in October of last year --
19  A. Uh-huh.
20  Q. -- as well as Mr. Phillips' deposition back
21 in -- whenever his deposition was taken.
22  A. Okay.
23  Q. What is InterProm?
24  A. InterProm is a company that was formed after
25 the 27 June '03 closing of the sale with Certified.

Page 557

1 That company became the employer of Mr. Phillips and
2 Mr. K.C. Mann, the two employees of ASR that we
3 discussed ad nauseam today that didn't go with the sale,
4 didn't transfer.
5       It is a -- was to be a capital management
6 fundraising company -- fund, f-u-n-d -- raising company
7 for our interest, primarily focused on the domestic
8 capitalization and needs of our international insurance
9 efforts.
10  Q. Is that the offshore insurance business?
11  A. What?
12  Q. Is that the offshore insurance business that
13 you referred to earlier today?
14  A. Is what? You said "is that." Is that what?
15 Is InterProm or is that reference that I just made to
16 the --
17  Q. Reference you just made to -- to international
18 insurance.
19  A. Not making sense.
20  Q. When you say "international insurance," is that
21 synonymous -- synonymous with "offshore insurance"?
22  A. Yes.
23  Q. Okay. You said InterProm was formed somewhere
24 right around June 2003. Who -- who formed it?
25  A. Answer to your first question you just asked is

Page 558

1 I believe so. And the answer to your second question
2 you just asked is I think our attorneys -- I don't
3 remember. Some of our attorneys somewhere formed it.
4   Q. Who owns InterProm?
5   A. I don't rightfully know, as we sit here.
6   Q. You don't know who owns it?
7   A. No.
8   Q. Do you have an ownership interest in InterProm?
9   A. I don't know who owns it.
10  Q. Do you have an ownership interest in InterProm?
11  A. We can play this game as long as you want to.
12 I don't know who owns it.
13  Q. I'm asking you a yes-or-no question. You can
14 answer yes or no.
15  A. There is no yes or no to the question you
16 asked.
17  Q. Because you simply don't know?
18  A. I don't know whether it's yes or no.
19  Q. So you don't know whether you own anything in
20 InterProm or not?
21      THE WITNESS: That's the fifth time.
22      MR. LEVINGER: You can answer it the same
23 way, and I'm -- look, Jason, I've given you, generously,
24 more time than was allocated to you, to really ask
25 questions that have nothing to do with the lawsuit, that

**Page 559**

1 have to do with postjudgment asset discovery. We all
2 know this. There is no secret about this. So I'm going
3 to give you about two more minutes and call it a day.
4 It's a quarter to six anyway.
5     Q. Mr. Baumgardner, you mentioned AmeriProm
6 earlier.
7     A. Yes, sir.
8     Q. Would you have the same response to AmeriProm
9 as though you don't know who owns it?
10    A. I know precisely who owns AmeriProm.
11    Q. Who is that?
12    A. I ain't going to tell you. It is not me. I
13 have no equity interest in it. It is a foreign entity.
14 And I'd really just rather not answer that question.
15    Q. Okay. Mr. Baumgardner, did BACE Motorsports
16 file a tax return for tax year 2002?
17    A. When you say "file a tax return," do you mean a
18 corporate income tax return?
19    Q. Sure.
20    A. Don't know.
21    Q. Weren't you a --
22    A. I'm still an officer, and I still don't know.
23    Q. Okay.
24    A. I am not avoiding your question.
25    Q. Did BACE Motorsports file a tax return for

**Page 560**

1 2003?
2     A. I'm a good bit more sure about that answer, and
3 the answer is probably not.
4     Q. As a legal entity -- operating entity, it
5 didn't file anything with the IRS for tax year --
6     A. It's still probably not.
7         MR. LEVINGER: Can I get you to give me
8 the time?
9         THE REPORTER: 1:16.
10    Q. What about tax year 2002? Did BACE
11 International Corporation file a tax return in tax year
12 2002?
13    A. I think that it did.
14    Q. You think it did?
15    A. Yeah.
16    Q. Has that been produced in this lawsuit?
17    A. I don't know. Might not have.
18    Q. Do you know why?
19    A. Sure.
20    Q. What about tax year 2003 for BACE International
21 Corporation? Did it file a return that year?
22    A. Probably not.
23    Q. Why not?
24    A. Same reason as before.
25        THE WITNESS: Excuse me. You can't do

**Page 561**

1 that, can you? You can't see that.
2         MR. LEVINGER: You're referring to Exhibit
3 158.
4         THE WITNESS: Thank you, sir.
5         MR. LEVINGER: All right. I think you've
6 had your time.
7     Q. Mr. Baumgardner, I've got one last question, if
8 your attorney will allow me ask this.
9         MR. LEVINGER: I'll hold you to one.
10        MR. BUNCHER: Provided he answers.
11    Q. As we sit here today -- as we sit here today,
12 what is your approximate net worth, personally?
13    A. I have a question. If I answer your question,
14 your last question, are you only going to ask it once?
15 I don't know. Through no fault of my own, I do not have
16 the ability to determine what is something worth. What
17 are the Pixler notes worth? I don't know. What are --
18 you just don't know. I don't know.
19        MR. LEVINGER: All right. I think that --
20    Q. How long were you a CPA?
21        MR. LEVINGER: I think that completes the
22 deposition.
23    A. Pardon?
24    Q. How long were you a CPA?
25    A. Until one of my investors, a senior resident

**Page 562**

1 judge in North Carolina, told me that doing what I was
2 doing, limited partnership work, I really probably ought
3 to part with my CPA certificate. I think it was about
4 seven years -- eight, nine years.
5     Q. Practicing as a certified public accountant?
6     A. That is correct.
7     Q. I believe your prior testimony was -- was that
8 at times --
9         MR. LEVINGER: I counted three there.
10        MR. NASH: Can I finish this, Jeff?
11        MR. LEVINGER: I let you ask one more, and
12 now you're wanting another one? Is this the last one?
13        MR. NASH: I need to finish this one line
14 of questioning, and that is it. Five more minutes.
15        MR. LEVINGER: Now you're talking about a
16 line of questioning. No. No. You -- I've -- I've let
17 you gone -- I've let you go 20 minutes over your
18 allotted hour. You're not asking questions relevant to
19 the lawsuit. I think this is more than fair. So we're
20 done.
21        THE VIDEOGRAPHER: We're off the record at
22 5:45.
23        (Proceedings adjourned at 5:45 p.m.)
24
25

Page 563

```
 1        CHANGES AND SIGNATURE
 2   WITNESS: _____ DATE OF DEPOSITION: _____
 3   PAGE  LINE        CHANGE/REASON
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15
16       _____
              Signature of Witness
17   STATE OF _____ X
18   COUNTY OF _____ X
19       SUBSCRIBED AND SWORN TO by the said witness,
20   _____ on this the _____ day of
21   _____, 2005.
22       _____
              Notary Public in and for the
23            State of _____.
24   My Commission expires: _____
25
```

Page 564

```
 1            NO. 067-202574-03
 2   PRAIRIE CAPITAL MEZZANINE  * IN THE DISTRICT COURT
     FUND, L.P., ANCOR HOLDINGS, *
 3   L.P., ADELINE MORRISON,     *
     THOMAS P. HUNTER, III,      *
 4   HARRISON I. STEANS,         *
     JENNIFER W. STEANS,         *
 5   REMOUNT CAPITAL, LLC,       *
     GEORGE P. BAUER, SIDNEY     *
 6   ECHOLS, RESOURCES TRUST     *
     COMPANY, MITCHELL GREEN,    *
 7   and THE ESTATE OF RICHARD   *
     D. MICHAELS,                *
 8        Plaintiffs,            *
                                 *
 9   VS.                         *
                                 *
10   BACE INTERNATIONAL          *
     CORPORATION, CERTIFIED      *
11   SERVICES, INC., THE CURA    *
     GROUP II, INC., AMERICAN    * OF TARRANT COUNTY, TEXAS
12   HR HOLDINGS, INC., and      *
     WILLIAM L.                  *
13   BAUMGARDNER, JR.,           *
          Defendants,            *
14                               *
     CERTIFIED SERVICES, INC.,   *
15   THE CURA GROUP II, INC.,    *
     and AMERICAN HR HOLDINGS,   *
16   INC.,                       *
          Third-Party Plaintiffs,*
17                               *
     VS.                         *
18                               *
     ERNST & YOUNG LLP,          *
19   KYLE C. MANN and ROBERT J.  *
     PHILLIPS, JR.,              *
20   Third-Party Defendants. * 67TH JUDICIAL DISTRICT
           REPORTER'S CERTIFICATION
21        ORAL AND VIDEOTAPED DEPOSITION OF
             WILLIAM L. BAUMGARDNER, JR.
22                 VOLUME 3
                APRIL 7, 2005
23       I, Angela L. Mancuso, Certified Shorthand
24   Reporter in and for the State of Texas, hereby certify
25
```

Page 565

```
 1   to the following:
 2        That the witness, WILLIAM L. BAUMGARDNER, JR.,
 3   was duly sworn by the officer and that the transcript of
 4   the oral deposition is a true record of the testimony
 5   given by the witness;
 6        That the deposition transcript was submitted on
 7   _____ to the witness or to the attorney for
 8   the witness for examination, signature and return to me
 9   by _____;
10        That the amount of time used by each party at
11   the deposition is as follows:
12        Mr. Douglas J. Buncher:  4 hours, 50 minutes
13        Mr. Jason C. Nash:  1 hour, 19 minutes
14        That pursuant to information given to the
15   deposition officer at the time said testimony was taken,
16   the following includes counsel for all parties of
17   record:
18        Mr. Jason C. Nash, Attorney for Plaintiffs
19        Mr. Douglas J. Buncher, Attorney for
             Defendants, Certified Services, Inc.,
20           The Cura Group II, Inc., and American HR
             Holdings, Inc.
21
          Mr. Jeffrey S. Levinger, Attorney for
22           Defendants, BACE International Corporation
             and William L. Baumgardner, Jr.
23
24        I further certify that I am neither counsel
25   for, related to, nor employed by any of the parties or
```

Page 566

```
 1   attorneys in the action in which this proceeding was
 2   taken, and further that I am not financially or
 3   otherwise interested in the outcome of the action.
 4        Further certification requirements pursuant to
 5   Rule 203 of TRCP will be certified to after they have
 6   occurred.
 7        Certified to by me on this 11th day of April,
 8   2005.
 9
              _____
10            ANGELA L. MANCUSO, CSR 4514
              Expiration Date:  12/31/05
11            Alpha Reporting Services, Inc.
              Firm Registration No. 298
12            4144 North Central Expressway
              Suite 240
13            Dallas, Texas 75204
              (214) 321-5599
14            (214) 321-1922 (Facsimile)
              (888) 667-DEPO (Toll Free)
15
16
17
18
19
20
21
22
23
24
25
```

Page 567

1  FURTHER CERTIFICATION UNDER RULE 203 TRCP
2      The original deposition was/was not returned to
3  the deposition officer on _____;
4      If returned, the attached Changes and Signature
5  Page contains any changes and the reasons therefor;
6      If returned, the original deposition was
7  delivered to _____, Custodial
8  Attorney;
9      That $_____ is the deposition
10 officer's charges to the Defendants for preparing the
11 original deposition transcript and any copies of
12 exhibits;
13     That the deposition was delivered in accordance
14 with Rule 203.3 and that a copy of this certificate was
15 served on all parties shown herein and filed with the
16 Clerk.
17     Certified to by me this _____ day of
18 _____, 2005.
19
20 _____
   ANGELA L. MANCUSO, CSR 4514
21 Expiration Date: 12/31/05
   Alpha Reporting Services, Inc.
22 Firm Registration No. 298
   4144 North Central Expressway
23 Suite 240
   Dallas, Texas 75204
24 (214) 321-5599
   (214) 321-1922 (Facsimile)
25 (888) 667-DEPO (Toll Free)